# Exhibit A
# Summons and Complaint

Approved, SCAO

| | Original - Court<br>1st copy - Defendant | | 2nd copy - Plaintiff<br>3rd copy - Return |

| **STATE OF MICHIGAN** | | **SUMMONS** | **CASE NO.**<br>2020-185155-CB |
| 6th | JUDICIAL DISTRICT<br>JUDICIAL CIRCUIT<br>COUNTY PROBATE | | JUDGE MARTHA D. ANDERSON |

Court address: 1200 N. Telegraph Road, Pontiac, MI 48341   Court telephone no. (888) 350-0900

Plaintiff's name(s), address(es), and telephone no(s).
FCA US LLC, a Delaware corporation

v

Defendant's name(s), address(es), and telephone no(s).
Martinrea International US Inc., a Delaware corporation
40600 Ann Arbor Road East, Suite 200
Plymouth, MI 48170

This case has been designated as an eFiling case. To review a copy of the Notice of Mandatory eFiling visit www.oakgov.com/efiling.

Plaintiff's attorney, bar no., address, and telephone no.
Moheeb H. Murray (P63893)
Bush Seyferth PLLC
100 West Big Beaver Road, Suite 400
Troy, MI 48084, (248) 822-7800

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**

☑ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____ .

The action ☐ remains ☐ is no longer pending.

Summons section completed by court clerk.     **SUMMONS**

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date<br>12/14/2020 | Expiration date*<br>03/15/2021 | Court clerk<br>Lisa Brown |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01   (9/19)   **SUMMONS**                    MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

FILED   Received for Filing   Oakland County Clerk   12/14/2020 8:00 AM

| **PROOF OF SERVICE** | **SUMMONS** |
| --- | --- |
| | Case No. |

TO PROCESS SERVER: You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

## CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE

| ☐ **OFFICER CERTIFICATE** | OR | ☐ **AFFIDAVIT OF PROCESS SERVER** |
| --- | --- | --- |
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that:  (notarization not required) | | Being first duly sworn, I state that I am a legally competent adult, and I am not a party or an officer of a corporate party (MCR 2.103[A]), and that:  (notarization required) |

☐ I served personally a copy of the summons and complaint,

☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,

together with _____
List all documents served with the summons and complaint

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
| --- | --- | --- |
| | | |
| | | |
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
| --- | --- | --- |
| | | |
| | | |
| | | |

I declare under the penalties of perjury that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled | Fee $ | | Signature |
| --- | --- | --- | --- | --- |
| Incorrect address fee $ | Miles traveled | Fee $ | **TOTAL FEE** $ | Name (type or print) |
| | | | | Title |

Subscribed and sworn to before me on _____ , _____ County, Michigan.
Date

My commission expires: _____ Signature: _____
Date                                         Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

## ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of the summons and complaint, together with _____
Attachments

_____ on _____
Day, date, time

_____ on behalf of _____ .
Signature

This case has been designated as an eFiling case. To review a copy of the
Notice of Mandatory eFiling visit www.oakgov.com/efiling.

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

FCA US LLC,

                Plaintiff,

v.

MARTINREA INTERNATIONAL US INC., and
MARTINREA HONSEL MEXICO SA DE CV,

                Defendants.

2020-185155-CB

Case No. 2020-      -CB

JUDGE MARTHA D.
Hon. ANDERSON

**BUSINESS COURT DOCKET**

---

Moheeb H. Murray (P63893)
Michael K. Steinberger (P76702)
Luis E. Gomez (P80573)
Bush Seyferth PLLC
100 W. Big Beaver Rd., Ste. 400
Troy, MI 48084
T: (248) 822-7800
F: (248) 822-7816
murray@bsplaw.com
steinberger@bsplaw.com
gomez@bsplaw.com
*Attorneys for FCA US LLC*

---

## VERIFIED COMPLAINT

There is no other pending or resolved civil action arising out of the
transaction or occurrence alleged in the complaint.

            /s/ Moheeb H. Murray
            Moheeb H. Murray (P63893)

Plaintiff FCA US LLC ("FCA US"), through counsel, states as follows for its Verified

Complaint against Defendants Martinrea International US Inc., and Martinrea Honsel Mexico SA

DE CV (collectively "Martinrea"):

1

FILED   Received for Filing   Oakland County Clerk   12/14/2020 8:00 AM

## VERIFICATION FOR BUSINESS COURT ASSIGNMENT

Pursuant to MCR 2.112(O), FCA US verifies that this case meets the statutory requirements of MCL § 600.8031 for assignment to the Business Court because all of the parties are business enterprises.

### Statement of the Case

1.     Because Martinrea refuses to honor its contractual obligations to provide the agreed-to capacity of critical engine blocks that FCA US uses to build several top-selling vehicle platforms, FCA US faces irreparable harm. Rather than adhere to its promise to meet FCA US's full capacity requirements for engine blocks, Martinrea improperly and unilaterally decided to re-allocate one of the engine-block-manufacturing machines to another customer, presumably at a more profitable rate. Martinrea led FCA US on, even presenting a plan as recently as November 2020 to meet FCA US's full capacity, before pulling the rug out from under FCA US when Martinrea secured a more lucrative deal for that capacity. Martinrea's decision will imminently cause a shortfall in parts from which FCA US will not be able to recover within any reasonable length of time, resulting in extraordinary monetary damages that could quickly eclipse $100,000,000.00 as well as plant shutdowns, layoffs, and reputational harm.

### Parties, Jurisdiction, and Venue

2.     FCA US is a Delaware limited liability company authorized to conduct business in the State of Michigan.

2

3.     Martinrea International US Inc. is a Michigan corporation with its registered office located at 40600 Ann Arbor Road East, Suite 201, Plymouth, Michigan, which is located in Wayne County, Michigan.

4.     Martinrea Honsel Mexico SA DE CV is a foreign entity located in Mexico.

5.     Martinrea International US Inc. and Martinrea Honsel Mexico SA DE CV are referred to in this Verified Complaint collectively as "Martinrea." On information and belief, Martinrea Honsel Mexico SA DE CV is a mere instrumentality of Martinrea International US, Inc.

6.     This Court has personal jurisdiction over FCA US and Martinrea because they regularly conduct business in Michigan.

7.     The Court also has personal jurisdiction because Martinrea consented to jurisdiction:

> For all disputes arising out of the Order, Seller irrevocably consents to the personal jurisdiction of the state and federal courts in and for Oakland County, Michigan, USA, and irrevocably waives any claim it may have that any proceedings brought in such courts have been brought in an inconvenient forum. Any suit regarding or relating to this Order may only be brought in the state or federal court in and for Oakland County, Michigan, USA, which are the exclusive venue for any such suit. **[Ex. 1, General Terms and Conditions, rev. 01/2017 ("GTCs"), Clause 26]**.

8.     This Court has subject-matter jurisdiction over this action because the amount in controversy exceeds $25,000, exclusive of interest and costs, and because FCA US seeks equitable relief.

9.     Venue is proper in this Court under MCL 600.1621 because Martinrea regularly conducts business in Oakland County and consented to venue in this Court. *See* **Ex. 1, Clause 26.**

### General Allegations

10.     FCA US is an original equipment manufacturer of automobiles.

3

11.    In connection with manufacturing several of its best-selling models of automobiles, FCA US purchases "casted and cubed" Pentastar Upgrade Engine Blocks, Part No. 04893461AG ("the Engine Blocks"), from Martinrea.

12.    One purchase order for the Engine Blocks—No. 10911293—contemplates that Martinrea will sell the Engine Blocks to FCA US. **Ex. 2, PO No. 10911293 (the "'293 PO")**. The '293 PO incorporates FCA US's January 2017 General Terms and Conditions. **Ex. 1, 01/2017 GTCs**. In addition, FCA US and Martinrea executed a July 24, 2019 Letter of Intent regarding the manufacture of the Engine Blocks, which also expressly incorporated 2017 GTCs. **Ex. 3, 07-24-17 Letter of Intent**.

13.    The other purchase order for the Engine Blocks—No. 10911294—contemplates that Martinrea will sell the Engine Blocks to FCA US's Mexican affiliate. **Ex. 4, PO No. 10911294 (The "'294 PO")**. The '294 PO incorporates the "Chrysler July 2013 General Terms and Conditions." **Ex. 5, 07/2013 GTCs**. Under the 2013 GTCs, the '294 PO also expressly incorporates by reference specifications, drawings, descriptions, and samples provided to Martinrea. The product specifications, drawings, descriptions, and samples provided to Martinrea identify that the Engine Blocks are manufactured for FCA US's benefit.

14.    Under both the '293 and '294 Purchase Orders (jointly, "the Purchase Orders"), Martinrea agreed to have capacity to manufacture 2,604 Engine Blocks daily and 13,021 Engine Blocks weekly for FCA US. Neither the '293 nor the '294 Purchase Order has been terminated. **Exs. 2 and 4.**

15.    FCA US incorporates the Engine Blocks into the following vehicle platforms: Jeep Wrangler, Jeep Gladiator, Jeep Grand Cherokee, Dodge Durango, Ram Truck, and Chrysler Pacifica. Each of these vehicle platforms is vital to FCA US's business.

4

16. Martinrea manufactures the Engine Blocks on a 3,500-ton aluminum die casting machine at Martinrea's facility in Quereataro, Mexico.

17. Martinrea is presently FCA US's only external supplier of the Engine Blocks.

18. Martinrea's timely supply of the Engine Blocks in accordance with the releases issued to it is essential to FCA US's ability to produce Jeep Wrangler, Jeep Gladiator, Jeep Grand Cherokee, Dodge Durango, Ram Truck, and Chrysler Pacifica vehicles to meet customer demand.

19. The '293 Purchase Order is a binding contract between FCA US and Martinrea.

20. FCA US is an intended third-party beneficiary of the '294 Purchase Order.

21. Upon information and belief, Martinrea has copies of all of the documents comprising the parties' contracts.

22. The 2017 GTCs state that "Seller accepts this Order: (a) if Seller acknowledges in writing (including an electronic communication) it acceptance of the Order; (b) if Seller performs any work or renders any services related to goods specifically manufactured for FCA US pursuant to the Order after Seller's receipt of the Order, or (c) if Seller delivers any of the goods or provides any of the services." **Ex. 1, 01/2017 GTCs, Clause 2.** Martinrea therefore accepted the '293 Purchase Order by acknowledging its acceptance and by performing work related to goods manufactured pursuant to that order, including process validation, and by delivering the Engine Blocks under the '293 Purchase Order.

23. Likewise, Martinrea accepted the '294 Purchase Order by acknowledging its acceptance, by performing work related to goods manufactured pursuant to the Order, and by delivering the Engine Blocks. **Ex. 5, 07/2013 GTCs.**

5

**The Parties' Contract Unambiguously Requires Martinrea
to Maintain Adequate Capacity to Meet FCA US's Releases**

24.     Under both Purchase Orders, Martinrea agreed to have capacity to manufacture

2,604 Engine Blocks daily and 13,021 Engine Blocks weekly for FCA US. **Exs. 2 and 4, Purchase**

**Orders.**

25.     Under the 2017 GTCs, Martinrea is required to have a production plan to supply

the peak daily, weekly, and annual requirements according to the capacity stated on the '293

Purchase Order:

> Seller must have a tooling and production plan in place that will
> enable Seller to supply FCA US's peak daily, weekly and annual
> requirements for the goods, including service parts, and Seller's
> capacity as stated in the Order will be based on such tooling and
> production plan. **[Ex. 1, 01/2017 GTCs, Clause 5.]**

26.     The 2013 GTCs likewise require Martinrea to have a production plan to supply the

peak daily, weekly, and annual requirements according to the capacity stated on the '294 Purchase

Order.

27.     On November 4, 2020, Martinrea International US submitted a written capacity

review presentation to FCA US stating Martinrea is able to support fully FCA US's releases for

13,021 Engine Blocks per week as stated in the '293 Purchase Order and the '294 Purchase Order.

**Martinrea intends to breach its Agreement by wrongfully allocating
manufacturing capacity to another customer**

28.     During phone conversations on December 2, 2020, and December 3, 2020, Pat

D'Eramo, Martinrea International US Inc.'s Chief Executive Officer, informed FCA US's Head of

Purchasing and Supply Chain North America, Martin Horneck, and FCA US's Chief Purchasing

& Supply Chain Officer, Carl Smiley, that Martinrea would reallocate capacity on one of its 3,500-

6

ton aluminum die casting machines from FCA US to another customer. Mr. D'Eramo stated that he was the one who made the decision to reallocate the capacity.

29.     Specifically, Martinrea has stated that instead of supplying the required 13,021 Engine Blocks per week, it will deliver to FCA US a maximum of only 6,247 Engine Blocks per week.

30.     As a result of improperly allocating capacity away from FCA US, Martinrea will immediately fall significantly behind by almost 7,000 units per week in satisfying FCA US's releases for the Engine Blocks, and the deficit will only continue to grow.

**FCA US attempted to convince Martinrea to adhere to the agreement**

31.     On December 4, 2020, in accordance with MCL §440.2609, FCA US sent Martinrea a letter explaining how Martinrea's reallocation of capacity away from FCA US would be a breach of contract, and in that letter, FCA US demanded adequate assurance of Martinrea's due performance. **Ex. 6, 12-4-20 Adequate Assurance Letter.**

32.     FCA US demanded that Martinrea provide written adequate assurance of due performance by 3:00 p.m. on Monday, December 7. *Id.* Martinrea requested additional time to respond to FCA US's demand, and FCA US, while reserving its rights, allowed Martinrea to respond by December 11, 2020, at 5:00 p.m.

33.     On December 11, 2020, Martinrea rejected FCA US's demand for adequate assurance. Instead, it reiterated its plan to improperly reallocate the capacity on one of its 3,500-ton aluminum die casting machines to another customer, making it impossible to meet releases issued under the Purchase Orders. By failing to provide FCA US with adequate assurance of performance, Martinrea has repudiated the Purchase Orders. **Ex. 7, 12-11-20 Response to Adequate Assurance Demand.**

7

34.     The 2017 GTCs state, "If [Martinrea] fails to make deliveries or perform services at the agreed time, all damages suffered by FCA US as a result of [Martinrea's] non-performance, including but not limited to any premium transportation or other costs incurred by FCA US in its efforts to mitigate the impact of [Martinrea's] late performance on its manufacturing operations, will be at [Martinrea's] expense." **Ex. 1, Clause 3.**

35.     Under the 2017 GTCs, even if Martinrea had a legitimate reason for failing to meet its capacity obligations, it is obligated to engage and pay for a third party acceptable to FCA US that will support Martinrea's remediation of its capacity deficiencies:

> FCA US may, upon fourteen (14) days' written notice to Seller of actual or threatened recurring non-performance concerning capacity or quality, engage (or require that Seller engage) a third party acceptable to FCA US for the purpose of supporting Seller's remediation of such capacity or quality deficiencies. Seller will pay all costs associated with such remediation efforts, and will reimburse FCA US for any reasonable costs incurred by FCA US hereunder, which may be recovered by means of FCA US's rights of setoff, recoupment, or deduction under Clause 14 hereof. **[Ex. 1, Clause 23.]**

36.     There are no provisions in the Purchase Orders or the GTCs that allow Martinrea to unilaterally vary the contract terms.

37.     Martinrea has refused to engage or pay for a third party to make up any capacity shortfall for the Engine Blocks.

### Martinrea's planned breach will cause
### incalculable and irreparable harm to FCA US

38.     Martinrea's failure to supply FCA US with the Engine Blocks on time in accordance with FCA US's releases will imminently cause a severe shortfall of the Engine Blocks for FCA US to use in manufacturing its most popular vehicles for customers. The shortfall will unavoidably create an unrecoverable inability for FCA US to have sufficient supply of the Engine

Blocks to meet its production output requirements. The insufficient supply will inevitably require FCA US to shut down production of six top-selling vehicle platforms in at least six of its plants.

39.     FCA US will not be able to find alternative sources to manufacture sufficient numbers of Engine Blocks to make up the shortfall Martinrea's breach of contract will create. Thus, although FCA US may be able to make up some of Martinrea's shortfall through mitigation efforts, absent Martinrea meeting its contractual obligations, FCA US will still experience devastating production disruptions and plant shut downs.

40.     Each *hour* Martinrea fails to meet fully FCA US's releases is already resulting in monetary damages to FCA US of thousands of dollars, plus other incidental and consequential damages. And this amount could continue to climb to hundreds of thousands of dollars *per hour*. The resulting damages could therefore quickly eclipse $100,000,000.00. Upon information and belief, Martinrea will be unable to compensate FCA US for such monetary damages. In addition, any production disruption resulting from Martinrea's failure to timely supply FCA US with the Engine Blocks will cause not only adverse employment consequences for thousands of FCA US's assembly workers, but also incalculable and irreparable harm to FCA US's relations, goodwill, and reputation with customers.

41.     FCA US requires immediate relief to prevent substantial and irreparable harm that will inevitably occur if Martinrea breaches its contractual obligations to FCA US.

## COUNT I – SPECIFIC PERFORMANCE/INJUNCTION

42.     FCA US incorporates Paragraphs 1 to 41 as if fully stated here.

43.     FCA US requests that the Court order Martinrea to continue supplying FCA US with the Engine Blocks in accordance with the full capacity set forth in FCA US's releases.

9

44.     The '293 Purchase Order and the 2017 GTCs incorporated into it constitute a valid and binding contract between FCA US and Martinrea.

45.     FCA US is an intended third-party beneficiary of the '294 Purchase Order and the 2013 GTCs incorporated into it, which constitute a binding contract between FCA Mexico and Martinrea.

46.     FCA US has performed its obligations under the '293 Purchase Order, and there are no unmet conditions precedent to Martinrea's performance.

47.     FCA Mexico has performed its obligations under the '294 Purchase Order, and there are no unmet conditions precedent to Martinrea's performance.

48.     If Martinrea does not perform its obligations under the Purchase Orders, FCA US will have no adequate remedy at law for the harm caused by Martinrea's breaches.

49.     Martinrea agreed that its violation of the '293 Purchase Order will cause irreparable damage to FCA US, entitling FCA US to equitable relief:

> [Martinrea] acknowledges that a material breach of its obligation to supply goods in accordance with Clause 3 of the Order . . . would cause irreparable damage to FCA US, including without limitation potential damage to FCA US's relationships with its customers, suppliers, labor unions, lenders, and prospective future customers, the exact amount of which would be difficult to ascertain, and that the remedies at law and monetary damages for any such breach would be inadequate. Accordingly, in the event of any action taken or threatened by [Martinrea] hereunder that, if taken, would constitute a material breach of its obligations under Clause 3 . . . of the Order, FCA US and it successors and assigns are entitled to injunctive or other equitable relief and/or a decree for specific performance, without the posting of any bond or other security, in addition to any other remedies it may have for damages or otherwise. **[Ex. 1, 01/2017 GTCs, Clause 33.]**

50.     FCA US is entitled to equitable relief in the form of an order for injunctive relief and specific performance because the Engine Blocks are a specially manufactured good without readily available substitutes.

10

51.     Further, under '293 Purchase Order, Martinrea agreed that FCA US is entitled to

its attorney fees and costs associated with seeking specific performance or injunctive relief:

> [Martinrea] may not take any action or position inconsistent with
> this acknowledgement, and FCA US will be entitled to recover its
> attorney fees and costs in connection with the enforcement of this
> Clause 33. *[Id.]*

### COUNT II – BREACH OF CONTRACT / ANTICIPATORY BREACH

52.     FCA US incorporates Paragraphs 1 to 51 as if fully stated here.

53.     The '293 Purchase Order is a valid and binding contract between FCA US and

Martinrea.

54.     FCA US has performed its obligations under the '293 Purchase Order, and there

are no unmet conditions precedent to Martinrea's performance.

55.     Martinrea's anticipatory refusal to meet FCA US's capacity requirements

constitutes a repudiation and breach of the '293 Purchase Order.

56.     Martinrea's breach of the '293 Purchase Order will cause a shortfall of the Engine

Blocks resulting in FCA US's plant shutdowns, missed production schedules, inability to produce

vehicles for customers, and other damages.

57.     Each *hour* Martinrea fails to meet fully FCA US's releases is already resulting in

monetary damages to FCA US of thousands of dollars, plus other incidental and consequential

damages. And this amount could continue to climb to hundreds of thousands of dollars per hour.

The resulting damages could therefore quickly eclipse $100,000,000.00 and continue to climb.

58.     In addition, any production disruption resulting from Martinrea's failure to timely

supply FCA US with the Engine Blocks will cause irreparable reputational harm for FCA US

among FCA US's customers.

11

59.     Under the parties' contract, "If [Martinrea] fails to make deliveries or perform services at the agreed time, all damages suffered by FCA US as a result of [Martinrea's] non-performance, including but not limited to any premium transportation or other costs incurred by FCA US in its efforts to mitigate the impact of [Martinrea's] late performance on its manufacturing operations, will be at [Martinrea's] expense." **Ex. 1, 01/2017 GTCs, Clause 3.**

60.     Even if Martinrea had a legitimate reason for not meeting FCA US's capacity requirements (though it does not), Martinrea is contractually is obligated to engage and pay for a third party acceptable to FCA US that will support Martinrea's remediation of its capacity deficiencies. *Id.*, **Clause 23**. Martinrea has refused to engage or pay for a third-party to support Martinrea's remediation of its capacity deficiencies.

### COUNT III – BREACH OF CONTRACT/THIRD-PARTY BENEFICIARY

61.     FCA US incorporates Paragraphs 1 to 60 as if fully stated here.

62.     Under MCL 600.1405, an intended third-party beneficiary has the same right to enforce a contract as the parties to the contract.

63.     The '294 Purchase Order and the 2013 GTCs incorporated into it constitute a valid and binding contract between FCA Mexico and Martinrea.

64.     FCA US LLC (referred to in the '294 Purchase Order by its former name, Chrysler LLC) is an intended third-party beneficiary of the contract between FCA Mexico and Martinrea.

65.     FCA Mexico has performed its obligations under the '294 Purchase Order, and there are no unmet conditions precedent to Martinrea's performance.

66.     Martinrea's anticipatory refusal to meet the capacity requirements in the '294 Purchase Order constitutes a repudiation and breach of the Purchase Order and GTCs.

12

67.     Martinrea's breach of the '294 Purchase Order will cause a shortfall of the Engine Blocks resulting in FCA US's plant shutdowns, missed production schedules, inability to produce vehicles for customers, and other damages.

68.     Each *hour* Martinrea fails to meet fully FCA US's releases is already resulting in monetary damages to FCA US of thousands of dollars, plus other incidental and consequential damages. And this amount will could continue to climb to hundreds of thousands of dollars per hour. The resulting damages could therefore quickly eclipse $100,000,000.00 and continue to climb.

69.     In addition, any production disruption resulting from Martinrea's failure to timely supply FCA Mexico with the Engine Blocks will cause irreparable reputational harm for FCA US among FCA US's customers.

## COUNT IV – PROMISSORY ESTOPPEL

70.     FCA US incorporates Paragraphs 1 to 69 as if fully stated here.

71.     Martinrea is estopped from claiming that it is not obligated to meet its requirements under the Purchase Order and GTCs.

72.     Martinrea promised to meet FCA US's requirements for the Engine Blocks.

73.     Indeed, as recently as November 4, 2020, Martinrea submitted a written capacity review presentation to FCA US that detailed Martinrea's plan to support FCA US's requirements through use of the full capacity set forth in the Purchase Order.

74.     By accepting and performing under FCA US's releases, Martinrea promised to continue providing FCA US's requirements for the Engine Blocks for the life of each vehicle program for which the FCA US uses the Engine Blocks, unless and until FCA US terminates the Purchase Order.

13

75.     Martinrea reasonably should have expected its promise to induce action of a definite and substantial character on the part of FCA US—specifically, that FCA US would continue to rely on Martinrea, as FCA US's supplier of the Engine Blocks, to meet timely FCA US's releases.

76.     Martinrea's promise in fact produced FCA US's reliance that Martinrea would timely meet FCA US's releases for the Engine Blocks.

77.     The circumstances require that Martinrea's promise be enforced if injustice is to be avoided.

## COUNT V – DECLARATORY RELIEF

78.     FCA US incorporates Paragraphs 1 to 77 as if fully stated here.

79.     There is an actual case in controversy between the parties for which declaratory judgment is appropriate.

80.     FCA US is entitled to a declaratory judgment that Martinrea is contractually obligated to (1) continue to supply the Engine Blocks to FCA US at the capacity levels required under the Purchase Orders, for the life of each vehicle program for which FCA US uses the Engine Blocks and (2) conform with all other obligations imposed on Martinrea by the Purchase Orders.

WHEREFORE, FCA US respectfully requests that this Court grant:

A.      Declaratory relief that Martinrea has anticipatorily and in bad faith repudiated its obligations under the Purchase Orders;

B.      Injunctive relief preventing Martinrea and all others acting in cooperation or concert with Martinrea, including any subsidiaries or affiliates, from taking any action inconsistent with its supply obligations to FCA US, FCA Mexico, or their affiliates;

14

C.      Permanent mandatory injunctive relief requiring Martinrea and all others acting in cooperation or concert with Martinrea, including any subsidiaries or affiliates, to supply FCA US, FCA Mexico, and their affiliates with necessary quantities of all Engine Blocks required under the Purchase Orders;

D.      An award of money damages in favor of FCA US sufficient to compensate it for those economic damages that are calculable;

E.      An award of legal fees and other costs arising out of Martinrea's failure to perform under the Purchase Orders; and

F.      All such other relief as the Court may deem just, equitable or appropriate under the circumstances.

## JURY DEMAND

FCA US demands a trial by jury.

Respectfully submitted,

BUSH SEYFERTH PLLC

By:    /s/ Moheeb H. Murray
        Moheeb H. Murray (P63893)
        Michael K. Steinberger (P76702)
        Luis E. Gomez (P80573)
        100 W. Big Beaver Rd., Ste. 400
        Troy, MI 48084
        T: (248) 822-7800
        F: (248) 822-7816
        murray@bsplaw.com
        steinberger@bsplaw.com
        gomez@bsplaw.com

Date:  December 13, 2020

15

## **VERIFICATION**

I, <u>Kevin Smith</u> , declare as follows:

I declare under the penalties of perjury that this Verified Complaint has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

Kevin Smith
FCA US LLC
Senior Manager
Powertrain Purchasing - Casting &
Machining

Dated: <u>12/13/20</u>

# Exhibit 1

## PRODUCTION AND MOPAR PURCHASING
## GENERAL TERMS AND CONDITIONS

**Introduction.** Seller and FCA US (the "Parties") acknowledge the following mutually beneficial goals and objectives in entering into this Order: (i) to ensure a reliable and timely supply of goods covered by the Order; (ii) to implement common or complementary processes to forecast necessary quantities, place orders, ship, receive and make payments for goods; (iii) to identify, contain and resolve promptly and fairly any issues as to timeliness and quality of goods delivered; and (iv) collaboratively to identify opportunities and implement cost savings measures related to the goods covered by the Order and the processes of creating, shipping, receiving, and Seller's using of those goods, all in accordance with applicable law and the specific terms and conditions of the Order. This statement of these shared goals and objectives is intended to be a general introduction to the Order and is not intended to expand or limit the scope of the Parties' obligations or alter the plain meaning of this Order's terms and conditions as set forth hereinafter. However, to the extent the terms and conditions of this Order are unclear or ambiguous, such terms and conditions are to be construed so as to be consistent with the goals and objectives set forth herein.

**1. AGREEMENT.** Seller agrees to sell and deliver the goods or services specified in FCA US's Order in ACCORDANCE WITH THESE GENERAL TERMS AND CONDITIONS CONTAINED IN THE ORDER, INCLUDING THE SUPPLEMENTAL CLAUSES REFERENCED IN THE ORDER, AND ANY DOCUMENTS SPECIFICALLY INCORPORATED IN THE ORDER, all of which constitute the entire and final agreement of the Parties and cancels and supersedes any prior or contemporaneous negotiation, agreements, or information provided to Seller as background in any Request for Proposal. The supplemental clauses referenced herein are as published on the date of the Order or on the date of any amendment to the Order, in each case as published on FCA US's supplier portal (the "FCA US Supplier Portal"). Seller must have an active login to access the FCA US Supplier Portal.

By accepting the Order, Seller acknowledges having actual knowledge of the text of the referenced clauses and documents. FCA US'S ORDER EXPRESSLY LIMITS ACCEPTANCE TO THE TERMS OF THE ORDER AND ANY ADDITIONAL OR DIFFERENT TERMS, WHETHER CONTAINED IN SELLER'S FORMS OR OTHERWISE PRESENTED BY SELLER AT ANY TIME, ARE REJECTED UNLESS EXPRESSLY AGREED TO IN WRITING BY FCA US BY INCORPORATION IN THE ORDER. "Order" as used in these General Terms and Conditions means a purchase order transmitted electronically to Seller by FCA US or delivered to Seller in a paper format. The Order may only be modified by FCA US's issuance of an amended Order to Seller.

**2. ACCEPTANCE.** This Order constitutes FCA US's offer to Seller and is not binding on FCA US until accepted by Seller. Seller accepts this Order: (a) if Seller acknowledges in writing (including any electronic communication) its acceptance of the Order, (b) if Seller performs any work or renders any services related to goods to be specially manufactured for FCA US pursuant to the Order after Seller's receipt of the Order; or (c) if Seller delivers any of the goods or provides any of the services. SELLER SPECIFICALLY WAIVES ANY REQUIREMENT FOR SIGNED ACCEPTANCE OF THE ORDER, AND SELLER AND FCA US EACH WAIVE ANY DEFENSE TO THE VALIDITY AND ENFORCEABILITY OF THE ORDER ARISING FROM THE ELECTRONIC SUBMISSION OF THE ORDER TO SELLER AND SELLER'S ACCEPTANCE OF THE ORDER IN ACCORDANCE WITH THIS CLAUSE 2.

**3. DELIVERY.** Time is of the essence. Delivery must be effected within the time specified in the Order, or in accordance with FCA US's releases, broadcasts, and/or written requirements;

(1/2017)                                             1

provided, however, in the event FCA US's releases, broadcasts, or written requirements request a delivery outside of Seller's stated lead time (as set forth in the Order), FCA US and Seller will agree on a delivery time as proximate to FCA US's original request as is commercially reasonable. If Seller fails to make deliveries or perform services at the agreed time, all damages suffered by FCA US as a result of Seller's non-performance, including but not limited to any premium transportation or other costs incurred by FCA US in its efforts to mitigate the impact of Seller's late performance on its manufacturing operations, will be at Seller's expense. Seller will make commercially reasonable preparations for the delivery of goods and/or the performance of services in accordance with FCA US's timing needs, including, as applicable, compliance with FCA US's IT specifications found on the FCA US Supplier Portal, and will make reasonable progress toward completing any required engineering and design activities. The term "broadcast," as used herein, means an electronic communication which indicates the parts requirements for the FCA US assembly plants. For Pay as Built (PAB) or sequencers, the broadcast is the P/N sequence. For Modular Pay as Built (MPAB), the broadcast is the collection of part numbers required to be built into the assembly as well as the sequence.

**4. PACKING, MARKING AND SHIPMENT.** (a) Seller will pack and mark goods and make shipments (including shipping on Saturdays and holidays, when requested) in accordance with FCA US's instructions, comply with all carrier requirements and assure delivery free of damage and deterioration. All shipments of goods to FCA US's facilities must include two packing slips, or four packing slips in the case of shipments directed to a FCA US consolidation point. Whenever shipment is made by truck, Seller will enclose one of the packing slips (or packing slip sets in the case of multiple item shipments) in an envelope and Seller will record written instructions on the bill of lading directing the delivering driver to deliver the envelope to FCA US's traffic representative upon arrival at FCA US's facility. Seller is responsible for the goods until delivery at the designated delivery point in the Order. (b) FCA US may specify the carrier and/or method of transportation and Seller will process shipping documents and route shipments of the goods from the delivery point accordingly. Seller will comply with all of FCA US's transportation routing instructions, including, but not limited to, mode of transportation, utilization of assigned carrier and identification of the shipping point. Seller will be responsible for all excess costs incurred because of its failure to comply with FCA US's transportation instructions or delivery requirements/schedules.

**5. VOLUME PROJECTIONS, CAPACITY, REQUIREMENTS, AND RELEASE AUTHORIZATION.** (a) FCA US may provide Seller with estimates, forecasts, or projections of its anticipated future quantity requirements for goods. Each of these expressions of anticipated future requirements for goods is provided for informational purposes only, and is not intended to be, and is not, a commitment by FCA US to buy those future requirements. (b) (i) Seller must have a tooling and production plan in place that will enable Seller to supply FCA US's peak daily, weekly and annual requirements for the goods, including service parts, and Seller's capacity as stated in the Order will be based on such tooling and production plan. The Order may cover goods that are manufactured by Seller using the same manufacturing process and tooling that Seller uses to manufacture other goods not covered by the Order ("Common Process Group goods"). If the Order covers a Common Process Group good, Seller's total capacity for all goods within the same Common Process Group, including the goods covered by the Order, will be stated in the FCA US Capacity Database or its successor database. In the event FCA US's peak requirements exceed Seller's capacity stated in the Order, FCA US and Seller will, upon request of either FCA US or Seller, meet promptly consistent with FCA US's capacity management policies (including its volume variance system and capacity database) to discuss what, if any, additional capital investments, together with expenses directly related to such increased demands, are reasonably required by Seller to continue to meet such peak requirements, after which Seller may submit a

claim for a price adjustment or new tooling purchase order as a result of the need for additional capital investments in writing within five (5) days following such meeting. FCA US will have the right to verify all claims regarding the need for additional capital investment and the sole discretion to determine whether to accept such charges or to source peak requirements beyond Seller's capacity stated in the Order elsewhere. No changes in the Order or these General Terms and Conditions, other than those changes in price or tooling requests directly tied to the need for additional capital investments agreed to between Seller and FCA US pursuant to this Clause 5, will be made. (ii) Seller must submit accurate information into the FCA US capacity management systems and databases in accordance with FCA US's instructions and manuals provided to Seller from time to time. Such information may include, without limitation, current and potential tool capacity, work pattern, overtime, and parts capabilities regarding Common Process Group goods and must consider not only Seller's capacity limits but any constraints faced by Seller's suppliers, it being understood that Seller is responsible for monitoring its suppliers' capacity constraints and limitations, regardless of whether such supplier is a directed supplier. FCA US may withhold payment for Tooling (as defined in Clause 10 of these General Terms and Conditions) used to manufacture the goods covered by the Order until Seller submits all required information into the FCA US capacity management systems and databases. FCA US is entitled to rely on information Seller submits into such systems and databases in planning FCA US's production schedule. (c) When deliveries are specified to be in accordance with FCA US's written releases, Seller will not fabricate or assemble any goods, nor procure required materials, nor ship any supplies, except to the extent authorized by such written releases or provisions of this Order specifying minimum fabrication or delivery requirements.

**6. INSPECTION AND REJECTIONS; QUALITY.** FCA US may, in its sole discretion, inspect, evaluate, and test all goods (including all Tooling, fixtures, all equipment, and all material used directly or indirectly in manufacture of the goods), and all services at times and places designated by FCA US. Seller will provide and maintain a Quality Management System that complies with ISO/TS 16949, the "FCA US Group LLC Customer Specification Requirements for use with ISO/TS 16949," the "Process Planning & Audit" manual and any document specified in the "Quality Management System" application on the FCA US Supplier Portal or any successor website. Seller will promptly comply with any revisions to ISO/TS 16949, the "FCA US Group LLC Customer Specific Requirements for use with ISO/TS 16949," the "Process Planning & Audit" manual, and any document specified in the "FCA US Quality Management System" application and "Supplier Quality Manuals and Forms" reference on the FCA US Supplier Portal or any of its successors. Seller will perform inspections as designated by FCA US and Seller will make inspection systems, procedures and records available to FCA US upon request. Seller must be, and remain throughout the Term, registered with the FCA US electronic FCA US Quality Management System ("CQMS") and any other electronic Advanced Quality Planning (AQP) system designated by FCA US. Notwithstanding payment or any prior inspection of goods, FCA US may revoke acceptance, reject or require correction and return the goods to Seller (at Seller's expense and risk of loss) regarding any goods delivered or services rendered that do not conform to applicable requirements. The Order is issued for the goods specifically identified in the Order and any substitution of material, without FCA US's prior written approval, will be a breach of the Order. Without limiting its remedies, after providing notice to Seller, FCA US may (a) replace or correct any non-conforming goods or services and charge or debit Seller the cost of such replacement or correction, (b) cancel the Order for default under Clause 21 hereof, (c) commence arbitration or other legal action to recover damages suffered by FCA US in accordance with Clause 26 hereof, and/or (d) cause the removal of Seller as an approved FCA US supplier.

Seller will comply with all Third-Party Containment and Problem Resolution ("3CPR") program policies and project requirements for the 3CPR Web Based System, as updated from time to time, and documented on the FCA US Supplier Portal.

Within 24 hours of initiation by FCA US of a 3CPR project on suspect materials of Seller, Seller will hire the 3CPR Provider identified by FCA US for the purpose of undertaking the required 3CPR project at each affected facility. Seller is required to provide a fully funded minimum $5,000 (USD or CAD) for projects in the U.S. or Canada and $2,000 USD for projects in Mexico hard copy purchase order within twenty-four (24) hours of the creation of the 3CPR project. Seller will bear the costs of the 3CPR project. However, if Seller disputes the charges, FCA US will initially bear the costs of the 3CPR project and will, in its reasonable discretion, examine the extent to which 3CPR costs should be borne by FCA US and Seller, respectively, based on an allocation of responsibility.

**7. LABOR DISPUTES.** Seller will notify FCA US immediately of any actual or potential labor dispute affecting Seller or its suppliers which delays or threatens to delay timely performance of the Order, and will include all relevant information to FCA US. Seller will notify FCA US in writing three (3) months in advance of the expiration of any current labor contract of Seller. Seller will ensure that union representation is disclosed and updated in the supplier profile maintained by suppliers through the FCA US Supplier Portal or its successor system. Seller will notify FCA US of any change in union related status, such as contract ratification or extension, within twenty-four (24) hours of occurrence (or such other time as may be commercially practicable). Seller must submit a written contingency plan to FCA US Purchasing two (2) weeks prior to such contract expiration detailing how Seller plans to continue production in the event of a labor dispute. Any additional costs incurred from this plan will be at Seller's expense. The supply of goods described in this Clause 7 will be subject to FCA US's audit rights under Clause 29 of these General Terms and Conditions. Suppliers will be liable for any costs associated with part shortages or downtime (CLS or CLD) at an FCA US Assembly or Manufacturing plant due to a labor dispute.

**8. GENERAL WARRANTY.** (a) Seller warrants that the goods or services will (i) comply with all performance standards and product characteristics, including without limitation specifications, drawings, descriptions or samples, furnished and/or specified by FCA US, (ii) be merchantable, and (iii) be free from defects in material and workmanship. Seller further warrants that to the extent that Seller designs any goods, or FCA US relies on Seller's expertise in any aspect of the design of the goods communicated by Seller to FCA US, those goods will be fit and sufficient for the purposes intended. The warranty term will be coterminous with the warranty extended to FCA US's customers by FCA US on the date of the Order, or any other date agreed upon by FCA US and Seller in the Order (except to the extent, prior to the commencement of initial volume production in connection with the applicable Request for Proposal, that FCA US and Seller agree that the goods must meet quality or durability requirements for a longer term, in which case the warranty term will be such longer term). (b) Seller's liability for FCA US's expense of reimbursing warranty claims made by FCA US's dealers due to Seller's breach of Clause 8(a) hereof or any warranties implied by law or otherwise made by Seller shall be determined in accordance with the Supplier Associated Warranty Reduction Program Policies and Procedures or any successor program or policies as published on the FCA US Supplier Portal (as referenced in Clause 1 hereof) on the date of the Order or on the date of any amendment to the Order. (c) Seller further warrants that FCA US will receive good title upon delivery of goods, services, Tooling, fixtures, or equipment under this Order, free and clear of all liens and encumbrances and that all goods, services, Tooling, fixtures, or equipment will be free from any actual or claimed patent, copyright or trademark infringement. (d) These warranties are in addition to any warranties implied by law or otherwise made by Seller and will survive acceptance and payment by FCA US.

(1/2017)                                                                                                          4

**9. PRICES.** The prices stated in this Order are firm and are not subject to adjustment for changes in volume, changes in the price of raw materials or labor, changes in currency valuation, or for any other reason, unless (a) a clause specifically incorporated in the Order (with FCA US's written consent) expressly provides that the prices will be adjusted on a particular basis, and then only to the extent specified in that clause, or (b) a document specifically incorporated in the Order (with FCA US's written consent) expressly provides that the prices will be adjusted on a particular basis, and then only to the extent specified in that document.

**10. PROPERTY AND TOOLING.** (a) Property and Tooling. (i) Tangible property of every description including without limitation all tools, equipment, material, drawings, manufacturing aides, dies, test and assembly fixtures, jigs, gauges, patterns, casting patterns, cavities, molds and documentation, including engineering specifications, PPAP books, and test reports together with any accessions, attachments, parts, accessories, substitutions, replacements, and appurtenances thereto that is necessary for the manufacture of component and service parts for FCA US ("Tooling") for which (i) FCA US issues a purchase order, or (ii) FCA US does not issue a purchase order, but which is used exclusively by Seller in connection with its manufacture of component and service parts for FCA US ("FCA US Tooling") is owned by, is property of, and is being held by Seller as a bailee at will for FCA US, except for Unpaid Tooling (as defined below). Upon payment in full of the applicable price for any item of Unpaid Tooling such item will thereafter be included in the definition of FCA US Tooling under the Order. With respect to each item of FCA US Tooling, Seller grants to FCA US, at the time of payment for such FCA US Tooling, in addition to any other license granted to FCA US under this Order: a non-exclusive, world-wide, paid-up, irrevocable and perpetual license under any (i) intellectual property of Seller that is incorporated into or used to make or design the goods under the Order, and (ii) knowledge and know how concerning the use of such FCA US Tooling, in each case as necessary and sufficient to enable FCA US to make, have, offer for sale, import, export, or modify such goods or any vehicles that FCA US manufactures using such goods, and (ii) to ensure that FCA US can make full beneficial use of the rights provided herein, Seller will provide the following: Tooling, dies, and molds for such goods, including without limitation, any computer aided design data for such Tooling, and in each as applicable, the specifications, bills of material, supplier information for any purchased components used in such Tooling, and manufacturing process information regarding such Tooling. In the case of Unpaid Tooling which is the subject of a purchase order, the applicable price under this Clause 10 will be the amount set forth in the applicable order less any payments already made by FCA US in respect of such Tooling and any amounts required to satisfy liens with respect to such Tooling. In all other cases, the applicable price under this Clause 10 will be the greater of net book value (defined as book value less depreciation applied to such Tooling by Seller using a consistently applied GAAP method) and orderly liquidation value, less any amounts required to satisfy liens with respect to such Tooling. FCA US reserves the right, in determining the applicable price for any payment under this Clause 10, to deduct appropriate amounts for incomplete or non-conforming Tooling. Seller acknowledges and agrees that FCA US is a third party beneficiary of any agreement between Seller and a party other than FCA US for the production of FCA US Tooling or Unpaid Tooling, and that FCA US will have ownership of, and access to, FCA US Tooling and/or Unpaid Tooling (if subject to an ownership dispute) held by any such party. Seller will comply with FCA US's instructions concerning bailed property and will keep Unpaid Tooling and FCA US Tooling (whether or not completed) in its possession and/or control, tagged and safely stored apart from Seller's property, in good condition, fully covered by insurance, free of liens and encumbrances (other than statutory liens) and will replace or repair any such Tooling when lost, damaged or destroyed. Seller will not re-locate any Unpaid Tooling or FCA US Tooling without FCA US's consent. Without limiting any of FCA US's rights and remedies under this Clause 10 (including, specifically, FCA US's ownership of FCA US Tooling), Seller also grants

(1/2017) 5

FCA US a purchase money security interest in and to all FCA US Tooling, and Seller, upon request from FCA US, agrees to reasonably cooperate in any act necessary to perfect or otherwise establish the priority of such interest, including, without limitation, identifying the date on which Seller takes possession of the FCA US Tooling and the filing of applicable financing statements. (ii) For purposes of the Order, the term "Unpaid Tooling" means any FCA US Tooling for which FCA US has not fully paid the applicable price (as calculated above) for such Tooling to either Seller or any of its predecessors-in-interest as defined above. (iii) Neither Seller, nor any other person or entity other than FCA US has any right, title or interest in the FCA US Tooling other than Seller's obligation, subject to FCA US's respective unfettered discretion, to use FCA US Tooling in the manufacture of FCA US's component and service parts. (iv) In the event of a dispute between Seller and FCA US over the applicable price for Unpaid Tooling, the applicable price will be assumed to be the amount proffered by FCA US and FCA US will have the right to immediate possession and use of the Tooling pending resolution of the dispute (and Seller may not withhold delivery of possession of the Unpaid Tooling to FCA US pending such resolution), but will remain subject to any claim or right to payment of Seller for the disputed amounts (despite Seller's relinquishment of possession). (v) Seller will submit all required information regarding FCA US Tooling through the FCA US "Tooling Process" system or its successor system, and will comply with all other requirements, policies, and procedures of FCA US regarding FCA US Tooling, including without limitation, use of the FCA US "Tool Record Form" or its successor. (vi) Seller will adhere to the FCA US procedure in effect at the time for submitting requests for reimbursement for FCA US Tooling costs, including but not limited to the use of the FCA US "Tool Record Form" or its successor. All requests for reimbursement for tooling costs are subject to review, approval and audit by FCA US. (vii) All FCA US Tooling will be transferred as FCA US may direct at any time. If Seller makes any unauthorized transfer or re-location of FCA US Tooling, Seller will reimburse FCA US for any costs incurred by FCA US in returning the FCA US Tooling to FCA US or moving the FCA US Tooling as directed by FCA US. If FCA US determines in good faith that Seller has made any use of FCA US Tooling inconsistent with this Order or with FCA US's interest in such FCA US Tooling, then Seller acknowledges and agrees that (A) FCA US will have a lien on any proceeds obtained by Seller as a result of such inconsistent use, (B) FCA US will be entitled to have a constructive trust imposed on such proceeds, and Seller will disgorge such proceeds upon receipt of written notice from FCA US, and (C) the damages incurred by FCA US, including lost profits, as a result of such inconsistent use will be a claim owed to FCA US under Clause 14 hereof, and will entitle FCA US to the rights and remedies set forth in such Clause 14, including, without limitation, deduction, set-off, and recoupment. Seller will maintain internal control policies sufficient to prevent any such inconsistent use of FCA US Tooling or Unpaid Tooling by Seller or any of Seller's employees.

(b) Bailed Property. (i) Property of every description, including but not limited to FCA US Tooling, and any sub-components, raw materials, and racks provided to Seller by FCA US in connection with Seller's performance of this Order (the "Bailed Property") is, and will at all times remain, the sole and exclusive property of, and is being held by Seller as a bailee at will for FCA US. (ii) Seller will take possession of the Bailed Property and keep such Bailed Property in its possession or control free from any loss or damage and safely stored apart from Seller's property marked to identify all Bailed Property in such location as the property of FCA US in a manner satisfactory to FCA US. (iii) Seller acknowledges that title to all such Bailed Property remains in FCA US, and that the Bailed Property will be subject to the direction and control of FCA US. Seller has no rights or interest in any Bailed Property except to use such Bailed Property as directed by FCA US and Seller cannot grant any rights or interest to any person including but not limited to an affiliate of Seller or a third party. (iv) Seller has no right to retain possession of any Bailed Property after receipt of a written demand, which may be given to Seller by FCA US at any time, for return of the

Bailed Property. (v) Seller will not permit any act to be done to the Bailed Property which is not necessary for the performance of this Order. (vi) If this Order is terminated for any reason, FCA US will have the right to enter upon Seller's premises and remove all of the Bailed Property without recourse to any legal proceeding. (vii) Seller will notify all of its secured and judgment creditors that it is processing FCA US's Bailed Property. Such notification will be given in a form, manner and at times reasonably acceptable to FCA US. To the extent permitted by law, Seller will not allow any liens (consensual or otherwise), security interests, encumbrances or claims of any nature to be imposed on the Bailed Property through Seller or as a result of Seller's actions. If a lien, security interest, encumbrance, or claim of any nature is imposed on the Bailed Property through Seller or as a result of Seller's actions, Seller will, to the extent permitted by law, immediately take all actions necessary to remove such lien, security interest, encumbrance, or claim. (viii) Seller will follow FCA US's instructions regarding the Bailed Property, including without limitation incorporating Bailed Property in processed goods and shipping processed goods as FCA US may direct. (ix) Seller will provide FCA US with reports periodically or as FCA US may, in its sole discretion, otherwise direct regarding the amount and status of the Bailed Property in Seller's possession or control.

**11. INSURANCE AND INDEMNIFICATION.** (a) Insurance. Seller will obtain and continuously maintain in force during the Term (i) statutory worker's compensation insurance, (ii) employer's liability insurance, (iii) commercial general liability insurance, including contractual liability and products and completed operations liability, (iv) automobile liability insurance, including owned, hired and non-owned liability, (v) crime insurance, including employee theft, and (vi) all-risk property insurance covering Seller's property, including Tooling and Unpaid Tooling and all FCA US property, raw materials and finished products, including Bailed Property and FCA US Tooling, while in Seller's possession or in Seller's care, custody and control, all in amounts and coverages sufficient to cover all claims hereunder. Unless FCA US instructs otherwise in writing, coverage for specific above-referenced categories of insurance will be not less than the following: $1,000,000 in employer's liability insurance; $5,000,000 in commercial general liability insurance; and $5,000,000 in automobile liability insurance. Such policies will name FCA US as an additional insured thereunder; be primary and not excess over or contributory with any other valid, applicable, and collectible insurance in force for or maintained by FCA US; and provide that the insurer will give FCA US thirty days prior written notice of cancellation or material change in coverage. Seller waives, and Seller will cause its insurers to waive, any right of subrogation or other recovery against FCA US or its subsidiaries, including their respective employees, officers, directors, agents or representatives. FCA US may require Seller to furnish evidence of the foregoing insurance, but FCA US's failure to request evidence of insurance will in no event relieve Seller of its obligation under this Clause 11. Seller will be financially responsible for any of Seller's premiums, deductibles, retentions, self-insurance, co-insurance, uninsured amounts, or any amounts in excess of policy limits. Seller may satisfy the insurance requirements under this Clause 11 through a combination of self-insurance and catastrophic excess insurance.

(b) Indemnification. Seller will defend, indemnify, and hold FCA US and its subsidiaries, including their respective employees, officers, directors, agents or representatives harmless against all claims, suits, actions or proceedings ("Claims") and pay (i) all liabilities, losses, damages (including without limitation judgments, amounts paid in settlement and other recoveries), (ii) fees and expenses (including without limitation fees of counsel and experts) and (iii) other costs (collectively, "Expenses") in connection with any breach or nonperformance by Seller of the Order, or for injury or death of any person and damage or loss of any property allegedly or actually resulting from or arising out of any act, omission or negligent work of Seller or its employees, agents, or subcontractors in connection with performing the Order, either on FCA US's property or

(1/2017)                                                    7

in the course of their employment (including without limitation, Expenses arising out of, or in connection with, vehicle recall and customer satisfaction campaigns, provided however that if FCA US and Seller agree upon an Authority Definition Plan ("ADP") for goods supplied under the Order setting forth at a minimum an allocation of responsibility for design-related defects in the goods, then Seller's indemnification obligation for campaign Expenses will be determined based on the ADP).

**12. CHANGES.** (a) FCA US may, at any time, make changes in the Order (including, without limitation, changes to the term of the Order described in Clause 38 hereof). Any claim by Seller for a change in price adjustment based on costs actually incurred, or to be incurred, as a result of the change must be asserted in writing within ten (10) days from date of receipt by Seller of FCA US's notification of any change. FCA US will have the right to verify all claims hereunder by auditing relevant records, facilities, work or materials of Seller. Seller agrees to proceed with the Order as changed under this Clause 12. (b) All engineering changes, whether initiated by FCA US or Seller, will be processed pursuant to FCA US practices in effect at the time of the change using the FCA US "Change Notice (CN)" system, or its successors. On or before the date seven (7) days after FCA US has provided Seller with a documented solution (currently referred to as an "alternative selection" in the CN system), including applicable design requirements, Seller will provide FCA US with all price changes (calculated as set forth below) and timing requirements to implement such solution; provided, however, FCA US may, in its reasonable discretion, determine to extend such seven (7) day response period in circumstances where the complexity of the solution merits a longer response period. In addition, once FCA US and Seller have agreed to the price and milestone date changes (currently referred to as the completion of "SPIN" in the CN system), Seller shall have 24 hours to input data into the CN system reflecting the agreed upon changes for FCA US's approval. All FCA US approved engineering changes to the part specification will be promptly implemented by Seller as directed by FCA US. Price changes for FCA US approved engineering changes are to be based solely on the design cost variance from the superseded design and must be substantiated with appropriate documentation satisfactory to FCA US. (c) Seller certifies the location(s) from which it will ship the goods covered by the Order are as specified in the Order. If Seller at any time intends to change such location(s), Seller must notify FCA US prior to the change so that the effect of such change can be evaluated, and negotiated as necessary, for its effect on transit time, packaging methods, and any other significant impact on FCA US. If Seller does not notify FCA US of any increased transportation charges in advance of a change in shipping point(s), Seller will be responsible for such costs. Seller may not change manufacturing locations without first receiving FCA US's written approval. (d) No changes in the Order or these General Terms and Conditions, other than those changes in price and transportation charges as provided in Clause 12, will be made.

**13. PARTS; SERVICE.** (a) Seller will make and sell to FCA US subcomponents (i.e., serviceable components to support service operations) for the goods covered in the Order for FCA US's service, after-market, and warranty requirements for ten years (fifteen years for goods which FCA US clearly identifies as "safety items" prior to issuance of the Order either through the source package process or its substantive equivalent) or for such longer time as may be required by FCA US (and agreed to by Seller in connection with the applicable Request for Proposal prior to the commencement of initial volume production) after the end of the duration of the applicable vehicle production program (the "Service Part Coverage Period"). Any change in this time period requirement will not be considered by FCA US until the goods have reached the end of their retention period (e.g., service life). While the goods that are covered by the Order are still used in production of vehicles for FCA US, the aggregate of the prices for the subcomponents for FCA US's service, after-market, and warranty requirements will be no greater than the price in the Order for their respective corresponding production goods plus costs actually incurred by Seller for

special packaging. Neither Seller nor its sub-suppliers may sell any obsolete or surplus goods covered in the Order to third parties without FCA US's written consent. (b) For at least the first three years after a good is no longer used in production of vehicles for FCA US, the aggregate of the prices of the subcomponents for FCA US's service, after-market, and warranty requirements will be no greater than the price last stated in the Order for their respective corresponding production goods plus costs actually incurred by Seller for special packaging. (c) After three years from the end of the duration of the applicable vehicle production program, the aggregate of the prices of the subcomponents for FCA US's service, after-market, and warranty requirements will be no greater than the price last stated in the Order for their respective corresponding production goods, plus or minus (i) any changes in the cost of materials since the end of the duration of the applicable vehicle production program, plus (ii) a volume-related price adjustment reflecting the actual increase in the cost per part of producing fewer subcomponents, plus (iii) a set-up charge reflecting the actual cost of preparation for the part production run, plus (iv) any additional costs actually incurred for special packaging. All of the foregoing components of the price will be documented to FCA US's reasonable satisfaction, including, but not limited to, set-up detail, machine productivity, scrap allowance, labor inefficiencies and excess raw material requirements. (d) FCA US has no obligation to change minimum order quantities, lead times or similar commercial terms throughout the Service Part Coverage Period. (e) Where Seller sells FCA US service subcomponents to third parties while purchasing such items on FCA US's behalf (e.g., remanufactured and/or "kitted" goods), Seller must sell such subcomponents to such third parties at the same price at which it sells them to FCA US, with the same level of technical support (e.g., testing) provided by Seller as if FCA US had furnished such subcomponents directly to Seller. This authorization by FCA US to effectuate such third party sales is premised on the understanding that such third parties have agreed to use such subcomponents solely for FCA US/Mopar production. FCA US's permission to sell and/or its imposition of requirements under this subparagraph may be withdrawn, at any time, at FCA US's discretion. (f) If the subcomponents are manufactured in a country other than the country in which the goods are delivered to FCA US, Seller will mark the subcomponents shipped for FCA US's service, after-market, and warranty requirements "Made in (country of origin)." (g) Seller will comply with all FCA US vehicle service requirements as documented on the FCA US Supplier Portal on the date of the Order or any amendment to the Order. (h) Seller will, at its expense, comply with all Mopar APQP policies and project requirements including but not limited to utilizing a third party APQP provider.

**14. PAYMENT; FCA US'S COMMITMENTS; CLAIMS ADJUSTMENT.** (a) Payment terms are as set forth in the Order. Seller will promptly submit correct and complete invoices or other agreed billing communications with appropriate supporting documentation and other information reasonably required by FCA US (collectively, the "Invoice") after delivery of goods and performance of services, and the payment period set forth in the Order will not commence until FCA US has received a correct and complete Invoice which meets all of FCA US's applicable requirements. FCA US will use commercially reasonable efforts to assist Seller in correcting any invoice that has been rejected as incomplete or otherwise incorrect. (b) FCA US is committed to paying Seller the amounts which are due to Seller pursuant to the terms of the Order and these General Terms and Conditions, and to provide Seller with periodic information concerning its financial condition and ability to fulfill its payment obligations. (c) FCA US may at any time and without notice deduct, set-off, or recoup Seller's claims for money due or to become due from FCA US against any claims that FCA US has or may have arising out of this or any other transaction between FCA US and Seller. (d) The "FCA Parties" (defined as FCA US LLC, FCA Canada Inc., and FCA Mexico, S.A. de CV) assign to each other the right to payment from Seller and each of its affiliates, and the FCA Parties are entitled to collect each amount owed from Seller to the FCA Parties. (e) Upon Seller's request, FCA US will substantiate the basis for any deduction, set-off, or

(1/2017)                                         9

recoupment within fifteen (15) days of such request or within such other period as may be agreed upon by the Parties.

**15. CUSTOMS; EXPORTS.** (a) Seller will promptly notify FCA US in writing of material or components used by Seller in filling this Order, which Seller purchases in a country other than the country in which the goods are delivered to FCA US and any duty included in the purchase price of the goods. Seller will furnish FCA US with any documentation and information necessary to establish the country of origin, comply with the destination country's rules of origin requirements, any special trade programs, and content reporting. (b) The rights to and benefits of any duty drawback, including rights developed by substitution and rights which may be acquired from Seller's suppliers and export credits, to the extent transferable to FCA US, are the property of FCA US. Seller will provide all documentation and information and take any necessary steps to obtain refunds or to drawback any duty, taxes or fees paid, and to receive export credits from, the government of the country of origin or export country. (c) The responsibility for customs duty and customs brokers' fees will be determined in accordance with the delivery point and transportation code stated in the Order. If FCA US is responsible for customs duties, it will be responsible for normal duties only. Seller will be responsible for any special duties, including but not limited to, marking, anti-dumping and countervailing duties, to the extent permitted under the law of the country of importation. (d) Seller will provide FCA US with all documentation and information required by law or regulation or otherwise necessary to determine admissibility, timely release, customs clearance and entry, and the proper minimum duty to be paid upon the importation of the goods into the destination country. (e) Seller will advise FCA US if the importation of the goods requires an import license and will assist FCA US in obtaining any such license. (f) Seller warrants that the information regarding the import or export of the goods supplied to FCA US is true and correct, and that all sales covered by this Order will be made at not less than fair value under the anti-dumping laws of the countries to which the goods are exported. (g) Seller must comply with all pertinent requirements of U.S. Customs and Border Protection's supply chain security program known as C-TPAT or a local security program recognized by U.S. Customs and C-TPAT. Seller must provide proof of participation by responding to the annual risk assessment survey initiated by FCA US. Seller must seal international shipments with a high security seal that meets C-TPAT standards and the seal number must be included on the Seller's ASN. (h) Seller and FCA US recognize that export control regulations may limit or prohibit the transfer of items to foreign nationals, including foreign nationals in the United States. The goods, services and/or technical data (collectively "Items") delivered under this Order may be subject to U.S., foreign and other applicable export control laws and regulations (collectively "Export Control Laws"), including, but not limited to, the International Traffic in Arms Regulations or the Export Administration Regulations (collectively "U.S. Export Laws") and/or (Export Control List(s)). Seller and FCA US will comply with all U.S. and other country's applicable Export Control Laws and shall not export, re-export or transfer items without first obtaining all required licenses and approvals. Any penalty, fine, expense (including reasonable attorneys' fees) or liability incurred by FCA US as a result of violation(s) of U.S. or foreign export control laws and regulations, or this clause, by the Seller, will be promptly reimbursed by Seller. Items that are identified during the course of this Order will be handled in the following manner: (1) the sending party will notify the other party of the Item's export classification prior to any shipment or transmission; (2) the party receiving notice under (1) above shall have an opportunity to accept or reject the delivery of the Item prior to shipment or transfer by the sending party; (3) FCA US and Seller will make reasonable efforts to cooperate in obtaining required licensing and implementing required internal controls for the involved Items; (4) rejection of an Item will not constitute a breach of this agreement; and (5) FCA US and Seller will assess the impact of the Item's rejection to determine if the Order can continue. Any notice regarding export controls will be in writing and sent to the FCA US Corporate Customs

Department. Compliance with these laws and regulations includes, but is not limited to, abiding by U.S. sanctions, embargoes and prohibitions on transactions with restricted parties. This includes, but is not limited to, the prohibition on the transfer of commodities, materials, software and technology (i.e., all Items) subject to this agreement, to U.S. sanctioned countries (e.g., Iran, Syria, North Korea, Sudan, and Cuba).

**16. USE OF FCA US'S NAME.** Seller will not, without the prior written consent of FCA US, in any manner publish the fact that Seller has furnished or contracted to furnish FCA US goods and/or services, or use the name or trademarks of FCA US, its products, or any of its affiliated companies in Seller's advertising or other publication. Seller will not place its, or any third party's trademark or other designation on the good if the good bears a FCA US trademark or an identifying mark specified by FCA US, or if the good is peculiar to FCA US's design (a "Marked Part"). Seller warrants that (i) it will sell each Marked Part, and similar goods, only to FCA US and (ii) it will not sell any Marked Part or similar goods to third parties without FCA US's prior written consent. Seller acknowledges that any sale by Seller of a Marked Part in violation of this Clause 16 is a willful violation of FCA US's trademark rights. Any goods manufactured by Seller based on FCA US's drawings, specifications, or other information disclosed to Seller by FCA US in connection with the Order may not be used for Seller's own use or sold to any third parties without FCA US's prior express written authorization; provided, however, this prohibition will not apply to goods manufactured by Seller based on Seller's designs using tooling other than FCA US Tooling, Unpaid Tooling which could become FCA US Tooling pursuant to Clause 10 of these General Terms and Conditions, or any intellectual property, knowledge, or know how subject to a non-exclusive, world-wide, paid-up, irrevocable and perpetual license to which FCA US is entitled under Clause 10 hereof, unless the manufacture of such goods would result in a breach by Seller of Clause 17 of these General Terms and Conditions. Seller will mark goods supplied to FCA US in accordance with FCA US's published marking standards.

**17. INFORMATION DISCLOSED; DATA RIGHTS; TRADEMARKS.** (a) "FCA US Data" means (i) all information and data that FCA US makes available to Seller in connection with the performance of the Order, including without limitation performance standards, product characteristics, specifications, drawings, descriptions, samples, designs, manufacturing data and other information, and (ii) any and all data (excluding Seller-provided data regarding its internal costs of producing goods or services that it provides to FCA US under the Order) that is entered into or processed by Seller directly or indirectly using any system that Seller owns or controls directly or indirectly for the purpose of performing Seller's obligations under the Order; provided, however, with respect to any and all data encompassed by any intellectual property conceived, developed, or acquired by Seller in the course of performing work under the Order, the rights to such data (whether ownership or license) shall be determined by the rights to the intellectual property of which such data is a part as set forth in the applicable supplemental clause or clauses referenced in the Order. (b) FCA US owns and retains all of its right, title and interest in FCA US Data, including any FCA US patents, patent applications, copyrights, trade secrets, trademarks, trade dress, and any other proprietary rights in FCA US Data, and in any derivative or improvement of any FCA US Data made by FCA US or by Seller as Work Product. Unless expressly provided in the Order or otherwise agreed to in a writing signed by FCA US, no rights or license is granted under the Order to use FCA US Data other than the right for Seller to use FCA US Data as required to perform Seller's obligations under this Order. Seller will not use or disclose FCA US Data for any other purpose. Seller will handle all FCA US Data in such a manner to insure that it is not used for any purpose detrimental to the interests of FCA US. Seller may not disclose FCA US Data to any third party without FCA US's prior written consent. Seller agrees to immediately discontinue any use of FCA US Data and/or items bearing designated FCA US-owned trademarks or logos upon FCA US's request or at the termination of the Order and

agrees to do one or more of the following at FCA US's option: (1) destroy any such item and present to FCA US an affidavit of destruction; (2) return to FCA US any such item; or (3) remove and destroy any FCA US-owned trademark or logo from any such item and present to FCA US an affidavit of removal and destruction. (c) Any rights that Seller may have to disclose, manufacture, use or distribute goods or services developed under or related to this Order in each case are subject to Seller's obligations concerning FCA US Data set forth in this Clause 17.

**18. PATENTS; NONINFRINGEMENT WARRANTY AND INDEMNITY.** No rights are granted to Seller under any FCA US patents except as may be necessary to fulfill Seller's obligations under the Order. Seller represents and warrants that any good or service provided under the Order or any work product resulting from any services performed by Seller under the Order ("Work Product"), including use of any Work Product for its intended purpose or making, having made, selling, offering to sell, importing, or using any good made by using the Work Product for its intended purpose, will not infringe any Intellectual Property of any third party. Seller agrees to investigate, defend, indemnify and hold harmless FCA US, its affiliated companies, their respective customers, distributors and dealers, and their respective customers, against any and all Claims made against any of them that any good or service or any Work Product, including use of any Work Product for its intended purpose or making, having made, selling, offering to sell, importing, or using any good made by using the Work Product for its intended purpose, infringes any Intellectual Property of any third party. Seller will pay all Expenses that are incurred or sustained by reason of any such Claim.

**19. ASSIGNMENT.** The Order may not be assigned or delegated, in whole or in part, without FCA US's prior written consent, including, but not limited to, the subcontracting of work to be performed hereunder or the transfer of FCA US Tooling to third parties for the performance of work hereunder, and any attempted assignment or delegation in violation of this Clause 19 will be void and of no legal effect.

**20. FINANCIAL REPORTING.** (a) Seller will promptly furnish to FCA US any information regarding the Seller's operations, business affairs and financial condition or such other information as FCA US may reasonably request in addition to the information about Seller to be provided periodically as set forth in section (b) below.

(b) Seller will furnish directly to FCA US, or to FCA US's designated third party service provider for collecting and processing supplier financial information, in the format designated by FCA US:

> 1. Quarterly Financial Statements. Within the earlier of (i) sixty (60) days after the close of each quarterly accounting period of Seller and (ii) the date the statements described herein are due (after the expiration of any automatic grace period) to any federal regulatory agency under applicable law, the balance sheet of Seller, as of the end of such period, the related statements of income and retained earnings, and statements of cash flow for such period, each prepared on a basis consistent with Seller's past practices and certified by an officer of Seller as representing fairly in all material respects the financial position, results of operation, and cash flows for the periods covered by such statements.

> 2. Annual Financial Statements. Within the earlier of (i) one hundred twenty (120) days after the close of each fiscal year of Seller and (ii) the date the statements described herein are due (after the expiration of any automatic grace period) to any federal regulatory agency under applicable law, the balance sheet of Seller as of the end of such fiscal year, and the related statements of income and retained

earnings and statements of cash flows for such fiscal year, setting forth comparative figures for the preceding fiscal year and certified by an officer of Seller as representing fairly in all material respects the financial position, results of operation, and cash flows for the periods covered by such statements, and, if an audit is performed, audited by independent certified public accountants and including a copy of such auditor's report thereon.

3. Notice of Events of Default. If a default or an event of default has occurred and is continuing under any contract to which Seller is a party, the effect of which could be reasonably anticipated to have a material adverse impact on Seller's financial condition or its ability to perform its obligations under the Order, then Seller will furnish notice of such default or event of default to FCA US.

4. Annual Information Survey. Once each calendar year, Seller will provide FCA US with its responses to FCA US's Annual Information Survey including but not limited to the Automotive Sales Mix Template and the Manufacturing Sales Mix Template.

5. Updates to Supplier Information. Seller must update the information provided on FCA US's Supplier Information System not less than once each quarter of Seller's calendar year.

6. Change in Control. Seller must disclose to FCA US a change in control under which another person or company acquires beneficial ownership of thirty five percent (35%) or more of the outstanding voting stock or voting rights of Seller within fifteen (15) days of the disclosure to Seller of any such event.

(c) FCA US agrees to use commercially reasonable efforts to keep Seller's Confidential Information from disclosure to (i) individuals or businesses outside of FCA US other than the present or future parent, subsidiary, or affiliate entities of FCA US or its parent entity (excepting any such present or future entities which, in their core business, are Tier 1 automotive suppliers and/or direct competitors of Seller), as well as FCA US's advisors, consultants, and service providers who need to know and who are subject to a confidentiality obligation regarding Seller's Confidential Information, and (ii) FCA US employees who do not need access to such information. Such Confidential Information may be used by FCA US for any reason related to or in connection with its risk management functions. "Confidential Information" as used in this Clause means information provided to FCA US pursuant to Clause 20(b) above that is either (i) Seller's information concerning its operations, systems, services, personnel, financial affairs, marketing, investment performance and investment, research, development efforts, (ii) information received from third parties by Seller under a confidentiality obligation, or (iii) any other information relating to the business of the Seller not made public directly or indirectly by Seller. Notwithstanding the foregoing, nothing herein shall prevent FCA US, if FCA US becomes compelled to disclose Confidential Information by a legal authority having competent jurisdiction over Seller or FCA US (by special deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process; each such process, a "demand"), from responding to such demand without Seller's prior written consent; provided, however, that FCA US will have given Seller written notice of any such demand promptly after the receipt thereof. In any event, the term "Confidential Information" does not include information (A) which was or becomes generally available to the public, other than as a result of a wrongful disclosure by FCA US; (B) which FCA US was aware of prior to its disclosure to FCA US by Seller; (C) which FCA US

learns of from a third party under no applicable obligation of confidentiality to Seller; or (D) which FCA US obtains in connection with any subsequent court, arbitration or other legal proceedings.

(d)     Seller may, with FCA US's written consent (which will not be unreasonably withheld) comply with the reporting requirements set forth in this Clause 20 by delivering parent-level financial information.

**21. CANCELLATION FOR DEFAULT.** (a) FCA US may cancel the whole or part of this Order without liability, except for payment due for goods and services delivered and accepted, and may exercise any of its legal rights, including without limitation its remedies under Clause 23 of these General Terms and Conditions, upon the occurrence of any of the following specified events (each an "Event of Default"):

(1) Seller fails to timely deliver goods or perform services and Seller fails to give FCA US a remediation plan within one day of FCA US's notice to Seller of such failure, obtain FCA US's acceptance of such plan, and perform such plan to FCA US's satisfaction; or

(2) Seller violates any other provision in, fails to meet any other requirements contained in, or fails to perform any other provision under the Order at the time specified therein and to the extent such other failure is capable of being cured, fails to so cure such failure within thirty (30) days after such Event of Default; or

(3) Seller (i) becomes insolvent or generally fails to pay, or admits in writing its inability to pay, its debts as they become due, or (ii) voluntarily commences any proceeding or files any petition under any bankruptcy, insolvency or similar law or seeking dissolution, liquidation or reorganization or the appointment of a receiver, trustee, custodian, conservator or liquidator for itself or a substantial portion of its property, assets or business or (iii) takes corporate action for the purpose of effecting any of the foregoing in (i) or (ii) above; an order for relief is entered in a case under the Bankruptcy Code in which Seller is a debtor; or involuntary proceedings are or an involuntary petition is commenced or filed against Seller under any bankruptcy, insolvency or similar law, unless any such petition is dismissed within forty-five (45) days; or

(4) Seller repudiates the Order (absent a legal right to do so,) in writing, including via e-mail, takes any action evidencing its intention not to perform (including threatening non-delivery of goods), or omits to take any action required to be performed by Seller, which is necessary for Seller to timely deliver goods and services under the Order; or

(5) Seller fails to pay any trade payables or other accounts payable owed to FCA US, or its subsidiaries or affiliates, incurred in the ordinary course of such Seller's business that are not reasonably disputed and have been outstanding for more than sixty (60) days after the date such payable is due.

(b) Seller may terminate this Order due to FCA US's material breach of the Order that is not remedied within thirty (30) days of Seller's notice to FCA US of the material breach.

(c) Upon Seller's receipt of any notice of termination under this Clause 21, Seller will stop work on the date and to the extent specified in such notice and terminate all orders and subcontracts that relate to the terminated Order or the applicable terminated portion thereof.

(d) If a Court of competent jurisdiction determines that any purported termination by FCA US under this Clause 21 was made without legally sufficient cause, then the purported termination will be a termination subject to Clause 22 of these General Terms and Conditions, and Seller's remedies, if any, will be limited to those set forth in Clause 22.

**22. TERMINATION AT FCA US'S OPTION.** (a) Upon giving Seller written notice of termination at FCA US's option, FCA US may terminate this Order in whole or in part at any time, and for any business reason (including, without limitation, Seller's non-competitiveness as defined in Clause 32 hereof); provided, however, FCA US may not terminate the Order pursuant to this Clause 22 for Seller's cost competitive deficiencies unless Seller has had notice and opportunity to cure such deficiencies pursuant to Clause 32 hereof. (b) Upon Seller's receipt of any notice of termination at FCA US's option, Seller will, within fifteen (15) days thereafter (during which time FCA US will review any request by Seller for reconsideration of the termination notice, but FCA US will be under no obligation to change its decision), stop work at such time and to the extent specified in such notice, terminate all orders and subcontracts that relate to the terminated Order or the applicable terminated portion thereof, and cooperate reasonably with FCA US in wind-down related functions. Within sixty (60) days after the effective date of such termination, Seller will submit all claims resulting from such termination. Seller may not include in its claim (i) selling, general or administrative costs, (ii) interest costs or the cost of capital, (iii) lost profit or lost opportunity costs, (iv) fixed overhead absorption, (v) capital equipment, (vi) facility costs, (vii) plant modification costs, (viii) labor assignment costs, including without limitation severance costs or labor inefficiencies, (ix) training costs, and (x) other costs related to obtaining the Order. In the case of Tooling for which FCA US has issued an Order that has not been completed, Seller's claim may include substantiated actual costs incurred for direct labor, direct material, and applied factory overhead, but must be reduced by the amount of the scrap value of the not yet completed Tooling. FCA US will have the right to verify such claims by auditing the relevant records, facilities, work or materials of Seller and/or its subcontractors. FCA US will pay Seller for finished work accepted by FCA US as well as for the documented cost to Seller of work in process and raw material allocable to the terminated work which is not in excess of any prior FCA US authorization. Payment of a valid claim made under this Clause 22 will constitute FCA US's only liability for termination hereunder with title and right of possession to all delivered goods and services vesting in FCA US immediately upon FCA US's tender of such payment. The provisions of this Clause 22 will not apply to any cancellation by FCA US for default by Seller or for any other cause recognized by law or specified by this Order. If a dispute arises regarding the amount of such costs to which Seller is entitled hereunder, then the dispute will be finally resolved in accordance with Clause 26 below, and, to the extent that the termination is only a partial termination of the Order, FCA US will not be in material breach of the Order for failing to pay the amount of costs claimed by Seller prior to conclusion of an adjudication or arbitration pursuant to Clause 26 hereof.

**23. REMEDIES.** (a) Upon the occurrence of any Event of Default as described in Clause 21 hereof, FCA US will have the right to cancel or terminate in whole or part the Order, take possession of and title to all or any part of any work performed by Seller under this Order upon written notice to Seller, and take any other action permitted under applicable law. FCA US will also have the right to take immediate possession of any and all of FCA US Tooling (as defined in Clause 10 hereof) at any time without payments of any kind to Seller. Should FCA US elect to exercise such right, Seller must cooperate with FCA US in FCA US's taking possession of FCA US Tooling, including allowing access to Seller's facilities. (b) If FCA US exercises its right to terminate or cancel the Order in whole for the occurrence of an Event of Default by Seller under Clause 21 hereof, then:

(1/2017)                                    15

(i)    Seller grants to FCA US a non-exclusive, world-wide, paid-up, irrevocable license under any intellectual property of Seller that is incorporated into or used to make or design the goods or Work Product, to make, have made, sell, offer for sale, import or export or modify such goods or Work Product. The license granted to FCA US under this Clause 23(a)(i) will remain in effect for the life of the applicable vehicle program(s) in which such goods or Work Product are utilized (now or in the future), including any service parts therefor;

(ii)    In addition, upon written request from FCA US, Seller will provide the following for such goods or Work Product: (A) any design aides, including without limitation, any computer aided design data and design aides, (B) specifications, (C) bills of material, (D) Seller information for any purchased components used in such goods or Work Product, and (E) manufacturing process information regarding such goods or Work Product; and

(iii)    To the extent FCA US may have paid for prototype tooling for the goods or Work Product under a separate purchase order or other agreement, then in order to ensure that FCA US could make full beneficial use of the rights provided in this Clause 23, Seller will provide the following for such goods and Work Product: (a) any prototype tools (e.g. dies and molds), including without limitation, any computer aided design data for such prototype tools, and (b) in each case as applicable, the specifications, bills of material, Seller information for any purchased components used in such prototype tools, and manufacturing process information regarding such prototype tools.

(c) In addition to all other rights and remedies, FCA US may, upon fourteen (14) days' written notice to Seller of actual or threatened recurring non-performance concerning capacity or quality, engage (or require that Seller engage) a third party acceptable to FCA US for the purpose of supporting Seller's remediation of such capacity or quality deficiencies. Seller will pay all costs associated with such remediation efforts, and will reimburse FCA US for any reasonable costs incurred by FCA US hereunder, which may be recovered by means of FCA US's rights of setoff, recoupment, or deduction under Clause 14 hereof.

(d) FCA US's rights and remedies herein reserved to FCA US are cumulative and in addition to any other rights and remedies available at law or equity. No waiver of any breach of (i) any provision of this Order, or (ii) any agreed-upon cure remediation plan arising under these General Terms and Conditions, will constitute a waiver of any other breach or a waiver of such provision.

## 24. REQUIRED COMPLIANCE.
(a)    In providing goods or services hereunder, Seller and its subcontractors will comply with (i) any and all applicable global, federal, state, provincial and local law, regulations, executive orders and other rules of law as in effect at any time during the Term; and (ii) any and all FCA US policies (including CS-9003 and sustainability guidelines) addressing such legal requirements. Seller will provide and maintain an Environmental Management System that complies with ISO 14001. In particular and without limitation, Seller and its subcontractors will not act in any fashion or take any action that will render FCA US liable for a violation of the U.S. Foreign Corrupt Practices Act ("FCPA"), which prohibits the offering, giving or promising to offer or give, directly or indirectly, money or anything of value to any official of a government, governmental entity, political party or instrumentality to assist it or FCA US in obtaining or retaining business or to gain an unfair business advantage. Seller further represents that neither it nor any of its subcontractors will utilize forced, compulsory, or child labor in connection with the supply of goods or the provision of services under this Order. FCA US may request Seller from time to time to certify in writing its compliance (and that of its subcontractors) with the foregoing, and Seller will comply with each such request.

(b)     In addition, to the extent applicable for the goods or services provided hereunder, Seller will comply with all applicable Environmental Requirements that apply to Hazardous Materials. Environmental Requirements includes without limitation all global, federal, state, provincial, and local laws, rules and regulations pertaining to the protection of human health, safety, wildlife or the environment. Hazardous Materials includes, without limitation, any material or substance that is regulated by an Environmental Requirement. In particular and without limitation, Seller will comply with all applicable global regulations regarding the registration, restriction, prohibition, and/or recyclability of chemicals, including without limitation those identified in the Global Automotive Declarable Substance List and FCA US's CS-9003. Seller will defend, indemnify, and hold FCA US harmless from and against any claims, losses, damages, costs and expenses resulting from or arising out of any failure to comply with any Environmental Requirement. Seller specifically certifies that all goods sold to FCA US which are required to be registered on an official inventory maintained by the pertinent governmental jurisdiction have been registered in full compliance with applicable law, and Seller will provide immediate notice to FCA US of any use restrictions, reporting requirements, or other obligations imposed with respect to such goods.

**25. SUPPLIER DIVERSITY PROGRAM.** FCA US has an established supplier development program to develop and maintain a qualified diverse supply base. FCA US actively seeks diverse suppliers and encourages Seller to use diverse suppliers. A diverse supplier is a business establishment which meets one or more of the following criteria: (a) a small business, as defined in Title 15, Section 632 of the United States Code and related regulations; (b) a small business owned and controlled by socially disadvantaged individuals (at least fifty-one percent (51) percent of the business is owned and controlled by one or more socially and economically disadvantaged individuals and the management and daily business operations are controlled by one or more such individuals); (c) a business that is at least fifty-one percent (51) percent owned by a woman or women who also control and operate the business; (d) a small business that obtains HUBZone (Historically Underutilized Business Zone) certification (maintains a principal office in a HUBZone, at least fifty-one percent (51) percent of the business is owned and controlled by one or more U.S. citizens, and at least thirty-five percent (35%) of its employees reside in a HUBZone); (e) a business that is at least fifty-one percent (51) percent owned by a service-disabled veteran (an individual who has served in the U.S. armed forces and has received an honorable discharge documented by DD Form 214, Certificate of Release of Discharge from Active Duty) or veterans who also control and operate the business; (f) a business that is at least fifty-one percent (51) percent owned by a veteran or veterans who also control and operate the business; or (g) other categories of diverse businesses as FCA US may include in its diversity supplier development program. Seller will report monthly to FCA US in accordance with FCA US's diversity supplier development program requirements, on the content provided by any such suppliers for the goods or services purchased hereunder as well as the basis for claiming that such content was provided by such a supplier.

**26. DISPUTE RESOLUTION; GOVERNING LAW.**
(a) The Order and all transactions between FCA US and Seller will be governed by and construed in accordance with the laws of Michigan as if entirely performed therein. In the case of FCA Canada Inc., this Order between FCA Canada Inc. and Seller will be governed by and construed in accordance with the laws of the province of Ontario, Canada as if entirely performed therein. The 1980 United Nations Convention on Contracts for the International Sale of Goods is not intended to and does not apply to the Order or any transactions pursuant hereto, and FCA US and Seller specifically waive its application to the Order or any transactions pursuant hereto.

(b) For all disputes arising out of the Order, Seller irrevocably consents to the personal

(1/2017)                17

jurisdiction of the state and federal courts in and for Oakland County, Michigan, USA, and irrevocably waives any claim it may have that any proceedings brought in such courts have been brought in an inconvenient forum. Any suit regarding or relating to this Order may only be brought in the state or federal court in and for Oakland County, Michigan, USA, which are the exclusive venue for any such suit.

(c) Any dispute arising out of or in connection with the Order or these General Terms and Conditions (other than FCA US's rights to injunctive relief, enforcement of Seller's delivery obligations, enforcement of FCA US's rights and remedies under Clause 32 hereof, and possession of Tooling, Unpaid Tooling, or other Bailed Property), or any other dispute, may, by agreement in writing of both Parties (or by FCA US's unilateral election, in the case of disputes relating to quality, warranty, or indemnification under Sections 6, 8, or 11 of these General Terms, including claims in connection with vehicle recall and customer satisfaction campaigns), be referred to and finally resolved by binding arbitration in accordance with the Expedited Rules of Arbitration set forth in Annex A to these General Terms and Conditions. Any unilateral election to arbitrate hereunder must be preceded by negotiations to resolve the dispute (provided, however, such negotiations may be terminated by either party at any time in their sole discretion, with seven (7) days' advance notice of such termination furnished to the other party) and, upon election of either party during such negotiation period, a non-binding mediation session, which must be completed within forty-five (45) days of the delivery of written notice by either party to the other requesting mediation. The unilateral arbitration election hereunder may be made by FCA US immediately following the completion of such mediation.

**27. ELECTRONIC COMMUNICATION.** FCA US may prescribe any aspect of electronic communication between Seller and FCA US, and Seller will follow each of FCA US's prescriptions regarding any of those aspects.

**28. COMPLIANCE WITH APPLICABLE REQUIREMENTS; FORMULA AND INFORMATION DISCLOSURE.** (a) Seller will comply with all FCA US requirements then in effect regarding (i) the handling, transportation, labeling, processing, registration, notification, prohibition, use, disposal or recyclability of the goods, containers and packing, including without limitation, the formulation and use of raw materials and other substances in the goods ("Environmental, Health and Safety Requirements"), and (ii) disclosures on the content and origins of such raw materials and substances, including conflict mineral disclosures and chemical and/or substance of concern disclosures (collectively, "Disclosure Requirements"). Seller promptly will provide to FCA US, in such form and detail as directed by FCA US, (i) the formula or list of all ingredients in the goods, (ii) the amount of all ingredients and the percentage of each ingredient in the goods, (iii) an updated formula or list of ingredients promptly upon any change from that provided to FCA US, and (iv) a list of the countries of origin for each ingredient contained in the goods; provided, however, FCA US may require such information from Seller only to the extent necessary to enable FCA US to comply with applicable law. Upon FCA US's request, Seller promptly will certify to FCA US that Seller is in compliance with all Environmental, Health and Safety Requirements and Disclosure Requirements. (b) Prior to and with shipment of the goods, Seller will furnish to FCA US (i) sufficient warning and notice in writing (including placing appropriate labels on the goods, containers, or packaging) of any material that is an ingredient or a part of any of the goods that is or could become hazardous so as to warrant special handling instructions as may be necessary to advise carriers, FCA US and their respective employees of how to exercise that measure of care and precaution that will best prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing shipped to FCA US, (ii) together with such special handling instructions for such materials.

**29. RIGHT TO AUDIT.** Seller grants to FCA US access to all of Seller's information, including, but not limited to, books, records, payroll data, receipts, correspondence, chemical data in connection with Seller's obligations under Clause 28 hereof, and other electronic and non-electronic documents relating to the goods or services to be provided under the Order, FCA US Tooling and Unpaid Tooling, Seller's obligations under the Order, any payment made to Seller, or any claim made by Seller, as reasonably required for the purpose of auditing or verifying Seller's performance of its obligations under this Order and its charges therefor. Seller will preserve this information and these documents for a period of four (4) years after the final payment is made under this Order. Seller will segregate its information and documents as directed by FCA US, and otherwise cooperate with FCA US to facilitate the audit or verification process. In addition, FCA US has the right to visually inspect and audit any facility or process relating to the goods or services to be provided under the Order, including those relating to production quality. Seller acknowledges that FCA US has the right to audit and make copies of all pertinent documents, data and other information relating to any of Seller's subcontractor's or supplier's obligations under the Order. Upon FCA US's request, Seller will permit FCA US to visually inspect and audit any such Seller's subcontractor's or supplier's facilities or processes relating to the goods or services to be provided under the Order. The provisions of this Clause 29 are not intended to expand FCA US's possessory or ownership interests in the property of either FCA US or Seller beyond those set forth elsewhere in the Order or these General Terms and Conditions. The information conveyed to FCA US under this Clause 29 will be "Confidential Information" within the meaning of Clause 20 hereof.

**30. ASSIGNMENT OF ANTITRUST CLAIMS.** Upon FCA US's request (which FCA US may make, in its discretion, provided it has a material interest in any claim described herein), Seller will execute a written assignment of all right, title, and interest in and to all causes of actions under any applicable antitrust laws arising out of or relating to Seller's purchase of raw materials or ingredients used in goods sold or resold to FCA US. If FCA US recovers damages on account of any such assigned claim, and a portion of such damages is reasonably allocable to Seller, FCA US will, net of its attorneys' fees in liquidating the claim, return such allocable amount to Seller.

**31. SURVIVAL.** The provisions of these General Terms and Conditions of the Order intended by their terms to survive termination, cancellation or expiration of the Order will survive any termination, cancellation or expiration of the Order, including without limitation Clauses 2, 5, 8, 9, 10, 11, 13, 14, 15, 16, 17, 18, 20, 21, 23, 26, 29, 30, 33, 34, 39, and 40.

**32. COMPETITIVENESS.** Seller will at all times be and remain competitive with respect to each good or service supplied to FCA US pursuant to the Order on a total cost basis taking into account each of the following attributes: cost, quality, delivery, reliability of supply, technology, financial stability, and performance of obligations under the Order. FCA US reserves the right, at any time during the term of the Order, to market test any good or services to be supplied under the Order to determine the competitiveness of the Supplier of a good or a service. To be "competitive" means to be (i) equal to or better than all other suppliers and potential suppliers of that good or service in as many of the listed attributes as any other supplier or potential supplier of similar goods or services, judged on a total cost basis, and (ii) in support of all FCA US requirements set forth in the Order to the extent that another qualified and cost-competitive supplier supports those requirements. Cost competitiveness comparisons will take into account applicable engineering, research, and development costs. If Seller is uncompetitive with respect to attributes other than cost, FCA US may terminate the Order pursuant to Clause 22 of these General Terms and Conditions. If Seller is not cost competitive with respect to a good or service, FCA US may notify Seller of its non-competitiveness by specifying the cost competitive deficiency in a written notice (the "Cure Notice"). FCA US agrees not to deliver a Cure Notice within twelve (12) months of the

commencement of volume production. Upon notification, Seller must cure such deficiency by (i) submitting to FCA US within thirty (30) days of such notice of non-competitiveness a plan acceptable to FCA US for the remediation of the non-competitiveness as soon as practicable, and (ii) if FCA US, in its reasonable discretion, accepts the plan, using Seller's reasonable best efforts to perform the plan. Seller's plan will identify the actions needed to remediate its deficiency with respect to cost competitiveness and an aggressive timeline for the completion of each such action. FCA US will notify Seller of its acceptance or rejection of Seller's remediation plan within thirty (30) days of receipt of such plan. FCA US must accept a plan from Seller which is more likely than not to promptly remediate a cost competitive deficiency. However, FCA US will be entitled to use its discretion in evaluating both the probability of success and the promptness of any such plan. In the event FCA US delivers a Cure Notice to Seller under this Clause 32, FCA US may not terminate the Order pursuant to Clause 22 of these General Terms and Conditions unless (i) Seller does not submit a remediation plan; (ii) FCA US rejects Seller's remediation plan; (iii) Seller fails to perform any material requirement of its remediation plan, or fails to meet any of the deadlines set forth therein; or (iv) upon the completion of Seller's remediation plan, Seller remains uncompetitive with respect to cost.

**33. EQUITABLE RELIEF.** Seller acknowledges that a material breach of its obligation to supply goods in accordance with Clause 3 of the Order or to transfer FCA US Tooling, Unpaid Tooling, or other Bailed Property to FCA US in accordance with Clause 10 of the Order, would cause irreparable damage to FCA US, including without limitation potential damage to FCA US's relationships with its customers, suppliers, labor unions, lenders, and prospective future customers, the exact amount of which would be difficult to ascertain, and that the remedies at law and monetary damages for any such breach would be inadequate. Accordingly, in the event of any action taken or threatened by Seller hereunder that, if taken, would constitute a material breach of its obligations under Clause 3 or Clause 10 of the Order, FCA US and it successors and assigns are entitled to injunctive or other equitable relief and/or a decree for specific performance, without the posting of any bond or other security, in addition to any other remedies it may have for damages or otherwise. Seller may not take any action or position inconsistent with this acknowledgement, and FCA US will be entitled to recover its attorney fees and costs in connection with the enforcement of this Clause 33.

**34. NOTICE.** Notices must be in writing. E-mail notification will be sufficient and acceptable written notice. Any e-mail notice sent will be deemed to have been received on the second business day after such notice was sent (if not first rejected by automatic response). Any written notice sent using any other manner will be deemed to have been received upon the earlier of (i) actual receipt by the party to whom the notice is directed, and (ii) the second business day after delivery, in the case of U.S. and Canadian deliveries, or the fifth business day after delivery for all other deliveries. Any notice to FCA US must be sent to its head of Production Purchasing.

**35. SEVERABILITY.** If any term of the Order is invalid or unenforceable under any law, regulation, executive order or other rule of law, such term will be deemed to be reformed or deleted, as the case may be, but only to the extent necessary to comply with such law, regulation, order or rule, and the remaining provisions of the Order will remain in full force and effect.

**36. COST SAVINGS PROGRAMS.** Seller will provide to FCA US, in writing by October 1 for each upcoming year during the term of the Order, Seller's plan for implementing cost savings and productivity improvements to reduce Seller's costs in accordance with the then-current FCA US cost savings program.

**37. SELLER'S CONTRACTS WITH ITS SUPPLIERS AND SUBCONTRACTORS.** (a) Seller will ensure that its suppliers and subcontractors for any goods or services to be provided under the Order comply with the obligations, and provide FCA US with no less than the rights, specified in Clauses 17, 24, and 28 of these General Terms and Conditions. Seller will also use commercially reasonable efforts to ensure that such suppliers and subcontractors comply with the obligations, and provide FCA US with no less than the rights, specified in Clauses 16 and 39 of these General Terms and Conditions. (b) If FCA US directs Seller in a writing signed by an officer of FCA US to use a supplier or subcontractor regarding the goods or services to be provided under the Order, then (i) FCA US will be responsible for negotiating the prices charged Seller by such supplier or subcontractor, (ii) Seller will be responsible for every other aspect of the supply relationship between Seller and such supplier or subcontractor, and (iii) Seller agrees to enforce the rights arising out of its agreement with such supplier or subcontractor for the benefit of FCA US, or upon FCA US's request, will assign to FCA US Seller's rights under such agreement for the benefit of FCA US.

**38. TERM.** This Order is a contract for a definite term. The term of the Order is stated on the first page of the Order ("Term"). If the Term is for less than the duration of the applicable vehicle production program, at FCA US's option, the Term may be extended for an additional model year with advance notice to Seller equal to the longer of ninety (90) days or the lead time set forth in the Order (either by FCA US's notifying Seller of the extension or by FCA US's issuance of part releases for some or all of the goods identified in the Order for a future model year), with the Order being extended for each good for which Seller receives a release or other appropriate communication extending this Order for such additional model year.

**39. DISPOSAL OF SCRAP.** Any goods, assemblies, subassemblies, or materials related to this Order which are disposed of by Seller in any manner other than through sale to FCA US under the terms of the Order are scrap ("Scrap") and must be mutilated or otherwise rendered unusable for anything other than material content. If the goods, assemblies, subassemblies, or materials are the subject of a cancellation claim, mutilation must occur only after audit inspection and receipt of disposal instructions from FCA US. FCA US has the right to examine all pertinent documents, data and other information relating to the mutilation of any and all Scrap. In addition, FCA US has the right to visually inspect and audit any facility or process relating to the mutilation of Scrap. Seller must maintain all relevant documents, data and other written information relating to its obligations to mutilate Scrap under the Order for at least four (4) years following the later of last delivery of the goods or final payment under the Order. Such documents, data and written information relating to Seller's obligations to mutilate Scrap will be made available to FCA US upon FCA US's request.

## 40. FCA US COMPUTER NETWORK; ACCESS CONFIDENTIALITY.

(a) If FCA US grants Seller access to FCA US's computer network, Seller understands that the access extends only to those employees of Seller who have a need for the access to perform work for FCA US. Seller must inform its employees that the data files they review are confidential and must not be communicated to others nor used for any purpose other than performing FCA US's work.

(b) FCA US does not grant any intellectual property right including, but not limited to, trade secret, patent or copyright, by granting Seller access to FCA US's computer network. No right to use FCA US-owned or leased hardware, facilities or software application programs, including by way of example but not of limitation, communication software or software design programs, may be inferred from FCA US's granting access to its computer network to Seller.

(c) FCA US may terminate Seller's access to FCA US's computer network in FCA US's sole discretion. Upon termination of Seller's access privileges, Seller must return any copy of data file obtained from FCA US's computer network or any information obtained from the data file that Seller possesses. Seller's confidentiality obligation with respect to each datum of information obtained from FCA US survives termination of its access privileges and continues until the data becomes public knowledge.

(d) Seller must inform FCA US whenever Seller suspects that data obtained from FCA US's computer network has been wrongfully released to a third party or that an unauthorized third party has accessed FCA US's computer network. Seller must defend, indemnify, and hold FCA US harmless from the wrongful disclosure of any information obtained from FCA US's computer network.

(e) Seller assumes all risk of accessing FCA US's computer network. FCA US makes no warranty, either express or implied, regarding its computer network, including implied warranties of merchantability and fitness for a particular purpose. FCA US's computer network and data files may contain errors or viruses. FCA US is not liable for any damage arising from Seller's use of FCA US's computer network including, but not limited to, loss of profit, use, goodwill, work stoppage, computer failure or malfunction, interruption of business, or any direct, indirect, special, exemplary, incidental or consequential damage arising out of the use or performance of FCA US's network.

**41. TAXES.** (a) The goods purchased hereunder are for resale or for an exempt purpose and are exempt from state and local sales or use taxes. FCA US's Office of Tax Affairs will provide an appropriate Certificate of Exemption upon Seller's written request. The following direct payment permit numbers are applicable for the states indicated:

```
Illinois (Belvidere Assembly Plant)...............5572-5570 (Valid 9/2/12 – 7/1/15)
Indiana (Kokomo Casting Plant)................. TID-Loc #0136356540-002
Indiana (Kokomo Transmission Plant)..........TID-Loc #0136356540-001
Indiana (Tipton Transmission Plant)............TID-Loc #0136356540-005
Indiana (IN Transmission Plant)..................TID-Loc #0136356540-003
Michigan (FCA US Group LLC)............ .........ME-0167670
Michigan (GEMA LLC)...............................20-0232860
Michigan (FCA Transport LLC)....................ME-0167777
Michigan (Auto Transport Services LLC)....................45-5062723
Ohio (Toledo Machining Plant)...................98 002923
Ohio (Toledo Assembly Complex)...............98 002921
Wisconsin..............................................008 1026854886-06
```

(b) For shipments to locations in Canada, this Order is subject to the goods and services tax (GST) and in the harmonized provinces, the harmonized sales tax (HST) and the Quebec sales tax (QST), where applicable, however is exempt from provincial sales tax;

| British Columbia vendor number | 1000-9880 |
|---|---|
| Saskatchewan vendor number | 1602309 |
| Manitoba vendor number | 100963941MT0003 |

The GST/HST and the QST amount must appear on all invoices as a separate line item and the GST/HST and QST numbers must appear on all invoices. Failure to comply with this requirement

may result in delay in payment and return of invoice to Seller.

## Annex A
## Expedited Rules of Arbitration

(i) For disputes less than Twenty-five Million Dollars ($25,000,000), the number of arbitrators will be one (1). For disputes in excess of Twenty-five Million Dollars ($25,000,000), the number of arbitrators will be three (3). FCA US and Seller will attempt to agree on the appointment of the arbitrator, in the case of a single arbitrator. In the case of a 3-person panel, each party will appoint one (1) arbitrator. FCA US and Seller will attempt to agree on the appointment of the third arbitrator, who will serve as chairperson of the arbitration panel. In the case of either a 1-member or a 3-member arbitration, if such agreement is not reached within five (5) business days of the referral to arbitration, the arbitrator (or third arbitrator, as the case may be) will be selected by the American Arbitration Association ("AAA") pursuant to the AAA arbitrator selection process.

(ii) The place of arbitration will be Detroit, Michigan, U.S.A., with Michigan-based arbitrators.

(iii) The arbitral proceedings shall be conducted in the English language.

(iv) Each party will submit a request for production of documents (and related electronic search terms) and identify custodians who may have knowledge or information regarding the dispute within twenty (20) business days of the referral to arbitration. Documents will be exchanged within seventy-five (75) days after identification of custodians. Third-party discovery will be permissible. All discovery issues shall be resolved by the arbitrator(s). The parties agree that subpoenas and discovery-related orders issued by the arbitrator(s) will be enforceable by court order, and that attorneys' fees and costs incurred in connection with the enforcement of such orders will be awarded by the arbitrator(s). No other written discovery will be permitted.

(v) Each party will be allowed to depose up to six (6) witnesses. Seller and FCA US must submit a detailed disclosure of any proposed expert testimony (including findings and opinions) in a written report to be served within one hundred twenty (120) days after the referral to arbitration. After the disclosures and reports are issued, depositions of the fact and expert witnesses may occur but each deposition may not exceed eight (8) hours.

(vi) The hearing date will be scheduled within fifteen (15) months after the referral to arbitration. The pre-hearing deadlines established in subsections (iv) and (v) hereof may be modified by agreement of the parties or direction of the arbitrator(s), provided that such modifications do not render impracticable the fulfillment of the fifteen month deadline set forth herein.

(vii) Thirty (30) days prior to arbitration, Seller and FCA US will submit proposed arbitration awards to the arbitrator(s), which will simultaneously be exchanged by Seller and FCA US.

(viii) Seller and FCA US will be limited to up to six (6) witnesses that are identified pursuant to subsection (v) hereof, together with two (2) rebuttal witnesses. Seller and FCA US will exchange written direct testimony for each witness, exhibits and

pre-hearing briefs two weeks before the hearing. The evidence at the hearing will be limited in scope to the exhibits and disclosures made at that time. The pre-hearing brief will address all issues of law, or such issues will be waived.

(ix) The hearing will be limited to no more than three (3) days per party, with hearings on consecutive days.

(x) Witnesses as the hearing must be presented for cross-examination. (Affidavits will not be allowed). If a witness cannot attend the hearing in person, the proponent of that witness must have previously offered the other party the opportunity to cross-examine the witness under oath, in which case the deposition record will be admissible.

(xi) The arbitrator(s) will choose one award from the submitted awards without modification.

(xii) All statute of limitations and repose will be tolled during the arbitration proceeding.

(xiii) The parties agree to share the costs of the arbitrator(s).

(xiv) The arbitration process will be confidential.

(xv) Judgment on the decision or award may be entered in any court of competent jurisdiction.

(xvi) Any referral of arbitration under these General Terms will be made with a full reservation of rights and remedies, and will not constitute a waiver, forfeiture, or election of any such rights and remedies.

# Exhibit 2

**FCA**
FIAT CHRYSLER AUTOMOBILES

Page 1 of 2

FCA US LLC 1000 Chrysler Drive Auburn Hills MI 48326 US

Last Transmission Date: 10/23/2020

Contract: 10911293 | Version

| Document Details | | Buyer: M1F | Requester |
|---|---|---|---|
| Original Document Date: | 08/30/2016 through life of the program | Taryn Stander Phone #:248 622 9661 taryn.stander@fcagroup.com | |
| Document Type: | OA1 | | |
| Document Currency: | USD | | |
| Expiration Date: | 12/31/9999 | | |

| Vendor Address | Delivery Details | Invoice Information |
|---|---|---|
| MARTINREA HONSEL MEXICO SA DE CV FRITZ HONSEL STARABE 30 MESCHEDE 59872 DE Vendor Code: 62780 | Incoterms: FCA Delivery Address: Mfg Location: 62780 A Querétaro QUE 76220 MX Ship From: 62780 A Querétaro QUE 76220 MX Rel Location: 62780 A Querétaro QUE 76220 MX | Payment Terms: XLZA NET 45 DAYS Invoice Instructions: All invoices must be submitted electronically. For CAP related inquiries, please call(844) 289-1227. CAP Phone Number: (844)-289-1227 |

Reason for Change as of 10/23/2020
Line Item 00990 Version REVISE 04893461AG CANCEL
Line Item 01000 , Version REVISE Add new line 04893461AG

| Item | Material | Quantity | UOM | Unit Price / Per / Currency | Pricing Start Date | Pricing End Date |
|---|---|---|---|---|---|---|
| 1000 | 04893461AG CYLINDER BLOCK-CUBED Tracking no: 1000698761 | 1.000 | EA | ▮/1/ USD | 01/01/2020 | 03/31/2020 |
| | | | | ▮/1/ USD | 04/01/2020 | 06/30/2020 |
| | | | | ▮/1/ USD | 07/01/2020 | 09/30/2020 |
| | | | | ▮/1/ USD | 10/01/2020 | 12/31/9999 |

This order is for approximately 65% - 100% of our requirements.

| Lead Time-14 | Raw-6 | Fab-2 | | Previous PO- |
|---|---|---|---|---|
| Tooling Capacity | 2604 | Daily-2604 | Weekly-13021 | Previouspart# |
| Work Pattern | 003/ | 8.00 | 00005 | Ship To: |
| Packaging | | | | Packaging:Returnable |

Packaging Price
Standard Text ID: 294, 430, 700, 471A, 098A, 022B, 100A, 156, 410, 014B, 014D, 014E, 133, 284
Header Text:
Stepped PO: Effective Date Capacity 02/27/2015 Weekly:813 Daily:163 Annual:39000 06/16/2015 Weekly:4646 Daily:929 Annual:223000

Seller agrees to sell and deliver the goods and services specified in FCA's order in accordance to the Terms and Conditions contained in the order, Standard Text IDs referenced in the order, the FCA Production - General Terms and Conditions (1/2017), the terms of this form and any signed documents referenced in this order, all of which constitute the entire and final agreement between FCA and Seller and cancel and supersede any prior or contemporaneous negotiations or agreements regarding the order. The FCA Production - General Terms and Conditions (1/2017) and Standard Text ID text are currently published on https://gsp.extra.chrysler.com/ps/psgtc/. By accepting the order, the Seller acknowledges having actual knowledge of the text of the reference instructions and the General Terms and Conditions. FCA's order expressly limits acceptance to the terms of the order and any additional or different terms, whether contained in Seller's forms or otherwise presented by Seller are rejected unless expressly agreed to by FCA. Seller specifically waives its signed acceptance of the order. "Order" means a purchase order transmitted to Seller via FCA Electronic Data Interchange system or delivered to Seller in a paper or email format.



FCA US LLC 1000 Chrysler Drive Auburn Hills MI 48326 US

Last Transmission Date: 10/23/2020

Contract: 10911293          Version

| Document Details | Buyer: M1F | Requester |
|---|---|---|
| Original Document Date: 08/30/2016 through life of the program<br>Document Type:     OA1<br>Document Currency:     USD<br>Expiration Date:     12/31/9999 | Taryn Stander<br>Phone #:248 622 9661<br>taryn.stander@fcagroup.com | |
| **Vendor Address** | **Delivery Details** | **Invoice Information** |
| MARTINREA HONSEL MEXICO SA DE CV<br>FRITZ HONSEL STARABE 30<br>MESCHEDE  59872 DE<br>Vendor Code:   62780 | Incoterms:     FCA<br>Delivery Address:<br>Mfg Location:     62780 A<br>Querétaro QUE 76220 MX<br>Ship From:          62780 A<br>Querétaro QUE 76220 MX<br>Rel Location:      62780 A<br>Querétaro QUE 76220 MX | Payment Terms:     XLZA<br>NET 45 DAYS<br>Invoice Instructions:<br>All invoices must be submitted electronically. For CAP related inquiries, please call(844) 289-1227.<br><br>CAP Phone Number:     (844)-289-1227 |

09/02/2015 Weekly:7813 Daily:1563 Annual:375000 09/07/2015 Weekly:8333 Daily:1667 Annual:400000 11/23/2015 Weekly:13021 Daily:2604 Annual:625000 Full Program Award units/year: 625000 4/1/14 - t6791kk: Revise Release/Mfg/Ship from location from V/C 62780 to V/C 62780A. 04893461AB Part Pricing: Casting - $▮▮▮▮ Machining (impregnation 100%) $ ▮▮▮▮ Total Price Award- $▮▮▮▮ Total Price Placement: 185.71 Price/Lb Aluminum $▮▮▮▮/lb @55.34 lbs Price/lb Iron: $▮▮▮▮/lb @ 17.4 lbs Long Term Agreement / Business Plan: Current Pentastar - $▮▮▮▮ reduction starting January 1, 2014 2016 Upgrade - $0.30 reduction starting January 1, 2017 Simulator/Metal Indexing Agreement: Aluminum Weight: 25.1 Kg. as delivered (cubed part excluding liners). Weight to be confirmed at PPAP; Material price: $▮▮▮▮ per kg (Platts Index). Index to be adjusted per Chrysler current adjustment practices; Chrysler simulator Index A101US/A380 Aluminum Liner material $▮▮▮▮ or $▮▮▮▮/Lb. (Chicago No. 1 Dealer Bundles/Chrysler S101US). Liner weight considered 2.9 Lb. each or (17.4 Lb. total). Liner price considered is $▮▮▮ each; Tooling: Casting Tools: $▮▮▮▮ Assumes Pentastar molds & holders will be refurbed via the tool refurbishment budget to accommodate Upgrade Cubing Tools: $▮▮▮▮

# Exhibit 3

v.



**FCA**
FIAT CHRYSLER AUTOMOBILES

July 24, 2019

MARTINREA HONSEL MEXIC
AV LA MONTANA 121
STA ROSA JAUREGUI
QUE, MEXICO 76220

**SUBJECT: Not To Exceed Letter of Intent - Production Projects/Expenditures**

This Letter Agreement constitutes FCA US LLC's ("FCA US") authorization to_____ VC: 63518 _____
_MARTINREA HONSEL MEXICO SA DE CV___ ("Supplier") to proceed with expenditures in
support of the___Pentastar Upgrade Cylinder Block PN 04893461AG_____ (the "Program").
FCA US acknowledges the immediate financial Not to Exceed ("NTE") commitment in the amount
of $8,171,220____ for_____PSU Cylinder Block Tooling Refurbishment_____
(collectively, "Property") that Supplier will incur to support Program (the "Immediate Commitment
Total"). This investment has been determined based on Supplier's response to the Program and is
provided pending completion of FCA US's existing processes for creating, issuing, and verifying
related purchase orders and/or amendments (collectively, "Orders").

In the event, prior to the issuance of any Orders contemplated by this Letter Agreement, the
Program is cancelled, modified, or otherwise not awarded to or accepted by Supplier, resulting in
the purchased Property no longer required (collectively, a "Cancellation Event"), FCA US will, to
compensate Supplier for the Immediate Commitment Total, make a cash payment to Supplier
equal to its verifiable, substantiated expenditures up to the Immediate Commitment Total, upon the
completion of FCA US's verification process pursuant to FCA US's standard audit procedures (the
"Cancellation Payment"). The Cancellation Payment will constitute full satisfaction of any and all
claims, demands, liabilities, or expenses (collectively, "Claims") in connection with the
Cancellation Event, whether arising under this Letter Agreement or any other basis for relief in law
or in equity, including any direct, indirect, and/or consequential damages, and Supplier releases
FCA US in full from any and all such Claims. For purposes of clarity, the Cancellation Payment will
be the sole and exclusive remedy available to Supplier for any Cancellation Event.

This Letter Agreement is subject to FCA US's Production and Mopar Purchasing General Terms
and Conditions (the "General Terms"), including, without limitation, the provisions thereof
governing Property and Tooling, Termination at FCA US's Option, Dispute Resolution, and
Governing Law. All such General Terms are incorporated herein by reference. For avoidance of
doubt, all Property subject to this Letter Agreement will be "FCA US Tooling" or "Chrysler Tooling"
as defined in such General Terms (which defines FCA US Tooling or Chrysler Tooling to include,
without limitation, tooling, equipment, and other items of personal property), and will be owned by



**FIAT CHRYSLER AUTOMOBILES**

FCA US to the extent provided therein.

This Letter Agreement will remain in place until such time as Orders are issued. Supplier's obligation to invest in Property hereunder is limited to a not to exceed amount of the initial Commitment Total until such time as FCA US and Supplier mutually agree upon the relevant purchase orders and/or amendments for the Program requirements. Upon issuance of such Orders, this Letter Agreement will terminate, with no surviving payment obligations owed by FCA US to Supplier in connection with the Initial Commitment Total or any of the terms herein. Any obligations of Supplier with respect to Tooling or the General Terms, each as defined hereinabove, will survive termination of the Letter Agreement.

This Letter Agreement constitutes the entire and final agreement of FCA US and Supplier with respect to the subject matter addressed herein, and cancels and supersedes any prior or contemporaneous negotiations or agreements concerning the specific subjects addressed herein. The Letter Agreement will be governed by and construed in accordance with the laws of Michigan.

Based on the above terms and receipt by FCA US of Supplier's written acceptance below, Supplier will proceed with the acquisition of Property in the NTE amount of the Initial Commitment Total required to support the Program.

Regards,

*Laura Stojan*   Laura Stojan   on behalf of Amy McLain
**Amy McLain - Director Powertrain Purchasing**   Email dated 8/5

Accepted:

By:
*FRANCESCO BARBARA*
                          7/25/2019

FRANK BARBARA
VICE PRESIDENT OPERATIONS AMERICAS
MARTIN MSA - HOUSER

# Exhibit 4

**FCA**

FIAT CHRYSLER AUTOMOBILES

Page 1 of 3

FCA Mexico, S.A. de C.V. Av Prolongacion Paseo de la Reforma
Santa Fe Cuajimalpa DIF 05348 MX

Last Transmission Date: 09/26/2019

Contract: 10911294

Version

| Document Details | Buyer: M1F | Requester |
|---|---|---|
| Original Document Date: 08/30/2016 through life of the program<br>Document Type: OA1<br>Document Currency: USD<br>Expiration Date: 12/31/9999 | Taryn Stander<br>Phone #:248 622 9661<br>taryn.stander@fcagroup.com | |

| Vendor Address | Delivery Details | Invoice Information |
|---|---|---|
| MARTINREA HONSEL MEXICO SA DE CV<br>AV LA MONTANA 121<br>STA ROSA JAUREGUI QUE 76220 MX<br>Vendor Code:  63518 | Incoterms:    FCA<br>Delivery Address:<br>Mfg Location:   63518<br>STA ROSA JAUREGUI QUE 76220 MX<br>Ship From:   63518<br>STA ROSA JAUREGUI QUE 76220 MX<br>Rel Location:    63518<br>STA ROSA JAUREGUI QUE 76220 MX | Payment Terms:    XLZA<br>NET 45 DAYS<br>Invoice Instructions:<br>FCA MEXICO, S.A. de C.V.<br>PROLONGACION PASEO DE LA REFORMA 1240<br>COL. SANTA FE CUAJIMALPA,DEL.CUAJIMALPA,<br>CP 05348 MEXICO, D.F. RFC:CME720930GM9<br>CAP Phone Number:    (844)-289-1227 |

Reason for Change as of 09/26/2019
Line Item 00980 Version  REVISE 04893461AG CANCEL
Line Item 00990 , Version  REVISE Add new line 04893461AG
Line Item 00990 Version  REVISE 04893461AG CANCEL
Line Item 01000 , Version  REVISE Add new line 04893461AG

| Item | Material | Quantity | UOM | Unit Price / Per / Currency | Pricing Start Date | Pricing End Date |
|---|---|---|---|---|---|---|
| 1000 | 04893461AG<br>CYLINDER BLOCK-CUBED<br>Tracking no: 1000698762 | 1.000 | EA | ██████/<br>USD | 10/01/2019 | 12/31/9999 |

Item text:
Material Type : A101US
Material Type Description : ALUM SECONDARY/ MW A-380 ALLOY-USD
Weight (Including Dross) : 55.34 LB
Original Base : 0.5956
Old Base : 0.8176
New Base : 0.7214
Delta : -0.0962
PO Change : -5.32
Effective Date : 10/01/2019
This order is for approximately 65% - 100% of our requirements.

Seller agrees to sell and deliver the goods and/or services specified in this Order in accordance to Chrysler Production General Terms and Conditions (07/2013), the standard clauses referenced in the Order and any other document referenced in this Order or signed by the parties, all of which constitute the entire and final agreement between Chrysler and Seller, and cancel and supersede any prior or current negotiations or agreements regarding the Order. The Chrysler Production-General Terms and Conditions (07/2013) and standard clauses are currently published on https://www.esupplierconnect.com. By accepting the Order, the Seller acknowledges having read the Chrysler Production-General Terms and Conditions (07/2013) and the standard clauses and accepts to be bound by them. Any additional or different terms, whether contained in Seller's forms or otherwise presented by Seller are rejected unless expressly agreed to by Chrysler. Seller specifically waives its signed acceptance of the Order. "Order" means a purchase order transmitted to Seller via Chrysler Electronic Data Interchange system or delivered to Seller in a paper or email format.

El Proveedor acuerda vender y entregar los bienes y/o servicios especificados en esta Orden de conformidad con los Términos y Condiciones Generales de Chrysler aplicables a Material Productivo (07/2013), las cláusulas suplementarias referenciadas en la Orden y cualquier otro documento referenciado en esta Orden o firmado por las partes, todos los cuales constituyen el acuerdo completo y final entre Chrysler y el Proveedor, y cancela y deja sin efecto cualquier otra negociación o acuerdo previo o actual relacionado con esta Orden. Los Términos y Condiciones Generales de Chrysler aplicables a Material Productivo (07/2013) y las cláusulas suplementarias están publicadas en https://www.esupplierconnect.com. Mediante la aceptación de la Orden, el Proveedor reconoce tener conocimiento de los Términos y Condiciones Generales de Chrysler aplicables a Material Productivo (07/2013) y de las cláusulas suplementarias y acepta estar sujeto a sus términos. Cualquier otro término adicional o diferente, ya sea contenido en los formatos del Proveedor o de cualquier otra forma presentado por el Proveedor, son rechazados por Chrysler, salvo que los acepte expresamente. El Proveedor expresamente reconoce que no requiere aceptación expresa al firmar de la aceptación



FCA Mexico, S.A. de C.V. Av Prolongacion Paseo de la Reforma
Santa Fe Cuajimalpa DIF 05348 MX

Last Transmission Date: 09/26/2019

Contract: 10911294          Version

| Document Details | | Buyer: M1F | Requester |
|---|---|---|---|
| Original Document Date: | 08/30/2016 through life of the program | Taryn Stander<br>Phone #:248 622 9661<br>taryn.stander@fcagroup.com | |
| Document Type: | OA1 | | |
| Document Currency: | USD | | |
| Expiration Date: | 12/31/9999 | | |

| Vendor Address | Delivery Details | Invoice Information |
|---|---|---|
| MARTINREA HONSEL MEXICO SA DE CV<br>AV LA MONTANA 121<br>STA ROSA JAUREGUI QUE 76220 MX<br>Vendor Code:   63518 | Incoterms:    FCA<br>Delivery Address:<br>Mfg Location:    63518<br>STA ROSA JAUREGUI QUE 76220 MX<br>Ship From:        63518<br>STA ROSA JAUREGUI QUE 76220 MX<br>Rel Location:      63518<br>STA ROSA JAUREGUI QUE 76220 MX | Payment Terms:      XLZA<br>NET 45 DAYS<br>Invoice Instructions:<br>FCA MEXICO, S.A. de C.V.<br>PROLONGACION PASEO DE LA REFORMA 1240<br>COL. SANTA FE CUAJIMALPA,DEL.CUAJIMALPA,<br>CP 05348 MEXICO, D.F.  RFC:CME720930GM9<br><br>CAP Phone Number:      (844)-289-1227 |

| Lead Time-14 | Raw-6 | Fab-2 | | Previous PO- |
|---|---|---|---|---|
| Tooling Capacity | 2604 | Daily-2604 | Weekly-13021 | Previouspart# |
| Work Pattern | 003/ | 8.00 | 00005 | Ship To: |
| Packaging | | | | Packaging:Returnable |
| Packaging Price | | | | |

Standard Text ID: 022B, 184B, 504F, 284
Header Text:

1.,,REFERENCE IN CHRYSLER ORDERS. ALL CHRYSLER ORDERS ISSUED FOR THE SERVICES ("CHRYSLER ORDERS") SHALL BE ISSUED, OR AMENDED AND REISSUED, WITH THE FOLLOWING REFERENCE:
THIS PURCHASE ORDER SHALL BE SUBJECT TO THE TERMS AND CONDIT ION OF THE SIDE LETTER, EXECUTED APRIL 26, 2010, BETWEEN CHRYSLER LLC AND HONSEL AG. 2.,,THE SERVICES. THE
SERVICES PERFORMED BY HONSEL AND TAFIME, SHALL CONSIST OF AND BE LIMITED TO: (A) ORDERING AND PURCHASING LINERS FOR THE PENTASTAR ENGINE BLOCK ("LINERS") FROM FEDERAL MOGUL
CORP. ("FMC") ON BEHALF OF CHRYSLER OR CHRYSLER MEXICO, (B) TAFIME'S RECEIPT OF LINER POSSESSION AND TITLE, AND (C) WAREHOUSING OF THE DELIVERED LINERS FOR CHRYSLER AND CHR
YSLER MEXICO AT TAFIME'S QUERETARO MEXICO FACILITY UNTIL SUCH TIME THE LINERS ARE INSTALLED IN THE PENTASTAR ENGINE BLOCKS BY TAFIME. 3.,,PAYMENT FOR SERVICES. IN
CONSIDERATION OF THE SERVICES PERFORMED, CHRYSLER AND/OR CHRYSLER MEXICO SHALL PAY HONSEL AND/OR TAFIME A SERVICE FEE BASED ON THE UNIT PRICING SET FORTH BELOW: ITEM UNIT
PRICE FMC LINERS ███ PER ENGINE (███ PER LINER) PACKAGING $███ PER ENGINE ($███ PER LINER) TRANSPORTATION $███ PER ENGINE ($███ PER LINER ) SUPPLIER HANDLING
FEE $███ PER ENGINE ($███ PER LINER) LINER SCRAP RATE $███ PER ENGINE ($███ PER LINER ) TOTAL $███ PER ENGINE ($███ PER LINER) HONSEL AND TAFIME SHALL BE
ENTITLED TO RECEIVE FROM CHRYSLER AND CHRYSLER MEXICO A MONTHLY RATE ADJUSTMENT FOR THE SCRAP STEEL RATE. 4.,,DISCLAIMER OF WARRANTIES. AS AN EXPRESS CONDITION TO THE
PERFORMANCE OF SERVICES BY HONSEL AND TAFIME, CHRYSLER ACKNOWLEDGES THAT FEDERAL MOGUL (AND NOT HONSEL OR TAFIME) HAVE ASSUMED THE ENTIRE RISK OF THE CONDITION AND
SUITABILITY OF THE LINERS, WHETHER SEPARATE OR INSTALLED IN THE PENTASTAR ENGINE BLOCKS. HONSEL AND TAFIME DISCLAIM ALL REPRESENTATIONS AND WARRANTIES IN THE LINERS, WHETHER



**FCA**
FIAT CHRYSLER AUTOMOBILES

Page 3 of 3

FCA Mexico, S.A. de C.V. Av Prolongacion Paseo de la Reforma
Santa Fe Cuajimalpa DIF 05348 MX

Last Transmission Date: 09/26/2019

| Contract: 10911294 | Version | |
|---|---|---|
| Document Details | Buyer: M1F | Requester |

| Document Details | | Buyer: M1F | Requester |
|---|---|---|---|
| Original Document Date: | 08/30/2016 through life of the program | Taryn Stander Phone #:248 622 9661 taryn.stander@fcagroup.com | |
| Document Type: | OA1 | | |
| Document Currency: | USD | | |
| Expiration Date: | 12/31/9999 | | |

| Vendor Address | Delivery Details | Invoice Information |
|---|---|---|
| MARTINREA HONSEL MEXICO SA DE CV AV LA MONTANA 121 STA ROSA JAUREGUI QUE 76220 MX Vendor Code:   63518 | Incoterms:    FCA Delivery Address: Mfg Location:     63518 STA ROSA JAUREGUI QUE 76220 MX Ship From:        63518 STA ROSA JAUREGUI QUE 76220 MX Rel Location:     63518 STA ROSA JAUREGUI QUE 76220 MX | Payment Terms:     XLZA NET 45 DAYS Invoice Instructions: FCA MEXICO, S.A. de C.V. PROLONGACION PASEO DE LA REFORMA 1240 COL. SANTA FE CUAJIMALPA,DEL.CUAJIMALPA, CP 05348 MEXICO, D.F.  RFC:CME720930GM9 CAP Phone Number:     (844)-289-1227 |

WRITTEN OR ORAL, INCLUDING , BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON INFRINGEMENT.
5.,,LIMITATION OF LIABILITY
 AND HOLD HARMLESS. HONSEL AND TAFIME SHALL NOT BE LIABLE TO CHRYSLER FOR ANY DAMAGES WHATSOEVER RELATE TO THE LINERS PURCHASED, HELD, AND SERVICED BY HONSEL AND/OR TAFIME ON
 BEHALF OF CHRYSLER AND CHRYSLER MEXICO UNDER A CHRYSLER ORDER AND THIS SIDE LETTER, INCLUDING ANY AMOUNTS REPRESENTING DIRECT DAMAGES, INDIRECT DAMAGES, CONSEQUENTIAL
 DAMAGES, LOSS OF PROFIT, LOSS OF BUSINESS, EXEMPLARY DAMAGES, OR PUNITIVE DAMAGES OF CHRYSLER OR IT'S AFFILIATES. 6.,,ORDER OF PRIORITY. IN THE EVENT OF A CONFLICT BETWEEN
 THE TERM AND CONDITIONS OF THIS SIDE LETTER AND THE TERMS AND CONDITIONS OF A CHRYSLER ORDER, INCLUDING THE ORDER'S PRODUCTION PURCHASING GENERAL TERMS AND CONDITIONS AND ANY
 CLAUSES AND DOCUMENTS REFERENCED IN THE ORDER, THEN THE TERMS AND CONDITIONS OF THIS SIDE LETTER WILL CONTROL AND PREVAIL OVER THE TERMS AND COND ITION OF THE OTHER CHRYSLER
 ORDER AND OTHER ORDER DOCUMENTS. 04893461AB Part Pricing: Casting - $███ Machining (impregnation 100%) $███ Total Price Award- $███ Total Price Placement: 185.71
 Price/Lb Aluminum $███/lb @55.34 lbs Price/lb Iron:  $███/lb @ 17.4 lbs Long Term Agreement / Business Plan: Current Pentastar - $███ reduction starting January 1,
 2014 2016 Upgrade - $███ reduction starting January 1, 2017 Simulator/Metal Indexing Agreement: Aluminum Weight: 25.1 Kg. as delivered (cubed part excluding liners). Weight
 to be confirmed at PPAP; Material price: $███ per kg (Platts Index). Index to be adjusted per Chrysler current adjustment practices;  Chrysler simulator Index A101US/A380
 Aluminum Liner material $███ or $███/Lb. (Chicago No. 1 Dealer Bundles/Chrysler S101US). Liner weight considered 2.9 Lb. each or (17.4 Lb. total). Liner price
 considered is $███ each; Tooling: Casting Tools:  $███ Assumes Pentastar  molds & holders will be refurbed via the tool refurbishment budget to accommodate Upgrade
 Cubing Tools:  $███

# Exhibit 5

### TÉRMINOS Y CONDICIONES GENERALES (07/2013)

### COMPRAS DIRECTAS (MATERIAL PRODUCTIVO)

### VIGENTES A PARTIR DEL 1 DE JULIO DE 2013

**PRIMERA.-**   **OBJETO**

El Proveedor y Chrysler de México, S.A. de C.V. (en adelante "Chrysler"), ambas referidas en su conjunto como las "Partes", reconocen las siguientes metas y objetivos de beneficio mutuo:

(i)   Asegurar un suministro confiable y oportuno de las mercancías incluidas en la Orden. El término "Orden" según es utilizado en estos Términos y Condiciones significa una orden de compra enviada al Proveedor por Chrysler vía electrónica o entregada al Proveedor en papel. La Orden sólo podrá ser modificada mediante la emisión de una Orden modificada emitida por Chrysler,

(ii)   Implementar procesos comunes o complementarios para proveer cantidades necesarias, realizar pedidos, enviar, recibir y realizar pagos de bienes,

(iii)   Identificar, incluir y resolver sin demora y en su totalidad cualquier problema en cuanto a la puntualidad y la calidad de los productos entregados, e

(iv)   Identificar en conjunto oportunidades, aplicar medidas de ahorro en los costos respecto a los productos contemplados en la Orden y en los procesos de creación, envío, recepción y uso de los bienes por parte del Proveedor, todo ello de conformidad con la ley aplicable y con los Términos y Condiciones especificados en la Orden.

Las Partes están de acuerdo que estas metas y objetivos no pretenden ampliar o limitar el alcance de las obligaciones de las Partes, ni alterar el sentido de estos términos y condiciones generales (en adelante los "Términos y Condiciones"), así como de la Orden.

Asimismo, las Partes reconocen que estos Términos y Condiciones formarán parte integrante de la Orden.

**SEGUNDA.-**   **ACUERDO**

El Proveedor se compromete a vender y entregar los productos o servicios especificados en la Orden de conformidad con estos Términos y Condiciones, incluyendo las cláusulas suplementarias y cualquier otro documento específicamente incorporado a la Orden, los cuales constituyen el acuerdo íntegro entre las Partes, quedando entendido sin embargo, que cualquier contradicción o conflicto entre lo estipulado en la Orden y estos Términos y Condiciones con cualquier otra negociación previa o presente, con acuerdos escritos, con determinación de precio o con información suministrada al Proveedor, prevalecerán la Orden y los presentes Términos y Condiciones. En caso de cualquier contradicción o conflicto entre la Orden y los Términos y Condiciones, prevalecerá la Orden.

Las cláusulas suplementarias mencionadas en el párrafo inmediato anterior, son aquellas publicadas en el portal electrónico de Chrysler o en el sitio web que lo sustituya en la fecha de emisión de la Orden o en la fecha de cualquier modificación a la misma. El portal electrónico de Chrysler se encuentra actualmente en: https://www.esupplierconnect.com.

Mediante la aceptación de la Orden, el Proveedor reconoce tener conocimiento del texto de las cláusulas de referencia, de los presentes Términos y Condiciones y demás documentos relacionados e incorporados a la Orden. LA ORDEN Y ESTOS TÉRMINOS Y CONDICIONES SE LIMITAN EXPRESAMENTE A LA ACEPTACIÓN DE SUS TÉRMINOS; CUALQUIER TÉRMINO ADICIONAL O DIFERENTE CONTENIDO EN FORMATOS DEL PROVEEDOR O PRESENTADO DE OTRA MANERA POR EL PROVEEDOR EN CUALQUIER MOMENTO, SERÁ NULO, SALVO ACUERDO EXPRESO POR ESCRITO DE CHRYSLER.

Nada de lo establecido en la Orden o en estos Términos y Condiciones se entenderá como una relación en exclusiva, por lo que Chrysler en todo momento podrá adquirir los productos y/o servicios del proveedor que mejor le convenga.

**TERCERA.-** **ACEPTACIÓN**

La Orden no se considerará obligatoria para Chrysler hasta que sea aceptada por el Proveedor. Se entenderá que el Proveedor acepta la presente Orden:

(i)     Si el Proveedor manifiesta por escrito (incluyendo cualquier comunicación electrónica) su aceptación de la Orden,

(ii)    Si el Proveedor realiza cualquier trabajo o presta algún servicio relacionado con los bienes que se fabrican especialmente para Chrysler de conformidad con la Orden después de que ésta haya sido recibida por el Proveedor,

(iii)   Si el Proveedor entrega cualquiera de los bienes o presta cualquiera de los servicios, o

(iv)    Si la Orden no es rechazada por escrito dentro de los 10 días siguientes a su recepción.

Una vez aceptada la Orden por el Proveedor, ésta será obligatoria para éste y para Chrysler.

En términos de lo anterior, el Proveedor en este acto renuncia expresamente a realizar solicitud alguna de firma de la Orden para su aceptación. Asimismo, el Proveedor y Chrysler renuncian a cualquier defensa que pudiere existir en relación a la validez y ejecutabilidad de la Orden que se llegara a originar, esto por tratarse de un documento enviado vía electrónica al Proveedor y por la aceptación de la Orden por parte del Proveedor en términos de esta Cláusula.

Con la aceptación de esta Orden, el Proveedor se obliga a asentar su clave de Proveedor asignada por Chrysler en toda documentación relacionada con la Orden y con estos Términos y Condiciones.

**CUARTA.-** **ENTREGA**

La entrega de los bienes deberá efectuarse dentro del Plazo (como se define en la Cláusula Cuadragésima Primera de estos Términos y Condiciones) establecido en la Orden, o de acuerdo con las solicitudes o requisitos que por escrito realice Chrysler, siempre que así se indique en la Orden. Sin embargo, en el caso de que Chrysler solicite por escrito una entrega fuera del Plazo establecido en la Orden, Chrysler y el Proveedor señalarán de común acuerdo un plazo cercano al señalado en la solicitud de Chrysler dentro de los estándares comercialmente razonables para que el Proveedor pueda cubrir el requerimiento de Chrysler.

Si el Proveedor no realiza las entregas o no presta los servicios en la fecha acordada, todos los daños y perjuicios sufridos por Chrysler como consecuencia del incumplimiento, incluyendo de manera enunciativa más no limitativa el contratar a su discreción cualquier transporte de primera calidad u otros costos incurridos por Chrysler en su esfuerzo por mitigar el impacto de cumplimiento extemporáneo en sus operaciones de fabricación, correrán a cargo del Proveedor.

Cuando se haya especificado en esta Orden que las entregas se hagan de acuerdo con programas específicos, el Proveedor no deberá fabricar, ensamblar o adquirir más de los materiales necesarios para cumplir con estos programas, en el entendido de que si violara esta indicación, asumirá cualquier responsabilidad que de ello se derive.

El Proveedor es responsable de emitir un Aviso Avanzado de Embarque (ASN) a través del sistema EDI (*Electronic Data Interchange*) inmediatamente después de que el embarque salga de su facilidad, con el objeto de permitir un rastreo adecuado del material, generar un recibo automático a través del sistema y permitir el pago oportuno por parte de Chrysler.

**QUINTA.-**      **EMBALAJE, ETIQUETADO Y ENVÍO**

(i)      El Proveedor empacará y marcará las mercancías y realizará los envíos (incluyendo los sábados y días festivos, cuando así se le solicite), de conformidad con las instrucciones de Chrysler. Asimismo, cumplirá con todos los requisitos de transportación y garantizará la entrega de los bienes, libres de daños y de cualquier tipo de deterioro.

Todos los envíos de mercancías a las instalaciones de Chrysler deberán incluir por lo menos dos comprobantes de embalaje, o cuatro comprobantes de embalaje en el caso de que los envíos sean dirigidos a un punto de consolidación de Chrysler. Cada vez que el envío se realice vía terrestre, el Proveedor incluirá uno de los comprobantes de embalaje (o el comprobante de embalaje establecido para el caso de varios envíos de mercancías) en un sobre. Asimismo, el Proveedor establecerá por escrito en el conocimiento de embarque las instrucciones para el conductor del vehículo que transporta los bienes, para que éste entregue el mencionado sobre al representante de tráfico de Chrysler a la llegada a las instalaciones de Chrysler.

Las Partes están de acuerdo en que el Proveedor será responsable de la mercancía hasta su entrega en el punto designado en la Orden.

(ii)      Chrysler podrá especificar qué transportista y/o qué modo de transporte de los bienes, y el Proveedor procesará los documentos de envío y las rutas de envío de la mercancía desde el punto de entrega, de acuerdo a las especificaciones de Chrysler. El Proveedor será responsable de todos los gastos adicionales en que incurra Chrysler derivado del incumplimiento de las instrucciones de transporte, de los requisitos de entrega y/o de los horarios especificados por Chrysler.

(iii)      Si el Proveedor no cumple con todos los requerimientos de entrega contenidos en esta Orden, Chrysler tendrá el derecho de exigir la misma entrega mediante envío express o embarque aéreo y el Proveedor reembolsará a Chrysler cualquier costo que ocasione dicho transporte, a menos que la falta del Proveedor se deba por caso fortuito o de fuerza mayor. Chrysler está autorizado a deducir de cualquier pago que deba hacer al Proveedor, cualquier costo de los mencionados en este párrafo.

(iv)      Las palabras "Material No Productivo" o "Material Productivo" deben estar claramente marcadas y visibles en el exterior de los contenedores o empaques.

(v)      Las etiquetas de identificación, así como los empaques Mopar, deberán ser adquiridos con los proveedores autorizados por Chrysler, los cuales se apegan a los estándares emitidos por Chrysler Group LLC. El listado de dichos Proveedores será proporcionado por Chrysler al Proveedor de tiempo en tiempo, según se vaya modificando dicho listado. Los precios de compra serán los previamente negociados entre Chrysler y los proveedores aprobados. Ninguna desviación de empaque y/o etiqueta podrá ser empleada sin la previa autorización de Chrysler y de la Gerencia de Almacén Mopar.

(vi)      De acuerdo al inciso que antecede, será responsabilidad del Proveedor que los productos estén debidamente etiquetados en cumplimiento de las disposiciones internacionales y nacionales en materia de etiquetado, incluyendo las leyes vigentes en la República Mexicana y las Normas Oficiales Mexicanas aplicables.

(vii)      El Proveedor será responsable de todos los gastos adicionales en que incurra Chrysler derivado del incumplimiento en el uso de los sistemas de Chrysler para el manejo de racks y contenedores, como pueden ser pérdida de racks y contenedores, exceso de transportación y/o uso de empaques de cartón. El Proveedor deberá mantener actualizados diariamente sus inventarios de racks y contenedores en los sistemas de Chrysler y deberá reportar cualquier discrepancia en el momento que sea detectada. Asimismo, el Proveedor deberá contar con un empaque alterno desarrollado en base al Manual de Empaque debidamente aprobado por Chrysler.

**SEXTA.-**  **PROYECCIONES DE VOLUMEN, CAPACIDAD, REQUERIMIENTOS Y AUTORIZACIÓN DE LIBERACIÓN**

(i)  Chrysler podrá proporcionar al Proveedor estimaciones, pronósticos o proyecciones de los próximos requerimientos de mercancías, cada una de estas estimaciones de futuros requerimientos de mercancías será proporcionada únicamente con propósitos informativos, y no constituirán un compromiso u obligación por parte de Chrysler de comprar al Proveedor mercancía conforme a dichas estimaciones.

(ii)  El Proveedor deberá:

(a)  Tener un plan de mantenimiento y producción local que le permitirá suministrar el flujo diario, semanal y anual de requerimientos de mercancía de Chrysler, incluidas piezas de servicio. Asimismo, la capacidad del Proveedor tendrá como base el Plan de Mantenimiento y Producción, tal y como se indica en la Orden.

La Orden podrá incluir mercancías que sean fabricadas por el Proveedor con el mismo proceso de fabricación y producción que el Proveedor utilice para la fabricación de otros materiales no incluidos en la Orden ("Proceso de Producción Común de Partes").

Si la Orden contempla un Proceso de Producción Común de Partes, la capacidad total del Proveedor para todas las mercancías dentro del mismo Proceso de Producción Común de Partes, incluyendo los bienes contemplados en la Orden, deberán ser cargados por el Proveedor en la "Base de Datos de Capacidad de Producción Chrysler" o la base de datos que la sustituya, mismas que serán proporcionadas por Chrysler al Proveedor.

En caso de que el Proveedor no cargue dicha información en la Base de Datos de Capacidad de Producción Chrysler o en la base de datos que la sustituya, Chrysler tendrá derecho de retener el pago de cualquier cantidad que le deba al Proveedor, hasta en tanto la información sea cargada en dicha base de datos.

En el caso de que los requerimientos de Chrysler establecidos en la Orden excedan la capacidad del Proveedor, Chrysler y el Proveedor, a petición de cualquiera de ellas, se reunirán para que de acuerdo con las políticas de administración de capacidad de Chrysler (incluidas el sistema de variación de volumen y la base de datos de capacidad) discutir si, en el caso particular, las posibles inversiones de capital adicionales que pudiera hacer el Proveedor, junto con los gastos directamente relacionados con tal aumento de la demanda, son razonables y justificables para que el Proveedor continúe cumpliendo con los requerimientos de Chrysler.

Posterior a dicha reunión, el Proveedor podrá presentar a Chrysler por escrito y dentro de los cinco (5) días siguientes, una solicitud de ajuste de precios o una nueva orden de producción como resultado de la necesidad de inversión de capital adicional de compra, derivado de la necesidad de las inversiones de capital adicionales.

Chrysler tendrá el derecho de aceptar o no las solicitudes de ajuste de precios o una nueva orden de producción por parte del Proveedor. Asimismo, Chrysler tendrá la facultad de solicitar los bienes y/o servicios que excedan la capacidad del Proveedor, de algún otro proveedor.

No habrá cambios en la Orden o en estos Términos y Condiciones, salvo aquellos que surjan derivados de la aceptación de la solicitud de ajuste de precios o de la emisión de una nueva orden de producción que estén directamente relacionados con la necesidad de inversiones de capital adicional acordadas entre el Proveedor y Chrysler en esta Cláusula.

(b)  Presentar la información precisa conforme a los sistemas, bases de datos de administración de capacidad, así como a las instrucciones y manuales de Chrysler que le

serán entregados al Proveedor de manera periódica. Esta información podrá incluir, sin limitación alguna, la capacidad de producción actual y potencial, los ritmos de trabajo, las horas extraordinarias y las capacidades de las Partes con respecto al Proceso de Producción Común de Partes, y deberá tener en cuenta no sólo los límites de capacidad del Proveedor sino cualquier restricción que enfrenten los proveedores del Proveedor, en el entendido de que el Proveedor será responsable de monitorear las limitaciones de capacidad de sus proveedores, independientemente si éstos son proveedores directos de Chrysler o no.

Chrysler podrá retener el pago del Herramental de Chrysler (como se define en la Cláusula Décima Primera de estos Términos y Condiciones) usado para fabricar las mercancías amparadas por la Orden, hasta en tanto el Proveedor presente toda la información necesaria conforme a los sistemas y bases de datos de capacidad proporcionados por Chrysler, y éste podrá basarse en la información que el Proveedor presente en dichos sistemas y bases de datos para planear sus tiempos de producción.

(iii)    Cuando se establezca que las entregas sean conforme a los comunicados de liberación emitidos por escrito por Chrysler, el Proveedor no fabricará o ensamblará ninguna mercancía, ni adquirirá los materiales necesarios, ni enviará suministro alguno, excepto en la medida que sea autorizado por tales comunicados de liberación o por las disposiciones de la Orden, los que especificarán la fabricación mínima o los requisitos de entrega.

## SÉPTIMA.-    INSPECCIÓN, RECHAZOS Y CALIDAD

Chrysler podrá, a su entera discreción, inspeccionar, evaluar y probar toda la mercancía (incluyendo el Herramental de Chrysler, accesorios, todo el equipo y todo el material utilizado directa o indirectamente en la fabricación de las mercancías) y todos los servicios proporcionados por el Proveedor en horas y lugares designados por Chrysler.

El Proveedor proporcionará y mantendrá un Sistema de Gestión de Calidad que cumpla con la norma ISO/TS 16949, para lo cual deberá cumplir con los siguientes requerimientos, políticas y manuales, o cualesquiera que los sustituyan de tiempo en tiempo:

(i)    Los "Requerimientos Específicos de Chrysler Group LLC para su uso con la norma ISO/TS 16949 e ISO 14001",

(ii)    El manual de "Procesos de Planeación y Auditoría" (*Process Planning & Audit Manual* en inglés, anteriormente conocido como Avance de Planeación Avanzada de la Calidad y Proceso de Liberación (*Advance Quality Planning & Process Sign-off Manual* en inglés)) y

(iii)    Cualquier documento específico dentro del "Sistema de Información de Gestión de Calidad" del portal electrónico del Portal Global de Proveedores o cualquier portal electrónico sustituto de Chrysler.

El Proveedor cumplirá puntualmente con las revisiones de la norma ISO/TS 16949, los "Requerimientos Específicos de Chrysler Group LLC para su uso con la norma ISO/TS 16949 e ISO 14001", el manual de "Revisión del Plan del Proceso de Manufactura" y cualquier documento señalado en el "Sistema de Información de Gestión de Calidad" del portal electrónico del Portal Global para Proveedores o cualquiera de los sitios sustitutos de Chrysler.

El Proveedor llevará a cabo inspecciones según lo señalado por Chrysler, y deberá implementar los sistemas de inspección, procedimientos y registros que razonablemente le solicite Chrysler y que tengan por objeto la mejora continua del suministro y/o prestación de servicio. El Proveedor deberá estar registrado y mantenerse durante toda la vigencia de la Orden, en el Sistema electrónico de Gestión de Calidad de Chrysler ("CQMS" por sus siglas en inglés) y en cualquier otro sistema electrónico de Planeación Avanzada de Calidad ("AQP" por sus siglas en inglés) que haya designado Chrysler.

No obstante el pago y cualquier inspección previa de la mercancía, Chrysler podrá revocar la aceptación, rechazarla o requerir la corrección y devolver la mercancía al Proveedor (a costo y riesgo de pérdida del Proveedor) respecto de las mercancías entregadas o servicios prestados, que no se ajusten a los requisitos aplicables solicitados por Chrysler.

La Orden se emite para los productos específicamente identificados en ésta, y cualquier sustitución de material sin la aprobación previa por escrito de Chrysler, será una violación a la Orden.

Sin perjuicio de las acciones legales a que tenga derecho Chrysler, y después de dar aviso al Proveedor, Chrysler podrá:

(i) Reemplazar o corregir cualquier producto o servicio con el que no esté conforme, estableciéndose que el costo y riesgo de tal sustitución o corrección correrá a cargo del Proveedor,

(ii) Rescindir la Orden por incumplimiento del Proveedor, de conformidad con lo establecido en la Cláusula Vigésima Tercera del presente,

(iii) Promover las acciones legales para reclamar los daños y perjuicios sufridos por Chrysler, y/o

(iv) Remover al Proveedor como un "proveedor autorizado" de Chrysler.

El Proveedor deberá cumplir con todas las reglas contempladas en el programa denominado "Contingencias con Terceros y Resolución de Problemas" ("3CPR" por sus siglas en inglés), o cualquiera que lo sustituya, así como con las políticas contenidas en dicho programa y en forma regular con los requisitos del proyecto contenidos en el sistema basado en la Red del programa 3CPR en su versión actualizada, documento que puede ser revisado en el siguiente portal electrónico: https://www.esupplierconnect.com.

Dentro de las 24 horas siguientes de haberse iniciado por parte de Chrysler un proyecto en el programa 3CPR sobre materiales sospechosos del Proveedor, el Proveedor afectado deberá contratar a un proveedor incluido en el programa 3CPR que Chrysler haya señalado, con el propósito de llevar a cabo el proyecto señalado en el programa 3CPR en cada instalación afectada.

El Proveedor y Chrysler asumirán por partes iguales el costo de pagar al proveedor que forme parte del programa 3CPR y que se requiera, respecto a un proyecto del programa 3CPR relacionado con la Orden. Una vez terminado un proyecto del programa 3CPR, Chrysler, a su entera discreción y de manera justa y razonable, examinará los costos generados por la implementación de un proyecto en el programa 3CPR a cargo de Chrysler y del Proveedor, respectivamente, estos costos se generarán sobre la base de una imputación de responsabilidad del Proveedor por materiales sospechosos y, tras la realización de dicho análisis, Chrysler informará al Proveedor de cualquier modificación de asignación de tales gastos, la cual se reflejará en la siguiente factura del Proveedor como débito o crédito.

**OCTAVA.- CONFLICTOS LABORALES**

El Proveedor deberá notificar inmediatamente a Chrysler de cualquier conflicto laboral actual o potencial que pueda afectar al Proveedor o a los proveedores de éste, o que pueda retrasar o amenazar con retrasar la ejecución oportuna de la Orden, proporcionando toda la información pertinente sobre el conflicto laboral a Chrysler.

El Proveedor notificará por escrito a Chrysler, con seis (6) meses de anticipación, sobre la expiración de cualquier contrato de trabajo vigente del Proveedor, que de no renovarse pudiera afectar el cumplimiento de la Orden. Antes del vencimiento del contrato de trabajo celebrado por el Proveedor, éste constituirá a su cargo (a excepción que se acuerde lo contrario por el Proveedor y Chrysler en forma escrita), un suministro de mercancías por un periodo de cuarenta (40) días hábiles en un lugar de almacenaje neutral que el Proveedor dará a conocer a Chrysler, y que estará ubicado en México a una distancia de por lo menos (80) ochenta kilómetros de las plantas de producción del Proveedor.

Este suministro de mercancías permanecerá en dicho lugar por lo menos diez (10) días hábiles antes del vencimiento de cualquiera de los contratos laborales celebrados por el Proveedor. El sitio de almacenamiento y suministro de mercancías que se describe en esta Cláusula, estará sujeto a derechos de auditoría de Chrysler, bajo la Cláusula Trigésima Primera de estos Términos y Condiciones Generales.

Asimismo las Partes reconocen expresamente que la única relación jurídica entre Chrysler y el Proveedor es la que deriva de la Orden, y que por ningún motivo podrá considerarse entablada una relación laboral, dirección, subordinación o dependencia alguna entre Chrysler y el Proveedor por virtud de la ejecución de la Orden.

Ambas Partes reconocen estar debidamente establecidas y contar con elementos propios en los términos del artículo 13 de la Ley Federal del Trabajo, por lo que no podrán considerarse en ningún momento como intermediarios. Debido a lo anterior, Chrysler y el Proveedor son los únicos responsables del cumplimiento de las obligaciones en materia laboral, fiscal, administrativa, así como ante el Instituto Mexicano del Seguro Social (IMSS), el Instituto del Fondo Nacional de la Vivienda para los Trabajadores (INFONAVIT), el Sistema de Ahorro para el Retiro (SAR), derivadas de las relaciones con los trabajadores que tienen a su cargo para dar cumplimiento a la Orden.

Las obligaciones antes mencionadas subsistirán aún a la terminación de la Orden, liberándose en éste momento ambas partes de cualquier obligación laboral que surja con motivo del cumplimiento de sus obligaciones conforme a la Orden, incluyendo a los subcontratados, haciéndose responsable cada parte ante cualquier autoridad por dichas relaciones, y obligándose a sacar en paz y a salvo de cualquier responsabilidad, demanda, reclamación o procedimiento que se entable en contra de alguna parte por alguno de sus empleados, y en su caso debiendo reembolsar los montos que hubiera tenido que pagar la otra parte por los conceptos aquí mencionados.

En términos de lo anterior el Proveedor se obliga a:

(i)     Que el personal destinado a dar cumplimiento a la Orden, se encuentre inscrito en el IMSS.

(ii)    Efectuar las retenciones, enteros y pagos correspondientes a:

    1.  Impuesto sobre la Renta que establece la Ley del Impuesto Sobre la Renta (ISR).

    2.  IMSS.

    3.  INFONAVIT.

    4.  Depósitos del SAR.

    5.  Cualesquiera otras disposiciones fiscales aplicables.

(iii)   Encontrarse al corriente de todas sus obligaciones frente al IMSS y hacer frente a todos los requerimientos provenientes de dicho Instituto en tiempo y forma; en este último caso, deberá dar aviso a Chrysler dentro de los 2 (dos) días hábiles siguientes a la fecha de notificación de cualquier requerimiento. Asimismo, el Proveedor contará con 2 (dos) días hábiles para informar a Chrysler de la atención oportuna de los mismos, enviando en todo caso copias de la documentación correspondiente.

(iv)    Para este último caso, el Proveedor se obliga a pagar de forma inmediata cualquier crédito, incluyendo de forma enunciativa más no limitativa: Cuotas obrero-patronales, multas y capitales constitutivos entre otros, mismos que sean requeridos al Proveedor y/o a Chrysler por el IMSS, debiendo entregar a Chrysler el comprobante de dicho pago, y en su caso, reembolsarle cualquier monto que éste hubiera tenido que pagar por el incumplimiento del Proveedor a sus obligaciones aquí establecidas.

(v)     En caso de que Chrysler requiera expresamente al Proveedor, éste deberá enviarle el

comprobante del pago así como el archivo .SUA que se hayan generado dentro del periodo en curso, así como cualquier otra documentación e información requerida por Chrysler para efecto de verificar el cumplimiento de sus obligaciones ante las autoridades descritas en esta Cláusula, el Proveedor lo entregará a más tardar dentro de los 3 (tres) días hábiles siguientes a la solicitud.

Asimismo, en caso de que el Proveedor subcontrate servicios para dar cumplimiento a la Orden, se obliga a liberar de cualquier responsabilidad y sacar en paz y a salvo a Chrysler por las contingencias obrero-patronales de sus subcontratistas.

**NOVENA.-**     <u>**GARANTÍA GENERAL**</u>

(i)     El Proveedor garantiza que los productos o servicios:

     (a)     Cumplirán con todas las normas de funcionamiento y las características del producto, incluyendo sin limitación alguna: Especificaciones, dibujos, descripciones, muestras y ensamblado especificados por Chrysler,

     (b)     Estarán libres de defectos en cuanto a su material y mano de obra.

     (c)     Contra fallas de manufactura o defectos de fabricación en condiciones normales de uso.

El Proveedor garantiza además, que en la medida en que éste lleve a cabo el diseño de cualquier mercancía o Chrysler se base en la experiencia del Proveedor, en cualquier aspecto del diseño de los productos, los bienes serán aptos y suficientes para los fines previstos.

El plazo de garantía coincidirá con la extensión de garantía que Chrysler ofrece a sus clientes, o con cualquier otra fecha acordada en la Orden por Chrysler y el Proveedor, salvo que, antes del comienzo de la producción del volumen inicial respecto a la Solicitud de Propuesta, Chrysler y el Proveedor acuerden que los productos deban cumplir con los requisitos de calidad o durabilidad por un mayor plazo, en cuyo caso el plazo de garantía deberá ser más largo.

Al amparo de dicha garantía el Proveedor deberá reembolsar, de manera enunciativa más no limitativa:

     (a)     El precio de la parte dañada a precio de venta de refacciones de Chrysler,

     (b)     el costo de la mano de obra originada por la falla de la parte, y

     (c)     el 40% del valor de la reclamación realizada por Chrysler por el manejo de materiales.

(ii)     La responsabilidad del Proveedor de reembolsar los gastos de garantía a Chrysler por los reclamos hechos por los distribuidores de Chrysler por incumplimiento del Proveedor al inciso anterior, o a cualquier garantía implícita por ley o en otro medio hecha por el Proveedor, se determinará de conformidad con el Programa de Políticas y Procedimientos de Reducción de Garantía del Proveedor, o de cualquier otro programa o política que lo sustituya, publicado en el portal electrónico de Chrysler (como se indica en la Cláusula Primera), en la fecha de la Orden o en la fecha de cualquier modificación a la Orden.

(iii)     El Proveedor garantiza además que Chrysler recibirá la mercancía, servicios, producción, accesorios o equipos, libre de todo gravamen y garantiza que los mismos no violarán ninguna patente, derecho de autor o marca que estén vigentes o en disputa.

(iv)     Estas garantías son adicionales a cualquier garantía implícita por ley o a cualquier otra garantía dada por el Proveedor y aplicarán aún después de la aceptación y pago por Chrysler de los bienes o productos.

(v)      El Proveedor está de acuerdo en defender, indemnizar y mantener a Chrysler a salvo de cualquier reclamación o queja, resultante de violaciones a la garantía antes mencionada.

## DÉCIMA.-      PRECIOS

Los precios indicados en la Orden son definitivos y no están sujetos a ningún ajuste por la variación en el volumen, por los cambios en el precio de las materias primas o la mano de obra, por los cambios en la valoración de la moneda o por cualquier otra razón, a menos que un documento específicamente agregado a la Orden o alguna Cláusula contenida en la Orden (previo consentimiento por escrito de Chrysler) determinen expresamente que los precios se ajustarán de forma particular y sólo en la medida especificada en el documento o en la Cláusula.

## DÉCIMA PRIMERA.-      PROPIEDAD Y HERRAMENTALES

Todas las herramientas, equipos, materiales, dibujos, ayudantes de producción, matrices, pruebas y montaje, plantillas, medidores, patrones, modelos de fundición, cavidades, moldes y documentación, incluyendo las especificaciones de ingeniería, libros PPAP (Proceso para Aprobación de Partes de Producción) e informes de ensayo, junto con los accesorios, partes, sustituciones, cambios y accesorios que resulten necesarios para la fabricación de componentes y servicios destinados para Chrysler y para los cuales ésta emita una Orden, serán denominados como el "Herramental de Chrysler". Dicho Herramental de Chrysler estará en posesión del Proveedor en calidad de comodato, y será utilizado exclusivamente por el Proveedor en relación con la fabricación de componentes y servicios para las mercancías y productos destinados a Chrysler, razón por la cual, bajo ninguna causa o circunstancia podrá fabricar componentes o prestar servicios para cualquier otro tercero. El "Herramental de Chrysler" será en todo momento, sin limitación alguna, propiedad de Chrysler, con excepción de aquel que no haya sido pagado por Chrysler; en éste caso, al efectuar Chrysler el pago completo del precio aplicable, dicho Herramental de Chrysler pasará a ser propiedad de Chrysler.

Con respecto al Herramental que no sea propiedad de Chrysler, al momento del pago, así como todo el "Herramental de Chrysler" (mismo que incluye las regalías correspondientes), el Proveedor concede a Chrysler, además de cualquier otra licencia concedida a Chrysler en la Orden, una licencia no exclusiva, mundial, irrevocable y perpetua en relación con:

(i)      Cualquier propiedad intelectual del Proveedor que se incorpore o utilice para la creación o diseño de las mercancías conforme a la Orden;

(ii)     el "Know How" y el procedimiento respecto al uso de tal "Herramental de Chrysler" para que éste pueda fabricar, poner a la venta, importar, exportar o modificar bienes, o cualquiera de los vehículos que Chrysler fabrique utilizando dichos bienes, y

(iii)    asegurar que Chrysler pueda hacer pleno uso de los derechos previstos en este documento, para lo cual el Proveedor proporcionará el Herramental de Chrysler, troqueles y moldes para esos bienes, incluyendo, sin limitación, cualquier información de diseño gráfico de tales herramientas así como sus especificaciones, listas de materiales, información del proveedor para cualquier componente que se emplee en ese Herramental de Chrysler y la información del proceso de fabricación con respecto a ese Herramental de Chrysler.

En el caso del "Herramental de Chrysler" no pagado, el precio aplicable en virtud de esta Cláusula, será el monto establecido en la Orden con la correspondiente deducción de los pagos ya efectuados por Chrysler al Proveedor en relación con ese Herramental de Chrysler, así como de la deducción de las cantidades necesarias para satisfacer los gravámenes que pudieran existir en relación con ese Herramental de Chrysler.

En los demás casos, el precio aplicable en virtud de esta Cláusula, será el mayor entre (i) el valor neto contable (definido como el valor contable menos la depreciación aplicada al Herramental de Chrysler por parte del Proveedor utilizando un método de aplicación coherente con el método GAAP (por sus siglas en inglés, Principios de Contabilidad Generalmente Aceptados) y/o NIF (Normas de Información Financiera) a

elección de Chrysler), y (ii) el precio de liquidación, con la deducción de los importes necesarios a efecto de satisfacer los gravámenes correspondientes en relación con ese Herramental de Chrysler.

En relación con la determinación del precio aplicable para cualquier pago en virtud de esta Cláusula, Chrysler se reserva el derecho a deducir los importes del "Herramental de Chrysler" incompleto o con los que no esté conforme. El Proveedor reconoce y acepta que Chrysler es un tercero beneficiario de un acuerdo entre el Proveedor y una parte distinta a Chrysler para la producción del "Herramental de Chrysler", y que Chrysler tendrá la propiedad de y el acceso al "Herramental de Chrysler" que se encuentre en poder de cualquiera de ellas, aún y cuando esté sujeto a una disputa por la propiedad de dicho Herramental de Chrysler.

El Proveedor deberá cumplir con las instrucciones de Chrysler relativas al "Herramental de Chrysler", (esté o no completo) en su posesión y/o control, y bajo los términos establecidos en la Cláusula inmediata siguiente.

Ni el Proveedor, ni ninguna otra persona o entidad diversa a Chrysler tendrá derecho alguno sobre el "Herramental de Chrysler", excepto por la obligación del Proveedor, sujeta a la discrecionalidad de Chrysler, de hacer uso de dicho "Herramental de Chrysler" en la fabricación de componentes y de piezas de servicio para beneficio de Chrysler.

En el caso de que exista alguna disputa entre el Proveedor y Chrysler sobre el precio aplicable para el "Herramental de Chrysler" que estuviera pendiente de pago, Chrysler tendrá el derecho a la posesión inmediata y uso del "Herramental de Chrysler" que se encuentre en disputa, y el Proveedor no podrá retener la entrega de la posesión del "Herramental a Chrysler" en tanto se resuelva dicha controversia, pero seguirá estando sujeta a cualquier reclamación o derecho al pago del Proveedor de las cantidades en disputa (a pesar de la renuncia del Proveedor a la posesión).

El Proveedor presentará toda la información necesaria sobre el "Herramental de Chrysler" a través del sistema de "Proceso de Herramental" o su sistema sustituto determinado por Chrysler y cumplirá con todos los demás requisitos, políticas y procedimientos respecto del "Herramental de Chrysler", incluyendo, sin limitación, el uso del Formulario de Registro de "Herramental de Chrysler" o su sustituto que determine Chrysler.

El Proveedor se adhiere al procedimiento en vigor determinado por Chrysler en el momento de la presentación de solicitudes de reembolso de los costos del "Herramental de Chrysler", incluyendo sin limitación alguna al uso del Formulario de Registro de Herramental de Chrysler o su sustituto. Todas las solicitudes de reembolso por costos de "Herramental de Chrysler" serán objeto de revisión, aprobación y auditoría por parte de Chrysler.

Todo el "Herramental de Chrysler" será transferido como Chrysler lo señale en cualquier momento; si el Proveedor hace cualquier transferencia no autorizada o re-ubicación del "Herramental de Chrysler", el Proveedor reembolsará los gastos de Chrysler efectuados en la devolución del "Herramental de Chrysler" a Chrysler, o su re-ubicación según las indicaciones de Chrysler.

Si Chrysler, de buena fe, determinara que el Proveedor ha hecho algún uso inapropiado del "Herramental de Chrysler" que fuere incompatible con estos Términos y Condiciones, con la Orden, o con los intereses de Chrysler, el Proveedor reconoce y acepta que:

(i)     Chrysler tendrá derecho a retener cualquier ganancia obtenida por el Proveedor como resultado del uso inapropiado.

(ii)    Los daños y perjuicios ocasionados a Chrysler como resultado del uso inapropiado, darán lugar a una reclamación por parte de Chrysler bajo la Cláusula Décima Sexta del presente, incluyendo, sin limitación, la deducción, la compensación y recuperación del "Herramental de Chrysler". El Proveedor mantendrá las políticas de control interno necesarias para evitar cualquier uso irregular del "Herramental de Chrysler" por el  propio Proveedor o por cualquiera de sus empleados.

**DÉCIMA SEGUNDA.-   PROPIEDAD EN COMODATO**

(i)     La propiedad de todo bien, incluyendo sin limitación al "Herramental de Chrysler" y cualquier sub-componente, materia prima y anaqueles  proporcionados al Proveedor por Chrysler en relación con el cumplimiento de la Orden (identificado como el "Equipo en Comodato") es y será en todo momento, de la única y exclusiva propiedad de Chrysler, y la posesión del equipo será detentada por el Proveedor en su calidad de comodatario.

(ii)    El Proveedor se obliga a usar el Equipo en Comodato en el domicilio que Chrysler le autorice y exclusivamente en la producción de los artículos que Chrysler le solicite, con exclusión de cualquier otro. Asimismo, el Proveedor deberá obtener autorización por escrito de Chrysler cuando desee cambiar la ubicación del Equipo en Comodato a un lugar distinto del autorizado inicialmente.

(iii)   El Proveedor se obliga a poner toda diligencia en la conservación del Equipo en Comodato y será responsable de su manejo, inventario, administración y custodia, así como del costo de su mantenimiento y reparación. En caso de pérdida, inutilización o discrepancias de inventario, por cualquier causa ajena a Chrysler, el Proveedor será responsable de su reposición, inclusive cuando la pérdida sobreviniera por caso fortuito o fuerza mayor. En caso de pérdida, inutilización o discrepancia por cualquier causa ajena a Chrysler, el Proveedor, además de cumplir con su obligación de reponer el Equipo en Comodato respectivo, se obliga a pagar a Chrysler a la vista, una pena convencional equivalente al valor del Equipo en Comodato que haya sufrido la pérdida o la inutilización; adicionalmente, el Proveedor será responsable del deterioro que sufra el  Equipo en Comodato, excepto por el deterioro que se origine por su uso normal, así como de los causados por el transcurso del tiempo. Para efectos de lo  anterior, las Partes convienen en que de conformidad con el artículo 2506 del Código Civil para el Distrito Federal, el valor de los objetos materia de este contrato, es el que se les asigna en la Orden.

(iv)    El Proveedor se obliga a mantener el Equipo en Comodato en su posesión o control y garantizará por su pérdida o daño. Asimismo lo almacenará en forma segura y separada de los bienes propiedad del Proveedor, marcado y plenamente identificado con leyendas claras y visibles como propiedad de Chrysler.

(v)     El Proveedor reconoce que la propiedad de todo Equipo en Comodato será siempre de Chrysler y que dicha propiedad en Comodato estará sujeta a la dirección y control de Chrysler. El Proveedor no tendrá ningún derecho sobre el Equipo en Comodato, excepto el de utilizarlo conforme a lo establecido por Chrysler. Asimismo, las Partes están de acuerdo en que el Proveedor no podrá conceder ningún derecho, incluyendo la posesión y la propiedad del Equipo en Comodato a persona alguna, incluyendo sin limitación a cualquier filial del Proveedor o de un tercero respecto de dicho Equipo en Comodato.

(vi)    Cualquier reparación o modificación del Equipo en Comodato, deberá ser supervisada y aprobada por Chrysler, quien manifestará su autorización para que el Proveedor pueda continuar la producción de las partes que Chrysler le haya encargado producir con el Equipo en Comodato, dicha autorización no será negada de manera irrazonable. El Proveedor será responsable ante Chrysler de los daños y perjuicios por el incumplimiento de esta obligación. Asimismo, Chrysler no estará obligada a adquirir del Proveedor las partes fabricadas por éste cuando el Equipo en Comodato haya sido modificado o reparado, si la modificación o reparación fue efectuada sin la aprobación de Chrysler.

(vii)   El Proveedor no tendrá derecho a retener la posesión de ningún Equipo en Comodato, una vez que haya recibido en cualquier momento, la solicitud de devolución por parte de Chrysler del Equipo en Comodato.

(viii)  El Proveedor no permitirá que ningún acto se realice en el Equipo en Comodato que no sea necesario para el cumplimiento de la Orden.

(ix)    No será necesario que Chrysler realice notificación alguna, cuando a ésta le sobreviniera la

necesidad urgente del Equipo en Comodato, tal y como lo establece el artículo 2512 del Código Civil para el Distrito Federal, y en este caso, el Proveedor deberá poner el Equipo en Comodato a disposición de Chrysler dentro de un plazo no mayor a 5 (cinco) días hábiles después de la solicitud de devolución), tomando en cuenta que la entrega del mismo se llevará a cabo en el domicilio de Chrysler o en el de un tercero designado por Chrysler.

(x) La entrega del Equipo en Comodato por parte del Proveedor, deberá realizarse en el domicilio de Chrysler o en el de un tercero designado por Chrysler y deberá incluir todos los objetos que de hecho y por derecho le corresponden, salvo por deterioros normales que se originen por su uso, así como de los causados por el transcurso del tiempo.

(xi) En caso de que la Orden terminara por cualquier motivo, desde este momento el Proveedor autoriza expresa e irrevocablemente a Chrysler a entrar en sus instalaciones y retirar todo el Equipo en Comodato sin necesidad de una orden judicial.

(xii) El Proveedor notificará a todos sus acreedores que tiene en comodato el Equipo de Chrysler, dicha notificación se realizará en la forma, manera y en tiempos razonablemente aceptables para Chrysler. En la medida establecida por la ley, el Proveedor no deberá permitir que se constituya ningún gravamen, carga, garantía real o reclamación de cualquier naturaleza sobre el Equipo en Comodato. Si se llegare a establecer un gravamen, carga, garantía real o reclamación de cualquier naturaleza sobre el Equipo en Comodato imputable al Proveedor, éste, de conformidad con lo establecido por la ley, de inmediato deberá tomar todas las medidas necesarias para eliminar tal gravamen, carga, garantía real o reclamo y restituir el Equipo en Comodato a Chrysler.

(xiii) El Proveedor deberá seguir las instrucciones de Chrysler en relación con el Equipo en Comodato, incluyendo, sin limitación alguna, la restitución del Equipo en Comodato, de la propiedad de bienes procesados y del envío de mercancías procesadas, tal y como lo establezca Chrysler.

(xiv) Chrysler tiene el derecho de supervisar en cualquier momento el Equipo en Comodato, por lo que del Proveedor se obliga a concederle todas las facilidades a su alcance para ese fin, siempre que dicha supervisión no entorpezca las operaciones del Proveedor.

(xv) Adicionalmente, el Proveedor se obliga a dar acceso a las instalaciones en donde se ubica el Equipo en Comodato, tanto a Chrysler como a quien ésta indique, a efecto de que puedan verificar el estado del Equipo en Comodato y en su caso retirarlo en cualquier momento si así lo decide Chrysler.

(xvi) El Proveedor proporcionará a Chrysler informes en forma periódica o conforme Chrysler se lo solicite, respecto a la cantidad y el estado del Equipo en Comodato en posesión o control del Proveedor.

**DÉCIMA TERCERA.- SEGURO E INDEMNIZACIÓN**

A. Seguro.

El Proveedor obtendrá y mantendrá en vigor durante el Plazo:

(i) Un seguro de compensación a los trabajadores.

(ii) Un seguro de contingencias laborales, tratándose de servicios en los que empleados del Proveedor entren a las instalaciones de Chrysler.

(iii) Un seguro de Responsabilidad Civil para Actividades e Inmuebles, incluida la responsabilidad contractual de los productos y la responsabilidad de completar las operaciones, tratándose de servicios en los que empleados del Proveedor entren a las instalaciones de Chrysler.

(iv) Un seguro de responsabilidad civil de automóviles, incluidos los de su propiedad, los arrendados y

los que tenga en su posesión por cualquier causa.

(v)     Un seguro contra robo, incluido el robo por parte de sus propios empleados.

(vi)    Un seguro amplio contra todo riesgo que cubra la propiedad del Proveedor, incluyendo el "Herramental de Chrysler" y el Herramental no pagado, así como todos los bienes de Chrysler, materias primas y productos terminados, incluyendo el Equipo en Comodato mientras se encuentren en posesión, custodia o control por parte del Proveedor.

Todos los seguros antes mencionados deberán tener la cobertura suficiente para cubrir todas las reclamaciones señaladas.

Estas pólizas señalarán a Chrysler como beneficiario en primer lugar, y dichos seguros no serán adicionales o adyacentes con cualquier otro seguro vigente pagado por Chrysler. Asimismo, deberán establecer que la aseguradora dará a Chrysler una notificación por escrito, con treinta días de anticipación, sobre cualquier cancelación o cambio sustancial en la cobertura de cualquiera de las pólizas.

El Proveedor renuncia y hará que sus aseguradoras renuncien a cualquier tipo de cesión de las pólizas y/o sus derechos, y evitará que se cobren deducibles o coaseguros derivados de dichas pólizas a Chrysler o a sus filiales, incluyendo a sus empleados, funcionarios, directores, agentes y/o representantes.

Chrysler podrá exigir al Proveedor que acredite la existencia de seguros anteriores; la falta de solicitud de Chrysler respecto de la acreditación, no exime al Proveedor de su obligación establecida en esta Cláusula Décima Tercera.

El Proveedor será responsable de pagar cualquiera de las primas, deducibles, retenciones, auto-seguro, coaseguro, o cualquier cantidad adicional; el Proveedor podrá optar por cumplir con los requisitos de esta Cláusula Décima Tercera a través de una combinación de auto-seguro y un seguro de catástrofe excesiva.

B.      Indemnización.

El Proveedor defenderá, indemnizará y mantendrá a Chrysler y a sus filiales, incluyendo sus empleados, funcionarios, directores, agentes o representantes, en paz y a salvo de cualquier reclamo, demanda, acción o procedimiento ("Reclamaciones") y pagará:

(i)     Todas las responsabilidades, pérdidas y daños (incluyendo, sin limitación alguna los juicios, cantidades pagadas en la liquidación y otras recuperaciones).

(ii)    Gastos y costas (incluyendo sin limitación alguna los honorarios de los abogados y expertos).

(iii)   Otros gastos (colectivamente los "Gastos") en relación con cualquier violación o incumplimiento por parte del Proveedor a la Orden y/o a estos Términos y Condiciones, incluyendo lesiones o muerte de cualquier persona; además del daño o pérdida de cualquier propiedad que resulte o que surja de cualquier acto, omisión o negligencia por parte del Proveedor o de sus empleados, agentes o subcontratistas, en relación con el cumplimiento de la Orden, ya sea en la propiedad de Chrysler o en el curso de su trabajo.

Lo anterior, incluye sin limitación alguna, todos aquellos gastos que surjan con motivo de llamados a revisión y campañas de satisfacción al cliente respecto de vehículos que contengan bienes suministrados por la Orden, sin embargo, si Chrysler y el Proveedor se someten al Plan de Definición de Autoridad ("ADP" por sus siglas en inglés) emitido por Chrysler respecto a los bienes suministrados en la Orden, el cual establecerá, como mínimo, la asignación de responsabilidad por defectos relacionados con el diseño de los productos, entonces la obligación del Proveedor al pago de la indemnización de los gastos de Campaña, estará determinada con base al plan ADP.

**DÉCIMA CUARTA.-     CAMBIOS**

(i)    Chrysler podrá, en cualquier momento, hacer cambios en la Orden, incluyendo sin limitación alguna, los cambios en la expresión de la Orden que se describe en la Cláusula Cuadragésima Primera del presente documento. Cualquier reclamación por parte del Proveedor derivada de un cambio en el ajuste de precios basado en los costos realmente incurridos, o en los que se incurrirá como consecuencia del cambio, deberá hacerse valer por escrito dentro de los diez (10) días contados a partir de la fecha de recepción por el Proveedor de la notificación hecha por Chrysler. Chrysler tendrá el derecho de verificar todas las reclamaciones presentadas mediante la auditoría de registros relevantes, instalaciones, trabajo o sobre los materiales del Proveedor. El Proveedor se compromete a cumplir con la Orden una vez que haya aceptado el cambio realizado conforme a esta Cláusula Décima Cuarta.

(ii)    Todos los cambios de ingeniería, ya sean iniciados por Chrysler o por el Proveedor, se llevarán a cabo de conformidad con las prácticas de Chrysler en vigor al momento del cambio, utilizando para ello el denominado "Sistema de Cambios de Ingeniería" emitido por Chrysler, o por los sistemas que surjan en un futuro.

A más tardar dentro de los siguientes siete (7) días posteriores a que Chrysler haya proporcionado una solución documentada (actualmente conocida como una "selección alternativa" en el Sistema de Cambios de Ingeniería), incluyendo los requisitos correspondientes de diseño, el Proveedor deberá proporcionar a Chrysler todos los cambios en los precios (calculados como se establece a continuación) y los requisitos de tiempo para poner en práctica esa solución, sujeto a la condición de que Chrysler podrá a su discreción, extender el periodo de los siete (7) días de respuesta, en caso de que la complejidad de la solución de fondo requiera una respuesta en un plazo mayor.

Asimismo, una vez que Chrysler y el Proveedor estén de acuerdo con los cambios de precio y fecha pactada (actualmente conocida como la realización de "SPIN" en el Sistema de Cambios de Ingeniería), el Proveedor tendrá veinticuatro (24) horas para capturar los datos en el sistema de NC emitido por Chrysler, reflejando los cambios acordados para la aprobación de Chrysler. Todos los cambios de ingeniería aprobados por Chrysler, respecto a la especificación de partes, se aplicarán lo antes posible por el Proveedor conforme a las indicaciones de Chrysler. Los cambios de precios para aprobación de Chrysler en los cambios de ingeniería, se basarán exclusivamente en la variación de los gastos de diseño respecto del diseño sustituido y deberán estar sustentados con la documentación adecuada y que Chrysler apruebe.

(iii)    El Proveedor certificará la(s) ubicación(es) a las cuales se enviarán los productos contenidos en la Orden. Si el Proveedor en cualquier momento pretende cambiar dicha(s) ubicación(es), deberá notificar previamente a Chrysler antes del cambio, de forma tal, que el efecto de dicho cambio pueda ser evaluado y negociado en caso necesario, derivado de su efecto sobre el tiempo de tránsito, los métodos de embalaje y cualquier otro impacto significativo para Chrysler.

Si el Proveedor no notifica a Chrysler sobre el incremento en los gastos de transporte respecto al cambio en el(os) punto(s) de embarque, el Proveedor asumirá dichos gastos. El Proveedor no podrá cambiar las ubicaciones de fabricación sin antes recibir la aprobación escrita de Chrysler.

(iv)    No se harán cambios en la Orden o en estos Términos y Condiciones, que sean distintos a los cambios en el precio y gastos de transporte conforme a lo dispuesto en esta Cláusula.

**DÉCIMA QUINTA.-**    **PIEZAS, SERVICIO**

(i)    El Proveedor fabricará y venderá a Chrysler las partes para los productos contemplados en la Orden por un periodo de 10 (diez) años posteriores al término de la duración del programa de producción de los vehículos aplicables, o por un plazo mayor, según lo solicite Chrysler (y acordado con el Proveedor en relación con la Solicitud de Propuesta previo al comienzo de la producción de volumen inicial), para que Chrysler esté en posibilidad de ofrecer el servicio a los vehículos aplicables, atención post venta y así cumplir con los requisitos de garantía de dichos vehículos.

Mientras que los productos que se encuentren contemplados en la Orden se sigan utilizando en la producción de vehículos para Chrysler, el incremento en los precios de las piezas que se utilicen para el servicio de los vehículos, atención post venta y requisitos de garantía, no será mayor que el precio contemplado en la Orden para dichos bienes, más los gastos efectivamente incurridos por el Proveedor para el embalaje especial de dichos bienes.

La Orden incluye acuerdos para potenciales requerimientos de la división de refacciones de Chrysler, si no están especificados en ese documento, serán requeridos y negociados por separado en empaque especial para partes de servicio. Los proveedores extranjeros deberán marcar con la leyenda "hecho en (país de origen)" las partes y refacciones para asegurar la correcta identificación de embarques, y las etiquetas de empaque siempre deberán incluir el número correspondiente del programa de entregas Chrysler.

(ii) Por lo menos durante los tres primeros años después de que un bien ya no sea utilizado en la producción de vehículos de Chrysler, el incremento en los precios de las piezas para el servicio de los vehículos, atención post venta y requisitos de garantía, no será mayor al precio establecido en la Orden que sea fijado para los productos respectivos a la producción correspondiente, más los gastos efectivamente incurridos por el Proveedor para el embalaje especial de dichos bienes.

(iii) Después de tres años de la terminación del periodo de duración del programa de producción de vehículos correspondiente, la suma de los precios de las piezas para el servicio de los vehículos, atención post venta y requisitos de garantía, no será mayor al último precio indicado en la Orden para dichos productos, más o menos:

(a) Cualquier cambio en el costo de los materiales desde la terminación del periodo de duración del programa de producción de vehículos aplicable, más

(b) un ajuste de precio relacionado con el volumen que refleje el aumento real en el costo por pieza cada por producir menos piezas, más

(c) un cargo que refleje el costo real de la preparación para la ejecución de la producción de piezas, más

(d) cualquier costo adicional incurrido por un embalaje especial.

Todos los componentes necesarios para fijar el precio se documentarán de manera razonable y de conformidad con lo señalado por Chrysler, incluyendo sin limitación alguna, a los detalles de configuración, productividad de la máquina, asignación de chatarra, ineficiencia del trabajo y el exceso en los requerimientos de materia prima.

(iv) Si las piezas se fabrican en un país distinto del país en el que las mercancías sean entregadas a Chrysler, el Proveedor marcará las piezas enviadas para el servicio de Chrysler, después de realizada la compra y habiendo cumplido los requisitos de garantía, con la leyenda "Hecho en (país de origen)".

(v) El Proveedor cumplirá con todos los requisitos establecidos por Chrysler para el servicio a los vehículos, tal y como se encuentra señalado en el Portal para Proveedores Globales de Chrysler, en la fecha de la Orden o en la de cualquier modificación a la Orden.

## DÉCIMA SEXTA.- **FACTURACIÓN Y PAGO**

Las condiciones de pago son las establecidas en la Orden. El Proveedor puntualmente presentará las facturas correspondientes, correctas y completas, u otro medio de cobro acordado junto con la documentación adecuada (en adelante, la "Factura") y cualquier otra información que Chrysler le requiera después de la entrega de mercancías y/o prestación de servicios. El plazo de pago establecido en la Orden comenzará hasta que Chrysler haya recibido la Factura correspondiente de manera correcta y completa y que cumpla con todos los requisitos establecidos por Chrysler, además de los requisitos

legales y fiscales aplicables.

(i) La Factura deberá indicar lo siguiente:

- Código de 5 dígitos del Proveedor.
- Número de Orden de compra y nivel correspondiente del aviso de cambio.
- Número de Requisición y/o programa de entregas (Release).
- Dirección "Embarcar a:".
- Dirección "Facturar a:".
- Código de Material No Productivo o número de parte productivo.
- Forma y/o condiciones de embarque.
- Fecha de embarque.
- Número de factura.
- Fecha de factura y fecha de embarque.
- Precio unitario.
- Cantidad y unidad de medida de acuerdo a la Orden.
- Gran Total de la Factura.

(ii) Chrysler se compromete a pagar al Proveedor las cantidades que se deban de conformidad con los términos de la Orden y de estos Términos y Condiciones.

(iii) Chrysler podrá en cualquier momento y sin notificación previa, deducir o compensar de las cantidades que le adeude al Proveedor con motivo de la Orden, los montos adeudados por el Proveedor a Chrysler derivados de la propia Orden, de estos Términos y Condiciones o de cualquier otra transacción de negocios entre Chrysler y el Proveedor. Para estos efectos, el Proveedor deberá levantar un ticket en la mesa de ayuda correspondiente de Chrysler, solicitando el soporte de dichos ajustes.

(iv) Chrysler tendrá derecho a ceder a sus afiliadas (Chrysler Canadá Inc. y Chrysler Group LLC), la obligación de pago al Proveedor y a sus afiliados, así como el derecho de cobro de cualquier cantidad adeudada por el Proveedor a Chrysler, quedando sus afiliadas obligadas a pagar al Proveedor, conforme se establezca en la Orden o en estos Términos y Condiciones.

(v) A petición del Proveedor, Chrysler fundamentará la base de cualquier deducción o compensación dentro de los quince (15) días siguientes a la solicitud que realice el Proveedor, o dentro de cualquier otro plazo que puede ser acordado por las Partes.

(vi) Con la aceptación de la Orden y de estos Términos y Condiciones, el Proveedor se responsabiliza en cumplir con lo establecido en los artículos 29 y 29-A del Código Fiscal de la Federación, relativo a los requisitos que deberán contener las notas, remisiones y/o facturas.

(vii) El Proveedor deberá facturar a:

Chrysler de México, S.A. de C.V.
Av. Prolongación Paseo de la Reforma 1240
Santa Fe, Distrito Federal.
C.P. 05109
R.F.C: CME720930GM9

(viii) Por la operación de contenido en pesos del precio indicado en la Orden y con base a lo establecido en las Cláusulas 051R, 147R, 261R y/o por el descuento por pronto pago acordado entre el Proveedor y Chrysler, el Proveedor se compromete a generar una nota de crédito o cargo, según sea el caso, a favor de Chrysler, la cual deberá incluir el IVA y cumplir con los requisitos fiscales que señala el Código Fiscal de la Federación para la emisión de Comprobantes Fiscales. Las notas mencionadas deberán ser entregadas dentro de los 5 días hábiles posteriores a la recepción de su pago.

(ix) El Proveedor documentará todos sus envíos mediante una Factura o Factura-Remisión, presentando el original con cuatro copias al momento de entregar la mercancía en la bodega de recibo, el Proveedor recabará el sello de recibido, tanto en la Factura o Factura-Remisión original, como en la copia que conservara como contra recibo.

(x) Asimismo, el Proveedor se obliga a enviar las facturas en papel al corporativo de Chrysler a la dirección señalada en el inciso (G) anterior y tratándose de facturas electrónicas, las mismas deberán ser cargadas en el sistema COFIDI.

(xi) El precio de la Orden será pagado en pesos mexicanos de acuerdo al tipo de cambio para solventar obligaciones denominadas en moneda extranjera pagaderas en la República Mexicana publicado por Banco de México en el Diario Oficial de la Federación el día hábil inmediato anterior al día en que se efectúa el pago de las facturas vencidas.

**DÉCIMA SÉPTIMA.-** **ADUANAS, EXPORTACIONES**

(i) El Proveedor deberá notificar por escrito y en forma inmediata a Chrysler, en el caso de que los materiales o componentes utilizados por el Proveedor para cumplir sus obligaciones en relación con la Orden, procedan de un país distinto del país en el que las mercancías se entreguen a Chrysler, así como cualquier impuesto incluido en el precio de compra de las mercancías. El Proveedor proporcionará a Chrysler toda la documentación e información necesaria para determinar el país de origen y demostrará que dichos materiales o componentes cumplen con las normas y requisitos de origen del país destino, así como cualquier otro programa especial de comercio.

(ii) El Proveedor declara que conoce el contenido, y está de acuerdo en sujetarse a las leyes de control a las exportaciones de los Estados Unidos de América ("*US Export Control Laws*"); razón por la cual no usará, transferirá, exportará, venderá o de cualquier otra forma dispondrá de las mercancías o información técnica objeto de la Orden, con algún destino o usuario final que esté prohibido por las *US Export Control Laws*, a menos que cuente con una autorización expresa por parte del gobierno de los Estados Unidos de América.

(iii) Asimismo, el Proveedor deberá proporcionar toda la información y soporte necesario para determinar la correcta clasificación arancelaria, incluyendo de manera enunciativa más no limitativa, catálogos, fotos y descripción de los materiales o componentes que integren el producto.

(iv) Los derechos y beneficios por cualquier devolución de derechos, incluidos los que surjan por sustitución y los que puedan ser adquiridos por proveedores del Proveedor y créditos a la exportación, en la medida que puedan ser transferidos a Chrysler, son propiedad de éste. El Proveedor deberá proporcionar toda la documentación e información necesaria y tomará las medidas pertinentes para obtener una restitución devolución de lo pagado indebidamente, ya sean impuestos o tasas, así como para recibir los créditos a la exportación por el gobierno del país de origen o de exportación.

(v) La responsabilidad de pago de los impuestos al comercio exterior así como los honorarios de los agentes aduanales, se determinará de conformidad con el punto de entrega y el código de transporte establecido en la Orden. Si la Orden establece que Chrysler será responsable de los impuestos al comercio exterior, lo anterior no incluirá ningún impuesto especial, incluyendo pero no limitando prácticas antidumping y cuotas compensatorias, mismas que en todo momento deberán ser asumidas por el Proveedor.

(vi) El Proveedor proporcionará a Chrysler toda la documentación e información requerida por la ley, reglamento o por cualquier otro ordenamiento aplicable que sea necesaria para determinar la correcta recepción, liberación oportuna y el despacho aduanal de las mercancías, así como la comprobación de que los costos incurridos fueron los mínimos necesarios para ingresar legalmente las mercancías al país de destino.

(vii)     El Proveedor deberá asesorar a Chrysler respecto a si la importación o exportación de los productos requiere el cumplimiento de algún requisito legal, y en caso de ser así, deberá auxiliar a Chrysler en el cumplimiento de dicho requisito.

(viii)    El Proveedor garantiza que la información proporcionada a Chrysler relativa a la importación o exportación de las mercancías suministradas a Chrysler es verdadera y correcta, y que todas las ventas a las que se refiere la Orden nunca se harán en un precio menor al valor justo de mercado conforme a las leyes anti-dumping de los países a los que se exportan las mercancías.

## DÉCIMA OCTAVA.-     USO DEL NOMBRE DE CHRYSLER

El Proveedor de ninguna forma podrá hacer público, sin el consentimiento previo por escrito de Chrysler, el hecho de que es proveedor de Chrysler.

El Proveedor tampoco podrá utilizar dentro de su publicidad, ni dentro de ningún otro tipo de publicación, el nombre o marcas registradas de Chrysler o de las cuales Chrysler sea licenciatario, ni de los productos de Chrysler o de cualquiera de sus empresas afiliadas.

El Proveedor no podrá establecer marcas registradas propias ni las de ningún otro tercero en la mercancía que ostente una marca propiedad de o licenciada a Chrysler, ni sobre ninguna otra mercancía cuyo diseño sea exclusivo de Chrysler (una "Parte Marcada").

El Proveedor garantiza que: (i) Venderá cada "Parte Marcada" y artículos similares sólo para Chrysler y (ii) Que no venderá ninguna "Parte Marcada" o productos similares a terceros, sin el previo consentimiento por escrito de Chrysler.

El Proveedor reconoce que cualquier venta por parte de éste de una "Parte Marcada" en violación de esta Cláusula, se considerará como una violación expresa de los derechos de marca propiedad de Chrysler.

Todos los productos manufacturados por el Proveedor con base en los dibujos, especificaciones u otra información que Chrysler le haya divulgado en relación con la Orden, no podrán ser utilizados para uso propio por el Proveedor, ni vendidos, transferidos o divulgados a terceros bajo ningún concepto.

No obstante la prohibición establecida en el párrafo inmediato anterior, dicha prohibición no será aplicable a los productos manufacturados por el Proveedor conforme a los diseños de su propiedad, en los cuales se utilice manufactura diversa a:

(i)     La de Chrysler.

(ii)    Herramental no pagado (pendiente de pago que podría convertirse en "Herramental de Chrysler" de conformidad con la Cláusula Décima Primera).

(iii)   Cualquier otra propiedad intelectual, conocimientos o procedimientos que estén sujetos a una licencia no exclusiva, mundial, irrevocable y perpetua a la que Chrysler tenga derecho en virtud de la Cláusula Décima Novena del presente.

El Proveedor marcará los bienes suministrados a Chrysler de conformidad con las normas de marcación publicadas por Chrysler.

## DÉCIMA NOVENA.-     DIVULGACIÓN DE INFORMACIÓN: DERECHOS DE PROPIEDAD INTELECTUAL

(i)     La "Información de Chrysler" significa: (i) Toda la información y los datos que Chrysler pone a disposición del Proveedor en relación con el cumplimiento de la Orden, incluyendo sin limitación alguna, normas de funcionamiento, características del producto, especificaciones, dibujos, descripciones, muestras de diseños y fabricación de datos entre otros y (ii) Toda la información (con exclusión de la información proporcionada por el Proveedor sobre sus costos internos de

producción de bienes y servicios que ofrece a Chrysler en virtud de la Orden) que sea procesada por el Proveedor, directa o indirectamente utilizando cualquier sistema que el Proveedor posea o controle directa o indirectamente con el propósito de llevar a cabo las obligaciones del Proveedor en virtud de la Orden.

No obstante lo anterior, los derechos sobre cualquier información que abarque propiedad intelectual concebida, desarrollada o adquirida por el Proveedor con el fin de dar cumplimiento a la Orden, se determinarán conforme a esta Cláusula.

(ii)   Serán propiedad de Chrysler todos aquellos derechos, títulos y beneficios sobre la "Información de Chrysler", incluidas las patentes y modelos de utilidad de Chrysler, diseños industriales, sus solicitudes, derechos de autor, secretos industriales, marcas, avisos y nombres comerciales, así como aquellos derechos, títulos o beneficios que se deriven del mejoramiento a la Información de Chrysler, incluyendo la reputación comercial inherente "*good will*" (en lo sucesivo la "Propiedad Intelectual"), ya sea que sean realizadas por Chrysler o por el Proveedor como Producto de Trabajo (como dicho término se define más adelante).

Salvo pacto en contrario, expreso y por escrito, no se concederá al Proveedor ningún derecho o licencia sobre la "Información de Chrysler", salvo aquella que sea estrictamente necesaria para que el Proveedor de cumplimiento a la Orden.

El Proveedor tiene prohibido utilizar o divulgar la "Información de Chrysler" para cualquier otro propósito no autorizado por la Orden. El Proveedor hará uso de la "Información de Chrysler" de tal forma que se asegure que no se utilizará para otro propósito en detrimento de los intereses de Chrysler. El Proveedor no podrá transmitir ni revelar la "Información de Chrysler" a terceros sin el previo consentimiento por escrito de Chrysler.

(iii)  El Proveedor se compromete a devolver a Chrysler o a destruir toda la Información que Chrysler le haya transmitido en cualquier forma, al momento en que Chrysler se lo solicite.

(iv)   No se otorgará ningún derecho de Propiedad Intelectual o cualquier tipo de Propiedad Intelectual licenciada por parte de Chrysler al Proveedor, salvo aquellos que sean necesarios para cumplir las obligaciones del Proveedor en virtud de la Orden.

(v)    El Proveedor será responsable de que ningún bien o servicio prestado conforme a la Orden ("Producto de Trabajo"), infrinja derechos de Propiedad Intelectual de terceros.

(vi)   El Proveedor se compromete a sacar en paz y a salvo a Chrysler, así como a sus compañías afiliadas, clientes, distribuidores, comerciantes y los clientes de éstos últimos, indistintamente, contra cualquier reclamación hecha contra alguno de ellos respecto a cualquier bien o servicio u otro Producto de Trabajo que infrinja la Propiedad Intelectual de terceros. El Proveedor pagará todos los gastos y costas, incluyendo el pago de abogados y asesores documentados, en los que incurra Chrysler con motivo de estas reclamaciones.

**VIGÉSIMA.-      INFORMACIÓN CONFIDENCIAL**

Chrysler se compromete a llevar a cabo todos los esfuerzos comercialmente razonables para mantener la confidencialidad de la "Información Confidencial" del Proveedor respecto a: (i) Terceros, excepto asesores, consultores y proveedores de servicios de Chrysler que necesiten saber y que estén sujetos a una obligación de confidencialidad con respecto a la "Información Confidencial" del Proveedor, y (ii) Los empleados de Chrysler que no necesiten tener acceso a dicha información.

Dicha "Información Confidencial" podrá ser utilizada por Chrysler por cualquier motivo relacionado con o en relación con sus funciones de gestión de riesgos.

"Información Confidencial" como se utiliza en la presente Cláusula, se entenderá como la información proporcionada a Chrysler de conformidad con la Cláusula Décimo Novena anterior, la que también

comprende: (i) La información del Proveedor relativa a sus operaciones, sistemas, servicios, personal, asuntos financieros, comercialización, realización de la inversión, inversión propiamente dicha, esfuerzos de investigación y desarrollo. (ii) La información que se obtenga de terceros por parte del Proveedor en virtud de una obligación de confidencialidad. (iii) Cualquier otra información relacionada con el negocio del Proveedor que no se haga pública, directamente o indirectamente por el Proveedor.

No obstante lo anterior, nada impedirá a Chrysler, en caso de ser requerida por autoridad judicial competente con jurisdicción sobre el Proveedor o sobre Chrysler, a revelar información confidencial sin el consentimiento previo y por escrito del Proveedor, siempre y cuando Chrysler haya notificado con anticipación al Proveedor de cualquier requerimiento hecho por la autoridad.

En cualquier caso, el término "Información Confidencial" no incluye la información: (i) Que fuera o se hubiera convertido en información disponible para el público como resultado de una divulgación indebida por parte de Chrysler; (ii) que Chrysler haya estado consciente de la misma, antes de que fuera divulgada a Chrysler por parte del Proveedor; (iii) que Chrysler haya obtenido de un tercero, sin que existiera la obligación de confidencialidad respecto al Proveedor, y (iv) que Chrysler obtenga de cualquier órgano jurisdiccional, por medio del arbitraje u otros procedimientos legales.

**VIGÉSIMA PRIMERA.- CESIÓN**

El Proveedor no podrá ceder los derechos ni obligaciones de la Orden y de los presentes Términos y Condiciones, sin el consentimiento previo y por escrito por parte de Chrysler, incluyendo sin limitación alguna, la subcontratación del trabajo a realizar descrito en la Orden; por lo que cualquier intento de cesión que viole esta Cláusula será nulo y no tendrá ningún efecto jurídico.

Chrysler podrá, sin embargo, ceder los derechos y obligaciones de la Orden y de estos Términos y Condiciones a cualquiera de sus empresas controladoras, filiales o subsidiarias, bastando para ello un aviso al Proveedor con posterioridad a la cesión correspondiente.

**VIGÉSIMA SEGUNDA.- INFORMACIÓN FINANCIERA**

(i)    El Proveedor proporcionará a Chrysler cualquier información relativa a sus operaciones, negocios y situación financiera, o cualquier otra información que Chrysler pueda razonablemente solicitarle al respecto, además de la información acerca del Proveedor que deba proporcionarle periódicamente según lo dispuesto en el inciso (B) siguiente.

(ii)   El Proveedor proporcionará Chrysler, o a un tercero designado por éste, en el formato establecido por Chrysler, la siguiente información:

   (a)    Estados Financieros Trimestrales. Dentro de los sesenta (60) días después del cierre de cada período contable trimestral del Proveedor o bien en la fecha en que los estados financieros descritos sean legalmente exigibles, lo que suceda primero, el Proveedor deberá entregar a Chrysler, el balance contable trimestral y los correspondientes estados de resultados sobre ingresos y ganancias retenidas, así como los estados de flujo de efectivo por ese periodo. Dichos balances deberán ser certificados por un representante legal del Proveedor.

   (b)    Estados Financieros Anuales. Dentro de los ciento veinte (120) días posteriores al cierre de cada ejercicio fiscal del Proveedor o bien en la fecha en que los estados financieros anuales sean legalmente exigibles, lo que suceda primero, el Proveedor deberá entregar a Chrysler su balance contable al cierre del año fiscal, así como los estados de resultados sobre ingresos y las utilidades retenidas y de flujo de efectivo para el año fiscal que establezcan cifras comparativas del año fiscal anterior y firmados por un representante legal del Proveedor. Asimismo, en caso de que el Proveedor audite sus estados financieros, deberá proporcionar a Chrysler una copia de los estados financieros auditados.

(c)     Notificación de Eventos de Incumplimiento. De manera inmediata, el Proveedor deberá notificar a Chrysler sobre cualquier incumplimiento a cualquier contrato en el que el Proveedor sea Parte y cuyo el efecto pueda tener un impacto material adverso en la situación financiera del Proveedor o en su capacidad para cumplir con las obligaciones establecidas en la Orden.

(d)     Información sobre la encuesta anual. Una vez por año calendario, el Proveedor proporcionará a Chrysler sus respuestas a la "Encuesta Anual de Chrysler de Información", incluyendo sin ninguna limitación, la "Plantilla de Ventas Mixtas de Autos" y la "Plantilla de Producción de Ventas Mixtas".

(e)     Actualizaciones de información de proveedores. El Proveedor deberá actualizar la información proporcionada a través del "Sistema de Información de Proveedores de Chrysler", por lo menos una vez cada trimestre.

(f)     Cambio en el Control. El Proveedor deberá informar a Chrysler, dentro de los quince (15) días siguientes al hecho, en el caso de que se dé un cambio de control del Proveedor, entendiéndose como tal, cuando un tercero adquiera por cualquier medio la propiedad del treinta y cinco por ciento (35%) o más de las acciones con derecho a voto del Proveedor; no obstante lo anterior, si el cambio de control es en favor de una empresa competidora de Chrysler (entendidas estas como cualquier empresa armadora de vehículos automotores terrestres, o empresas distribuidoras o vendedoras en mayoreo de dichos vehículos), entonces bastará con que adquiera un diez por ciento (10%) para que se haga efectiva la obligación del Proveedor de notificar a Chrysler.

(iii)   La información descrita en esta Cláusula y que sea entregada a Chrysler debidamente identificada con la leyenda de "Confidencial", será considerada como Información Confidencial (según dicho término se define en la Cláusula Vigésima), por lo tanto Chrysler deberá tratarla de conformidad con lo establecido en dicha Cláusula.

**VIGÉSIMA TERCERA.-**     **INCUMPLIMIENTO**

(i)     Chrysler podrá, a su entera discreción, exigir el cumplimiento forzoso o rescindir la totalidad o parte de la Orden, más el pago de daños y perjuicios en ambos casos, sin responsabilidad alguna para Chrysler, con excepción del pago de las mercancías que se hubieran entregado o de los servicios que se hubieran prestado en cumplimiento de la Orden y de estos Términos y Condiciones, y podrá ejercer cualquiera de las acciones legales a que tenga derecho en caso de que suceda cualquiera de los siguientes supuestos (señalado cada uno como un "Evento de Incumplimiento"):

(a)     Si el Proveedor incumple en la entrega de la mercancía o en la prestación de servicios en forma oportuna, y éste no pueda darle a Chrysler un plan de recuperación dentro del siguiente día a aquel en que Chrysler le hubiere notificado dicho incumplimiento; o

(b)     Si el Proveedor incumple cualquier otra disposición, o cualquier requisito contenido en la Orden dentro del Plazo fijado, si dicho incumplimiento fuera subsanable y no lo hiciere dentro de los cinco (5) días siguientes a dicho "Evento de Incumplimiento"; o

(c)     Si el Proveedor: (i) Se declara insolvente, no paga o admite por escrito su incapacidad para pagar sus deudas a su vencimiento, (ii) entra en concurso mercantil, se acuerda su disolución, liquidación quiebra o reorganización, o de cualquier manera cede a un tercero la totalidad o una parte sustancial de sus bienes, activos o negocios, (iii) lleve a cabo un acto corporativo con el fin de efectuar cualquiera de los supuestos (i) o (ii) anteriores, o se inicie un procedimiento conforme a la Ley de Concursos Mercantiles o procedimiento legal similar, a menos que dicha petición se deje sin efectos en un plazo de cuarenta y cinco (45) días; o

(d)     Si el Proveedor incumple las disposiciones establecidas en estos Términos y Condiciones,

y dicho incumplimiento no es remediado en un plazo de cinco (5) días naturales contados a partir de la notificación que haga Chrysler, señalando la causa del incumplimiento (salvo que expresamente se disponga un plazo de curación diferente para dicho incumplimiento); o

(e)     Si el Proveedor no paga alguna de las cuentas pendientes por pagar frente a terceros, frente a Chrysler, o frente a alguna de las subsidiarias o filiales de Chrysler conforme al curso ordinario de los negocios del Proveedor que no sean razonablemente materia de disputa y que hayan estado pendientes de pago durante más de sesenta (60) días después de la fecha que se debieron pagar.

(ii)     El Proveedor podrá rescindir la Orden por incumplimiento grave y material por parte de Chrysler conforme a la Orden y siempre que dicho incumplimiento no se resuelva dentro de los treinta (30) días contados desde la notificación que haga el Proveedor a Chrysler del incumplimiento sustancial.

(iii)    Respecto a la recepción, de cualquier aviso de rescisión con arreglo a esta Cláusula Vigésima Tercera, el Proveedor dejará de operar en la fecha y conforme a la medida especificada en dicho aviso, y cancelará todos los pedidos y subcontratos que se relacionen con la Orden o con respecto a la parte que se haya terminado.

## VIGÉSIMA CUARTA.-   TERMINACIÓN ANTICIPADA

Chrysler podrá dar por terminada anticipadamente la Orden en su totalidad o parcialmente, en cualquier momento y por cualquier motivo de negocios sin necesidad de justificarlo (incluyendo, sin limitación alguna, la "competitividad" como se define en la Cláusula Trigésima Séptima del presente). No obstante lo anterior, Chrysler no podrá dar por terminada anticipadamente la Orden de conformidad con la Cláusula Vigésima Cuarta por deficiencias en costos competitivos a menos que el Proveedor haya tenido conocimiento y la oportunidad para remediar las carencias de éstas, de conformidad con la Cláusula Trigésima Séptima del presente.

Dentro de los 15 (quince) días posteriores a que el Proveedor reciba cualquier notificación de terminación anticipada por parte de Chrysler, a opción de ésta, el Proveedor deberá cesar sus trabajos conforme a la Orden en la medida especificada en dicho aviso, y dar por terminado todos los pedidos y subcontratos que se relacionan con dicha Orden.

Dentro de los sesenta (60) días siguientes a la terminación efectiva de la Orden, el Proveedor podrá presentar a Chrysler todas las reclamaciones derivadas de dicha terminación. No obstante lo anterior, el Proveedor no podrá incluir en su reclamación: (i) Los costos generales de venta o administrativos, (ii) los costos por intereses o el costo del capital, (iii) las pérdidas de ganancia, (iv) la absorción de gastos fijos, (v) la inversión en activos no amortizados, (vi) los costos de instalación, (vii) los costos de modificación de las fábricas, (viii) los costos laborales, (ix) los gastos de capacitación, y (x) otros costos relacionados con el cumplimiento de la Orden.

En el caso de Herramental de Chrysler solicitado por Chrysler, que aún no se haya completado, la reclamación del Proveedor podrá incluir los costos efectivos de mano de obra directa, materiales directos y los gastos generales aplicados en la fabricación, pero deberá restarse el importe del valor de los desechos del Herramental de Chrysler no completado a dicha reclamación. Chrysler tendrá el derecho de verificar las reclamaciones presentadas a través de una auditoria de los registros, las instalaciones, el trabajo o los materiales del Proveedor y/o de sus subcontratistas.

Chrysler pagará al Proveedor por el trabajo terminado aceptado por Chrysler, así como por el costo documentado en el que el Proveedor incurra por trabajo en proceso y materias primas imputables a la labor terminada a la fecha del aviso de terminación, siempre que el monto no sea superior a la autorización previa de Chrysler. El pago de una reclamación válida, en virtud de la presente Cláusula, incluirá la transmisión de la propiedad y posesión en favor de Chrysler respecto de todas las mercancías entregadas y servicios prestados a Chrysler inmediatamente después de la realización del pago por parte de Chrysler.

Las disposiciones de esta Cláusula no se aplicarán a la rescisión por parte de Chrysler debido a un incumplimiento por parte del Proveedor, o por cualquier otra causa reconocida por la ley o especificada por la Orden o por estos Términos y Condiciones.

**VIGÉSIMA QUINTA.- OBLIGACIONES DEL PROVEEDOR EN CASO DE RESCISIÓN O TERMINACIÓN ANTICIPADA TOTAL O PARCIAL DE LA ORDEN**

(i) En caso de cualquier "Evento de Incumplimiento" según lo descrito en la Cláusula Vigésima Tercera, o de terminación anticipada conforme a la Cláusula Vigésima Cuarta, Chrysler tendrá el derecho de tomar la posesión y la titularidad de la totalidad o parte de cualquier trabajo realizado por el Proveedor en virtud de la Orden, para lo cual efectuará una notificación por escrito al Proveedor y podrá realizar cualquier otra acción que le permita la ley aplicable. Chrysler también tendrá el derecho a tomar posesión inmediata de todo "Herramental de Chrysler" (como se define en la Cláusula Décima Primera del presente) en cualquier momento y sin pago de ningún tipo al Proveedor; si Chrysler opta por ejercer este derecho, el Proveedor deberá cooperar con Chrysler en la toma de posesión del "Herramental de Chrysler", incluyendo el acceso a las instalaciones del Proveedor.

(ii) Si Chrysler ejerce su derecho de dar por terminado anticipadamente o rescindir la Orden en su totalidad, entonces:

(a) El Proveedor deberá otorgar a Chrysler una licencia no exclusiva, mundial, irrevocable y sin el pago de regalías adicionales, respecto a cualquier propiedad intelectual del Proveedor que se incorpore o utilice para la creación o diseño de los productos o de Productos del Trabajo utilizados para las mercancías o servicios encomendados en la Orden, a efecto de que Chrysler esté en posibilidad de fabricar, vender, importar, exportar o modificar dichos bienes o Productos del Trabajo. La licencia concedida a Chrysler en esta Cláusula, permanecerá en vigor durante la vida del (los) programa(s) de vehículos en los cuales dichos bienes o Productos del Trabajo sean utilizados (en la actualidad o en el futuro), incluyendo partes para dar servicio a dichos vehículos;

(b) Por otra parte, previa solicitud por escrito de Chrysler al Proveedor, éste último proporcionará lo siguiente para este tipo de bienes o Productos del Trabajo: (a) Cualquier asistente de diseño, incluyendo sin limitación alguna, cualquier información sobre el diseño asistido de computadora, (b) especificaciones, (c) las listas de materiales, (d) la información del Proveedor de los componentes utilizados para comprar estos bienes o Productos del Trabajo y (e) información sobre el proceso de fabricación de tales bienes o Productos del Trabajo, y

(c) En la medida en que Chrysler haya pagado por los prototipos de herramientas de los productos o de Productos del Trabajo en virtud de una orden de compra, ya sea por separado o en otro acuerdo, y a fin de asegurar que Chrysler pueda hacer pleno uso de los derechos previstos en esta Cláusula, el Proveedor proporcionará a Chrysler los siguientes bienes y Productos del Trabajo: (a) Cualquier herramienta prototipo (por ejemplo, moldes y matrices), incluyendo sin limitación alguna, cualquier información asistida de diseño para las herramientas de prototipo y (b) las especificaciones, listas de materiales, información del Proveedor para todos los componentes comprados y usados en herramientas como prototipo y la información de proceso de fabricación con respecto a estos prototipos de herramienta.

**VIGÉSIMA SEXTA.- CUMPLIMIENTO REQUERIDO**

El Proveedor se obliga y deberá cumplir en todo momento con (a) las Leyes Aplicables, y (b) las políticas que Chrysler dé a conocer de tiempo en tiempo.

Por lo tanto, el Proveedor y sus Personas Afiliadas acuerdan y se obligan a lo siguiente:

(i) Cumplir y continuar cumpliendo con las Leyes Aplicables y ejercer o dejar de ejercer cualquier acción cuyo ejercicio u omisión, respectivamente, pueda sujetar a Chrysler o a Grupo Chrysler a responsabilidad alguna bajo las Leyes Aplicables.

(ii) No ofrecer ni otorgar favores ni recompensas ni directa o indirectamente pagar, prestar, otorgar, prometer o proporcionar dinero, valores, descuentos, prestaciones, incentivos u otros bienes en especie o de valor (incluyendo regalos, beneficios u otros favores) a o en beneficio de cualquier Funcionario, con el objeto de: (a) influenciar algún acto o decisión de dichos Funcionarios en el ámbito de sus atribuciones, (b) inducir a dichos Funcionarios a hacer o dejar de hacer algún acto en violación de sus deberes oficiales, (c) obtener cualquier provecho indebido, o (d) inducir a dichos Funcionarios a utilizar su influencia frente a una Entidad Gubernamental para modificar o influenciar cualquier acto de esa Entidad Gubernamental, que influya directamente en que el Proveedor, sus Personas Afiliadas, Chrysler o Grupo Chrysler se viera favorecido o beneficiado, buscando obtener cualquier clase de beneficio para sí o para una tercera persona.

(iii) Excusarse de intervenir en forma alguna en la atención, tramitación o resolución de asuntos en los que pueda resultar algún beneficio indebido para Chrysler y/o que el mismo pueda implicar un conflicto de intereses.

(iv) No inducir a que se realice u omita cualquier acto que viole las Leyes Aplicables y que le proporcione alguna ventaja sobre sus competidores o que influya para que cualquier Entidad Gubernamental tome una decisión favoreciendo una relación de negocio directa con Chrysler.

(v) El Proveedor y sus Personas Afiliadas no son ni serán una Entidad Gubernamental o Funcionarios, cuyos deberes oficiales incluyan tomar decisiones que envíen negocios al Proveedor, sus Personas Afiliadas, Chrysler o Grupo Chrysler o que supervisen o controlen las acciones directas de Funcionarios que se encuentran en una posición de negocios directa con el Proveedor, sus Personas Afiliadas, Chrysler o Grupo Chrysler excepto cuando el Proveedor así lo divulgue y notifique a Chrysler de conformidad con lo señalado en inciso (vii) a continuación.

(vi) En caso de que el Proveedor o cualquiera de sus Personas Afiliadas sean una Entidad Gubernamental o Funcionarios, el Proveedor y/o sus Personas Afiliadas se obligan a en su carácter de Entidad Gubernamental o Funcionario (i) no participar de manera alguna en decisiones gubernamentales para comprar productos o servicios de Chrysler o Grupo Chrysler, (ii) hacer o dirigir negocios en beneficio de Chrysler o a cualquier compañía del Grupo Chrysler, (iii) en su carácter de Funcionario influenciar decisiones de gobierno que pudiesen beneficiar a Chrysler o a cualquier compañía del Grupo Chrysler, o (iv) tomar decisiones gubernamentales que beneficiarían directo o indirectamente a Chrysler o a cualquier compañía del Grupo Chrysler.

(vii) El Proveedor acepta que tan pronto tenga conocimiento o razón suficiente de que se realizó algún pago o transferencia (o cualquier oferta o promesa de pago o transferencia) que viole esta Cláusula o las Leyes Aplicables, deberá hacerlo del conocimiento de Chrysler.

(viii) El Proveedor deberá auxiliar y cooperar, y se encargará que sus Personas Afiliadas auxilien y cooperen, completamente con los esfuerzos de Chrysler para cumplir con las Leyes Aplicables.

(ix) Asimismo, el Proveedor deberá indemnizar, defender y sacar a Chrysler y al Grupo Chrysler en paz y a salvo de cualquier acción, demanda, procedimiento, litigio, juicio, controversia, multa, clausura o cualquier otra sanción judicial o administrativa, que se hubiera generado porque el Proveedor y/o sus Personas Afiliadas hubiere incumplido cualquiera de sus obligaciones señaladas en la presente cláusula o en el resto del Contrato o en cualquier Ley Aplicable, y el Proveedor deberá repararle a Chrysler y al Grupo Chrysler cualquier daño o perjuicio, incluyendo honorarios y gastos erogados por la prestación de servicios legales, que les sean ocasionados en relación con o derivados de lo anterior.

(x) En ningún caso Chrysler estará obligada a llevar a cabo cualquier acción si considera que dichos actos u omisiones podrían ser considerados un incumplimiento, ya sea por parte de Chrysler o Grupo Chrysler, a las Leyes Aplicables.

(xi) Adicionalmente el Proveedor garantiza que ni él ni ninguna de sus Personas Afiliadas utilizan esclavos, prisioneros, niños o cualquier otra forma de trabajo forzoso o involuntario en relación con el suministro de bienes o prestación de servicios en virtud del presente Contrato. Chrysler podrá solicitar al Proveedor certificar por escrito su conformidad con lo anterior y el Proveedor cumplirá dicha solicitud.

(xii) En caso que el Proveedor o cualquiera de sus Personas Afiliadas incumplan con cualquiera de las disposiciones aquí señaladas, en adición a cualquier otro derecho que Chrysler pueda tener bajo el presente Contrato, el Proveedor se estará a lo siguiente:

(a) El Proveedor renuncia a su derecho de cobro de cualquier cantidad que Chrysler le adeude, renunciado al reembolso de cualquier cantidad pagada u otorgada en crédito en favor de Chrysler de conformidad con las Leyes Aplicables.

(b) El Proveedor acepta que le será retenida la entrega de productos sin responsabilidad alguna para Chrysler por cualquier queja, pérdida o daños relacionados con dicha decisión.

Para efectos de la presente Cláusula, se deberá entender lo siguiente:

1. Chrysler.- Significa Chrysler de México, S.A. de C.V.

2. Entidad Gubernamental.- Significa, en los Estados Unidos Mexicanos, cualquier:

(a) Entidad Federativa, Municipio o el Distrito Federal;

(b) Poder Ejecutivo, sea éste Federal, Estatal o Municipal, incluyendo todas las entidades de la administración pública centralizada ya sea Federal, Estatal o Municipal y cualquiera de sus órganos desconcentrados o descentralizados;

(c) Empresas de participación estatal mayoritaria, fideicomisos públicos, instituciones nacionales de crédito, organizaciones auxiliares nacionales de crédito e instituciones nacionales de seguros y de fianzas;

(d) Organizaciones internacionales públicas;

(e) Organismos Constitucionales Autónomos, incluyendo de manera enunciativa más no limitativa, el Instituto Federal Electoral, la Comisión Nacional de los Derechos Humanos y el Banco de México;

(f) Poder Legislativo, sea éste Federal o Estatal, incluyendo enunciativa mas no limitativamente, el Congreso de la Unión, la Cámara de Diputados, el Senado de la República, así como las legislaturas de los Estados y la Asamblea Legislativa del Distrito Federal;

(g) Poder Judicial, entendiéndose por éste cualquier órgano que realice una función jurisdiccional, pudiendo ser tribunales federales o locales, ya sean éstos judiciales, administrativos, electorales, militares o del trabajo; y

(h) Persona que maneje recursos económicos públicos y toda aquella persona que trabaje, tenga una relación de supra a subordinación o que preste cualquier tipo de servicio en cualquiera de las entidades anteriores.

3. Familiar.- Toda persona con quien cualquier Servidor Público Nacional, Servidor Público Extranjero o Miembro de Partido Político tenga parentesco por afinidad o civil hasta en tercer grado en línea recta o colateral.

4. Funcionarios.- Conjuntamente, los Servidores Públicos Nacionales, Servidores Públicos Extranjeros, Miembros de Partidos Políticos y los Familiares.

5. Grupo Chrysler.- Significa Chrysler Group LLC y sus filiales y subsidiarias o empresas o sociedades en las cuales Chrysler Group LLC o Chrysler tenga participación o el control.

6. Leyes Aplicables.- Significa toda la legislación federal, estatal y municipal, reglas, reglamentos, normas mexicanas o normas oficiales mexicanas, así como todos los Tratados Internacionales en los que México sea parte, incluyendo la Convención Interamericana contra la Corrupción de la Organización de Estados Americanos, Contrato de lucha contra la corrupción de agentes públicos extranjeros en las transacciones comerciales internacionales, la Convención de las Naciones Unidas contra la Corrupción y cualesquiera otro que de tiempo en tiempo se ratifiquen por el gobierno de los Estados Unidos Mexicanos, así como la Ley de los Estados Unidos de América sobre Prácticas Corruptas en el Extranjero(*Foreign Corrupt Practices Act*), independientemente de sus limitantes jurisdiccionales y todas las demás leyes, reglamentos, reglas, ordenes, decretos o directrices que tengan el carácter de legislación aplicable a cualquier de las actividades realizadas por el Proveedor o cualquier de sus Personas Afiliadas en relación con el presente Contrato o cualquier otro acto comercial que involucre al Proveedor, a Chrysler o a Grupo Chrysler.

7. Miembro de Partido Político.- Toda persona que desempeñe un empleo, cargo o comisión en cualquier Partido Político.

8. Partido Político.- Organizaciones políticas que hayan obtenido su registro como tal de conformidad a las leyes electorales mexicanas o extranjeras.

9. Personas Afiliadas.- Significa, de forma enunciativa mas no limitativa, las subsidiarias, filiales y matriz del Proveedor, así como sus respectivos accionistas, socios, administradores, directores, funcionarios, personal, empleados, agentes, sucesores, cesionarios, subcontratistas y distribuidores autorizados.

10. Servidor Público Extranjero.- Toda persona que desempeñe un empleo, cargo o comisión de cualquier naturaleza, ya sea por designación o elección popular, en cualquier Entidad Gubernamental de un país extranjero.

11. Servidor Público Nacional.- Toda persona que desempeñe un empleo, cargo o comisión de cualquier naturaleza, ya sea por designación o elección popular, en cualquier Entidad Gubernamental de los Estados Unidos Mexicanos.

**VIGÉSIMA SÉPTIMA.- IMPUESTOS**

Las Partes reconocen que cada una será responsable de los impuestos que se generen a su cargo derivado del cumplimiento de las obligaciones de la Orden.

Con fundamento en la fracción IV del Artículo 1-A de la Ley del Impuesto al Valor Agregado vigente, Chrysler efectuará la retención del IVA (Impuesto al Valor Agregado), cuando adquiera de proveedores nacionales bienes destinados al proceso de manufactura y ensamble de vehículos y/o de autopartes.

**VIGÉSIMA OCTAVA.- COMUNICACIÓN ELECTRÓNICA**

Chrysler establecerá los aspectos referentes a la comunicación electrónica entre el Proveedor y Chrysler, y el Proveedor cumplirá con cada una de las directrices establecidas por Chrysler respecto a cualquiera de esos aspectos. Los proveedores de Chrysler deben contar con acceso a por lo menos los siguientes sistemas, o aquellos que los substituyan: EFT (*Electronic Fund Transfer*), EDI (*Electronic Data*

*Interchange*) y eSupplierConnect (antes Covisint).

El Proveedor está de acuerdo que en caso de presentarse circunstancias que temporalmente le impidan mantener actualizada su información, contactará inmediatamente a su comprador, designado por Chrysler, y al grupo de EDI (*Electronic Data Interchange*), para encontrar soluciones alternativas.

## VIGÉSIMA NOVENA.- CUMPLIMIENTO CON LOS REQUISITOS APLICABLES

El Proveedor deberá cumplir con todos los requisitos vigentes establecidos por Chrysler en relación con la manipulación, transporte, procesamiento, uso o disposición de los productos, envases y embalajes, incluyendo sin limitación alguna, la formulación y el uso de materias primas y otras sustancias en los productos (denominados "Medio Ambiente, Salud y Requisitos de Seguridad"). Asimismo, el Proveedor se obliga a cumplir con las leyes, reglamentos, Normas Mexicanas o Normas Oficiales Mexicanas, decretos, acuerdos, así como con cualquier disposición de carácter general y obligatorio que en materia de protección ambiental y de seguridad e higiene en el trabajo se encuentren vigentes en los Estados Unidos Mexicanos. El Proveedor se obliga, por tanto, a sacar en paz y a salvo a Chrysler de los daños y/o perjuicios que se hayan generado por cualquier acto u omisión que le sea directamente atribuible a las actividades que en esta materia se realicen con motivo de la Orden.

A petición de Chrysler, el Proveedor proporcionará de inmediato y en la forma y detalle que Chrysler establezca: (i) la fórmula o lista de todos los ingredientes o materiales de los productos, (ii) la cantidad de todos los ingredientes o materiales y el porcentaje de cada ingrediente o material en los bienes y (iii) una fórmula de actualización o lista de ingredientes o materiales respecto a cualquier cambio a lo establecido por Chrysler. Esta información podrá ser requerida por Chrysler para ésta cumpla con las leyes aplicables. A petición de Chrysler, el Proveedor certificará que cumple con todos los requisitos de medio ambiente, salud y seguridad.

Antes de y con el envío de la mercancía, el Proveedor proporcionará a Chrysler la advertencia pertinente y el aviso por escrito (incluyendo la colocación de las etiquetas adecuadas en los productos, envases, o en el embalaje) de cualquier material que sea un ingrediente, material de o una parte de cualquiera de los bienes que sean o pudieran ser peligrosos. Asimismo, deberá informar las instrucciones necesarias de manejo especial y una advertencia para los transportistas, para Chrysler y sus respectivos empleados, sobre la forma de prevenir lesiones o daño en la propiedad, en el manejo, transporte, transformación, utilización o eliminación de los productos, envases y embalajes enviados a Chrysler.

## TRIGÉSIMA.- ANÁLISIS

A.      Programa de Retorno de Materiales:

(i)     El Proveedor deberá presentarse en el Centro de Retorno de Materiales, indicado por Chrysler, cuando menos cada quince (15) días calendario para recoger partes para análisis, firmando el reporte de asistencia. En caso de que el Proveedor no recoja las partes en un periodo de quince (15) días, recibirá un cargo por el costo de las partes, basado en el costo de garantía de Chrysler y las partes se enviarán al proceso de destrucción de material, sin responsabilidad para Chrysler.

(ii)    El Proveedor contará con un periodo de veinte (20) días, desde la fecha en que recoja el material en las instalaciones del Centro de Retorno de Materiales, para presentar el resultado del análisis debidamente firmado por la persona del Departamento de Calidad señalada por Chrysler que haya presenciado dicho análisis, así como presentar las partes analizadas en las que no existiera responsabilidad para el Proveedor de acuerdo al resultado, debidamente identificadas. Si el Proveedor no envía el resultado del análisis, así como las partes en las que no tenga responsabilidad, dentro del periodo de veinte (20) días, recibirá un cargo por el costo de las partes involucradas basado en el costo de garantía de Chrysler. Si el resultado del análisis indica que la falla es responsabilidad del Proveedor, este recibirá un cargo por el costo de las partes involucradas, basado en el costo de garantía de Chrysler. El costo de garantía de Chrysler incluirá el costo de la parte a precio de distribuidor de Chrysler. El costo de la mano de obra utilizada en la reparación del reclamo de garantía de la parte, incluirá un cuarenta por ciento (40%) del costo de

la parte a precio de distribuidor de Chrysler por manejo de material.

B.       Programa de Muestreo:

(i)      Los Proveedores participantes en el "Programa de Muestreo" señalado por Chrysler, tendrán que presentarse en el Centro de Retorno de Materiales a recoger las partes enviadas por la zona de servicio en cuestión, proveniente de reclamos de garantía que no se hayan incluido en el Programa de Retorno de Materiales, de acuerdo al calendario emitido por Chrysler. En caso de que el Proveedor no recoja las partes en un periodo de quince (15) días, recibirá un cargo por el costo de las partes, basado en el costo de garantía de Chrysler, y las partes se enviarán al proceso de destrucción de materiales, sin responsabilidad para Chrysler.

(ii)     Los Proveedores contaran con un periodo veinte (20) días, desde la fecha en la que recogieron el material en las instalaciones del Centro de Retorno de Materiales, para presentar el resultado del análisis firmado por la persona del Departamento de Calidad señalada por Chrysler que haya presenciado dicho análisis, así como las partes analizadas en las que no exista responsabilidad para el Proveedor de acuerdo al resultado, debidamente identificadas. En caso de que el Proveedor no envíe el resultado del análisis, así como las partes en las que no tiene responsabilidad dentro del periodo de veinte días, recibirá un cargo por el costo de las partes involucradas, basado en el costo de garantía de Chrysler. Si el resultado del análisis indica que la falla es responsabilidad del Proveedor, este recibirá un cargo por el costo de las partes involucradas, basado en el costo de garantía de Chrysler.

## TRIGÉSIMA PRIMERA.-       DERECHO A AUDITAR

El Proveedor deberá otorgarle a Chrysler el acceso a toda su información, incluyendo sin limitación alguna, a los libros, registros, datos de nómina, recibos, correspondencia y otros documentos electrónicos y no electrónicos relacionados con los productos o servicios que se prestarán en virtud de la Orden, "Herramental de Chrysler" y Herramental no pagado, las obligaciones del Proveedor en virtud de la Orden y cualquier pago hecho al Proveedor o cualquier reclamación hecha por el Proveedor, que sea razonablemente necesaria para los fines de la auditoría o la verificación del funcionamiento deseado de sus obligaciones, en virtud de la Orden y los cargos surgidos.

El Proveedor conservará dicha información y estos documentos por un período de por lo menos cinco (5) años después de haberse hecho el último pago en virtud de la Orden. El Proveedor compartirá su información y los documentos, según las indicaciones de Chrysler, y cooperará con Chrysler para facilitar la auditoría o el proceso de verificación.

Además, Chrysler tendrá el derecho de inspeccionar visualmente y auditar cualquier instalación o proceso, en relación con los productos o servicios que se prestarán en virtud de la Orden, incluidas las relativas a la calidad de producción. El Proveedor reconoce que Chrysler tendrá el derecho de auditar y realizar copias de todos los documentos pertinentes, los datos y otras informaciones referentes a cualquier obligación de algún subcontratista o proveedor del Proveedor en virtud de la Orden.

Previa petición de Chrysler, el Proveedor le permitirá inspeccionar visualmente y auditar las instalaciones o procesos de cualquier subcontratista relacionados con los productos o servicios que se prestarán en virtud de la Orden. La información transmitida a Chrysler mediante esta Cláusula Trigésima Primara será considerada como "Información Confidencial".

## TRIGÉSIMA SEGUNDA.-       ELIMINACIÓN DE DESECHOS

Las mercancías, ensambles, sub-ensambles o materiales relacionados con la Orden, que se consideren como "chatarra", y que el Proveedor no venda a Chrysler en los términos de la Orden, deberán ser destruidos o utilizados como desechos y/o "chatarra" de acuerdo a la normatividad aplicable.

Si alguna autoridad competente solicita la destrucción de cualquiera de las mercancías, ensambles, sub-ensambles o materiales, dicha destrucción deberá ser posterior a la inspección, auditoría y recepción de

instrucciones para la eliminación por parte de Chrysler.

Chrysler tiene el derecho de examinar todos los documentos pertinentes, los datos y toda la información relativa a la destrucción de cualquier desecho. Asimismo, Chrysler tiene el derecho de inspeccionar visualmente y auditar cualquier instalación o proceso en relación con la destrucción de chatarra. El Proveedor estará obligado a mantener todos los documentos, datos e información escrita sobre su obligación de destruir chatarra conforme a la Orden, durante al menos cinco (5) años contados a partir de la última entrega de mercancía o el pago final en virtud de la Orden. Los documentos, datos e información por escrito sobre la obligación del Proveedor de destruir la chatarra se pondrán a disposición de Chrysler previa instrucción de ésta.

**TRIGÉSIMA TERCERA.-**       **PROGRAMAS DE AHORRO DE COSTOS**

El Proveedor proporcionará a Chrysler, por escrito, a más tardar el 1 de octubre de cada año y durante la vigencia de la Orden, el plan deseado para la aplicación de ahorro de costos y mejoras de la productividad para reducir los costos del Proveedor, de conformidad con el programa de Chrysler de ahorro de costos vigente en ese momento.

**TRIGÉSIMA CUARTA.-**       **CONTRATOS DEL PROVEEDOR CELEBRADOS CON SUS PROVEEDORES Y SUBCONTRATISTAS**

El Proveedor se asegurará de que sus proveedores y subcontratistas de bienes o servicios, suministrados en virtud de la Orden, cumplan con las obligaciones y otorguen a Chrysler por lo menos los derechos especificados en las Cláusulas Décimo Novena, Vigésima Sexta y Vigésima Octava de estos Términos y Condiciones. El Proveedor también hará uso de los esfuerzos comercialmente razonables para asegurar que sus proveedores y subcontratistas cumplan con las obligaciones y proporcionen a Chrysler por lo menos los derechos que se especifican en las Cláusulas Décimo Octava y Trigésima Segunda de estos Términos y Condiciones.

Si Chrysler solicita por escrito al Proveedor la contratación de un proveedor o subcontratista particular, en relación con los productos o servicios que se prestarán en virtud de la Orden, entonces: (i) Chrysler será responsable de negociar los precios establecidos para el Proveedor con el proveedor o subcontratista particular de que se trate, (ii) el Proveedor será responsable de todos los demás aspectos de la relación de suministro entre el Proveedor y el proveedor o subcontratista designado, y (iii) el Proveedor se compromete a hacer cumplir los derechos derivados de su acuerdo con dicho proveedor o subcontratista para el beneficio de Chrysler.

En todos los casos en los que el Proveedor esté autorizado a subcontratar proveedores o contratistas, queda expresamente acordado que el Proveedor será responsable frente a Chrysler del incumplimiento a la Orden o a estos Términos y Condiciones por parte de dichos terceros.

**TRIGÉSIMA QUINTA.- DATOS PERSONALES / DATOS PERSONALES SENSIBLES**

El Proveedor será el único responsable en obtener el consentimiento de los titulares de datos personales y/o datos personales sensibles de conformidad con la Ley Federal de Protección de Datos Personales en Posesión de los Particulares, cuando se obtengan con motivo de una prestación de servicios conforme a la Orden y a estos Términos y Condiciones.

El Proveedor se obliga a hacer los avisos de privacidad correspondientes, de conformidad con la mencionada ley, y obtener las autorizaciones correspondientes para transferir dichos datos a Chrysler, cuando así sea requerido por las Partes, y de conformidad con la Orden y estos Términos y Condiciones.

Asimismo, el Proveedor será responsable del manejo, almacenamiento y protección de los datos personales y los datos personales sensibles, y sacará en paz y a salvo a Chrysler de cualquier reclamación, multa o sanción que pudiera derivarse del uso indebido o ilegal de dichos datos, así como a pagar los gastos y costas y honorarios de abogados en que incurra Chrysler en su defensa conforme a esta Cláusula.

**TRIGÉSIMA SEXTA.- SUBSISTENCIA DE OBLIGACIONES**

Las disposiciones de estos Términos y Condiciones contenidos en la Orden, mismos que se pretende sigan vigentes a la terminación, cancelación o caducidad de la Orden, tendrán efecto independientemente de cualquier terminación, cancelación o caducidad de la Orden, incluyendo, sin limitación alguna las Cláusulas Tercera, Sexta, Novena, Décima, Décima Primera, Décima Segunda, Décima Tercera, Décima Quinta, Décima Sexta, Décima Séptima, Décima Octava, Décima Novena, Vigésima, Vigésima Segunda, Vigésima Tercera, Vigésima Quinta, Vigésima Novena, Trigésima Sexta, Trigésima Tercera y Trigésima Cuarta.

**TRIGÉSIMA SÉPTIMA.- COMPETITIVIDAD**

El Proveedor deberá ser y continuar siendo competitivo con respecto a cada mercancía suministrada o servicio prestado a Chrysler, de conformidad con la Orden, sobre la base del costo total, teniendo en cuenta cada uno de los siguientes atributos: costo, calidad, entrega, fiabilidad del suministro, tecnología, estabilidad financiera y cumplimiento de las obligaciones conforme a la Orden.

Chrysler se reserva el derecho, en cualquier momento durante la vigencia de la Orden, a poner a prueba de mercado (Benchmarking) los servicios o bienes que vaya a suministrar el Proveedor, en virtud de la Orden, para determinar la competitividad de los proveedores de un bien o un servicio.

Ser "competitivos" significa que el Proveedor deberá: (i) Ser igual o mejor que los demás proveedores y los proveedores potenciales de ese bien o servicio en la mayoría de los atributos enumerados anteriormente, y (ii) mantener un costo competitivo.

Las comparaciones de costos competitivos se tendrán en cuenta para la ingeniería de aplicación, la investigación y los costos de desarrollo; si el Proveedor no es competitivo con respecto a otros atributos diferentes al costo, Chrysler podrá rescindir la Orden de conformidad con la Cláusula Vigésima Cuarta de estos Términos y Condiciones.

Si el Proveedor no mantiene un costo competitivo con respecto a un bien o servicio, Chrysler podrá notificar al Proveedor su no-competitividad mediante la especificación de la deficiencia de costo competitivo en un aviso por escrito (el "Aviso de Modificación"). Chrysler se compromete a no entregar una carta de aviso dentro de los doce (12) meses siguientes al inicio de la producción de volumen.

Tras la notificación, el Proveedor podrá, dentro de un plazo de treinta (30) días posteriores a la notificación de falta de competencia, proponer a Chrysler un plan para mejorar la competitividad de su producto o servicio.

El plan para mejorar la competitividad propuesto por el Proveedor, identificará las acciones necesarias para remediar su déficit con respecto a la competitividad de costos, además de incluir un calendario para la realización de cada acción. Chrysler deberá notificar al Proveedor la aceptación o rechazo de dicho plan de solución, en un plazo de treinta (30) días siguientes a la recepción del plan.

**TRIGÉSIMA OCTAVA.- DERECHOS ACUMULATIVOS; NO MODIFICACIÓN O NOVACIÓN**

Los derechos de Chrysler y los recursos reservados en este documento a Chrysler son acumulativos y en adición a cualquier otro derecho y recurso disponible en ley. El hecho de que Chrysler, en algún momento, no exija del Proveedor el cumplimiento de cualesquiera de las obligaciones consignadas en la Orden o en estos Términos y Condiciones, de ninguna manera significará una modificación o novación de las obligaciones o una renuncia a exigirlos, por lo que no afectará el derecho de Chrysler a exigir el cumplimiento de la obligación de que se trate.

**TRIGÉSIMA NOVENA.- NOTIFICACIONES**

Los avisos deberán ser por escrito. Las notificaciones por correo electrónico serán válidas y aceptables; cualquier notificación por correo electrónico enviada a Chrysler se considerará que se ha recibido en el

segundo día hábil después de que dicha notificación haya sido enviada (si no se rechaza primero mediante la respuesta automática). Cualquier aviso escrito, deberá llevar acuse de recibo.

**CUADRAGÉSIMA.-** <u>**TÍTULOS DE LAS CLÁUSULAS**</u>

Los títulos de las Cláusulas que aparecen en estos Términos y Condiciones, son exclusivamente para facilitar su lectura y manejo, por lo que no se considera que definan, limiten o describan el contenido de las mismas, por lo que en nada trascienden a su contenido, ni deberán de ser tomadas en consideración para su interpretación.

**CUADRAGÉSIMA PRIMERA.-** <u>**PLAZO**</u>

La Orden es un acuerdo por un periodo definido. El plazo de la Orden se señala en la primera página de la Orden ("Plazo"). Si el Plazo de duración es inferior a la duración del Programa de Producción de Vehículos aplicable, a elección de Chrysler, el Plazo podrá ser prorrogado por un año más respecto al modelo adicional, mediante notificación previa que Chrysler haga al Proveedor en un plazo no mayor de noventa (90) días, o en el Plazo de ejecución establecido en la Orden (ya sea que Chrysler notifique al Proveedor de la extensión o por la presentación de un comunicado por parte de Chrysler respecto a algunos o todos los productos señalados en la Orden para un modelo de un año futuro), que haya sido ampliada por cada bien del cual el Proveedor reciba una liberación o comunicación adecuada para ampliar esta la Orden para un modelo de un año futuro adicional.

**CUADRAGÉSIMA SEGUNDA.-** <u>**JURISDICCIÓN Y LEGISLACIÓN APLICABLE**</u>

Para la interpretación y cumplimiento del presente Contrato, las Partes se someten expresamente a las leyes y tribunales competentes de la Ciudad de México, Distrito Federal, renunciando a cualquier otro fuero o competencia que por motivo de su domicilio presente o futuro les pudiera corresponder.

# Exhibit 6



FIAT CHRYSLER AUTOMOBILES

December 4, 2020

**Via Email to** pderamo@martinrea.com

Pat D'Eramo
Chief Executive Officer
Martinrea International US Inc.
2100 N Opdyke Rd
Auburn Hills, MI 48326

    **Re:   FCA US LLC's ("FCA US") Demand for Adequate Assurance of Performance**

        I am writing in response to our telephone conferences on December 2, 2020 and December 3, 2020 in which you indicated Martinrea intends to reallocate capacity on one of its 3,500-ton aluminum die casting machines from FCA US to another customer and, as a result, Martinrea will not be able to satisfy FCA US's releases for Pentastar Upgrade Blocks (the "Parts") under purchase order number 10911294 (the "PO"). This is unacceptable.

        Pursuant to the PO, Martinrea must continue to timely deliver in accordance with FCA US's release requirements. Martinrea is well aware of the fact that the PO is valid and remains in full force and effect. As recently as November 4, 2020, your team submitted a written capacity review presentation to FCA US that detailed Martinrea's plan to support FCA US's increasing demand requirements through utilization of the full capacity set forth in the PO. Martinrea's obligations under the PO are separate from and in addition to any future delivery obligations under purchase order number 11407555 for machine-only parts, which have a different part number.

        Martinrea has not provided FCA US with any credible information as to why Martinrea believes it is excused from fully performing under the PO. In communications with FCA US, Martinrea has made vague references to Covid-19. But that is not sufficient to excuse Martinrea's performance. The PO does not include a "force majeure" clause. Therefore, MCL 440.2615 governs whether Martinrea's performance is excused under any particular circumstance. Courts routinely find that a seller cannot claim its performance is excused based on increased expense (i.e., expedited shipments or additional labor) or if the seller caused the circumstances leading to a claimed impracticability (i.e., breached the contract by improperly reallocating capacity).

        If Martinrea maintains its current position, its failure to timely supply FCA US with Parts in accordance with our releases will imminently cause a shortfall of Parts resulting in production disruptions and other damages. Under the terms and conditions incorporated in the PO, Martinrea is required to have a production plan to supply FCA US's peak daily, weekly, and annual requirements according to the capacity stated on the PO. And "[i]f [Martinrea] fails to make deliveries or perform services at the agreed time, all damages suffered by FCA US as a result of [Martinrea's] non-performance, including but not limited to any premium transportation or other costs incurred by FCA US in its efforts to mitigate the impact of [Martinrea's] late performance on its manufacturing operations, will be at [Martinrea's] expense." Separately, under the PO terms and conditions, even if Martinrea had a legitimate reason for not meeting the capacity requirements, it



FIAT CHRYSLER AUTOMOBILES

is obligated to engage and pay for a third party acceptable to FCA US that will support Martinrea's remediation of its capacity deficiencies. **To be clear, FCA US will hold Martinrea fully responsible for all damages relating to Martinrea's failure to timely deliver and any related production disruptions. This will include, but is not limited to, downtime charges, expediting costs, lost profits, and all other incidental and consequential damages, which in very short order will likely amount to tens of millions of dollars or more.**

Based on Martinrea's recent statements and failure to provide any substantiated evidence to support its position, FCA US has reasonable grounds for insecurity that Martinrea will perform in a manner that satisfies its contractual obligations. Therefore, pursuant to MCL 440.2609, FCA US demands that by 3:00 p.m. Eastern on December 7, 2020, Martinrea provide FCA US with written adequate assurance that it will continue to make available to FCA US the capacity set forth under the PO and Martinrea will continue timely shipments to FCA US according to FCA US's releases. If Martinrea fails to provide the requested adequate assurance, FCA US will pursue all necessary legal remedies.

I look forward to your response.

Sincerely,

*Martin Horneck*

Martin Horneck
Head of Purchasing and Supply Chain North America
FCA US LLC

# Exhibit 7



**Martinrea International US Inc.**
2100 N Opdyke Rd
Auburn Hills, Michigan, 48326
www.martinrea.com

December 11, 2020

**By e-mail to** martin.horneck@fcagroup.com

Martin Horneck
Head of Purchasing and Supply Chain, North America
FCA US LLC
1000 Chrysler Drive
Auburn Hills, MI 48326

Dear Mr. Horneck:

**Re:    Martinrea's Supply of Pentastar Engine Blocks**

This letter responds to your December 4, 2020 letter. For several reasons, FCA's demand for adequate assurance of performance is legally and factually baseless.

First, you have addressed the wrong company: the ordering, production, and delivery of the Engine Blocks (the "Parts") is done entirely in Mexico between two Mexican entities. Martinrea International US Inc. is not contractually obligated to supply FCA US LLC with the "Parts" to support the Pentastar PSU Program (the "Program"). The Parts are supplied by Martinrea Honsel México S.A. de C.V. ("Martinrea México") to FCA México, S.A. de C.V. ("FCA México") pursuant to Purchase Orders 10911294 and 11407555 (collectively, the "Purchase Orders").

Second, FCA US's demand for assurances is mistakenly based on Michigan law, which does not apply.    Specifically, FCA US cites Michigan Compiled Laws § 440.2609, part of Michigan's adoption of the Uniform Commercial Code. But Mexican law, not Michigan law, governs the Purchase Orders.    Both Purchase Orders state that the following terms and conditions apply: "Los T?rminos [*sic*] y Condiciones Generales de Chrysler aplicables a Material Productivo (07/2013)" which are "Chrysler's General Terms and Conditions (07/2013)" (the "T&C").    The governing version of the T&C are in Spanish, and FCA labeled the English translation **"ENGLISH TRANSLATION FOR INFORMATION PURPOSES ONLY."**    Bold original. Nonetheless, for ease of reference, I will refer to the English translation, which Martinrea's Mexican counsel,

cc'd here, have confirmed is accurate. Section 42 of the T&C states that the Purchase Orders are governed by Mexican law and that all disputes must be brought in Mexico City:

**FORTY TWO. JURISDICTION AND GOVERNING LAW**
For the interpretation and compliance of this Agreement, the Parties expressly submit to the laws and competent courts of Mexico City, Federal District; thereby waiving any other venue or jurisdiction that may correspond by virtue of their present or future domicile.

Martinrea's counsel in Mexico advises that Mexican law does not have a provision like Uniform Commercial Code 2-609 allowing a buyer a right to demand adequate assurances of performance from a seller. Therefore, FCA US's demand is without legal basis. Although we have been advised that we have no duty to answer your letter, because FCA is a valued customer, and we remain willing to try to work through this problem together, we will proceed to address the allegations in your letter.

Third, even if Michigan law did apply (it doesn't) and the correct FCA entity had demanded assurances from the correct Martinrea entity, the demand would still have failed, because Martinrea México has not breached, or threatened to breach, its agreement with FCA México.

Your letter cites as the contract Purchase Order 10911294, but that purchase order is not the whole agreement. Your letter fails to cite Purchase Order 11407555, which FCA México issued less than two months ago, on October 12, 2020, after FCA decided to take away from Martinrea, México and in-source, approximately 30% of the casting production it now claims is necessary to support the Program.

As you know, in August 2016, FCA México issued to Martinrea México Purchase Order 10911294 and historically has ordered, on average, substantially less than the weekly volumes that FCA is asking to supply today. At this time, for all Parts, Martinrea México was manufacturing raw castings and then machining those castings into finished engine blocks with a process referred to by FCA México as "cubing."

Beginning in 2018, FCA communicated that it planned to take away from Martinrea, and in-source to FCA US's Kokomo, Indiana facility, the manufacture of approximately 30% of the castings required to support the Program and, with respect to these castings, Martinrea would only perform the cubing / machining operation.   From May 2019 to March 2020, FCA requested Martinrea to quote on several different "Cubing-Only" volume scenarios culminating with FCA México's issuance of Purchase Order 11407555 on October 12, 2020 confirming the reduction in casting manufacture by Martinrea. FCA proceeded down this path, and earlier this year, refused to refurbish all eight dies, and only refurbished six, leaving Martinrea without sufficient tooling. Martinrea was disappointed that FCA chose to in-source a significant portion of the casting production but, Martinrea relied on, and reallocated, the open casting production capacity created by FCA's decision.   What your letter ignores is that Martinrea wanted to keep this business, but FCA took it away anyway.   Martinrea tried to persuade FCA to keep the business with Martinrea, including throughout the summer of 2020, but despite Martinrea's efforts, FCA decided to in-

2

source this production and award Martinrea only the machining for those blocks, as evidenced by Purchase Order 11407555.

FCA recently abruptly changed course, apparently in response to another supplier's situation after which FCA elected to in-source its operations. FCA is now suddenly demanding that Martinrea produce 13,000 Parts per week – for a period of time – a weekly volume that FCA has *never* come close to demanding for many years.

Martinrea has no contractual obligation to meet FCA's new, increased volume demand. And, in any event, Martinrea cannot meet FCA's demand for three reasons. First, as stated above, Martinrea dedicated to another customer the excess casting production capacity it had because of FCA's decision to pull the work, since it had the capacity it would need to meet FCA's new, lower demand. Second, as stated above, Martinrea does not have enough tooling because in January 2020, Martinrea requested refurbishment for eight dies but FCA authorized the refurbishment of only six dies. Third, as previously communicated, COVID-19 has had a crippling effect on Martinrea's labor force and operations. Martinrea does not have the skilled labor necessary to meet FCA's new production demands and, despite its best efforts, has been unable to strengthen its work force with sufficient qualified operators. Martinrea's counsel in Mexico advises that, under Mexican law and due to the unforeseeable circumstances created by COVID-19, Martinrea's full performance is excused and Martinrea rightfully declared force majeure, as referenced in the T&C (unlike FCA's U.S. T&C, its T&C in Mexico reference force majeure).

Martinrea understands that FCA is in a difficult position, but that is entirely the consequence of FCA's own choices. If we could both turn the clock back, Martinrea would have preferred to retain this business. FCA, however, made its choice, as evidenced by its machining only purchase order. Martinrea has also been forced to make its choices. This is what people in this business must do every day.

Fortunately, FCA has choices that will allow it to continue production uninterrupted. First, it can simply proceed to do what it has planned to do since early 2018 – cast the Parts at its Kokomo, Indiana facility. Second, as separately communicated, there are other casting suppliers with capacity who are able to support FCA to cover the excess Part volume. The damages you allege in your letter would be the result of FCA's own choices, past and future, and Martinrea will not be responsible for them.

If FCA chooses to initiate legal action in Mexico, Martinrea will have no choice but to aggressively defend itself. However, taking legal action against Martinrea is not going to remedy FCA's problem and result in more Parts. Martinrea values its business relationship with and will continue to do what it can to support, FCA. If you wish us to increase capacity, buy a new machine, refurbish tools and get to a position where we can on mutually beneficial terms, we would love to work with you.

Please give me a call to discuss.

Sincerely,

Rob Fairchild
Executive Vice-President, Sales and Engineering

cc by e-mail only:

Pat D'Eramo, President and Chief Executive Officer
Carlos Arguelles, Santamarina + Steta (carguelles@s-s.mx)
Carlos Brehm T., Santamarina + Steta (cbrehm@s-s.mx)

4

This case has been designated as an eFiling case. To review a copy of
the Notice of Mandatory eFiling visit www.oakgov.com/efiling.

### STATE OF MICHIGAN

#### IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

FCA US LLC,

          Plaintiff,

v.

MARTINREA INTERNATIONAL US INC., and
MARTINREA HONSEL MEXICO SA DE CV,

          Defendants.

2020-185155-CB

Case No. 2020-      -CB
    JUDGE MARTHA D.
Hon ANDERSON

**BUSINESS COURT DOCKET**

Moheeb H. Murray (P63893)
Michael K. Steinberger (P76702)
Luis E. Gomez (P80573)
Bush Seyferth PLLC
100 W. Big Beaver Rd., Ste. 400
Troy, MI 48084
T: (248) 822-7800
F: (248) 822-7816
murray@bsplaw.com
steinberger@bsplaw.com
gomez@bsplaw.com
*Attorneys for FCA US LLC*

### NOTICE OF HEARING

PLEASE TAKE NOTICE that Plaintiff FCA US LLC's Motion for Temporary Restraining

Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue will be brought

on for hearing before the Honorable _____ on a date and time to be set by the Court.

Respectfully submitted,

Bush Seyferth PLLC
*Attorneys for FCA US LLC*

By: /s/ Moheeb H. Murray (P63893)

Dated: December 13, 2020

FILED  Received for Filing  Oakland County Clerk  12/14/2020 8:00 AM

This case has been designated as an eFiling case. To
review a copy of the Notice of Mandatory eFiling visit
www.oakgov.com/efiling.

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

FCA US LLC,

2020-185155-CB

Plaintiff,

v.

Case No. 2020-          -CB

Hon:  JUDGE MARTHA D.
ANDERSON

**BUSINESS COURT DOCKET**

MARTINREA INTERNATIONAL US INC., and
MARTINREA HONSEL MEXICO SA DE CV,

Defendants.

---

Moheeb H. Murray (P63893)
Michael K. Steinberger (P76702)
Luis E. Gomez (P80573)
Bush Seyferth PLLC
100 W. Big Beaver Rd., Ste. 400
Troy, MI 48084
T: (248) 822-7800
F: (248) 822-7816
murray@bsplaw.com
steinberger@bsplaw.com
gomez@bsplaw.com
*Attorneys for FCA US LLC*

---

## FCA US LLC'S MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE

Plaintiff FCA US LLC moves under MCR 3.310 for a temporary restraining order and an

order for Defendants Martinrea International US Inc., and Martinrea Honsel Mexico SA DE CV

(collectively "Martinrea") to show cause why a preliminary injunction should not issue against

them.  As more fully detailed in the accompanying brief, Martinrea manufactures engine blocks

that it sells to FCA US under a Purchase Order and General Terms and Conditions ("GTCs") that

constitute a binding contract. The Purchase Order and GTCs require Martinrea to maintain a

certain production capacity. But Martinrea has re-allocated a portion of its production capacity

away from FCA US and to another customer, preventing it from manufacturing the number of engine blocks required under FCA US's Purchase Order. Martinrea's breach and repudiation of the parties' binding contract will cause irreparable and incalculable harm, including monetary harm, reputational harm, plant shutdowns, and worker layoffs.

WHEREFORE, FCA US requests that this Court issue a Temporary Restraining Order and Order to Show Cause in the form attached as Exhibit A hereto, and grant such other and further relief as it finds appropriate under the circumstances.

Respectfully submitted,

Bush Seyferth PLLC
*Attorneys for FCA US LLC*

By: /s/ Moheeb H. Murray (P63893)

Dated: December 13, 2020

2

This case has been designated as an eFiling case. To
review a copy of the Notice of Mandatory eFiling visit
www.oakgov.com/efiling.

## STATE OF MICHIGAN

### IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

FCA US LLC,

Plaintiff,

v.

MARTINREA INTERNATIONAL US INC., and
MARTINREA HONSEL MEXICO SA DE CV,

Defendants.

2020-185155-CB

Case No. 2020-        -CB

Hon:        JUDGE MARTHA D.
ANDERSON

**BUSINESS COURT DOCKET**

---

Moheeb H. Murray (P63893)
Michael K. Steinberger (P76702)
Luis E. Gomez (P80573)
Bush Seyferth PLLC
100 W. Big Beaver Rd., Ste. 400
Troy, MI 48084
T: (248) 822-7800
F: (248) 822-7816
murray@bsplaw.com
steinberger@bsplaw.com
gomez@bsplaw.com
*Attorneys for FCA US LLC*

---

### BRIEF IN SUPPORT OF FCA US LLC'S MOTION FOR
### TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE
### WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE

Because Martinrea refuses to honor its contractual obligations to provide FCA US with

critical engine blocks that FCA US uses to build several vehicle platforms, FCA US faces

immediate, irreparable harm. Though it promised to provide FCA US with 13,021 engine blocks

per week, Martinrea improperly and unilaterally decided to reallocate one of the engine-block-

manufacturing machines to another customer, leaving it substantially short of its capacity

commitment. The effects of Martinrea's decision will begin immediately—causing a shortfall in

parts from which FCA US will not be able to recover within any reasonable length of time,

resulting in extraordinary monetary damages that could quickly exceed $100,000,000.00, plant

shutdowns, layoffs, and reputational harm. To prevent this imminent, irreparable harm, FCA US

requests that this Court issue a Temporary Restraining Order and Order to Show Cause.

## STATEMENT OF FACTS

FCA US is an original equipment manufacturer of automobiles. Ex. B, Verified Complaint,

¶ 9. It is a Delaware limited liability company authorized to conduct business in the State of

Michigan. *Id.*, ¶ 1. In connection with manufacturing several of its best-selling models of

automobiles, FCA US purchases "casted and cubed" Pentastar Upgrade Engine Blocks, Part No.

04893461AG ("the Engine Blocks"), from Martinrea. *Id.*, ¶ 10. Martinrea International US Inc. is

a Michigan corporation with its registered office located at 40600 Ann Arbor Road East, Suite

201, Plymouth, Michigan, which is located in Wayne County, Michigan. *Id.*, ¶ 2. Martinrea Honsel

Mexico SA DE CV is a foreign entity located in Mexico. *Id.*, ¶ 3. Martinrea International US Inc.

and Martinrea Honsel Mexico SA DE CV are referred to throughout this motion collectively as

"Martinrea." On information and belief, Martinrea Honsel Mexico SA DE CV is a mere

instrumentality of Martinrea International US, Inc. *Id.*, ¶ 4.

FCA US purchases the Engine Blocks from Martinrea. *Id.*, ¶ 10. One purchase order for

the Engine Blocks—No. 10911293—contemplates that Martinrea will sell the Engine Blocks to

FCA US. **Ex. 2, PO No. 10911293 (the "'293 PO")**[1]. The '293 PO incorporates FCA US's

January 2017 General Terms and Conditions. **Ex. 1, 01/2017 GTCs**. In addition, FCA US and

Martinrea executed a July 24, 2019 Letter of Intent regarding the manufacture of the Engine

---

[1] All exhibit numbers refer to the exhibit to the Verified Complaint, which is Exhibit B to this motion.

Blocks, which also expressly incorporated 2017 GTCs. **Ex. 3, 07-24-17 Letter of Intent**. *Id.*, ¶ 11.

The other purchase order for the Engine Blocks—No. 10911294—contemplates that Martinrea will sell the Engine Blocks to FCA US's Mexican affiliate. **Ex. 4, PO No. 10911294 (The "'294 PO")**. The '294 PO incorporates the "Chrysler July 2013 General Terms and Conditions." **Ex. 5, 07/2013 GTCs.** Under the 2013 GTCs, the '294 PO also expressly incorporates by reference specifications, drawings, descriptions, and samples provided to Martinrea. The product specifications, drawings, descriptions, and samples provided to Martinrea identify that the Engine Blocks are manufactured for FCA US's benefit. *Id.*, ¶ 12.

Under both the '293 and'294 Purchase Orders (jointly, "the Purchase Orders"), Martinrea agreed to have capacity to manufacture 2,604 Engine Blocks daily and 13,021 Engine Blocks weekly for FCA US. **Exs. 2 and 4.** *Id.*, ¶ 13. Neither of these Purchase Orders have been terminated. These Engine Blocks are critical to FCA US's business. Indeed, FCA US incorporates the Engine Blocks into the following vehicle platforms: Jeep Wrangler, Jeep Gladiator, Jeep Grand Cherokee, Dodge Durango, Ram Truck, and Chrysler Pacifica. Each of these vehicle platforms is vital to FCA US's business. *Id.*, ¶ 14.

Martinrea manufactures the Engine Blocks on a 3,500-ton aluminum die casting machine at Martinrea's facility in Quereataro, Mexico. *Id.*, ¶ 15. And presently, Martinrea is FCA US's only external supplier of the Engine Blocks. *Id.*, ¶ 16. Therefore, Martinrea's timely supply of the Engine Blocks in accordance with the releases issued to it is essential to FCA US's ability to produce Jeep Wrangler, Jeep Gladiator, Jeep Grand Cherokee, Dodge Durango, Ram Truck, and Chrysler Pacifica vehicles to meet customer demand. *Id.*, ¶ 17.

The '293 Purchase Order is a binding contract between FCA US and Martinrea, and FCA US is an intended third-party beneficiary of the '294 Purchase Order. *Id.*, ¶¶ 18 and 19. The 2017 GTCs state that "Seller accepts this Order: (a) if Seller acknowledges in writing (including an electronic communication) it acceptance of the Order; (b) if Seller performs any work or renders any services related to goods specifically manufactured for FCA US pursuant to the Order after Seller's receipt of the Order, or (c) if Seller delivers any of the goods or provides any of the services." **Ex. 1, 01/2017 GTCs, Clause 2.** Martinrea therefore accepted the '293 Purchase Order by acknowledging its acceptance and by performing work related to goods manufactured pursuant to that order, including process validation, and by delivering the Engine Blocks under the '293 Purchase Order. *Id.*, ¶ 21. Likewise, Martinrea accepted the '294 Purchase Order by acknowledging its acceptance, by performing work related to goods manufactured pursuant to the Order, and by delivering the Engine Blocks. **Ex. 5, 07/2013 GTCs.** *Id.*, ¶ 22.

### The Parties' Contract Unambiguously Requires Martinrea to Maintain Adequate Capacity to Meet FCA US's Releases

Under both Purchase Orders, Martinrea agreed to have capacity to manufacture 2,604 Engine Blocks daily and 13,021 Engine Blocks weekly for FCA US. **Exs. 2 and 4, Purchase Orders.** *Id.*, ¶ 23.

Under the 2017 GTCs, Martinrea is required to have a production plan to supply the peak daily, weekly, and annual requirements according to the capacity stated on the '293 Purchase Order:

> Seller must have a tooling and production plan in place that will enable Seller to supply FCA US's peak daily, weekly and annual requirements for the goods, including service parts, and Seller's capacity as stated in the Order will be based on such tooling and production plan. **[Ex. 1, 01/2017 GTCs, Clause 5.]** *Id.*, ¶ 24.

The 2013 GTCs likewise require Martinrea to have a production plan to supply the peak daily, weekly, and annual requirements according to the capacity stated on the '294 Purchase Order. *Id.*, ¶ 25. Consistent with its obligations under both Purchase Orders, Martinrea International US submitted a written capacity review presentation to FCA US stating Martinrea is able to support fully FCA US's releases for 13,021 Engine Blocks per week as stated in the '293 Purchase Order and the '294 Purchase Order on November 4, 2020. *Id.*, ¶ 26.

### Martinrea intends to breach its Agreement by wrongfully allocating manufacturing capacity to another customer

Then, Martinrea decided to renege on its obligations. During phone conversations on December 2, 2020, and December 3, 2020, Pat D'Eramo, Martinrea International US Inc.'s Chief Executive Officer, informed FCA US's Head of Purchasing and Supply Chain North America, Martin Horneck, and FCA US's Chief Purchasing & Supply Chain Officer, Carl Smiley, that Martinrea would reallocate capacity on one of its 3,500-ton aluminum die casting machines from FCA US to another customer. Mr. D'Eramo stated that he was the one who made the decision to reallocate the capacity. *Id.*, ¶ 27. Specifically, Martinrea has stated that instead of supplying the required 13,021 Engine Blocks per week, it will deliver to FCA US a maximum of only 6,000 Engine Blocks per week. *Id.*, ¶ 28. As a result of improperly allocating capacity away from FCA US, Martinrea will immediately fall significantly behind by almost 7,000 units per week in satisfying FCA US's releases for the Engine Blocks, and the deficit will only continue to grow. *Id.*, ¶ 29.

### FCA US attempted to convince Martinrea to adhere to the agreement

On December 4, 2020, in accordance with MCL §440.2609, FCA US sent Martinrea a letter explaining how Martinrea's reallocation of capacity away from FCA US would be a breach of contract, and in that letter, FCA US demanded adequate assurance of Martinrea's due

7

performance. **Ex. 6, 12-4-20 Adequate Assurance Letter.** *Id.*, ¶ 30. FCA US demanded that

Martinrea provide written adequate assurance of due performance by 3:00 p.m. on Monday,

December 7. *Id.* Martinrea requested additional time to respond to FCA US's demand, and FCA

US, while reserving its rights, allowed Martinrea to respond by December 11, 2020, at 5:00 p.m.

*Id.*, ¶ 31.

Unfortunately, on December 11, 2020, Martinrea rejected FCA US's demand for adequate

assurance. Instead, it reiterated its plan to improperly reallocate the capacity on one of its 3,500-

ton aluminum die casting machines away from FCA US and provide FCA US with just over 6,000

units per week, making it impossible to meet FCA US's releases. By failing to provide FCA US

with adequate assurance of performance, Martinrea has repudiated the Purchase Orders. **Ex. 7,**

**12-11-20 Response to Adequate Assurance Demand.** *Id.*, ¶ 32.

Martinrea's actions trigger consequences. The 2017 GTCs state, "If [Martinrea] fails to

make deliveries or perform services at the agreed time, all damages suffered by FCA US as a result

of [Martinrea's] non-performance, including but not limited to any premium transportation or other

costs incurred by FCA US in its efforts to mitigate the impact of [Martinrea's] late performance

on its manufacturing operations, will be at [Martinrea's] expense." **Ex. 1, Clause 3.** *Id.*, ¶ 33.

Under the 2017 GTCs, even if Martinrea had a legitimate reason for failing to meet its capacity

obligations (it doesn't) it is obligated to engage and pay for a third party acceptable to FCA US

that will support Martinrea's remediation of its capacity deficiencies:

> FCA US may, upon fourteen (14) days' written notice to Seller of actual or
> threatened recurring non-performance concerning capacity or quality, engage (or
> require that Seller engage) a third party acceptable to FCA US for the purpose of
> supporting Seller's remediation of such capacity or quality deficiencies. Seller will
> pay all costs associated with such remediation efforts, and will reimburse FCA US
> for any reasonable costs incurred by FCA US hereunder, which may be recovered
> by means of FCA US's rights of setoff, recoupment, or deduction under Clause 14
> hereof. **[Ex. 1, Clause 23.]** *Id.*, ¶ 34.

8

There are no provisions in the Purchase Orders or the GTCs that allow Martinrea to unilaterally vary the contract terms. *Id.*, ¶ 35. And Martinrea has refused to engage or pay for a third party to make up any capacity shortfall for the Engine Blocks. *Id.*, ¶ 36.

### Martinrea's planned breach will cause incalculable and irreparable harm to FCA US

Martinrea's failure to supply FCA US with the Engine Blocks on time in accordance with FCA US's releases will imminently cause a severe shortfall of the Engine Blocks for FCA US to use in manufacturing its most popular vehicles for customers. The shortfall will unavoidably create an unrecoverable inability for FCA US to have sufficient supply of the Engine Blocks to meet its production output requirements. The insufficient supply will inevitably require FCA US to shut down production of six top-selling vehicle platforms in at least six of its plants. *Id.*, ¶ 37.

FCA US will not be able to find alternative sources to manufacture sufficient numbers of Engine Blocks to make up the shortfall Martinrea's breach of contract will create. Thus, although FCA US may be able to make up some of Martinrea's shortfall through mitigation efforts, absent Martinrea meeting its contractual obligations, FCA US will still experience devastating production disruptions and plant shut downs. *Id.*, ¶ 38.

The potential damages are extraordinary. Each *hour* Martinrea fails to meet fully FCA US's releases is already resulting in monetary damages to FCA US of thousands of dollars, plus other incidental and consequential damages. And this amount could continue to climb hundreds of thousands of dollars *per hour*. The resulting damages could therefore quickly eclipse $100,000,000.00. Upon information and belief, Martinrea will be unable to compensate FCA US for such monetary damages. In addition, any production disruption resulting from Martinrea's failure to timely supply FCA US with the Engine Blocks will cause not only adverse employment consequences for thousands of FCA US's assembly workers, but also incalculable and irreparable

9

harm to FCA US's relations, goodwill, and reputation with customers. *Id.*, ¶ 39. FCA US requires this Court's immediate intervention to prevent substantial and irreparable harm that will inevitably occur if Martinrea breaches its contractual obligations to FCA US. *Id.*, ¶ 40.

## ARGUMENT

FCA US seeks a temporary restraining order and a show-cause order against Defendants under MCR 3.310. The decision to grant such relief is within the Court's sound discretion. *See, e.g., Red D Freight, Inc v Sexton*, No. 330834, 2017 WL 4818898, at *3 (Mich Ct App Oct 24, 2017) (citing *Barrow v Detroit Election Commission*, 305 Mich App 649, 662; 854 NW2d 489 (2014). The object of such relief is to prevent further damage to the plaintiff so that the rights of the parties at final hearing may be determined.

"[T]he issuance of a TRO requires only that 'it clearly appears from specific facts shown by affidavit or by a verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant from the delay required to effect notice.'" *Red D Freight*, 2017 WL 4818898, at *3 (quoting MCR 3.310(B)(1)(a)). This is a "minimal standard." *Id.*

FCA US will suffer—and already has suffered—irreparable harm in the absence of immediate relief. An injury is irreparable if not fully compensable in monetary terms. *Thermatool Corp. v Borzym*, 227 Mich App 366, 377; 575 NW2d 334 (1998). Michigan courts have repeatedly recognized the gravity of harm to buyers in the automotive industry that may result if a sole-source supplier is permitted to refuse to continue performance. In *Key Safety Systems, Inc v Invista, SARL, LLC*, the supplier demanded a price increase because the cost of the petroleum-based raw materials that it used in the special yarn it supplied to Key Safety Systems ("KSS") for airbags increased dramatically, and it refused to ship unless KSS agreed to pay the increased price. No. 08-CV-10558, 2008 WL 4279358 at *1-2, 5 (ED Mich Sept. 16, 2008). The court granted KSS's motion

10

for injunction, recognizing it would be irreparably harmed if the supplier stopped shipments of the

yarn. *Id.* at *10-12.

Likewise, in *Kelsey-Hayes Co* v *Galtaco Redlaw Castings Corp*, 749 F Supp 794 (ED Mich

1990), the court also explained the type of irreparable injury that can be caused to a buyer in the

automotive industry, if a supplier ceases to provide the buyer with parts under a requirements

contract. The court in the *Kelsey-Hayes* case noted the extreme prejudice that could be caused in

the automotive industry by an interruption in the supply of parts:

> It is well known that in an effort to promote efficiency, car manufacturers are reducing the size of their reserve banks. As a result, component parts are often incorporated into a finished product within a few hours of their delivery. *A supplier's failure to make scheduled shipments may have immediate and dramatic consequences* . . . . Thus, a breach of contract in the automotive industry may be more coercive than in other industries.

*Id.* at 798, n7 (emphasis added).

Also, in *In re Autostyle Plastics, Inc*, 216 BR 784 (Bankr WD Mich 1997), a bankruptcy

court approved extraordinary measures to avoid a shutdown of General Motors plants because it

recognized the distressing consequences of cutting off a "single source" supplier for parts:

> Because [Debtor] was a "single source" supplier to General Motors Corporation (among others), it feared that any interruption in its production schedules might result in a shut down of certain assembly lines while GM and other customers obtained new suppliers and made the necessary arrangements for new production tooling and dies. In turn these shut downs might cause the layoff of innumerable employees of GM and Debtor's other customers. . . . The Debtor calculated that a shut down of a GM assembly line could result in a damage claim by GM and an offset against outstanding GM accounts receivable in excess of $9 million per day.

*Id.* at 788; see also *General Motors Corp v Paramount Metal Prods Co*, 90 F Supp 2d 861, 875

(ED Mich 2000) (citing testimony that "GMC would have lost millions of dollars per day if

Paramount immediately ceased production of the plaintiffs' seat frame requirement").

11

As in these cases, if Martinrea does not continue supplying FCA US with the Engine Blocks under the Purchase Order, FCA US faces the immediate and dramatic consequence of plant shutdowns. Because of the far-reaching consequences to FCA US and the degree of financial harm at stake, the only adequate remedy available is to require Martinrea to continue delivering the Engine Blocks to FCA US in accordance with Purchase Order.

At the temporary-restraining-order stage, FCA US need not meet the additional factors for issuance of a preliminary injunction, other than showing irreparable harm. See MCR 3.310. But reviewing those factors[2] further demonstrates that this Court should order the relief requested.

FCA US is Likely to Succeed on the Merits. As detailed in the Verified Complaint, FCA US has asserted strong claims for relief. There is no debate that Martinrea has repudiated the Purchase Order by telling FCA US that it will begin underperforming its capacity requirements by 6,000 Engine Blocks per week, and by expressly repudiating FCA US's demand for adequate assurance. The breach is clear, and, in fact, Martinrea has contractually reaffirmed its

---

[2]     Michigan courts have established a four-factor analysis to determine whether a preliminary injunction should be issued:

> (1) the danger that the party seeking the injunction will suffer irreparable injury if the injunction is not issued;
> (2) the likelihood that the party seeking the injunction will prevail on the merits;
> (3) the risk that the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the relief; and
> (4) the harm to the public interest if the injunction is issued.

*E.g., Mich State Employees Ass'n v Dep't of Mental Health*, 421 Mich 152, 157-158; 365 NW2d 93 (1984). An applicant for injunctive relief need not demonstrate that *all* of these factors are satisfied. Instead, "the four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *In re DeLorean Motor Co*, 755 F2d 1223, 1229 (6th Cir 1985).

understanding that its failure to deliver the required number of Engine Blocks entitles FCA US to

specific performance *and* the associated attorney fees:

> *[Martinrea] acknowledges that a material breach of its obligation to supply goods in accordance with Clause 3 of the Order . . . would cause irreparable damage to FCA US,* including without limitation potential damage to FCA US's relationships with its customers, suppliers, labor unions, lenders, and prospective future customers, the exact amount of which would be difficult to ascertain, and that the remedies at law and monetary damages for any such breach would be inadequate. *Accordingly, in the event of any action taken or threatened by [Martinrea] hereunder that, if taken, would constitute a material breach of its obligations under Clause 3 . . . of the Order, FCA US and it successors and assigns are entitled to injunctive or other equitable relief and/or a decree for specific performance,* without the posting of any bond or other security, in addition to any other remedies it may have for damages or otherwise. [Martinrea] may not take any action or position inconsistent with this acknowledgement, and *FCA US will be entitled to recover its attorney fees and costs* in connection with the enforcement of this Clause 33 **[Ex. 1, Clause 33. (emphasis added)]**

At bottom, this case is governed by an unambiguous contract. "[T]he proper interpretation

of a contract is a question of law." *Klapp v United Ins Grp Agency*, 468 Mich 459, 463; 663 NW2d

447 (2003). Where the language of a contract is clear and unambiguous,[3] "it is to be construed

according to its plain sense and meaning." *City of Grosse Pointe Park v Mich. Mun Liab & Prop*

*Pool*, 473 Mich 188, 198; 702 NW2d 106 (2005). Because Martinrea's breach of the Purchase

Order and GTCs is clear, FCA US is likely to prevail on the merits.

Injunctive Relief Will Not Unreasonably Harm Martinrea. The requested TRO is narrowly

tailored to protect FCA US's interests and will not unreasonably harm Martinrea. The requested

---

[3] Whether contract language is ambiguous also is a question of law. *Klapp*, 468 Mich at 463. That parties disagree on interpretation does not render a contract ambiguous; only reasonable interpretations may be enforced. *Genesee Foods Servs, Inc v Meadowbrook, Inc*, 279 Mich.App. 649, 656; 760 NW2d 259 (2008).

TRO would merely compel Martinrea to do that which it has been doing and which it agreed to do in the Purchase Order and GTCs.

In this case, the Court should enjoin Martinrea from unilaterally reducing its production capacity for FCA US, in violation of the Purchase Order and GTCs. Any harm that Martinrea might conceivably sustain from specific performance, in the unlikely event that Martinrea prevails on the merits, can easily be remedied through money damages. The balance of hardships thus tips decidedly in FCA US's favor: on the one hand, FCA US faces the shutdown of its manufacturing facilities and catastrophic irreparable losses, while on the other hand, Martinrea risks only the temporary loss of a percentage of income that could be recovered in a damages award. *See, e.g., Zurn Constructors, Inc* v *BF Goodrich Co*, 685 F Supp 1172, 1182 (D Kan 1988) (granting preliminary injunction of specific performer to buyer of PVC compound where "plaintiff's potential loss of its entire business outweighs defendant's potential lost profits and its being forced to alter its corporate strategy"); *Kaiser Trading Co*, 321 F Supp at 934 (granting preliminary injunction of specific performance to buyer of compound used to make aluminum where "even if [Defendant] were to prevail ultimately on the merits by justifying its repudiation of the contract, the probability of which is not substantial, it could be recompensed adequately in money damages").

An order compelling Martinrea to continue delivery of the Engine Blocks under the Purchase Order to fully satisfy FCA US's releases will not injure Martinrea, because it would merely preserve the status quo by compelling Martinrea to do that which it already agreed to do.

Injunctive Relief Would Serve the Public Interest. The public interest is promoted by the relief sought here. First, the public has in interest in seeing valid contracts enforced. See *ComForCare Franchise Sys, LLC v ComForCare Hillsboro McMinnville Corp*, No. 2:19-CV-

14

12037, 2019 WL 7584401, at *5 (ED Mich, October 28, 2019) ("The public interest is served by enforcing valid contracts."). Second, an injunction will prevent the shutdown of FCA US's plants, and the consequent layoffs and other far-reaching public economic harm will be avoided.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court issue a Temporary Restraining Order and Order to Show Cause in the form attached as Exhibit A.

Respectfully submitted,

Bush Seyferth PLLC
*Attorneys for FCA US LLC*

By: /s/ Moheeb H. Murray (P63893)

Dated: December 13, 2020

15

# Exhibit A

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

FCA US LLC,

           Plaintiff,

v.

MARTINREA INTERNATIONAL US INC., and
MARTINREA HONSEL MEXICO SA DE CV,

           Defendants.

Case No. 2020-    -CB

Hon:

**BUSINESS COURT DOCKET**

---

Moheeb H. Murray (P63893)
Michael K. Steinberger (P76702)
Luis E. Gomez (P80573)
Bush Seyferth PLLC
100 W. Big Beaver Rd., Ste. 400
Troy, MI 48084
T: (248) 822-7800
F: (248) 822-7816
murray@bsplaw.com
steinberger@bsplaw.com
gomez@bsplaw.com
*Attorneys for FCA US LLC*

---

### [PROPOSED] TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

At a session of Court,
held in Pontiac, Oakland County, Michigan
on: _____

PRESENT: HON. _____
CIRCUIT COURT JUDGE

This matter having come before the court upon Plaintiff FCA US's Motion for

Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should

Not Issue ("Motion"); the Court having considered the Motion, the Verified Complaint and its exhibits; and the Court being otherwise advised in the premises:

**THE COURT FINDS THAT** FCA US has made a prima facie showing that Defendants Martinrea International US Inc., and Martinrea Honsel Mexico SA DE CV (collectively "Martinrea") have breached their contractual obligations as described in the Verified Complaint;

**THE COURT FURTHER FINDS THAT** it appears that FCA US will suffer immediate and irreparable injury if Martinrea is not restrained from reallocating its production capacity, which would prevent Martinrea from meeting its obligation to provide FCA US with 13,021 Pentastar Upgrade Engine Blocks per week;

**NOW, THEREFORE, IT IS ORDERED** that Martinrea and all others acting in cooperation or concert with Martinrea, including any subsidiaries or affiliates are ordered to continue supplying FCA US, FCA Mexico, and their affiliates with necessary quantities of all Engine Blocks required under the Purchase Orders described in the Verified Complaint;

**IT IS FURTHER ORDERED** that the Defendants shall appear before this Court on _____ 2020, at _____ a.m./p.m. to show cause why this restraining order should not be converted to a preliminary injunction.

**IT IS FURTHER ORDERED** that FCA US is not required to post security because Martinrea will not suffer irreparable injury from its issuance and because the 2017 General Terms and Conditions by which Martinrea are bound specifically state that security shall not be required.

_____
CIRCUIT COURT JUDGE

2

# Exhibit B

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

FCA US LLC,

                Plaintiff,

v.

MARTINREA INTERNATIONAL US INC., and
MARTINREA HONSEL MEXICO SA DE CV,

                Defendants.

Case No. 2020-    -CB

Hon:

**BUSINESS COURT DOCKET**

---

Moheeb H. Murray (P63893)
Michael K. Steinberger (P76702)
Luis E. Gomez (P80573)
Bush Seyferth PLLC
100 W. Big Beaver Rd., Ste. 400
Troy, MI 48084
T: (248) 822-7800
F: (248) 822-7816
murray@bsplaw.com
steinberger@bsplaw.com
gomez@bsplaw.com
*Attorneys for FCA US LLC*

---

## VERIFIED COMPLAINT

There is no other pending or resolved civil action arising out of the
transaction or occurrence alleged in the complaint.

/s/ Moheeb H. Murray
Moheeb H. Murray (P63893)

Plaintiff FCA US LLC ("FCA US"), through counsel, states as follows for its Verified

Complaint against Defendants Martinrea International US Inc., and Martinrea Honsel Mexico SA

DE CV (collectively "Martinrea"):

1

## VERIFICATION FOR BUSINESS COURT ASSIGNMENT

Pursuant to MCR 2.112(O), FCA US verifies that this case meets the statutory requirements of MCL § 600.8031 for assignment to the Business Court because all of the parties are business enterprises.

### Statement of the Case

1.     Because Martinrea refuses to honor its contractual obligations to provide the agreed-to capacity of critical engine blocks that FCA US uses to build several top-selling vehicle platforms, FCA US faces irreparable harm. Rather than adhere to its promise to meet FCA US's full capacity requirements for engine blocks, Martinrea improperly and unilaterally decided to re-allocate one of the engine-block-manufacturing machines to another customer, presumably at a more profitable rate. Martinrea led FCA US on, even presenting a plan as recently as November 2020 to meet FCA US's full capacity, before pulling the rug out from under FCA US when Martinrea secured a more lucrative deal for that capacity. Martinrea's decision will imminently cause a shortfall in parts from which FCA US will not be able to recover within any reasonable length of time, resulting in extraordinary monetary damages that could quickly eclipse $100,000,000.00 as well as plant shutdowns, layoffs, and reputational harm.

### Parties, Jurisdiction, and Venue

2.     FCA US is a Delaware limited liability company authorized to conduct business in the State of Michigan.

2

3.     Martinrea International US Inc. is a Michigan corporation with its registered office located at 40600 Ann Arbor Road East, Suite 201, Plymouth, Michigan, which is located in Wayne County, Michigan.

4.     Martinrea Honsel Mexico SA DE CV is a foreign entity located in Mexico.

5.     Martinrea International US Inc. and Martinrea Honsel Mexico SA DE CV are referred to in this Verified Complaint collectively as "Martinrea." On information and belief, Martinrea Honsel Mexico SA DE CV is a mere instrumentality of Martinrea International US, Inc.

6.     This Court has personal jurisdiction over FCA US and Martinrea because they regularly conduct business in Michigan.

7.     The Court also has personal jurisdiction because Martinrea consented to jurisdiction:

> For all disputes arising out of the Order, Seller irrevocably consents to the personal jurisdiction of the state and federal courts in and for Oakland County, Michigan, USA, and irrevocably waives any claim it may have that any proceedings brought in such courts have been brought in an inconvenient forum. Any suit regarding or relating to this Order may only be brought in the state or federal court in and for Oakland County, Michigan, USA, which are the exclusive venue for any such suit. [**Ex. 1, General Terms and Conditions, rev. 01/2017 ("GTCs"), Clause 26**].

8.     This Court has subject-matter jurisdiction over this action because the amount in controversy exceeds $25,000, exclusive of interest and costs, and because FCA US seeks equitable relief.

9.     Venue is proper in this Court under MCL 600.1621 because Martinrea regularly conducts business in Oakland County and consented to venue in this Court. *See* **Ex. 1, Clause 26.**

## General Allegations

10.     FCA US is an original equipment manufacturer of automobiles.

3

11.     In connection with manufacturing several of its best-selling models of automobiles, FCA US purchases "casted and cubed" Pentastar Upgrade Engine Blocks, Part No. 04893461AG ("the Engine Blocks"), from Martinrea.

12.     One purchase order for the Engine Blocks—No. 10911293—contemplates that Martinrea will sell the Engine Blocks to FCA US. **Ex. 2, PO No. 10911293 (the "'293 PO")**. The '293 PO incorporates FCA US's January 2017 General Terms and Conditions. **Ex. 1, 01/2017 GTCs**. In addition, FCA US and Martinrea executed a July 24, 2019 Letter of Intent regarding the manufacture of the Engine Blocks, which also expressly incorporated 2017 GTCs. **Ex. 3, 07-24-17 Letter of Intent**.

13.     The other purchase order for the Engine Blocks—No. 10911294—contemplates that Martinrea will sell the Engine Blocks to FCA US's Mexican affiliate. **Ex. 4, PO No. 10911294 (The "'294 PO")**. The '294 PO incorporates the "Chrysler July 2013 General Terms and Conditions." **Ex. 5, 07/2013 GTCs**. Under the 2013 GTCs, the '294 PO also expressly incorporates by reference specifications, drawings, descriptions, and samples provided to Martinrea. The product specifications, drawings, descriptions, and samples provided to Martinrea identify that the Engine Blocks are manufactured for FCA US's benefit.

14.     Under both the '293 and '294 Purchase Orders (jointly, "the Purchase Orders"), Martinrea agreed to have capacity to manufacture 2,604 Engine Blocks daily and 13,021 Engine Blocks weekly for FCA US. Neither the '293 nor the '294 Purchase Order has been terminated. **Exs. 2 and 4.**

15.     FCA US incorporates the Engine Blocks into the following vehicle platforms: Jeep Wrangler, Jeep Gladiator, Jeep Grand Cherokee, Dodge Durango, Ram Truck, and Chrysler Pacifica. Each of these vehicle platforms is vital to FCA US's business.

4

16.     Martinrea manufactures the Engine Blocks on a 3,500-ton aluminum die casting machine at Martinrea's facility in Quereataro, Mexico.

17.     Martinrea is presently FCA US's only external supplier of the Engine Blocks.

18.     Martinrea's timely supply of the Engine Blocks in accordance with the releases issued to it is essential to FCA US's ability to produce Jeep Wrangler, Jeep Gladiator, Jeep Grand Cherokee, Dodge Durango, Ram Truck, and Chrysler Pacifica vehicles to meet customer demand.

19.     The '293 Purchase Order is a binding contract between FCA US and Martinrea.

20.     FCA US is an intended third-party beneficiary of the '294 Purchase Order.

21.     Upon information and belief, Martinrea has copies of all of the documents comprising the parties' contracts.

22.     The 2017 GTCs state that "Seller accepts this Order: (a) if Seller acknowledges in writing (including an electronic communication) it acceptance of the Order; (b) if Seller performs any work or renders any services related to goods specifically manufactured for FCA US pursuant to the Order after Seller's receipt of the Order, or (c) if Seller delivers any of the goods or provides any of the services." **Ex. 1, 01/2017 GTCs, Clause 2.** Martinrea therefore accepted the '293 Purchase Order by acknowledging its acceptance and by performing work related to goods manufactured pursuant to that order, including process validation, and by delivering the Engine Blocks under the '293 Purchase Order.

23.     Likewise, Martinrea accepted the '294 Purchase Order by acknowledging its acceptance, by performing work related to goods manufactured pursuant to the Order, and by delivering the Engine Blocks. **Ex. 5, 07/2013 GTCs.**

5

**The Parties' Contract Unambiguously Requires Martinrea
to Maintain Adequate Capacity to Meet FCA US's Releases**

24.     Under both Purchase Orders, Martinrea agreed to have capacity to manufacture

2,604 Engine Blocks daily and 13,021 Engine Blocks weekly for FCA US. **Exs. 2 and 4, Purchase**

**Orders.**

25.     Under the 2017 GTCs, Martinrea is required to have a production plan to supply

the peak daily, weekly, and annual requirements according to the capacity stated on the '293

Purchase Order:

> Seller must have a tooling and production plan in place that will
> enable Seller to supply FCA US's peak daily, weekly and annual
> requirements for the goods, including service parts, and Seller's
> capacity as stated in the Order will be based on such tooling and
> production plan. **[Ex. 1, 01/2017 GTCs, Clause 5.]**

26.     The 2013 GTCs likewise require Martinrea to have a production plan to supply the

peak daily, weekly, and annual requirements according to the capacity stated on the '294 Purchase

Order.

27.     On November 4, 2020, Martinrea International US submitted a written capacity

review presentation to FCA US stating Martinrea is able to support fully FCA US's releases for

13,021 Engine Blocks per week as stated in the '293 Purchase Order and the '294 Purchase Order.

**Martinrea intends to breach its Agreement by wrongfully allocating
manufacturing capacity to another customer**

28.     During phone conversations on December 2, 2020, and December 3, 2020, Pat

D'Eramo, Martinrea International US Inc.'s Chief Executive Officer, informed FCA US's Head of

Purchasing and Supply Chain North America, Martin Horneck, and FCA US's Chief Purchasing

& Supply Chain Officer, Carl Smiley, that Martinrea would reallocate capacity on one of its 3,500-

ton aluminum die casting machines from FCA US to another customer. Mr. D'Eramo stated that he was the one who made the decision to reallocate the capacity.

29.     Specifically, Martinrea has stated that instead of supplying the required 13,021 Engine Blocks per week, it will deliver to FCA US a maximum of only 6,247 Engine Blocks per week.

30.     As a result of improperly allocating capacity away from FCA US, Martinrea will immediately fall significantly behind by almost 7,000 units per week in satisfying FCA US's releases for the Engine Blocks, and the deficit will only continue to grow.

**FCA US attempted to convince Martinrea to adhere to the agreement**

31.     On December 4, 2020, in accordance with MCL §440.2609, FCA US sent Martinrea a letter explaining how Martinrea's reallocation of capacity away from FCA US would be a breach of contract, and in that letter, FCA US demanded adequate assurance of Martinrea's due performance. **Ex. 6, 12-4-20 Adequate Assurance Letter.**

32.     FCA US demanded that Martinrea provide written adequate assurance of due performance by 3:00 p.m. on Monday, December 7. *Id.* Martinrea requested additional time to respond to FCA US's demand, and FCA US, while reserving its rights, allowed Martinrea to respond by December 11, 2020, at 5:00 p.m.

33.     On December 11, 2020, Martinrea rejected FCA US's demand for adequate assurance. Instead, it reiterated its plan to improperly reallocate the capacity on one of its 3,500-ton aluminum die casting machines to another customer, making it impossible to meet releases issued under the Purchase Orders. By failing to provide FCA US with adequate assurance of performance, Martinrea has repudiated the Purchase Orders. **Ex. 7, 12-11-20 Response to Adequate Assurance Demand.**

7

34.     The 2017 GTCs state, "If [Martinrea] fails to make deliveries or perform services at the agreed time, all damages suffered by FCA US as a result of [Martinrea's] non-performance, including but not limited to any premium transportation or other costs incurred by FCA US in its efforts to mitigate the impact of [Martinrea's] late performance on its manufacturing operations, will be at [Martinrea's] expense." **Ex. 1, Clause 3.**

35.     Under the 2017 GTCs, even if Martinrea had a legitimate reason for failing to meet its capacity obligations, it is obligated to engage and pay for a third party acceptable to FCA US that will support Martinrea's remediation of its capacity deficiencies:

> FCA US may, upon fourteen (14) days' written notice to Seller of actual or threatened recurring non-performance concerning capacity or quality, engage (or require that Seller engage) a third party acceptable to FCA US for the purpose of supporting Seller's remediation of such capacity or quality deficiencies. Seller will pay all costs associated with such remediation efforts, and will reimburse FCA US for any reasonable costs incurred by FCA US hereunder, which may be recovered by means of FCA US's rights of setoff, recoupment, or deduction under Clause 14 hereof. **[Ex. 1, Clause 23.]**

36.     There are no provisions in the Purchase Orders or the GTCs that allow Martinrea to unilaterally vary the contract terms.

37.     Martinrea has refused to engage or pay for a third party to make up any capacity shortfall for the Engine Blocks.

### Martinrea's planned breach will cause incalculable and irreparable harm to FCA US

38.     Martinrea's failure to supply FCA US with the Engine Blocks on time in accordance with FCA US's releases will imminently cause a severe shortfall of the Engine Blocks for FCA US to use in manufacturing its most popular vehicles for customers. The shortfall will unavoidably create an unrecoverable inability for FCA US to have sufficient supply of the Engine

8

Blocks to meet its production output requirements. The insufficient supply will inevitably require FCA US to shut down production of six top-selling vehicle platforms in at least six of its plants.

39.     FCA US will not be able to find alternative sources to manufacture sufficient numbers of Engine Blocks to make up the shortfall Martinrea's breach of contract will create. Thus, although FCA US may be able to make up some of Martinrea's shortfall through mitigation efforts, absent Martinrea meeting its contractual obligations, FCA US will still experience devastating production disruptions and plant shut downs.

40.     Each *hour* Martinrea fails to meet fully FCA US's releases is already resulting in monetary damages to FCA US of thousands of dollars, plus other incidental and consequential damages. And this amount could continue to climb to hundreds of thousands of dollars *per hour*. The resulting damages could therefore quickly eclipse $100,000,000.00. Upon information and belief, Martinrea will be unable to compensate FCA US for such monetary damages. In addition, any production disruption resulting from Martinrea's failure to timely supply FCA US with the Engine Blocks will cause not only adverse employment consequences for thousands of FCA US's assembly workers, but also incalculable and irreparable harm to FCA US's relations, goodwill, and reputation with customers.

41.     FCA US requires immediate relief to prevent substantial and irreparable harm that will inevitably occur if Martinrea breaches its contractual obligations to FCA US.

### COUNT I – SPECIFIC PERFORMANCE/INJUNCTION

42.     FCA US incorporates Paragraphs 1 to 41 as if fully stated here.

43.     FCA US requests that the Court order Martinrea to continue supplying FCA US with the Engine Blocks in accordance with the full capacity set forth in FCA US's releases.

9

44.     The '293 Purchase Order and the 2017 GTCs incorporated into it constitute a valid and binding contract between FCA US and Martinrea.

45.     FCA US is an intended third-party beneficiary of the '294 Purchase Order and the 2013 GTCs incorporated into it, which constitute a binding contract between FCA Mexico and Martinrea.

46.     FCA US has performed its obligations under the '293 Purchase Order, and there are no unmet conditions precedent to Martinrea's performance.

47.     FCA Mexico has performed its obligations under the '294 Purchase Order, and there are no unmet conditions precedent to Martinrea's performance.

48.     If Martinrea does not perform its obligations under the Purchase Orders, FCA US will have no adequate remedy at law for the harm caused by Martinrea's breaches.

49.     Martinrea agreed that its violation of the '293 Purchase Order will cause irreparable damage to FCA US, entitling FCA US to equitable relief:

> [Martinrea] acknowledges that a material breach of its obligation to supply goods in accordance with Clause 3 of the Order . . . would cause irreparable damage to FCA US, including without limitation potential damage to FCA US's relationships with its customers, suppliers, labor unions, lenders, and prospective future customers, the exact amount of which would be difficult to ascertain, and that the remedies at law and monetary damages for any such breach would be inadequate. Accordingly, in the event of any action taken or threatened by [Martinrea] hereunder that, if taken, would constitute a material breach of its obligations under Clause 3 . . . of the Order, FCA US and it successors and assigns are entitled to injunctive or other equitable relief and/or a decree for specific performance, without the posting of any bond or other security, in addition to any other remedies it may have for damages or otherwise. **[Ex. 1, 01/2017 GTCs, Clause 33.]**

50.     FCA US is entitled to equitable relief in the form of an order for injunctive relief and specific performance because the Engine Blocks are a specially manufactured good without readily available substitutes.

51.     Further, under '293 Purchase Order, Martinrea agreed that FCA US is entitled to its attorney fees and costs associated with seeking specific performance or injunctive relief:

> [Martinrea] may not take any action or position inconsistent with this acknowledgement, and FCA US will be entitled to recover its attorney fees and costs in connection with the enforcement of this Clause 33. [*Id.*]

### COUNT II – BREACH OF CONTRACT / ANTICIPATORY BREACH

52.     FCA US incorporates Paragraphs 1 to 51 as if fully stated here.

53.     The '293 Purchase Order is a valid and binding contract between FCA US and Martinrea.

54.     FCA US has performed its obligations under the '293 Purchase Order, and there are no unmet conditions precedent to Martinrea's performance.

55.     Martinrea's anticipatory refusal to meet FCA US's capacity requirements constitutes a repudiation and breach of the '293 Purchase Order.

56.     Martinrea's breach of the '293 Purchase Order will cause a shortfall of the Engine Blocks resulting in FCA US's plant shutdowns, missed production schedules, inability to produce vehicles for customers, and other damages.

57.     Each *hour* Martinrea fails to meet fully FCA US's releases is already resulting in monetary damages to FCA US of thousands of dollars, plus other incidental and consequential damages. And this amount could continue to climb to hundreds of thousands of dollars per hour. The resulting damages could therefore quickly eclipse $100,000,000.00 and continue to climb.

58.     In addition, any production disruption resulting from Martinrea's failure to timely supply FCA US with the Engine Blocks will cause irreparable reputational harm for FCA US among FCA US's customers.

11

59.     Under the parties' contract, "If [Martinrea] fails to make deliveries or perform services at the agreed time, all damages suffered by FCA US as a result of [Martinrea's] non-performance, including but not limited to any premium transportation or other costs incurred by FCA US in its efforts to mitigate the impact of [Martinrea's] late performance on its manufacturing operations, will be at [Martinrea's] expense." **Ex. 1, 01/2017 GTCs, Clause 3.**

60.     Even if Martinrea had a legitimate reason for not meeting FCA US's capacity requirements (though it does not), Martinrea is contractually is obligated to engage and pay for a third party acceptable to FCA US that will support Martinrea's remediation of its capacity deficiencies. *Id.*, **Clause 23**. Martinrea has refused to engage or pay for a third-party to support Martinrea's remediation of its capacity deficiencies.

### COUNT III – BREACH OF CONTRACT/THIRD-PARTY BENEFICIARY

61.     FCA US incorporates Paragraphs 1 to 60 as if fully stated here.

62.     Under MCL 600.1405, an intended third-party beneficiary has the same right to enforce a contract as the parties to the contract.

63.     The '294 Purchase Order and the 2013 GTCs incorporated into it constitute a valid and binding contract between FCA Mexico and Martinrea.

64.     FCA US LLC (referred to in the '294 Purchase Order by its former name, Chrysler LLC) is an intended third-party beneficiary of the contract between FCA Mexico and Martinrea.

65.     FCA Mexico has performed its obligations under the '294 Purchase Order, and there are no unmet conditions precedent to Martinrea's performance.

66.     Martinrea's anticipatory refusal to meet the capacity requirements in the '294 Purchase Order constitutes a repudiation and breach of the Purchase Order and GTCs.

12

67. Martinrea's breach of the '294 Purchase Order will cause a shortfall of the Engine Blocks resulting in FCA US's plant shutdowns, missed production schedules, inability to produce vehicles for customers, and other damages.

68. Each *hour* Martinrea fails to meet fully FCA US's releases is already resulting in monetary damages to FCA US of thousands of dollars, plus other incidental and consequential damages. And this amount will could continue to climb to hundreds of thousands of dollars per hour. The resulting damages could therefore quickly eclipse $100,000,000.00 and continue to climb.

69. In addition, any production disruption resulting from Martinrea's failure to timely supply FCA Mexico with the Engine Blocks will cause irreparable reputational harm for FCA US among FCA US's customers.

## COUNT IV – PROMISSORY ESTOPPEL

70. FCA US incorporates Paragraphs 1 to 69 as if fully stated here.

71. Martinrea is estopped from claiming that it is not obligated to meet its requirements under the Purchase Order and GTCs.

72. Martinrea promised to meet FCA US's requirements for the Engine Blocks.

73. Indeed, as recently as November 4, 2020, Martinrea submitted a written capacity review presentation to FCA US that detailed Martinrea's plan to support FCA US's requirements through use of the full capacity set forth in the Purchase Order.

74. By accepting and performing under FCA US's releases, Martinrea promised to continue providing FCA US's requirements for the Engine Blocks for the life of each vehicle program for which the FCA US uses the Engine Blocks, unless and until FCA US terminates the Purchase Order.

13

75.     Martinrea reasonably should have expected its promise to induce action of a definite and substantial character on the part of FCA US—specifically, that FCA US would continue to rely on Martinrea, as FCA US's supplier of the Engine Blocks, to meet timely FCA US's releases.

76.     Martinrea's promise in fact produced FCA US's reliance that Martinrea would timely meet FCA US's releases for the Engine Blocks.

77.     The circumstances require that Martinrea's promise be enforced if injustice is to be avoided.

### COUNT V – DECLARATORY RELIEF

78.     FCA US incorporates Paragraphs 1 to 77 as if fully stated here.

79.     There is an actual case in controversy between the parties for which declaratory judgment is appropriate.

80.     FCA US is entitled to a declaratory judgment that Martinrea is contractually obligated to (1) continue to supply the Engine Blocks to FCA US at the capacity levels required under the Purchase Orders, for the life of each vehicle program for which FCA US uses the Engine Blocks and (2) conform with all other obligations imposed on Martinrea by the Purchase Orders.

WHEREFORE, FCA US respectfully requests that this Court grant:

A.      Declaratory relief that Martinrea has anticipatorily and in bad faith repudiated its obligations under the Purchase Orders;

B.      Injunctive relief preventing Martinrea and all others acting in cooperation or concert with Martinrea, including any subsidiaries or affiliates, from taking any action inconsistent with its supply obligations to FCA US, FCA Mexico, or their affiliates;

14

C. Permanent mandatory injunctive relief requiring Martinrea and all others acting in cooperation or concert with Martinrea, including any subsidiaries or affiliates, to supply FCA US, FCA Mexico, and their affiliates with necessary quantities of all Engine Blocks required under the Purchase Orders;

D. An award of money damages in favor of FCA US sufficient to compensate it for those economic damages that are calculable;

E. An award of legal fees and other costs arising out of Martinrea's failure to perform under the Purchase Orders; and

F. All such other relief as the Court may deem just, equitable or appropriate under the circumstances.

## JURY DEMAND

FCA US demands a trial by jury.

Respectfully submitted,

BUSH SEYFERTH PLLC

By: /s/ Moheeb H. Murray
   Moheeb H. Murray (P63893)
   Michael K. Steinberger (P76702)
   Luis E. Gomez (P80573)
   100 W. Big Beaver Rd., Ste. 400
   Troy, MI 48084
   T: (248) 822-7800
   F: (248) 822-7816
   murray@bsplaw.com
   steinberger@bsplaw.com
   gomez@bsplaw.com

Date: December 13, 2020

15

## **VERIFICATION**

I, _Kevin Smith_ , declare as follows:

I declare under the penalties of perjury that this Verified Complaint has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

Kevin Smith
FCA US LLC
Senior Manager
Powertrain Purchasing - Casting &
Machining

Dated: ___12/13/20___

# Exhibit 1

## PRODUCTION AND MOPAR PURCHASING
## GENERAL TERMS AND CONDITIONS

**Introduction.** Seller and FCA US (the "Parties") acknowledge the following mutually beneficial goals and objectives in entering into this Order: (i) to ensure a reliable and timely supply of goods covered by the Order; (ii) to implement common or complementary processes to forecast necessary quantities, place orders, ship, receive and make payments for goods; (iii) to identify, contain and resolve promptly and fairly any issues as to timeliness and quality of goods delivered; and (iv) collaboratively to identify opportunities and implement cost savings measures related to the goods covered by the Order and the processes of creating, shipping, receiving, and Seller's using of those goods, all in accordance with applicable law and the specific terms and conditions of the Order. This statement of these shared goals and objectives is intended to be a general introduction to the Order and is not intended to expand or limit the scope of the Parties' obligations or alter the plain meaning of this Order's terms and conditions as set forth hereinafter. However, to the extent the terms and conditions of this Order are unclear or ambiguous, such terms and conditions are to be construed so as to be consistent with the goals and objectives set forth herein.

**1. AGREEMENT.** Seller agrees to sell and deliver the goods or services specified in FCA US's Order in ACCORDANCE WITH THESE GENERAL TERMS AND CONDITIONS CONTAINED IN THE ORDER, INCLUDING THE SUPPLEMENTAL CLAUSES REFERENCED IN THE ORDER, AND ANY DOCUMENTS SPECIFICALLY INCORPORATED IN THE ORDER, all of which constitute the entire and final agreement of the Parties and cancels and supersedes any prior or contemporaneous negotiation, agreements, or information provided to Seller as background in any Request for Proposal. The supplemental clauses referenced herein are as published on the date of the Order or on the date of any amendment to the Order, in each case as published on FCA US's supplier portal (the "FCA US Supplier Portal"). Seller must have an active login to access the FCA US Supplier Portal.

By accepting the Order, Seller acknowledges having actual knowledge of the text of the referenced clauses and documents. FCA US'S ORDER EXPRESSLY LIMITS ACCEPTANCE TO THE TERMS OF THE ORDER AND ANY ADDITIONAL OR DIFFERENT TERMS, WHETHER CONTAINED IN SELLER'S FORMS OR OTHERWISE PRESENTED BY SELLER AT ANY TIME, ARE REJECTED UNLESS EXPRESSLY AGREED TO IN WRITING BY FCA US BY INCORPORATION IN THE ORDER. "Order" as used in these General Terms and Conditions means a purchase order transmitted electronically to Seller by FCA US or delivered to Seller in a paper format. The Order may only be modified by FCA US's issuance of an amended Order to Seller.

**2. ACCEPTANCE.** This Order constitutes FCA US's offer to Seller and is not binding on FCA US until accepted by Seller. Seller accepts this Order: (a) if Seller acknowledges in writing (including any electronic communication) its acceptance of the Order, (b) if Seller performs any work or renders any services related to goods to be specially manufactured for FCA US pursuant to the Order after Seller's receipt of the Order; or (c) if Seller delivers any of the goods or provides any of the services. SELLER SPECIFICALLY WAIVES ANY REQUIREMENT FOR SIGNED ACCEPTANCE OF THE ORDER, AND SELLER AND FCA US EACH WAIVE ANY DEFENSE TO THE VALIDITY AND ENFORCEABILITY OF THE ORDER ARISING FROM THE ELECTRONIC SUBMISSION OF THE ORDER TO SELLER AND SELLER'S ACCEPTANCE OF THE ORDER IN ACCORDANCE WITH THIS CLAUSE 2.

**3. DELIVERY.** Time is of the essence. Delivery must be effected within the time specified in the Order, or in accordance with FCA US's releases, broadcasts, and/or written requirements;

provided, however, in the event FCA US's releases, broadcasts, or written requirements request a delivery outside of Seller's stated lead time (as set forth in the Order), FCA US and Seller will agree on a delivery time as proximate to FCA US's original request as is commercially reasonable. If Seller fails to make deliveries or perform services at the agreed time, all damages suffered by FCA US as a result of Seller's non-performance, including but not limited to any premium transportation or other costs incurred by FCA US in its efforts to mitigate the impact of Seller's late performance on its manufacturing operations, will be at Seller's expense. Seller will make commercially reasonable preparations for the delivery of goods and/or the performance of services in accordance with FCA US's timing needs, including, as applicable, compliance with FCA US's IT specifications found on the FCA US Supplier Portal, and will make reasonable progress toward completing any required engineering and design activities. The term "broadcast," as used herein, means an electronic communication which indicates the parts requirements for the FCA US assembly plants. For Pay as Built (PAB) or sequencers, the broadcast is the P/N sequence. For Modular Pay as Built (MPAB), the broadcast is the collection of part numbers required to be built into the assembly as well as the sequence.

**4. PACKING, MARKING AND SHIPMENT.** (a) Seller will pack and mark goods and make shipments (including shipping on Saturdays and holidays, when requested) in accordance with FCA US's instructions, comply with all carrier requirements and assure delivery free of damage and deterioration. All shipments of goods to FCA US's facilities must include two packing slips, or four packing slips in the case of shipments directed to a FCA US consolidation point. Whenever shipment is made by truck, Seller will enclose one of the packing slips (or packing slip sets in the case of multiple item shipments) in an envelope and Seller will record written instructions on the bill of lading directing the delivering driver to deliver the envelope to FCA US's traffic representative upon arrival at FCA US's facility. Seller is responsible for the goods until delivery at the designated delivery point in the Order. (b) FCA US may specify the carrier and/or method of transportation and Seller will process shipping documents and route shipments of the goods from the delivery point accordingly. Seller will comply with all of FCA US's transportation routing instructions, including, but not limited to, mode of transportation, utilization of assigned carrier and identification of the shipping point. Seller will be responsible for all excess costs incurred because of its failure to comply with FCA US's transportation instructions or delivery requirements/schedules.

**5. VOLUME PROJECTIONS, CAPACITY, REQUIREMENTS, AND RELEASE AUTHORIZATION.** (a) FCA US may provide Seller with estimates, forecasts, or projections of its anticipated future quantity requirements for goods. Each of these expressions of anticipated future requirements for goods is provided for informational purposes only, and is not intended to be, and is not, a commitment by FCA US to buy those future requirements. (b) (i) Seller must have a tooling and production plan in place that will enable Seller to supply FCA US's peak daily, weekly and annual requirements for the goods, including service parts, and Seller's capacity as stated in the Order will be based on such tooling and production plan. The Order may cover goods that are manufactured by Seller using the same manufacturing process and tooling that Seller uses to manufacture other goods not covered by the Order ("Common Process Group goods"). If the Order covers a Common Process Group good, Seller's total capacity for all goods within the same Common Process Group, including the goods covered by the Order, will be stated in the FCA US Capacity Database or its successor database. In the event FCA US's peak requirements exceed Seller's capacity stated in the Order, FCA US and Seller will, upon request of either FCA US or Seller, meet promptly consistent with FCA US's capacity management policies (including its volume variance system and capacity database) to discuss what, if any, additional capital investments, together with expenses directly related to such increased demands, are reasonably required by Seller to continue to meet such peak requirements, after which Seller may submit a

claim for a price adjustment or new tooling purchase order as a result of the need for additional capital investments in writing within five (5) days following such meeting. FCA US will have the right to verify all claims regarding the need for additional capital investment and the sole discretion to determine whether to accept such charges or to source peak requirements beyond Seller's capacity stated in the Order elsewhere. No changes in the Order or these General Terms and Conditions, other than those changes in price or tooling requests directly tied to the need for additional capital investments agreed to between Seller and FCA US pursuant to this Clause 5, will be made. (ii) Seller must submit accurate information into the FCA US capacity management systems and databases in accordance with FCA US's instructions and manuals provided to Seller from time to time. Such information may include, without limitation, current and potential tool capacity, work pattern, overtime, and parts capabilities regarding Common Process Group goods and must consider not only Seller's capacity limits but any constraints faced by Seller's suppliers, it being understood that Seller is responsible for monitoring its suppliers' capacity constraints and limitations, regardless of whether such supplier is a directed supplier. FCA US may withhold payment for Tooling (as defined in Clause 10 of these General Terms and Conditions) used to manufacture the goods covered by the Order until Seller submits all required information into the FCA US capacity management systems and databases. FCA US is entitled to rely on information Seller submits into such systems and databases in planning FCA US's production schedule. (c) When deliveries are specified to be in accordance with FCA US's written releases, Seller will not fabricate or assemble any goods, nor procure required materials, nor ship any supplies, except to the extent authorized by such written releases or provisions of this Order specifying minimum fabrication or delivery requirements.

**6. INSPECTION AND REJECTIONS; QUALITY.** FCA US may, in its sole discretion, inspect, evaluate, and test all goods (including all Tooling, fixtures, all equipment, and all material used directly or indirectly in manufacture of the goods), and all services at times and places designated by FCA US. Seller will provide and maintain a Quality Management System that complies with ISO/TS 16949, the "FCA US Group LLC Customer Specification Requirements for use with ISO/TS 16949," the "Process Planning & Audit" manual and any document specified in the "Quality Management System" application on the FCA US Supplier Portal or any successor website. Seller will promptly comply with any revisions to ISO/TS 16949, the "FCA US Group LLC Customer Specific Requirements for use with ISO/TS 16949," the "Process Planning & Audit" manual, and any document specified in the "FCA US Quality Management System" application and "Supplier Quality Manuals and Forms" reference on the FCA US Supplier Portal or any of its successors. Seller will perform inspections as designated by FCA US and Seller will make inspection systems, procedures and records available to FCA US upon request. Seller must be, and remain throughout the Term, registered with the FCA US electronic FCA US Quality Management System ("CQMS") and any other electronic Advanced Quality Planning (AQP) system designated by FCA US. Notwithstanding payment or any prior inspection of goods, FCA US may revoke acceptance, reject or require correction and return the goods to Seller (at Seller's expense and risk of loss) regarding any goods delivered or services rendered that do not conform to applicable requirements. The Order is issued for the goods specifically identified in the Order and any substitution of material, without FCA US's prior written approval, will be a breach of the Order. Without limiting its remedies, after providing notice to Seller, FCA US may (a) replace or correct any non-conforming goods or services and charge or debit Seller the cost of such replacement or correction, (b) cancel the Order for default under Clause 21 hereof, (c) commence arbitration or other legal action to recover damages suffered by FCA US in accordance with Clause 26 hereof, and/or (d) cause the removal of Seller as an approved FCA US supplier.

Seller will comply with all Third-Party Containment and Problem Resolution ("3CPR") program policies and project requirements for the 3CPR Web Based System, as updated from time to time, and documented on the FCA US Supplier Portal.

Within 24 hours of initiation by FCA US of a 3CPR project on suspect materials of Seller, Seller will hire the 3CPR Provider identified by FCA US for the purpose of undertaking the required 3CPR project at each affected facility. Seller is required to provide a fully funded minimum $5,000 (USD or CAD) for projects in the U.S. or Canada and $2,000 USD for projects in Mexico hard copy purchase order within twenty-four (24) hours of the creation of the 3CPR project. Seller will bear the costs of the 3CPR project. However, if Seller disputes the charges, FCA US will initially bear the costs of the 3CPR project and will, in its reasonable discretion, examine the extent to which 3CPR costs should be borne by FCA US and Seller, respectively, based on an allocation of responsibility.

**7. LABOR DISPUTES.** Seller will notify FCA US immediately of any actual or potential labor dispute affecting Seller or its suppliers which delays or threatens to delay timely performance of the Order, and will include all relevant information to FCA US. Seller will notify FCA US in writing three (3) months in advance of the expiration of any current labor contract of Seller. Seller will ensure that union representation is disclosed and updated in the supplier profile maintained by suppliers through the FCA US Supplier Portal or its successor system. Seller will notify FCA US of any change in union related status, such as contract ratification or extension, within twenty-four (24) hours of occurrence (or such other time as may be commercially practicable). Seller must submit a written contingency plan to FCA US Purchasing two (2) weeks prior to such contract expiration detailing how Seller plans to continue production in the event of a labor dispute. Any additional costs incurred from this plan will be at Seller's expense. The supply of goods described in this Clause 7 will be subject to FCA US's audit rights under Clause 29 of these General Terms and Conditions. Suppliers will be liable for any costs associated with part shortages or downtime (CLS or CLD) at an FCA US Assembly or Manufacturing plant due to a labor dispute.

**8. GENERAL WARRANTY.** (a) Seller warrants that the goods or services will (i) comply with all performance standards and product characteristics, including without limitation specifications, drawings, descriptions or samples, furnished and/or specified by FCA US, (ii) be merchantable, and (iii) be free from defects in material and workmanship. Seller further warrants that to the extent that Seller designs any goods, or FCA US relies on Seller's expertise in any aspect of the design of the goods communicated by Seller to FCA US, those goods will be fit and sufficient for the purposes intended. The warranty term will be coterminous with the warranty extended to FCA US's customers by FCA US on the date of the Order, or any other date agreed upon by FCA US and Seller in the Order (except to the extent, prior to the commencement of initial volume production in connection with the applicable Request for Proposal, that FCA US and Seller agree that the goods must meet quality or durability requirements for a longer term, in which case the warranty term will be such longer term). (b) Seller's liability for FCA US's expense of reimbursing warranty claims made by FCA US's dealers due to Seller's breach of Clause 8(a) hereof or any warranties implied by law or otherwise made by Seller shall be determined in accordance with the Supplier Associated Warranty Reduction Program Policies and Procedures or any successor program or policies as published on the FCA US Supplier Portal (as referenced in Clause 1 hereof) on the date of the Order or on the date of any amendment to the Order. (c) Seller further warrants that FCA US will receive good title upon delivery of goods, services, Tooling, fixtures, or equipment under this Order, free and clear of all liens and encumbrances and that all goods, services, Tooling, fixtures, or equipment will be free from any actual or claimed patent, copyright or trademark infringement. (d) These warranties are in addition to any warranties implied by law or otherwise made by Seller and will survive acceptance and payment by FCA US.

(1/2017)                                   4

**9. PRICES.** The prices stated in this Order are firm and are not subject to adjustment for changes in volume, changes in the price of raw materials or labor, changes in currency valuation, or for any other reason, unless (a) a clause specifically incorporated in the Order (with FCA US's written consent) expressly provides that the prices will be adjusted on a particular basis, and then only to the extent specified in that clause, or (b) a document specifically incorporated in the Order (with FCA US's written consent) expressly provides that the prices will be adjusted on a particular basis, and then only to the extent specified in that document.

**10. PROPERTY AND TOOLING.** (a) Property and Tooling. (i) Tangible property of every description including without limitation all tools, equipment, material, drawings, manufacturing aides, dies, test and assembly fixtures, jigs, gauges, patterns, casting patterns, cavities, molds and documentation, including engineering specifications, PPAP books, and test reports together with any accessions, attachments, parts, accessories, substitutions, replacements, and appurtenances thereto that is necessary for the manufacture of component and service parts for FCA US ("Tooling") for which (i) FCA US issues a purchase order, or (ii) FCA US does not issue a purchase order, but which is used exclusively by Seller in connection with its manufacture of component and service parts for FCA US ("FCA US Tooling") is owned by, is property of, and is being held by Seller as a bailee at will for FCA US, except for Unpaid Tooling (as defined below). Upon payment in full of the applicable price for any item of Unpaid Tooling such item will thereafter be included in the definition of FCA US Tooling under the Order. With respect to each item of FCA US Tooling, Seller grants to FCA US, at the time of payment for such FCA US Tooling, in addition to any other license granted to FCA US under this Order: a non-exclusive, world-wide, paid-up, irrevocable and perpetual license under any (i) intellectual property of Seller that is incorporated into or used to make or design the goods under the Order, and (ii) knowledge and know how concerning the use of such FCA US Tooling, in each case as necessary and sufficient to enable FCA US to make, have, offer for sale, import, export, or modify such goods or any vehicles that FCA US manufactures using such goods, and (ii) to ensure that FCA US can make full beneficial use of the rights provided herein, Seller will provide the following: Tooling, dies, and molds for such goods, including without limitation, any computer aided design data for such Tooling, and in each as applicable, the specifications, bills of material, supplier information for any purchased components used in such Tooling, and manufacturing process information regarding such Tooling. In the case of Unpaid Tooling which is the subject of a purchase order, the applicable price under this Clause 10 will be the amount set forth in the applicable order less any payments already made by FCA US in respect of such Tooling and any amounts required to satisfy liens with respect to such Tooling. In all other cases, the applicable price under this Clause 10 will be the greater of net book value (defined as book value less depreciation applied to such Tooling by Seller using a consistently applied GAAP method) and orderly liquidation value, less any amounts required to satisfy liens with respect to such Tooling. FCA US reserves the right, in determining the applicable price for any payment under this Clause 10, to deduct appropriate amounts for incomplete or non-conforming Tooling. Seller acknowledges and agrees that FCA US is a third party beneficiary of any agreement between Seller and a party other than FCA US for the production of FCA US Tooling or Unpaid Tooling, and that FCA US will have ownership of, and access to, FCA US Tooling and/or Unpaid Tooling (if subject to an ownership dispute) held by any such party. Seller will comply with FCA US's instructions concerning bailed property and will keep Unpaid Tooling and FCA US Tooling (whether or not completed) in its possession and/or control, tagged and safely stored apart from Seller's property, in good condition, fully covered by insurance, free of liens and encumbrances (other than statutory liens) and will replace or repair any such Tooling when lost, damaged or destroyed. Seller will not re-locate any Unpaid Tooling or FCA US Tooling without FCA US's consent. Without limiting any of FCA US's rights and remedies under this Clause 10 (including, specifically, FCA US's ownership of FCA US Tooling), Seller also grants

(1/2017)                                   5

FCA US a purchase money security interest in and to all FCA US Tooling, and Seller, upon request from FCA US, agrees to reasonably cooperate in any act necessary to perfect or otherwise establish the priority of such interest, including, without limitation, identifying the date on which Seller takes possession of the FCA US Tooling and the filing of applicable financing statements. (ii) For purposes of the Order, the term "Unpaid Tooling" means any FCA US Tooling for which FCA US has not fully paid the applicable price (as calculated above) for such Tooling to either Seller or any of its predecessors-in-interest as defined above. (iii) Neither Seller, nor any other person or entity other than FCA US has any right, title or interest in the FCA US Tooling other than Seller's obligation, subject to FCA US's respective unfettered discretion, to use FCA US Tooling in the manufacture of FCA US's component and service parts. (iv) In the event of a dispute between Seller and FCA US over the applicable price for Unpaid Tooling, the applicable price will be assumed to be the amount proffered by FCA US and FCA US will have the right to immediate possession and use of the Tooling pending resolution of the dispute (and Seller may not withhold delivery of possession of the Unpaid Tooling to FCA US pending such resolution), but will remain subject to any claim or right to payment of Seller for the disputed amounts (despite Seller's relinquishment of possession). (v) Seller will submit all required information regarding FCA US Tooling through the FCA US "Tooling Process" system or its successor system, and will comply with all other requirements, policies, and procedures of FCA US regarding FCA US Tooling, including without limitation, use of the FCA US "Tool Record Form" or its successor. (vi) Seller will adhere to the FCA US procedure in effect at the time for submitting requests for reimbursement for FCA US Tooling costs, including but not limited to the use of the FCA US "Tool Record Form" or its successor. All requests for reimbursement for tooling costs are subject to review, approval and audit by FCA US. (vii) All FCA US Tooling will be transferred as FCA US may direct at any time. If Seller makes any unauthorized transfer or re-location of FCA US Tooling, Seller will reimburse FCA US for any costs incurred by FCA US in returning the FCA US Tooling to FCA US or moving the FCA US Tooling as directed by FCA US. If FCA US determines in good faith that Seller has made any use of FCA US Tooling inconsistent with this Order or with FCA US's interest in such FCA US Tooling, then Seller acknowledges and agrees that (A) FCA US will have a lien on any proceeds obtained by Seller as a result of such inconsistent use, (B) FCA US will be entitled to have a constructive trust imposed on such proceeds, and Seller will disgorge such proceeds upon receipt of written notice from FCA US, and (C) the damages incurred by FCA US, including lost profits, as a result of such inconsistent use will be a claim owed to FCA US under Clause 14 hereof, and will entitle FCA US to the rights and remedies set forth in such Clause 14, including, without limitation, deduction, set-off, and recoupment. Seller will maintain internal control policies sufficient to prevent any such inconsistent use of FCA US Tooling or Unpaid Tooling by Seller or any of Seller's employees.

(b) Bailed Property. (i) Property of every description, including but not limited to FCA US Tooling, and any sub-components, raw materials, and racks provided to Seller by FCA US in connection with Seller's performance of this Order (the "Bailed Property") is, and will at all times remain, the sole and exclusive property of, and is being held by Seller as a bailee at will for FCA US. (ii) Seller will take possession of the Bailed Property and keep such Bailed Property in its possession or control free from any loss or damage and safely stored apart from Seller's property marked to identify all Bailed Property in such location as the property of FCA US in a manner satisfactory to FCA US. (iii) Seller acknowledges that title to all such Bailed Property remains in FCA US, and that the Bailed Property will be subject to the direction and control of FCA US. Seller has no rights or interest in any Bailed Property except to use such Bailed Property as directed by FCA US and Seller cannot grant any rights or interest to any person including but not limited to an affiliate of Seller or a third party. (iv) Seller has no right to retain possession of any Bailed Property after receipt of a written demand, which may be given to Seller by FCA US at any time, for return of the

Bailed Property. (v) Seller will not permit any act to be done to the Bailed Property which is not necessary for the performance of this Order. (vi) If this Order is terminated for any reason, FCA US will have the right to enter upon Seller's premises and remove all of the Bailed Property without recourse to any legal proceeding. (vii) Seller will notify all of its secured and judgment creditors that it is processing FCA US's Bailed Property. Such notification will be given in a form, manner and at times reasonably acceptable to FCA US. To the extent permitted by law, Seller will not allow any liens (consensual or otherwise), security interests, encumbrances or claims of any nature to be imposed on the Bailed Property through Seller or as a result of Seller's actions. If a lien, security interest, encumbrance, or claim of any nature is imposed on the Bailed Property through Seller or as a result of Seller's actions, Seller will, to the extent permitted by law, immediately take all actions necessary to remove such lien, security interest, encumbrance, or claim. (viii) Seller will follow FCA US's instructions regarding the Bailed Property, including without limitation incorporating Bailed Property in processed goods and shipping processed goods as FCA US may direct. (ix) Seller will provide FCA US with reports periodically or as FCA US may, in its sole discretion, otherwise direct regarding the amount and status of the Bailed Property in Seller's possession or control.

**11. INSURANCE AND INDEMNIFICATION.** (a) Insurance. Seller will obtain and continuously maintain in force during the Term (i) statutory worker's compensation insurance, (ii) employer's liability insurance, (iii) commercial general liability insurance, including contractual liability and products and completed operations liability, (iv) automobile liability insurance, including owned, hired and non-owned liability, (v) crime insurance, including employee theft, and (vi) all-risk property insurance covering Seller's property, including Tooling and Unpaid Tooling and all FCA US property, raw materials and finished products, including Bailed Property and FCA US Tooling, while in Seller's possession or in Seller's care, custody and control, all in amounts and coverages sufficient to cover all claims hereunder. Unless FCA US instructs otherwise in writing, coverage for specific above-referenced categories of insurance will be not less than the following: $1,000,000 in employer's liability insurance; $5,000,000 in commercial general liability insurance; and $5,000,000 in automobile liability insurance. Such policies will name FCA US as an additional insured thereunder; be primary and not excess over or contributory with any other valid, applicable, and collectible insurance in force for or maintained by FCA US; and provide that the insurer will give FCA US thirty days prior written notice of cancellation or material change in coverage. Seller waives, and Seller will cause its insurers to waive, any right of subrogation or other recovery against FCA US or its subsidiaries, including their respective employees, officers, directors, agents or representatives. FCA US may require Seller to furnish evidence of the foregoing insurance, but FCA US's failure to request evidence of insurance will in no event relieve Seller of its obligation under this Clause 11. Seller will be financially responsible for any of Seller's premiums, deductibles, retentions, self-insurance, co-insurance, uninsured amounts, or any amounts in excess of policy limits. Seller may satisfy the insurance requirements under this Clause 11 through a combination of self-insurance and catastrophic excess insurance.

(b) Indemnification. Seller will defend, indemnify, and hold FCA US and its subsidiaries, including their respective employees, officers, directors, agents or representatives harmless against all claims, suits, actions or proceedings ("Claims") and pay (i) all liabilities, losses, damages (including without limitation judgments, amounts paid in settlement and other recoveries), (ii) fees and expenses (including without limitation fees of counsel and experts) and (iii) other costs (collectively, "Expenses") in connection with any breach or nonperformance by Seller of the Order, or for injury or death of any person and damage or loss of any property allegedly or actually resulting from or arising out of any act, omission or negligent work of Seller or its employees, agents, or subcontractors in connection with performing the Order, either on FCA US's property or

(1/2017)                                                                 7

in the course of their employment (including without limitation, Expenses arising out of, or in connection with, vehicle recall and customer satisfaction campaigns, provided however that if FCA US and Seller agree upon an Authority Definition Plan ("ADP") for goods supplied under the Order setting forth at a minimum an allocation of responsibility for design-related defects in the goods, then Seller's indemnification obligation for campaign Expenses will be determined based on the ADP).

**12. CHANGES.** (a) FCA US may, at any time, make changes in the Order (including, without limitation, changes to the term of the Order described in Clause 38 hereof). Any claim by Seller for a change in price adjustment based on costs actually incurred, or to be incurred, as a result of the change must be asserted in writing within ten (10) days from date of receipt by Seller of FCA US's notification of any change. FCA US will have the right to verify all claims hereunder by auditing relevant records, facilities, work or materials of Seller. Seller agrees to proceed with the Order as changed under this Clause 12. (b) All engineering changes, whether initiated by FCA US or Seller, will be processed pursuant to FCA US practices in effect at the time of the change using the FCA US "Change Notice (CN)" system, or its successors. On or before the date seven (7) days after FCA US has provided Seller with a documented solution (currently referred to as an "alternative selection" in the CN system), including applicable design requirements, Seller will provide FCA US with all price changes (calculated as set forth below) and timing requirements to implement such solution; provided, however, FCA US may, in its reasonable discretion, determine to extend such seven (7) day response period in circumstances where the complexity of the solution merits a longer response period. In addition, once FCA US and Seller have agreed to the price and milestone date changes (currently referred to as the completion of "SPIN" in the CN system), Seller shall have 24 hours to input data into the CN system reflecting the agreed upon changes for FCA US's approval. All FCA US approved engineering changes to the part specification will be promptly implemented by Seller as directed by FCA US. Price changes for FCA US approved engineering changes are to be based solely on the design cost variance from the superseded design and must be substantiated with appropriate documentation satisfactory to FCA US. (c) Seller certifies the location(s) from which it will ship the goods covered by the Order are as specified in the Order. If Seller at any time intends to change such location(s), Seller must notify FCA US prior to the change so that the effect of such change can be evaluated, and negotiated as necessary, for its effect on transit time, packaging methods, and any other significant impact on FCA US. If Seller does not notify FCA US of any increased transportation charges in advance of a change in shipping point(s), Seller will be responsible for such costs. Seller may not change manufacturing locations without first receiving FCA US's written approval. (d) No changes in the Order or these General Terms and Conditions, other than those changes in price and transportation charges as provided in Clause 12, will be made.

**13. PARTS; SERVICE.** (a) Seller will make and sell to FCA US subcomponents (i.e., serviceable components to support service operations) for the goods covered in the Order for FCA US's service, after-market, and warranty requirements for ten years (fifteen years for goods which FCA US clearly identifies as "safety items" prior to issuance of the Order either through the source package process or its substantive equivalent) or for such longer time as may be required by FCA US (and agreed to by Seller in connection with the applicable Request for Proposal prior to the commencement of initial volume production) after the end of the duration of the applicable vehicle production program (the "Service Part Coverage Period"). Any change in this time period requirement will not be considered by FCA US until the goods have reached the end of their retention period (e.g., service life). While the goods that are covered by the Order are still used in production of vehicles for FCA US, the aggregate of the prices for the subcomponents for FCA US's service, after-market, and warranty requirements will be no greater than the price in the Order for their respective corresponding production goods plus costs actually incurred by Seller for

(1/2017) 8

special packaging. Neither Seller nor its sub-suppliers may sell any obsolete or surplus goods covered in the Order to third parties without FCA US's written consent. (b) For at least the first three years after a good is no longer used in production of vehicles for FCA US, the aggregate of the prices of the subcomponents for FCA US's service, after-market, and warranty requirements will be no greater than the price last stated in the Order for their respective corresponding production goods plus costs actually incurred by Seller for special packaging. (c) After three years from the end of the duration of the applicable vehicle production program, the aggregate of the prices of the subcomponents for FCA US's service, after-market, and warranty requirements will be no greater than the price last stated in the Order for their respective corresponding production goods, plus or minus (i) any changes in the cost of materials since the end of the duration of the applicable vehicle production program, plus (ii) a volume-related price adjustment reflecting the actual increase in the cost per part of producing fewer subcomponents, plus (iii) a set-up charge reflecting the actual cost of preparation for the part production run, plus (iv) any additional costs actually incurred for special packaging. All of the foregoing components of the price will be documented to FCA US's reasonable satisfaction, including, but not limited to, set-up detail, machine productivity, scrap allowance, labor inefficiencies and excess raw material requirements. (d) FCA US has no obligation to change minimum order quantities, lead times or similar commercial terms throughout the Service Part Coverage Period. (e) Where Seller sells FCA US service subcomponents to third parties while purchasing such items on FCA US's behalf (e.g., remanufactured and/or "kitted" goods), Seller must sell such subcomponents to such third parties at the same price at which it sells them to FCA US, with the same level of technical support (e.g., testing) provided by Seller as if FCA US had furnished such subcomponents directly to Seller. This authorization by FCA US to effectuate such third party sales is premised on the understanding that such third parties have agreed to use such subcomponents solely for FCA US/Mopar production. FCA US's permission to sell and/or its imposition of requirements under this subparagraph may be withdrawn, at any time, at FCA US's discretion. (f) If the subcomponents are manufactured in a country other than the country in which the goods are delivered to FCA US, Seller will mark the subcomponents shipped for FCA US's service, after-market, and warranty requirements "Made in (country of origin)." (g) Seller will comply with all FCA US vehicle service requirements as documented on the FCA US Supplier Portal on the date of the Order or any amendment to the Order. (h) Seller will, at its expense, comply with all Mopar APQP policies and project requirements including but not limited to utilizing a third party APQP provider.

**14. PAYMENT; FCA US'S COMMITMENTS; CLAIMS ADJUSTMENT.** (a) Payment terms are as set forth in the Order. Seller will promptly submit correct and complete invoices or other agreed billing communications with appropriate supporting documentation and other information reasonably required by FCA US (collectively, the "Invoice") after delivery of goods and performance of services, and the payment period set forth in the Order will not commence until FCA US has received a correct and complete Invoice which meets all of FCA US's applicable requirements. FCA US will use commercially reasonable efforts to assist Seller in correcting any invoice that has been rejected as incomplete or otherwise incorrect. (b) FCA US is committed to paying Seller the amounts which are due to Seller pursuant to the terms of the Order and these General Terms and Conditions, and to provide Seller with periodic information concerning its financial condition and ability to fulfill its payment obligations. (c) FCA US may at any time and without notice deduct, set-off, or recoup Seller's claims for money due or to become due from FCA US against any claims that FCA US has or may have arising out of this or any other transaction between FCA US and Seller. (d) The "FCA Parties" (defined as FCA US LLC, FCA Canada Inc., and FCA Mexico, S.A. de CV) assign to each other the right to payment from Seller and each of its affiliates, and the FCA Parties are entitled to collect each amount owed from Seller to the FCA Parties. (e) Upon Seller's request, FCA US will substantiate the basis for any deduction, set-off, or

(1/2017)                                    9

recoupment within fifteen (15) days of such request or within such other period as may be agreed upon by the Parties.

**15. CUSTOMS; EXPORTS.** (a) Seller will promptly notify FCA US in writing of material or components used by Seller in filling this Order, which Seller purchases in a country other than the country in which the goods are delivered to FCA US and any duty included in the purchase price of the goods. Seller will furnish FCA US with any documentation and information necessary to establish the country of origin, comply with the destination country's rules of origin requirements, any special trade programs, and content reporting. (b) The rights to and benefits of any duty drawback, including rights developed by substitution and rights which may be acquired from Seller's suppliers and export credits, to the extent transferable to FCA US, are the property of FCA US. Seller will provide all documentation and information and take any necessary steps to obtain refunds or to drawback any duty, taxes or fees paid, and to receive export credits from, the government of the country of origin or export country. (c) The responsibility for customs duty and customs brokers' fees will be determined in accordance with the delivery point and transportation code stated in the Order. If FCA US is responsible for customs duties, it will be responsible for normal duties only. Seller will be responsible for any special duties, including but not limited to, marking, anti-dumping and countervailing duties, to the extent permitted under the law of the country of importation. (d) Seller will provide FCA US with all documentation and information required by law or regulation or otherwise necessary to determine admissibility, timely release, customs clearance and entry, and the proper minimum duty to be paid upon the importation of the goods into the destination country. (e) Seller will advise FCA US if the importation of the goods requires an import license and will assist FCA US in obtaining any such license. (f) Seller warrants that the information regarding the import or export of the goods supplied to FCA US is true and correct, and that all sales covered by this Order will be made at not less than fair value under the anti-dumping laws of the countries to which the goods are exported. (g) Seller must comply with all pertinent requirements of U.S. Customs and Border Protection's supply chain security program known as C-TPAT or a local security program recognized by U.S. Customs and C-TPAT. Seller must provide proof of participation by responding to the annual risk assessment survey initiated by FCA US. Seller must seal international shipments with a high security seal that meets C-TPAT standards and the seal number must be included on the Seller's ASN. (h) Seller and FCA US recognize that export control regulations may limit or prohibit the transfer of items to foreign nationals, including foreign nationals in the United States. The goods, services and/or technical data (collectively "Items") delivered under this Order may be subject to U.S., foreign and other applicable export control laws and regulations (collectively "Export Control Laws"), including, but not limited to, the International Traffic in Arms Regulations or the Export Administration Regulations (collectively "U.S. Export Laws") and/or (Export Control List(s)). Seller and FCA US will comply with all U.S. and other country's applicable Export Control Laws and shall not export, re-export or transfer items without first obtaining all required licenses and approvals. Any penalty, fine, expense (including reasonable attorneys' fees) or liability incurred by FCA US as a result of violation(s) of U.S. or foreign export control laws and regulations, or this clause, by the Seller, will be promptly reimbursed by Seller. Items that are identified during the course of this Order will be handled in the following manner: (1) the sending party will notify the other party of the Item's export classification prior to any shipment or transmission; (2) the party receiving notice under (1) above shall have an opportunity to accept or reject the delivery of the Item prior to shipment or transfer by the sending party; (3) FCA US and Seller will make reasonable efforts to cooperate in obtaining required licensing and implementing required internal controls for the involved Items; (4) rejection of an Item will not constitute a breach of this agreement; and (5) FCA US and Seller will assess the impact of the Item's rejection to determine if the Order can continue. Any notice regarding export controls will be in writing and sent to the FCA US Corporate Customs

Department. Compliance with these laws and regulations includes, but is not limited to, abiding by U.S. sanctions, embargoes and prohibitions on transactions with restricted parties. This includes, but is not limited to, the prohibition on the transfer of commodities, materials, software and technology (i.e., all Items) subject to this agreement, to U.S. sanctioned countries (e.g., Iran, Syria, North Korea, Sudan, and Cuba).

**16. USE OF FCA US'S NAME.** Seller will not, without the prior written consent of FCA US, in any manner publish the fact that Seller has furnished or contracted to furnish FCA US goods and/or services, or use the name or trademarks of FCA US, its products, or any of its affiliated companies in Seller's advertising or other publication. Seller will not place its, or any third party's trademark or other designation on the good if the good bears a FCA US trademark or an identifying mark specified by FCA US, or if the good is peculiar to FCA US's design (a "Marked Part"). Seller warrants that (i) it will sell each Marked Part, and similar goods, only to FCA US and (ii) it will not sell any Marked Part or similar goods to third parties without FCA US's prior written consent. Seller acknowledges that any sale by Seller of a Marked Part in violation of this Clause 16 is a willful violation of FCA US's trademark rights. Any goods manufactured by Seller based on FCA US's drawings, specifications, or other information disclosed to Seller by FCA US in connection with the Order may not be used for Seller's own use or sold to any third parties without FCA US's prior express written authorization; provided, however, this prohibition will not apply to goods manufactured by Seller based on Seller's designs using tooling other than FCA US Tooling, Unpaid Tooling which could become FCA US Tooling pursuant to Clause 10 of these General Terms and Conditions, or any intellectual property, knowledge, or know how subject to a non-exclusive, world-wide, paid-up, irrevocable and perpetual license to which FCA US is entitled under Clause 10 hereof, unless the manufacture of such goods would result in a breach by Seller of Clause 17 of these General Terms and Conditions. Seller will mark goods supplied to FCA US in accordance with FCA US's published marking standards.

**17. INFORMATION DISCLOSED; DATA RIGHTS; TRADEMARKS.** (a) "FCA US Data" means (i) all information and data that FCA US makes available to Seller in connection with the performance of the Order, including without limitation performance standards, product characteristics, specifications, drawings, descriptions, samples, designs, manufacturing data and other information, and (ii) any and all data (excluding Seller-provided data regarding its internal costs of producing goods or services that it provides to FCA US under the Order) that is entered into or processed by Seller directly or indirectly using any system that Seller owns or controls directly or indirectly for the purpose of performing Seller's obligations under the Order; provided, however, with respect to any and all data encompassed by any intellectual property conceived, developed, or acquired by Seller in the course of performing work under the Order, the rights to such data (whether ownership or license) shall be determined by the rights to the intellectual property of which such data is a part as set forth in the applicable supplemental clause or clauses referenced in the Order. (b) FCA US owns and retains all of its right, title and interest in FCA US Data, including any FCA US patents, patent applications, copyrights, trade secrets, trademarks, trade dress, and any other proprietary rights in FCA US Data, and in any derivative or improvement of any FCA US Data made by FCA US or by Seller as Work Product. Unless expressly provided in the Order or otherwise agreed to in a writing signed by FCA US, no rights or license is granted under the Order to use FCA US Data other than the right for Seller to use FCA US Data as required to perform Seller's obligations under this Order. Seller will not use or disclose FCA US Data for any other purpose. Seller will handle all FCA US Data in such a manner to insure that it is not used for any purpose detrimental to the interests of FCA US. Seller may not disclose FCA US Data to any third party without FCA US's prior written consent. Seller agrees to immediately discontinue any use of FCA US Data and/or items bearing designated FCA US-owned trademarks or logos upon FCA US's request or at the termination of the Order and

agrees to do one or more of the following at FCA US's option: (1) destroy any such item and present to FCA US an affidavit of destruction; (2) return to FCA US any such item; or (3) remove and destroy any FCA US-owned trademark or logo from any such item and present to FCA US an affidavit of removal and destruction. (c) Any rights that Seller may have to disclose, manufacture, use or distribute goods or services developed under or related to this Order in each case are subject to Seller's obligations concerning FCA US Data set forth in this Clause 17.

**18. PATENTS; NONINFRINGEMENT WARRANTY AND INDEMNITY.** No rights are granted to Seller under any FCA US patents except as may be necessary to fulfill Seller's obligations under the Order. Seller represents and warrants that any good or service provided under the Order or any work product resulting from any services performed by Seller under the Order ("Work Product"), including use of any Work Product for its intended purpose or making, having made, selling, offering to sell, importing, or using any good made by using the Work Product for its intended purpose, will not infringe any Intellectual Property of any third party. Seller agrees to investigate, defend, indemnify and hold harmless FCA US, its affiliated companies, their respective customers, distributors and dealers, and their respective customers, against any and all Claims made against any of them that any good or service or any Work Product, including use of any Work Product for its intended purpose or making, having made, selling, offering to sell, importing, or using any good made by using the Work Product for its intended purpose, infringes any Intellectual Property of any third party. Seller will pay all Expenses that are incurred or sustained by reason of any such Claim.

**19. ASSIGNMENT.** The Order may not be assigned or delegated, in whole or in part, without FCA US's prior written consent, including, but not limited to, the subcontracting of work to be performed hereunder or the transfer of FCA US Tooling to third parties for the performance of work hereunder, and any attempted assignment or delegation in violation of this Clause 19 will be void and of no legal effect.

**20. FINANCIAL REPORTING.** (a) Seller will promptly furnish to FCA US any information regarding the Seller's operations, business affairs and financial condition or such other information as FCA US may reasonably request in addition to the information about Seller to be provided periodically as set forth in section (b) below.

(b) Seller will furnish directly to FCA US, or to FCA US's designated third party service provider for collecting and processing supplier financial information, in the format designated by FCA US:

> 1. Quarterly Financial Statements. Within the earlier of (i) sixty (60) days after the close of each quarterly accounting period of Seller and (ii) the date the statements described herein are due (after the expiration of any automatic grace period) to any federal regulatory agency under applicable law, the balance sheet of Seller, as of the end of such period, the related statements of income and retained earnings, and statements of cash flow for such period, each prepared on a basis consistent with Seller's past practices and certified by an officer of Seller as representing fairly in all material respects the financial position, results of operation, and cash flows for the periods covered by such statements.
>
> 2. Annual Financial Statements. Within the earlier of (i) one hundred twenty (120) days after the close of each fiscal year of Seller and (ii) the date the statements described herein are due (after the expiration of any automatic grace period) to any federal regulatory agency under applicable law, the balance sheet of Seller as of the end of such fiscal year, and the related statements of income and retained

(1/2017)                                    12

earnings and statements of cash flows for such fiscal year, setting forth comparative figures for the preceding fiscal year and certified by an officer of Seller as representing fairly in all material respects the financial position, results of operation, and cash flows for the periods covered by such statements, and, if an audit is performed, audited by independent certified public accountants and including a copy of such auditor's report thereon.

3. Notice of Events of Default. If a default or an event of default has occurred and is continuing under any contract to which Seller is a party, the effect of which could be reasonably anticipated to have a material adverse impact on Seller's financial condition or its ability to perform its obligations under the Order, then Seller will furnish notice of such default or event of default to FCA US.

4. Annual Information Survey. Once each calendar year, Seller will provide FCA US with its responses to FCA US's Annual Information Survey including but not limited to the Automotive Sales Mix Template and the Manufacturing Sales Mix Template.

5. Updates to Supplier Information. Seller must update the information provided on FCA US's Supplier Information System not less than once each quarter of Seller's calendar year.

6. Change in Control. Seller must disclose to FCA US a change in control under which another person or company acquires beneficial ownership of thirty five percent (35%) or more of the outstanding voting stock or voting rights of Seller within fifteen (15) days of the disclosure to Seller of any such event.

(c) FCA US agrees to use commercially reasonable efforts to keep Seller's Confidential Information from disclosure to (i) individuals or businesses outside of FCA US other than the present or future parent, subsidiary, or affiliate entities of FCA US or its parent entity (excepting any such present or future entities which, in their core business, are Tier 1 automotive suppliers and/or direct competitors of Seller), as well as FCA US's advisors, consultants, and service providers who need to know and who are subject to a confidentiality obligation regarding Seller's Confidential Information, and (ii) FCA US employees who do not need access to such information. Such Confidential Information may be used by FCA US for any reason related to or in connection with its risk management functions. "Confidential Information" as used in this Clause means information provided to FCA US pursuant to Clause 20(b) above that is either (i) Seller's information concerning its operations, systems, services, personnel, financial affairs, marketing, investment performance and investment, research, development efforts, (ii) information received from third parties by Seller under a confidentiality obligation, or (iii) any other information relating to the business of the Seller not made public directly or indirectly by Seller. Notwithstanding the foregoing, nothing herein shall prevent FCA US, if FCA US becomes compelled to disclose Confidential Information by a legal authority having competent jurisdiction over Seller or FCA US (by special deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process; each such process, a "demand"), from responding to such demand without Seller's prior written consent; provided, however, that FCA US will have given Seller written notice of any such demand promptly after the receipt thereof. In any event, the term "Confidential Information" does not include information (A) which was or becomes generally available to the public, other than as a result of a wrongful disclosure by FCA US; (B) which FCA US was aware of prior to its disclosure to FCA US by Seller; (C) which FCA US

learns of from a third party under no applicable obligation of confidentiality to Seller; or (D) which FCA US obtains in connection with any subsequent court, arbitration or other legal proceedings.

(d)    Seller may, with FCA US's written consent (which will not be unreasonably withheld) comply with the reporting requirements set forth in this Clause 20 by delivering parent-level financial information.

**21. CANCELLATION FOR DEFAULT.** (a) FCA US may cancel the whole or part of this Order without liability, except for payment due for goods and services delivered and accepted, and may exercise any of its legal rights, including without limitation its remedies under Clause 23 of these General Terms and Conditions, upon the occurrence of any of the following specified events (each an "Event of Default"):

   (1) Seller fails to timely deliver goods or perform services and Seller fails to give FCA US a remediation plan within one day of FCA US's notice to Seller of such failure, obtain FCA US's acceptance of such plan, and perform such plan to FCA US's satisfaction; or

   (2) Seller violates any other provision in, fails to meet any other requirements contained in, or fails to perform any other provision under the Order at the time specified therein and to the extent such other failure is capable of being cured, fails to so cure such failure within thirty (30) days after such Event of Default; or

   (3) Seller (i) becomes insolvent or generally fails to pay, or admits in writing its inability to pay, its debts as they become due, or (ii) voluntarily commences any proceeding or files any petition under any bankruptcy, insolvency or similar law or seeking dissolution, liquidation or reorganization or the appointment of a receiver, trustee, custodian, conservator or liquidator for itself or a substantial portion of its property, assets or business or (iii) takes corporate action for the purpose of effecting any of the foregoing in (i) or (ii) above; an order for relief is entered in a case under the Bankruptcy Code in which Seller is a debtor; or involuntary proceedings are or an involuntary petition is commenced or filed against Seller under any bankruptcy, insolvency or similar law, unless any such petition is dismissed within forty-five (45) days; or

   (4) Seller repudiates the Order (absent a legal right to do so,) in writing, including via e-mail, takes any action evidencing its intention not to perform (including threatening non-delivery of goods), or omits to take any action required to be performed by Seller, which is necessary for Seller to timely deliver goods and services under the Order; or

   (5) Seller fails to pay any trade payables or other accounts payable owed to FCA US, or its subsidiaries or affiliates, incurred in the ordinary course of such Seller's business that are not reasonably disputed and have been outstanding for more than sixty (60) days after the date such payable is due.

(b) Seller may terminate this Order due to FCA US's material breach of the Order that is not remedied within thirty (30) days of Seller's notice to FCA US of the material breach.

(c) Upon Seller's receipt of any notice of termination under this Clause 21, Seller will stop work on the date and to the extent specified in such notice and terminate all orders and subcontracts that relate to the terminated Order or the applicable terminated portion thereof.

(d) If a Court of competent jurisdiction determines that any purported termination by FCA US under this Clause 21 was made without legally sufficient cause, then the purported termination will be a termination subject to Clause 22 of these General Terms and Conditions, and Seller's remedies, if any, will be limited to those set forth in Clause 22.

**22. TERMINATION AT FCA US'S OPTION.** (a) Upon giving Seller written notice of termination at FCA US's option, FCA US may terminate this Order in whole or in part at any time, and for any business reason (including, without limitation, Seller's non-competitiveness as defined in Clause 32 hereof); provided, however, FCA US may not terminate the Order pursuant to this Clause 22 for Seller's cost competitive deficiencies unless Seller has had notice and opportunity to cure such deficiencies pursuant to Clause 32 hereof. (b) Upon Seller's receipt of any notice of termination at FCA US's option, Seller will, within fifteen (15) days thereafter (during which time FCA US will review any request by Seller for reconsideration of the termination notice, but FCA US will be under no obligation to change its decision), stop work at such time and to the extent specified in such notice, terminate all orders and subcontracts that relate to the terminated Order or the applicable terminated portion thereof, and cooperate reasonably with FCA US in wind-down related functions. Within sixty (60) days after the effective date of such termination, Seller will submit all claims resulting from such termination. Seller may not include in its claim (i) selling, general or administrative costs, (ii) interest costs or the cost of capital, (iii) lost profit or lost opportunity costs, (iv) fixed overhead absorption, (v) capital equipment, (vi) facility costs, (vii) plant modification costs, (viii) labor assignment costs, including without limitation severance costs or labor inefficiencies, (ix) training costs, and (x) other costs related to obtaining the Order. In the case of Tooling for which FCA US has issued an Order that has not been completed, Seller's claim may include substantiated actual costs incurred for direct labor, direct material, and applied factory overhead, but must be reduced by the amount of the scrap value of the not yet completed Tooling. FCA US will have the right to verify such claims by auditing the relevant records, facilities, work or materials of Seller and/or its subcontractors. FCA US will pay Seller for finished work accepted by FCA US as well as for the documented cost to Seller of work in process and raw material allocable to the terminated work which is not in excess of any prior FCA US authorization. Payment of a valid claim made under this Clause 22 will constitute FCA US's only liability for termination hereunder with title and right of possession to all delivered goods and services vesting in FCA US immediately upon FCA US's tender of such payment. The provisions of this Clause 22 will not apply to any cancellation by FCA US for default by Seller or for any other cause recognized by law or specified by this Order. If a dispute arises regarding the amount of such costs to which Seller is entitled hereunder, then the dispute will be finally resolved in accordance with Clause 26 below, and, to the extent that the termination is only a partial termination of the Order, FCA US will not be in material breach of the Order for failing to pay the amount of costs claimed by Seller prior to conclusion of an adjudication or arbitration pursuant to Clause 26 hereof.

**23. REMEDIES.** (a) Upon the occurrence of any Event of Default as described in Clause 21 hereof, FCA US will have the right to cancel or terminate in whole or part the Order, take possession of and title to all or any part of any work performed by Seller under this Order upon written notice to Seller, and take any other action permitted under applicable law. FCA US will also have the right to take immediate possession of any and all of FCA US Tooling (as defined in Clause 10 hereof) at any time without payments of any kind to Seller. Should FCA US elect to exercise such right, Seller must cooperate with FCA US in FCA US's taking possession of FCA US Tooling, including allowing access to Seller's facilities. (b) If FCA US exercises its right to terminate or cancel the Order in whole for the occurrence of an Event of Default by Seller under Clause 21 hereof, then:

(i)     Seller grants to FCA US a non-exclusive, world-wide, paid-up, irrevocable license under any intellectual property of Seller that is incorporated into or used to make or design the goods or Work Product, to make, have made, sell, offer for sale, import or export or modify such goods or Work Product. The license granted to FCA US under this Clause 23(a)(i) will remain in effect for the life of the applicable vehicle program(s) in which such goods or Work Product are utilized (now or in the future), including any service parts therefor;

(ii)    In addition, upon written request from FCA US, Seller will provide the following for such goods or Work Product: (A) any design aides, including without limitation, any computer aided design data and design aides, (B) specifications, (C) bills of material, (D) Seller information for any purchased components used in such goods or Work Product, and (E) manufacturing process information regarding such goods or Work Product; and

(iii)   To the extent FCA US may have paid for prototype tooling for the goods or Work Product under a separate purchase order or other agreement, then in order to ensure that FCA US could make full beneficial use of the rights provided in this Clause 23, Seller will provide the following for such goods and Work Product:  (a) any prototype tools (e.g. dies and molds), including without limitation, any computer aided design data for such prototype tools, and (b) in each case as applicable, the specifications, bills of material, Seller information for any purchased components used in such prototype tools, and manufacturing process information regarding such prototype tools.

(c) In addition to all other rights and remedies, FCA US may, upon fourteen (14) days' written notice to Seller of actual or threatened recurring non-performance concerning capacity or quality, engage (or require that Seller engage) a third party acceptable to FCA US for the purpose of supporting Seller's remediation of such capacity or quality deficiencies.  Seller will pay all costs associated with such remediation efforts, and will reimburse FCA US for any reasonable costs incurred by FCA US hereunder, which may be recovered by means of FCA US's rights of setoff, recoupment, or deduction under Clause 14 hereof.

(d) FCA US's rights and remedies herein reserved to FCA US are cumulative and in addition to any other rights and remedies available at law or equity. No waiver of any breach of (i) any provision of this Order, or (ii) any agreed-upon cure remediation plan arising under these General Terms and Conditions, will constitute a waiver of any other breach or a waiver of such provision.

## 24. REQUIRED COMPLIANCE.
(a)     In providing goods or services hereunder, Seller and its subcontractors will comply with (i) any and all applicable global, federal, state, provincial and local law, regulations, executive orders and other rules of law as in effect at any time during the Term; and (ii) any and all FCA US policies (including CS-9003 and sustainability guidelines) addressing such legal requirements. Seller will provide and maintain an Environmental Management System that complies with ISO 14001. In particular and without limitation, Seller and its subcontractors will not act in any fashion or take any action that will render FCA US liable for a violation of the U.S. Foreign Corrupt Practices Act ("FCPA"), which prohibits the offering, giving or promising to offer or give, directly or indirectly, money or anything of value to any official of a government, governmental entity, political party or instrumentality to assist it or FCA US in obtaining or retaining business or to gain an unfair business advantage.  Seller further represents that neither it nor any of its subcontractors will utilize forced, compulsory, or child labor in connection with the supply of goods or the provision of services under this Order.  FCA US may request Seller from time to time to certify in writing its compliance (and that of its subcontractors) with the foregoing, and Seller will comply with each such request.

(b)    In addition, to the extent applicable for the goods or services provided hereunder, Seller will comply with all applicable Environmental Requirements that apply to Hazardous Materials. Environmental Requirements includes without limitation all global, federal, state, provincial, and local laws, rules and regulations pertaining to the protection of human health, safety, wildlife or the environment. Hazardous Materials includes, without limitation, any material or substance that is regulated by an Environmental Requirement. In particular and without limitation, Seller will comply with all applicable global regulations regarding the registration, restriction, prohibition, and/or recyclability of chemicals, including without limitation those identified in the Global Automotive Declarable Substance List and FCA US's CS-9003. Seller will defend, indemnify, and hold FCA US harmless from and against any claims, losses, damages, costs and expenses resulting from or arising out of any failure to comply with any Environmental Requirement. Seller specifically certifies that all goods sold to FCA US which are required to be registered on an official inventory maintained by the pertinent governmental jurisdiction have been registered in full compliance with applicable law, and Seller will provide immediate notice to FCA US of any use restrictions, reporting requirements, or other obligations imposed with respect to such goods.

**25. SUPPLIER DIVERSITY PROGRAM.** FCA US has an established supplier development program to develop and maintain a qualified diverse supply base. FCA US actively seeks diverse suppliers and encourages Seller to use diverse suppliers. A diverse supplier is a business establishment which meets one or more of the following criteria: (a) a small business, as defined in Title 15, Section 632 of the United States Code and related regulations; (b) a small business owned and controlled by socially disadvantaged individuals (at least fifty-one percent (51) percent of the business is owned and controlled by one or more socially and economically disadvantaged individuals and the management and daily business operations are controlled by one or more such individuals); (c) a business that is at least fifty-one percent (51) percent owned by a woman or women who also control and operate the business; (d) a small business that obtains HUBZone (Historically Underutilized Business Zone) certification (maintains a principal office in a HUBZone, at least fifty-one percent (51) percent of the business is owned and controlled by one or more U.S. citizens, and at least thirty-five percent (35%) of its employees reside in a HUBZone); (e) a business that is at least fifty-one percent (51) percent owned by a service-disabled veteran (an individual who has served in the U.S. armed forces and has received an honorable discharge documented by DD Form 214, Certificate of Release of Discharge from Active Duty) or veterans who also control and operate the business; (f) a business that is at least fifty-one percent (51) percent owned by a veteran or veterans who also control and operate the business; or (g) other categories of diverse businesses as FCA US may include in its diversity supplier development program. Seller will report monthly to FCA US in accordance with FCA US's diversity supplier development program requirements, on the content provided by any such suppliers for the goods or services purchased hereunder as well as the basis for claiming that such content was provided by such a supplier.

**26. DISPUTE RESOLUTION; GOVERNING LAW.**
(a) The Order and all transactions between FCA US and Seller will be governed by and construed in accordance with the laws of Michigan as if entirely performed therein. In the case of FCA Canada Inc., this Order between FCA Canada Inc. and Seller will be governed by and construed in accordance with the laws of the province of Ontario, Canada as if entirely performed therein. The 1980 United Nations Convention on Contracts for the International Sale of Goods is not intended to and does not apply to the Order or any transactions pursuant hereto, and FCA US and Seller specifically waive its application to the Order or any transactions pursuant hereto.

(b) For all disputes arising out of the Order, Seller irrevocably consents to the personal

(1/2017)                                    17

jurisdiction of the state and federal courts in and for Oakland County, Michigan, USA, and irrevocably waives any claim it may have that any proceedings brought in such courts have been brought in an inconvenient forum. Any suit regarding or relating to this Order may only be brought in the state or federal court in and for Oakland County, Michigan, USA, which are the exclusive venue for any such suit.

(c) Any dispute arising out of or in connection with the Order or these General Terms and Conditions (other than FCA US's rights to injunctive relief, enforcement of Seller's delivery obligations, enforcement of FCA US's rights and remedies under Clause 32 hereof, and possession of Tooling, Unpaid Tooling, or other Bailed Property), or any other dispute, may, by agreement in writing of both Parties (or by FCA US's unilateral election, in the case of disputes relating to quality, warranty, or indemnification under Sections 6, 8, or 11 of these General Terms, including claims in connection with vehicle recall and customer satisfaction campaigns), be referred to and finally resolved by binding arbitration in accordance with the Expedited Rules of Arbitration set forth in Annex A to these General Terms and Conditions. Any unilateral election to arbitrate hereunder must be preceded by negotiations to resolve the dispute (provided, however, such negotiations may be terminated by either party at any time in their sole discretion, with seven (7) days' advance notice of such termination furnished to the other party) and, upon election of either party during such negotiation period, a non-binding mediation session, which must be completed within forty-five (45) days of the delivery of written notice by either party to the other requesting mediation. The unilateral arbitration election hereunder may be made by FCA US immediately following the completion of such mediation.

**27. ELECTRONIC COMMUNICATION.** FCA US may prescribe any aspect of electronic communication between Seller and FCA US, and Seller will follow each of FCA US's prescriptions regarding any of those aspects.

**28. COMPLIANCE WITH APPLICABLE REQUIREMENTS; FORMULA AND INFORMATION DISCLOSURE.** (a) Seller will comply with all FCA US requirements then in effect regarding (i) the handling, transportation, labeling, processing, registration, notification, prohibition, use, disposal or recyclability of the goods, containers and packing, including without limitation, the formulation and use of raw materials and other substances in the goods ("Environmental, Health and Safety Requirements"), and (ii) disclosures on the content and origins of such raw materials and substances, including conflict mineral disclosures and chemical and/or substance of concern disclosures (collectively, "Disclosure Requirements"). Seller promptly will provide to FCA US, in such form and detail as directed by FCA US, (i) the formula or list of all ingredients in the goods, (ii) the amount of all ingredients and the percentage of each ingredient in the goods, (iii) an updated formula or list of ingredients promptly upon any change from that provided to FCA US, and (iv) a list of the countries of origin for each ingredient contained in the goods; provided, however, FCA US may require such information from Seller only to the extent necessary to enable FCA US to comply with applicable law. Upon FCA US's request, Seller promptly will certify to FCA US that Seller is in compliance with all Environmental, Health and Safety Requirements and Disclosure Requirements. (b) Prior to and with shipment of the goods, Seller will furnish to FCA US (i) sufficient warning and notice in writing (including placing appropriate labels on the goods, containers, or packaging) of any material that is an ingredient or a part of any of the goods that is or could become hazardous so as to warrant special handling instructions as may be necessary to advise carriers, FCA US and their respective employees of how to exercise that measure of care and precaution that will best prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing shipped to FCA US, (ii) together with such special handling instructions for such materials.

**29. RIGHT TO AUDIT.** Seller grants to FCA US access to all of Seller's information, including, but not limited to, books, records, payroll data, receipts, correspondence, chemical data in connection with Seller's obligations under Clause 28 hereof, and other electronic and non-electronic documents relating to the goods or services to be provided under the Order, FCA US Tooling and Unpaid Tooling, Seller's obligations under the Order, any payment made to Seller, or any claim made by Seller, as reasonably required for the purpose of auditing or verifying Seller's performance of its obligations under this Order and its charges therefor. Seller will preserve this information and these documents for a period of four (4) years after the final payment is made under this Order. Seller will segregate its information and documents as directed by FCA US, and otherwise cooperate with FCA US to facilitate the audit or verification process. In addition, FCA US has the right to visually inspect and audit any facility or process relating to the goods or services to be provided under the Order, including those relating to production quality. Seller acknowledges that FCA US has the right to audit and make copies of all pertinent documents, data and other information relating to any of Seller's subcontractor's or supplier's obligations under the Order. Upon FCA US's request, Seller will permit FCA US to visually inspect and audit any such Seller's subcontractor's or supplier's facilities or processes relating to the goods or services to be provided under the Order. The provisions of this Clause 29 are not intended to expand FCA US's possessory or ownership interests in the property of either FCA US or Seller beyond those set forth elsewhere in the Order or these General Terms and Conditions. The information conveyed to FCA US under this Clause 29 will be "Confidential Information" within the meaning of Clause 20 hereof.

**30. ASSIGNMENT OF ANTITRUST CLAIMS.** Upon FCA US's request (which FCA US may make, in its discretion, provided it has a material interest in any claim described herein), Seller will execute a written assignment of all right, title, and interest in and to all causes of actions under any applicable antitrust laws arising out of or relating to Seller's purchase of raw materials or ingredients used in goods sold or resold to FCA US. If FCA US recovers damages on account of any such assigned claim, and a portion of such damages is reasonably allocable to Seller, FCA US will, net of its attorneys' fees in liquidating the claim, return such allocable amount to Seller.

**31. SURVIVAL.** The provisions of these General Terms and Conditions of the Order intended by their terms to survive termination, cancellation or expiration of the Order will survive any termination, cancellation or expiration of the Order, including without limitation Clauses 2, 5, 8, 9, 10, 11, 13, 14, 15, 16, 17, 18, 20, 21, 23, 26, 29, 30, 33, 34, 39, and 40.

**32. COMPETITIVENESS.** Seller will at all times be and remain competitive with respect to each good or service supplied to FCA US pursuant to the Order on a total cost basis taking into account each of the following attributes: cost, quality, delivery, reliability of supply, technology, financial stability, and performance of obligations under the Order. FCA US reserves the right, at any time during the term of the Order, to market test any good or services to be supplied under the Order to determine the competitiveness of the Supplier of a good or a service. To be "competitive" means to be (i) equal to or better than all other suppliers and potential suppliers of that good or service in as many of the listed attributes as any other supplier or potential supplier of similar goods or services, judged on a total cost basis, and (ii) in support of all FCA US requirements set forth in the Order to the extent that another qualified and cost-competitive supplier supports those requirements. Cost competitiveness comparisons will take into account applicable engineering, research, and development costs. If Seller is uncompetitive with respect to attributes other than cost, FCA US may terminate the Order pursuant to Clause 22 of these General Terms and Conditions. If Seller is not cost competitive with respect to a good or service, FCA US may notify Seller of its non-competitiveness by specifying the cost competitive deficiency in a written notice (the "Cure Notice"). FCA US agrees not to deliver a Cure Notice within twelve (12) months of the

commencement of volume production. Upon notification, Seller must cure such deficiency by (i) submitting to FCA US within thirty (30) days of such notice of non-competitiveness a plan acceptable to FCA US for the remediation of the non-competitiveness as soon as practicable, and (ii) if FCA US, in its reasonable discretion, accepts the plan, using Seller's reasonable best efforts to perform the plan. Seller's plan will identify the actions needed to remediate its deficiency with respect to cost competitiveness and an aggressive timeline for the completion of each such action. FCA US will notify Seller of its acceptance or rejection of Seller's remediation plan within thirty (30) days of receipt of such plan. FCA US must accept a plan from Seller which is more likely than not to promptly remediate a cost competitive deficiency. However, FCA US will be entitled to use its discretion in evaluating both the probability of success and the promptness of any such plan. In the event FCA US delivers a Cure Notice to Seller under this Clause 32, FCA US may not terminate the Order pursuant to Clause 22 of these General Terms and Conditions unless (i) Seller does not submit a remediation plan; (ii) FCA US rejects Seller's remediation plan; (iii) Seller fails to perform any material requirement of its remediation plan, or fails to meet any of the deadlines set forth therein; or (iv) upon the completion of Seller's remediation plan, Seller remains uncompetitive with respect to cost.

**33. EQUITABLE RELIEF.** Seller acknowledges that a material breach of its obligation to supply goods in accordance with Clause 3 of the Order or to transfer FCA US Tooling, Unpaid Tooling, or other Bailed Property to FCA US in accordance with Clause 10 of the Order, would cause irreparable damage to FCA US, including without limitation potential damage to FCA US's relationships with its customers, suppliers, labor unions, lenders, and prospective future customers, the exact amount of which would be difficult to ascertain, and that the remedies at law and monetary damages for any such breach would be inadequate. Accordingly, in the event of any action taken or threatened by Seller hereunder that, if taken, would constitute a material breach of its obligations under Clause 3 or Clause 10 of the Order, FCA US and it successors and assigns are entitled to injunctive or other equitable relief and/or a decree for specific performance, without the posting of any bond or other security, in addition to any other remedies it may have for damages or otherwise. Seller may not take any action or position inconsistent with this acknowledgement, and FCA US will be entitled to recover its attorney fees and costs in connection with the enforcement of this Clause 33.

**34. NOTICE.** Notices must be in writing. E-mail notification will be sufficient and acceptable written notice. Any e-mail notice sent will be deemed to have been received on the second business day after such notice was sent (if not first rejected by automatic response). Any written notice sent using any other manner will be deemed to have been received upon the earlier of (i) actual receipt by the party to whom the notice is directed, and (ii) the second business day after delivery, in the case of U.S. and Canadian deliveries, or the fifth business day after delivery for all other deliveries. Any notice to FCA US must be sent to its head of Production Purchasing.

**35. SEVERABILITY.** If any term of the Order is invalid or unenforceable under any law, regulation, executive order or other rule of law, such term will be deemed to be reformed or deleted, as the case may be, but only to the extent necessary to comply with such law, regulation, order or rule, and the remaining provisions of the Order will remain in full force and effect.

**36. COST SAVINGS PROGRAMS.** Seller will provide to FCA US, in writing by October 1 for each upcoming year during the term of the Order, Seller's plan for implementing cost savings and productivity improvements to reduce Seller's costs in accordance with the then-current FCA US cost savings program.

**37. SELLER'S CONTRACTS WITH ITS SUPPLIERS AND SUBCONTRACTORS.** (a) Seller will ensure that its suppliers and subcontractors for any goods or services to be provided under the Order comply with the obligations, and provide FCA US with no less than the rights, specified in Clauses 17, 24, and 28 of these General Terms and Conditions. Seller will also use commercially reasonable efforts to ensure that such suppliers and subcontractors comply with the obligations, and provide FCA US with no less than the rights, specified in Clauses 16 and 39 of these General Terms and Conditions. (b) If FCA US directs Seller in a writing signed by an officer of FCA US to use a supplier or subcontractor regarding the goods or services to be provided under the Order, then (i) FCA US will be responsible for negotiating the prices charged Seller by such supplier or subcontractor, (ii) Seller will be responsible for every other aspect of the supply relationship between Seller and such supplier or subcontractor, and (iii) Seller agrees to enforce the rights arising out of its agreement with such supplier or subcontractor for the benefit of FCA US, or upon FCA US's request, will assign to FCA US Seller's rights under such agreement for the benefit of FCA US.

**38. TERM.** This Order is a contract for a definite term. The term of the Order is stated on the first page of the Order ("Term"). If the Term is for less than the duration of the applicable vehicle production program, at FCA US's option, the Term may be extended for an additional model year with advance notice to Seller equal to the longer of ninety (90) days or the lead time set forth in the Order (either by FCA US's notifying Seller of the extension or by FCA US's issuance of part releases for some or all of the goods identified in the Order for a future model year), with the Order being extended for each good for which Seller receives a release or other appropriate communication extending this Order for such additional model year.

**39. DISPOSAL OF SCRAP.** Any goods, assemblies, subassemblies, or materials related to this Order which are disposed of by Seller in any manner other than through sale to FCA US under the terms of the Order are scrap ("Scrap") and must be mutilated or otherwise rendered unusable for anything other than material content. If the goods, assemblies, subassemblies, or materials are the subject of a cancellation claim, mutilation must occur only after audit inspection and receipt of disposal instructions from FCA US. FCA US has the right to examine all pertinent documents, data and other information relating to the mutilation of any and all Scrap. In addition, FCA US has the right to visually inspect and audit any facility or process relating to the mutilation of Scrap. Seller must maintain all relevant documents, data and other written information relating to its obligations to mutilate Scrap under the Order for at least four (4) years following the later of last delivery of the goods or final payment under the Order. Such documents, data and written information relating to Seller's obligations to mutilate Scrap will be made available to FCA US upon FCA US's request.

**40. FCA US COMPUTER NETWORK; ACCESS CONFIDENTIALITY.**

(a) If FCA US grants Seller access to FCA US's computer network, Seller understands that the access extends only to those employees of Seller who have a need for the access to perform work for FCA US. Seller must inform its employees that the data files they review are confidential and must not be communicated to others nor used for any purpose other than performing FCA US's work.

(b) FCA US does not grant any intellectual property right including, but not limited to, trade secret, patent or copyright, by granting Seller access to FCA US's computer network. No right to use FCA US-owned or leased hardware, facilities or software application programs, including by way of example but not of limitation, communication software or software design programs, may be inferred from FCA US's granting access to its computer network to Seller.

(c)  FCA US may terminate Seller's access to FCA US's computer network in FCA US's sole discretion.  Upon termination of Seller's access privileges, Seller must return any copy of data file obtained from FCA US's computer network or any information obtained from the data file that Seller possesses.  Seller's confidentiality obligation with respect to each datum of information obtained from FCA US survives termination of its access privileges and continues until the data becomes public knowledge.

(d)  Seller must inform FCA US whenever Seller suspects that data obtained from FCA US's computer network has been wrongfully released to a third party or that an unauthorized third party has accessed FCA US's computer network.  Seller must defend, indemnify, and hold FCA US harmless from the wrongful disclosure of any information obtained from FCA US's computer network.

(e)  Seller assumes all risk of accessing FCA US's computer network.  FCA US makes no warranty, either express or implied, regarding its computer network, including implied warranties of merchantability and fitness for a particular purpose.  FCA US's computer network and data files may contain errors or viruses.  FCA US is not liable for any damage arising from Seller's use of FCA US's computer network including, but not limited to, loss of profit, use, goodwill, work stoppage, computer failure or malfunction, interruption of business, or any direct, indirect, special, exemplary, incidental or consequential damage arising out of the use or performance of FCA US's network.

**41.  TAXES.**  (a) The goods purchased hereunder are for resale or for an exempt purpose and are exempt from state and local sales or use taxes.  FCA US's Office of Tax Affairs will provide an appropriate Certificate of Exemption upon Seller's written request.  The following direct payment permit numbers are applicable for the states indicated:

Illinois (Belvidere Assembly Plant)...............5572-5570 (Valid 9/2/12 – 7/1/15)
Indiana (Kokomo Casting Plant)................. TID-Loc #0136356540-002
Indiana (Kokomo Transmission Plant)..........TID-Loc #0136356540-001
Indiana (Tipton Transmission Plant).............TID-Loc #0136356540-005
Indiana (IN Transmission Plant)..................TID-Loc #0136356540-003
Michigan (FCA US Group LLC)...................ME-0167670
Michigan (GEMA LLC)...............................20-0232860
Michigan (FCA Transport LLC)....................ME-0167777
Michigan (Auto Transport Services LLC)....................45-5062723
Ohio (Toledo Machining Plant)...................98 002923
Ohio (Toledo Assembly Complex)...............98 002921
Wisconsin..............................................008 1026854886-06

(b) For shipments to locations in Canada, this Order is subject to the goods and services tax (GST) and in the harmonized provinces, the harmonized sales tax (HST) and the Quebec sales tax (QST), where applicable, however is exempt from provincial sales tax;

British Columbia vendor number          1000-9880
Saskatchewan vendor number            1602309
Manitoba vendor number                  100963941MT0003

The GST/HST and the QST amount must appear on all invoices as a separate line item and the GST/HST and QST numbers must appear on all invoices.  Failure to comply with this requirement

may result in delay in payment and return of invoice to Seller.

## Annex A
## Expedited Rules of Arbitration

(i) For disputes less than Twenty-five Million Dollars ($25,000,000), the number of arbitrators will be one (1). For disputes in excess of Twenty-five Million Dollars ($25,000,000), the number of arbitrators will be three (3). FCA US and Seller will attempt to agree on the appointment of the arbitrator, in the case of a single arbitrator. In the case of a 3-person panel, each party will appoint one (1) arbitrator. FCA US and Seller will attempt to agree on the appointment of the third arbitrator, who will serve as chairperson of the arbitration panel. In the case of either a 1-member or a 3-member arbitration, if such agreement is not reached within five (5) business days of the referral to arbitration, the arbitrator (or third arbitrator, as the case may be) will be selected by the American Arbitration Association ("AAA") pursuant to the AAA arbitrator selection process.

(ii) The place of arbitration will be Detroit, Michigan, U.S.A., with Michigan-based arbitrators.

(iii) The arbitral proceedings shall be conducted in the English language.

(iv) Each party will submit a request for production of documents (and related electronic search terms) and identify custodians who may have knowledge or information regarding the dispute within twenty (20) business days of the referral to arbitration. Documents will be exchanged within seventy-five (75) days after identification of custodians. Third-party discovery will be permissible. All discovery issues shall be resolved by the arbitrator(s). The parties agree that subpoenas and discovery-related orders issued by the arbitrator(s) will be enforceable by court order, and that attorneys' fees and costs incurred in connection with the enforcement of such orders will be awarded by the arbitrator(s). No other written discovery will be permitted.

(v) Each party will be allowed to depose up to six (6) witnesses. Seller and FCA US must submit a detailed disclosure of any proposed expert testimony (including findings and opinions) in a written report to be served within one hundred twenty (120) days after the referral to arbitration. After the disclosures and reports are issued, depositions of the fact and expert witnesses may occur but each deposition may not exceed eight (8) hours.

(vi) The hearing date will be scheduled within fifteen (15) months after the referral to arbitration. The pre-hearing deadlines established in subsections (iv) and (v) hereof may be modified by agreement of the parties or direction of the arbitrator(s), provided that such modifications do not render impracticable the fulfillment of the fifteen month deadline set forth herein.

(vii) Thirty (30) days prior to arbitration, Seller and FCA US will submit proposed arbitration awards to the arbitrator(s), which will simultaneously be exchanged by Seller and FCA US.

(viii) Seller and FCA US will be limited to up to six (6) witnesses that are identified pursuant to subsection (v) hereof, together with two (2) rebuttal witnesses. Seller and FCA US will exchange written direct testimony for each witness, exhibits and

pre-hearing briefs two weeks before the hearing. The evidence at the hearing will be limited in scope to the exhibits and disclosures made at that time. The pre-hearing brief will address all issues of law, or such issues will be waived.

(ix) The hearing will be limited to no more than three (3) days per party, with hearings on consecutive days.

(x) Witnesses as the hearing must be presented for cross-examination. (Affidavits will not be allowed). If a witness cannot attend the hearing in person, the proponent of that witness must have previously offered the other party the opportunity to cross-examine the witness under oath, in which case the deposition record will be admissible.

(xi) The arbitrator(s) will choose one award from the submitted awards without modification.

(xii) All statute of limitations and repose will be tolled during the arbitration proceeding.

(xiii) The parties agree to share the costs of the arbitrator(s).

(xiv) The arbitration process will be confidential.

(xv) Judgment on the decision or award may be entered in any court of competent jurisdiction.

(xvi) Any referral of arbitration under these General Terms will be made with a full reservation of rights and remedies, and will not constitute a waiver, forfeiture, or election of any such rights and remedies.

# Exhibit 2



**FCA**
FIAT CHRYSLER AUTOMOBILES

Page 1 of 2

FCA US LLC 1000 Chrysler Drive Auburn Hills MI 48326 US

Last Transmission Date: 10/23/2020

Contract: 10911293          Version

| Document Details | | Buyer: M1F | Requester |
|---|---|---|---|
| Original Document Date: | 08/30/2016 through life of the program | Taryn Stander Phone #:248 622 9661 taryn.stander@fcagroup.com | |
| Document Type: | OA1 | | |
| Document Currency: | USD | | |
| Expiration Date: | 12/31/9999 | | |

| Vendor Address | Delivery Details | Invoice Information |
|---|---|---|
| MARTINREA HONSEL MEXICO SA DE CV FRITZ HONSEL STARABE 30 MESCHEDE 59872 DE Vendor Code: 62780 | Incoterms: FCA Delivery Address: Mfg Location: 62780 A Querétaro QUE 76220 MX Ship From: 62780 A Querétaro QUE 76220 MX Rel Location: 62780 A Querétaro QUE 76220 MX | Payment Terms: XLZA NET 45 DAYS Invoice Instructions: All invoices must be submitted electronically. For CAP related inquiries, please call(844) 289-1227. CAP Phone Number: (844)-289-1227 |

Reason for Change as of 10/23/2020
Line Item 00990 Version  REVISE 04893461AG CANCEL
Line Item 01000 , Version  REVISE Add new line 04893461AG

| Item | Material | Quantity | UOM | Unit Price / Per / Currency | Pricing Start Date | Pricing End Date |
|---|---|---|---|---|---|---|
| 1000 | 04893461AG CYLINDER BLOCK-CUBED Tracking no: 1000698761 | 1.000 | EA | ███/1/ USD | 01/01/2020 | 03/31/2020 |
| | | | | ███/1/ USD | 04/01/2020 | 06/30/2020 |
| | | | | ███/1/ USD | 07/01/2020 | 09/30/2020 |
| | | | | ███/1/ USD | 10/01/2020 | 12/31/9999 |

This order is for approximately 65% - 100% of our requirements.

| Lead Time-14 | Raw-6 | Fab-2 | | Previous PO- |
|---|---|---|---|---|
| Tooling Capacity | 2604 | Daily-2604 | Weekly-13021 | Previouspart# |
| Work Pattern | 003/ | 8.00 | 00005 | Ship To: |
| Packaging | | | | Packaging:Returnable |

Packaging Price
Standard Text ID: 294, 430, 700, 471A, 098A, 022B, 100A, 156, 410, 014B, 014D, 014E, 133, 284
Header Text:
Stepped PO: Effective Date Capacity 02/27/2015 Weekly:813 Daily:163 Annual:39000 06/16/2015 Weekly:4646 Daily:929 Annual:223000

Seller agrees to sell and deliver the goods and services specified in FCA's order in accordance to the Terms and Conditions contained in the order. Standard Text ID's referenced in the order. The FCA Production - General Terms and Conditions (1/2017), the terms of this form and any signed document referenced in this order, all of which constitute the entire and final agreement between FCA and Seller and cancel and supersede any prior or contemporaneous negotiations or agreements regarding the order. The FCA Production - General Terms and Conditions (1/2017) and Standard Text ID text are currently published on https://gsp.extra.chrysler.com/ps/psglc/. By accepting the order, the Seller acknowledges having actual knowledge of the text of the reference Instructions and the General Terms and Conditions. FCA's order expressly limits acceptance to the terms of the order and any additional or different terms, whether contained in Seller's forms or otherwise presented by Seller are rejected unless expressly agreed to by FCA. Seller specifically waives its signed acceptance of the order. "Order" means a purchase order transmitted to Seller via FCA Electronic Data Interchange system or delivered to Seller in a paper or email format.



**FCA**

Page 2 of 2

FCA US LLC 1000 Chrysler Drive Auburn Hills MI 48326 US

Last Transmission Date: 10/23/2020

Contract: 10911293       Version

| Document Details | | Buyer: M1F | Requester |
|---|---|---|---|
| Original Document Date: | 08/30/2016 through life of the program | Taryn Stander Phone #:248 622 9661 taryn.stander@fcagroup.com | |
| Document Type: | OA1 | | |
| Document Currency: | USD | | |
| Expiration Date: | 12/31/9999 | | |

| Vendor Address | Delivery Details | Invoice Information |
|---|---|---|
| MARTINREA HONSEL MEXICO SA DE CV FRITZ HONSEL STARABE 30 MESCHEDE 59872 DE Vendor Code:   62780 | Incoterms:    FCA Delivery Address: Mfg Location:          62780 A Querétaro QUE 76220 MX Ship From:              62780 A Querétaro QUE 76220 MX Rel Location:          62780 A Querétaro QUE 76220 MX | Payment Terms:     XLZA NET 45 DAYS Invoice Instructions: All invoices must be submitted electronically. For CAP related inquiries, please call(844) 289-1227. CAP Phone Number:     (844)-289-1227 |

09/02/2015 Weekly:7813 Daily:1563 Annual:375000 09/07/2015 Weekly:8333 Daily:1667 Annual:400000 11/23/2015 Weekly:13021 Daily:2604 Annual:625000 Full Program Award units/year: 625000 4/1/14 - 16791kk: Revise Release/Mfg/Ship from location from V/C 62780 to V/C 62780A. 04893461AB Part Pricing: Casting - $███ Machining (impregnation 100%) $███ Total Price Award- $███ Total Price Placement: 185.71 Price/Lb Aluminum $███/lb @55.34 Price/lb Iron: $███/lb @ 17.4 lbs Long Term Agreement / Business Plan: Current Pentastar - $███ reduction starting January 1, 2014 2016 Upgrade - $0.30 reduction starting January 1, 2017 Simulator/Metal Indexing Agreement: Aluminum Weight: 25.1 Kg. as delivered (cubed part excluding liners). Weight to be confirmed at PPAP; Material price: $███ per kg (Platts Index). Index to be adjusted per Chrysler current adjustment practices; Chrysler simulator Index A101US/A380 Aluminum Liner material $███ or $███/Lb. (Chicago No. 1 Dealer Bundles/Chrysler S101US). Liner weight considered 2.9 Lb. each or (17.4 Lb. total). Liner price considered is $███ each; Tooling: Casting Tools: $███ Assumes Pentastar molds & holders will be refurbed via the tool refurbishment budget to accommodate Upgrade Cubing Tools: $███

# Exhibit 3

v.



**FIAT CHRYSLER AUTOMOBILES**

July 24, 2019

•

MARTINREA HONSEL MEXIC
AV LA MONTANA 121
STA ROSA JAUREGUI
QUE, MEXICO 76220

**SUBJECT: Not To Exceed Letter of Intent - Production Projects/Expenditures**

This Letter Agreement constitutes FCA US LLC's ("FCA US") authorization to____ VC: 63518
_ MARTINREA HONSEL MEXICO SA DE CV ___ ("Supplier") to proceed with expenditures in
support of the____Pentastar Upgrade Cylinder Block PN 04893461AG____ (the "Program").
FCA US acknowledges the immediate financial Not to Exceed ("NTE") commitment in the amount
of $ 8,171,220 ____ for____ PSU Cylinder Block Tooling Refurbishment
(collectively, "Property") that Supplier will incur to support Program (the "Immediate Commitment
Total"). This investment has been determined based on Supplier's response to the Program and is
provided pending completion of FCA US's existing processes for creating, issuing, and verifying
related purchase orders and/or amendments (collectively, "Orders").

In the event, prior to the issuance of any Orders contemplated by this Letter Agreement, the
Program is cancelled, modified, or otherwise not awarded to or accepted by Supplier, resulting in
the purchased Property no longer required (collectively, a "Cancellation Event"), FCA US will, to
compensate Supplier for the Immediate Commitment Total, make a cash payment to Supplier
equal to its verifiable, substantiated expenditures up to the Immediate Commitment Total, upon the
completion of FCA US's verification process pursuant to FCA US's standard audit procedures (the
"Cancellation Payment"). The Cancellation Payment will constitute full satisfaction of any and all
claims, demands, liabilities, or expenses (collectively, "Claims") in connection with the
Cancellation Event, whether arising under this Letter Agreement or any other basis for relief in law
or in equity, including any direct, indirect, and/or consequential damages, and Supplier releases
FCA US in full from any and all such Claims. For purposes of clarity, the Cancellation Payment will
be the sole and exclusive remedy available to Supplier for any Cancellation Event.

This Letter Agreement is subject to FCA US's Production and Mopar Purchasing General Terms
and Conditions (the "General Terms"), including, without limitation, the provisions thereof
governing Property and Tooling, Termination at FCA US's Option, Dispute Resolution, and
Governing Law. All such General Terms are incorporated herein by reference. For avoidance of
doubt, all Property subject to this Letter Agreement will be "FCA US Tooling" or "Chrysler Tooling"
as defined in such General Terms (which defines FCA US Tooling or Chrysler Tooling to include,
without limitation, tooling, equipment, and other items of personal property), and will be owned by



**FIAT CHRYSLER AUTOMOBILES**

FCA US to the extent provided therein.

This Letter Agreement will remain in place until such time as Orders are issued. Supplier's obligation to invest in Property hereunder is limited to a not to exceed amount of the Initial Commitment Total until such time as FCA US and Supplier mutually agree upon the relevant purchase orders and/or amendments for the Program requirements. Upon issuance of such Orders, this Letter Agreement will terminate, with no surviving payment obligations owed by FCA US to Supplier in connection with the Initial Commitment Total or any of the terms herein. Any obligations of Supplier with respect to Tooling or the General Terms, each as defined hereinabove, will survive termination of the Letter Agreement.

This Letter Agreement constitutes the entire and final agreement of FCA US and Supplier with respect to the subject matter addressed herein, and cancels and supersedes any prior or contemporaneous negotiations or agreements concerning the specific subjects addressed herein. The Letter Agreement will be governed by and construed in accordance with the laws of Michigan.

Based on the above terms and receipt by FCA US of Supplier's written acceptance below, Supplier will proceed with the acquisition of Property in the NTE amount of the Initial Commitment Total required to support the Program.

Regards,

_Laura Stojan_ Laura Stojan on behalf of Amy McLain

**Amy McLain - Director Powertrain Purchasing** Email dated 8/5

Accepted:

By:

FRANCESCO BARBARA

7/25/2019

FRANK BARBARA
VICE PRESIDENT OPERATIONS AMERICAS
MARTIN MSA - HOUSER

FCA US LLC | 1000 Chrysler Drive | Auburn Hills, MI USA | 48326

# Exhibit 4

 **FCA**
FIAT CHRYSLER AUTOMOBILES

Page 1 of 3

FCA Mexico, S.A. de C.V. Av Prolongacion Paseo de la Reforma
Santa Fe Cuajimalpa DIF 05348 MX

Last Transmission Date: 09/26/2019

Contract: 10911294    Version

| Document Details | Buyer: M1F | Requester |
|---|---|---|
| Original Document Date:  08/30/2016 through life of the program<br>Document Type:      OA1<br>Document Currency:   USD<br>Expiration Date:        12/31/9999 | Taryn Stander<br>Phone #:248 622 9661<br>taryn.stander@fcagroup.com | |
| **Vendor Address** | **Delivery Details** | **Invoice Information** |
| MARTINREA HONSEL MEXICO SA DE CV<br>AV LA MONTANA 121<br>STA ROSA JAUREGUI QUE 76220 MX<br>Vendor Code:    63518 | Incoterms:     FCA<br>Delivery Address:<br>Mfg Location:      63518<br>STA ROSA JAUREGUI QUE 76220 MX<br>Ship From:        63518<br>STA ROSA JAUREGUI QUE 76220 MX<br>Rel Location:       63518<br>STA ROSA JAUREGUI QUE 76220 MX | Payment Terms:     XLZA<br>NET 45 DAYS<br>Invoice Instructions:<br>FCA MEXICO, S.A. de C.V.<br>PROLONGACION PASEO DE LA REFORMA 1240<br>COL. SANTA FE CUAJIMALPA,DEL.CUAJIMALPA,<br>CP 05348 MEXICO, D.F. RFC:CME720930GM9<br><br>CAP Phone Number:      (844)-289-1227 |

Reason for Change as of 09/26/2019
Line Item 00980 Version  REVISE 04893461AG CANCEL
Line Item 00990 , Version  REVISE Add new line 04893461AG
Line Item 00990 Version  REVISE 04893461AG CANCEL
Line Item 01000 , Version  REVISE Add new line 04893461AG

| Item | Material | Quantity | UOM | Unit Price / Per / Currency | Pricing Start Date | Pricing End Date |
|---|---|---|---|---|---|---|
| 1000 | 04893461AG<br>CYLINDER BLOCK-CUBED<br>Tracking no: 1000698762 | 1.000 | EA | ████ /<br>USD | 10/01/2019 | 12/31/9999 |

Item text:
Material Type : A101US
Material Type Description : ALUM SECONDARY/ MW A-380 ALLOY-USD
Weight (Including Dross) : 55.34 LB
Original Base : 0.5956
Old Base : 0.8176
New Base : 0.7214
Delta : -0.0962
PO Change : -5.32
Effective Date : 10/01/2019
This order is for approximately 65% - 100% of our requirements.

Seller agrees to sell and deliver the goods and/or services specified in this Order in accordance to Chrysler Production General Terms and Conditions (07/2013), the standard clauses referenced in the Order and any other document referenced in this Order or signed by the parties, all of which constitute the entire and final agreement between Chrysler and Seller, and cancel and supersede any prior or current negotiations or agreements regarding the Order. The Chrysler Production-General Terms and Conditions (07/2013) and standard clauses are currently published on https://www.esupplierconnect.com. By accepting the Order, the Seller acknowledges having read the Chrysler Production-General Terms and Conditions (07/2013) and the standard clauses and accepts to be bound by them. Any additional or different terms, whether contained in Seller's forms or otherwise presented by Seller are rejected unless expressly agreed to by Chrysler. Seller specifically waives its signed acceptance of the Order. "Order" means a purchase order transmitted to Seller via Chrysler Electronic Data Interchange system or delivered to Seller in a paper or email format.
El Proveedor acuerda vender y entregar los bienes y/o servicios especificados en esta Orden de conformidad con los Términos y Condiciones Generales de Chrysler aplicables a Material Productivo (07/2013), las cláusulas suplementarias referenciadas en la Orden y cualquier otro documento referenciado en esta Orden o firmado por las partes, todos los cuales constituyen el acuerdo completo y final entre Chrysler y el Proveedor, y cancela y deja sin efecto cualquier otra negociación o acuerdo previo o actual relacionado con esta Orden. Los Términos y Condiciones Generales de Chrysler aplicables a Material Productivo (07/2013) y las cláusulas suplementarias están publicadas en https://www.esupplierconnect.com. Mediante la aceptación de la Orden, el Proveedor reconoce tener conocimiento de los Términos y Condiciones Generales de Chrysler aplicables a Material Productivo (07/2013) y de las cláusulas suplementarias y acepta estar sujeto a sus términos. Cualquier otro término adicional o diferente, ya sea contenido en los formatos del Proveedor o de cualquier otra forma presentado por el Proveedor, son rechazados por Chrysler, salvo que los acepte expresamente. El Proveedor expresamente reconoce que no requiere aceptación expresa ni firma de aceptación de

**FCA**
FIAT CHRYSLER AUTOMOBILES

Page 2 of 3

FCA Mexico, S.A. de C.V. Av Prolongacion Paseo de la Reforma
Santa Fe Cuajimalpa DIF 05348 MX

Last Transmission Date: 09/26/2019

| | Contract: 10911294 | Version |
|---|---|---|

| Document Details | Buyer: M1F | Requester |
|---|---|---|
| Original Document Date:  08/30/2016 through life of the program<br><br>Document Type:  OA1<br>Document Currency:  USD<br>Expiration Date:  12/31/9999 | Taryn Stander<br>Phone #:248 622 9661<br>taryn.stander@fcagroup.com | |

| Vendor Address | Delivery Details | Invoice Information |
|---|---|---|
| MARTINREA HONSEL MEXICO SA DE CV<br>AV LA MONTANA 121<br>STA ROSA JAUREGUI QUE 76220 MX<br>Vendor Code:  63518 | Incoterms:  FCA<br>Delivery Address:<br>Mfg Location:  63518<br>STA ROSA JAUREGUI QUE 76220 MX<br>Ship From:  63518<br>STA ROSA JAUREGUI QUE 76220 MX<br>Rel Location:  63518<br>STA ROSA JAUREGUI QUE 76220 MX | Payment Terms:  XLZA<br>NET 45 DAYS<br>Invoice Instructions:<br>FCA MEXICO, S.A. de C.V.<br>PROLONGACION PASEO DE LA REFORMA 1240<br>COL. SANTA FE CUAJIMALPA,DEL.CUAJIMALPA,<br>CP 05348 MEXICO, D.F.  RFC:CME720930GM9<br><br>CAP Phone Number:   (844)-289-1227 |

| Lead Time-14 | Raw-6 | Fab-2 | | Previous PO- |
|---|---|---|---|---|
| Tooling Capacity | 2604 | Daily-2604 | | Previouspart# |
| Work Pattern | 003/ | 8.00 | Weekly-13021 | Ship To: |
| Packaging | | | 00005 | Packaging:Returnable |
| Packaging Price | | | | |

Standard Text ID:  022B, 184B, 504F, 284
Header Text:

1.,,REFERENCE IN CHRYSLER ORDERS. ALL CHRYSLER ORDERS ISSUED FOR THE SERVICES ("CHRYSLER ORDERS") SHALL BE ISSUED, OR AMENDED AND REISSUED, WITH THE FOLLOWING REFERENCE:
THIS PURCHASE ORDER SHALL BE SUBJECT TO THE TERMS AND CONDIT ION OF THE SIDE LETTER, EXECUTED APRIL 26, 2010, BETWEEN CHRYSLER LLC AND HONSEL AG.
2.,,THE SERVICES. THE
SERVICES PERFORMED BY HONSEL AND TAFIME, SHALL CONSIST OF AND BE LIMITED TO: (A) ORDERING AND PURCHASING LINERS FOR THE PENTASTAR ENGINE BLOCK ("LINERS") FROM FEDERAL MOGUL
CORP. ("FMC") ON BEHALF OF CHRYSLER OR CHRYSLER MEXICO, (B) TAFIME'S RECEIPT OF LINER POSSESSION AND TITLE, AND (C) WAREHOUSING OF THE DELIVERED LINERS FOR CHRYSLER AND CHR
YSLER MEXICO AT TAFIME'S QUERETARO MEXICO FACILITY UNTIL SUCH TIME THE LINERS ARE INSTALLED IN THE PENTASTAR ENGINE BLOCKS BY TAFIME. 3.,,PAYMENT FOR SERVICES. IN
CONSIDERATION OF THE SERVICES PERFORMED, CHRYSLER AND/OR CHRYSLER MEXICO SHALL PAY HONSEL AND/OR TAFIME A SERVICE FEE BASED ON THE UNIT PRICING SET FORTH BELOW: ITEM UNIT
PRICE FMC LINERS ███ PER ENGINE (███ PER LINER) PACKAGING $███ PER ENGINE ($███ PER LINER) TRANSPORTATION $███ PER ENGINE ($███ PER LINER ) SUPPLIER HANDLING
FEE $███ PER ENGINE ($███ PER LINER) LINER SCRAP RATE $███ PER ENGINE ($███ PER LINER ) TOTAL $███ PER ENGINE ($███ PER LINER) HONSEL AND TAFIME SHALL BE
ENTITLED TO RECEIVE FROM CHRYSLER AND CHRYSLER MEXICO A MONTHLY RATE ADJUSTMENT FOR THE SCRAP STEEL RATE. 4.,,DISCLAIMER OF WARRANTIES. AS AN EXPRESS CONDITION TO THE
PERFORMANCE OF SERVICES BY HONSEL AND TAFIME, CHRYSLER ACKNOWLEDGES THAT FEDERAL MOGUL (AND NOT HONSEL OR TAFIME) HAVE ASSUMED THE ENTIRE RISK OF THE CONDITION AND
SUITABILITY OF THE LINERS, WHETHER SEPARATE OR INSTALLED IN THE PENTASTAR ENGINE BLOCKS. HONSEL AND TAFIME DISCLAIM ALL REPRESENTATIONS AND WARRANTIES IN THE LINERS, WHETHER



FCA Mexico, S.A. de C.V. Av Prolongacion Paseo de la Reforma
Santa Fe Cuajimalpa DIF 05348 MX

Last Transmission Date: 09/26/2019

Contract: 10911294     Version

| Document Details | Buyer: M1F | Requester |
|---|---|---|
| Original Document Date:   08/30/2016 through life of the program<br><br>Document Type:   OA1<br>Document Currency:   USD<br>Expiration Date:   12/31/9999 | Taryn Stander<br>Phone #:248 622 9661<br>taryn.stander@fcagroup.com | |
| Vendor Address | Delivery Details | Invoice Information |
| MARTINREA HONSEL MEXICO SA DE CV<br>AV LA MONTANA 121<br>STA ROSA JAUREGUI QUE 76220 MX<br>Vendor Code:   63518 | Incoterms:   FCA<br>Delivery Address:<br>Mfg Location:   63518<br>STA ROSA JAUREGUI QUE 76220 MX<br>Ship From:   63518<br>STA ROSA JAUREGUI QUE 76220 MX<br>Rel Location:   63518<br>STA ROSA JAUREGUI QUE 76220 MX | Payment Terms:   XLZA<br>NET 45 DAYS<br>Invoice Instructions:<br>FCA MEXICO, S.A. de C.V.<br>PROLONGACION PASEO DE LA REFORMA 1240<br>COL. SANTA FE CUAJIMALPA,DEL.CUAJIMALPA,<br>CP 05348 MEXICO, D.F. RFC:CME720930GM9<br><br>CAP Phone Number:   (844)-289-1227 |

WRITTEN OR ORAL, INCLUDING , BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON INFRINGEMENT.
5.,,LIMITATION OF LIABILITY
AND HOLD HARMLESS. HONSEL AND TAFIME SHALL NOT BE LIABLE TO CHRYSLER FOR ANY DAMAGES WHATSOEVER RELATE TO THE LINERS PURCHASED, HELD, AND SERVICED BY HONSEL AND/OR TAFIME ON
BEHALF OF CHRYSLER AND CHRYSLER MEXICO UNDER A CHRYSLER ORDER AND THIS SIDE LETTER, INCLUDING ANY AMOUNTS REPRESENTING DIRECT DAMAGES, INDIRECT DAMAGES, CONSEQUENTIAL
DAMAGES, LOSS OF PROFIT, LOSS OF BUSINESS, EXEMPLARY DAMAGES, OR PUNITIVE DAMAGES OF CHRYSLER OR IT'S AFFILIATES. 6.,,ORDER OF PRIORITY. IN THE EVENT OF A CONFLICT BETWEEN
THE TERM AND CONDITIONS OF THIS SIDE LETTER AND THE TERMS AND CONDITIONS OF A CHRYSLER ORDER, INCLUDING THE ORDER'S PRODUCTION PURCHASING GENERAL TERMS AND CONDITIONS AND ANY
CLAUSES AND DOCUMENTS REFERENCED IN THE ORDER, THEN THE TERMS AND CONDITIONS OF THIS SIDE LETTER WILL CONTROL AND PREVAIL OVER THE TERMS AND COND ITION OF THE OTHER CHRYSLER
ORDER AND OTHER ORDER DOCUMENTS. 04893461AB Part Pricing: Casting - $███ Machining (impregnation 100%) $███ Total Price Award- $███ Total Price Placement: 185.71
Price/Lb Aluminum $███/lb @55.34 lbs Price/lb Iron:  $███/lb @ 17.4 lbs Long Term Agreement / Business Plan: Current Pentastar - $███ reduction starting January 1,
2014 2016 Upgrade - $███ reduction starting January 1, 2017 Simulator/Metal Indexing Agreement: Aluminum Weight: 25.1 Kg. as delivered (cubed part excluding liners). Weight
to be confirmed at PPAP; Material price: $███ per kg (Platts Index). Index to be adjusted per Chrysler current adjustment practices;  Chrysler simulator Index A101US/A380
Aluminum Liner material $███ or $███/Lb. (Chicago No. 1 Dealer Bundles/Chysler S101US). Liner weight considered 2.9 Lb. each or (17.4 Lb. total). Liner price
considered is $███ each; Tooling: Casting Tools: $███ Assumes Pentastar molds & holders will be refurbed via the tool refurbishment budget to accommodate Upgrade
Cubing Tools: $███

# Exhibit 5

## TÉRMINOS Y CONDICIONES GENERALES (07/2013)

## COMPRAS DIRECTAS (MATERIAL PRODUCTIVO)

## VIGENTES A PARTIR DEL 1 DE JULIO DE 2013

**PRIMERA.-**   **OBJETO**

El Proveedor y Chrysler de México, S.A. de C.V. (en adelante "Chrysler"), ambas referidas en su conjunto como las "Partes", reconocen las siguientes metas y objetivos de beneficio mutuo:

(i)   Asegurar un suministro confiable y oportuno de las mercancías incluidas en la Orden. El término "Orden" según es utilizado en estos Términos y Condiciones significa una orden de compra enviada al Proveedor por Chrysler vía electrónica o entregada al Proveedor en papel. La Orden sólo podrá ser modificada mediante la emisión de una Orden modificada emitida por Chrysler,

(ii)   Implementar procesos comunes o complementarios para proveer cantidades necesarias, realizar pedidos, enviar, recibir y realizar pagos de bienes,

(iii)   Identificar, incluir y resolver sin demora y en su totalidad cualquier problema en cuanto a la puntualidad y la calidad de los productos entregados, e

(iv)   Identificar en conjunto oportunidades, aplicar medidas de ahorro en los costos respecto a los productos contemplados en la Orden y en los procesos de creación, envío, recepción y uso de los bienes por parte del Proveedor, todo ello de conformidad con la ley aplicable y con los Términos y Condiciones especificados en la Orden.

Las Partes están de acuerdo que estas metas y objetivos no pretenden ampliar o limitar el alcance de las obligaciones de las Partes, ni alterar el sentido de estos términos y condiciones generales (en adelante los "Términos y Condiciones"), así como de la Orden.

Asimismo, las Partes reconocen que estos Términos y Condiciones formarán parte integrante de la Orden.

**SEGUNDA.-**   **ACUERDO**

El Proveedor se compromete a vender y entregar los productos o servicios especificados en la Orden de conformidad con estos Términos y Condiciones, incluyendo las cláusulas suplementarias y cualquier otro documento específicamente incorporado a la Orden, los cuales constituyen el acuerdo íntegro entre las Partes, quedando entendido sin embargo, que cualquier contradicción o conflicto entre lo estipulado en la Orden y estos Términos y Condiciones con cualquier otra negociación previa o presente, con acuerdos escritos, con determinación de precio o con información suministrada al Proveedor, prevalecerán la Orden y los presentes Términos y Condiciones. En caso de cualquier contradicción o conflicto entre la Orden y los Términos y Condiciones, prevalecerá la Orden.

Las cláusulas suplementarias mencionadas en el párrafo inmediato anterior, son aquellas publicadas en el portal electrónico de Chrysler o en el sitio web que lo sustituya en la fecha de emisión de la Orden o en la fecha de cualquier modificación a la misma. El portal electrónico de Chrysler se encuentra actualmente en: https://www.esupplierconnect.com.

Mediante la aceptación de la Orden, el Proveedor reconoce tener conocimiento del texto de las cláusulas de referencia, de los presentes Términos y Condiciones y demás documentos relacionados e incorporados a la Orden. LA ORDEN Y ESTOS TÉRMINOS Y CONDICIONES SE LIMITAN EXPRESAMENTE A LA ACEPTACIÓN DE SUS TÉRMINOS; CUALQUIER TÉRMINO ADICIONAL O DIFERENTE CONTENIDO EN FORMATOS DEL PROVEEDOR O PRESENTADO DE OTRA MANERA POR EL PROVEEDOR EN CUALQUIER MOMENTO, SERÁ NULO, SALVO ACUERDO EXPRESO POR ESCRITO DE CHRYSLER.

Nada de lo establecido en la Orden o en estos Términos y Condiciones se entenderá como una relación en exclusiva, por lo que Chrysler en todo momento podrá adquirir los productos y/o servicios del proveedor que mejor le convenga.

**TERCERA.-** **ACEPTACIÓN**

La Orden no se considerará obligatoria para Chrysler hasta que sea aceptada por el Proveedor. Se entenderá que el Proveedor acepta la presente Orden:

(i)     Si el Proveedor manifiesta por escrito (incluyendo cualquier comunicación electrónica) su aceptación de la Orden,

(ii)    Si el Proveedor realiza cualquier trabajo o presta algún servicio relacionado con los bienes que se fabrican especialmente para Chrysler de conformidad con la Orden después de que ésta haya sido recibida por el Proveedor,

(iii)   Si el Proveedor entrega cualquiera de los bienes o presta cualquiera de los servicios, o

(iv)   Si la Orden no es rechazada por escrito dentro de los 10 días siguientes a su recepción.

Una vez aceptada la Orden por el Proveedor, ésta será obligatoria para éste y para Chrysler.

En términos de lo anterior, el Proveedor en este acto renuncia expresamente a realizar solicitud alguna de firma de la Orden para su aceptación. Asimismo, el Proveedor y Chrysler renuncian a cualquier defensa que pudiere existir en relación a la validez y ejecutabilidad de la Orden que se llegara a originar, esto por tratarse de un documento enviado vía electrónica al Proveedor y por la aceptación de la Orden por parte del Proveedor en términos de esta Cláusula.

Con la aceptación de esta Orden, el Proveedor se obliga a asentar su clave de Proveedor asignada por Chrysler en toda documentación relacionada con la Orden y con estos Términos y Condiciones.

**CUARTA.-** **ENTREGA**

La entrega de los bienes deberá efectuarse dentro del Plazo (como se define en la Cláusula Cuadragésima Primera de estos Términos y Condiciones) establecido en la Orden, o de acuerdo con las solicitudes o requisitos que por escrito realice Chrysler, siempre que así se indique en la Orden. Sin embargo, en el caso de que Chrysler solicite por escrito una entrega fuera del Plazo establecido en la Orden, Chrysler y el Proveedor señalarán de común acuerdo un plazo cercano al señalado en la solicitud de Chrysler dentro de los estándares comercialmente razonables para que el Proveedor pueda cubrir el requerimiento de Chrysler.

Si el Proveedor no realiza las entregas o no presta los servicios en la fecha acordada, todos los daños y perjuicios sufridos por Chrysler como consecuencia del incumplimiento, incluyendo de manera enunciativa más no limitativa el contratar a su discreción cualquier transporte de primera calidad u otros costos incurridos por Chrysler en su esfuerzo por mitigar el impacto de cumplimiento extemporáneo en sus operaciones de fabricación, correrán a cargo del Proveedor.

Cuando se haya especificado en esta Orden que las entregas se hagan de acuerdo con programas específicos, el Proveedor no deberá fabricar, ensamblar o adquirir más de los materiales necesarios para cumplir con estos programas, en el entendido de que si violara esta indicación, asumirá cualquier responsabilidad que de ello se derive.

El Proveedor es responsable de emitir un Aviso Avanzado de Embarque (ASN) a través del sistema EDI (*Electronic Data Interchange*) inmediatamente después de que el embarque salga de su facilidad, con el objeto de permitir un rastreo adecuado del material, generar un recibo automático a través del sistema y permitir el pago oportuno por parte de Chrysler.

**QUINTA.-**     **EMBALAJE, ETIQUETADO Y ENVÍO**

(i)     El Proveedor empacará y marcará las mercancías y realizará los envíos (incluyendo los sábados y días festivos, cuando así se le solicite), de conformidad con las instrucciones de Chrysler. Asimismo, cumplirá con todos los requisitos de transportación y garantizará la entrega de los bienes, libres de daños y de cualquier tipo de deterioro.

Todos los envíos de mercancías a las instalaciones de Chrysler deberán incluir por lo menos dos comprobantes de embalaje, o cuatro comprobantes de embalaje en el caso de que los envíos sean dirigidos a un punto de consolidación de Chrysler. Cada vez que el envío se realice vía terrestre, el Proveedor incluirá uno de los comprobantes de embalaje (o el comprobante de embalaje establecido para el caso de varios envíos de mercancías) en un sobre. Asimismo, el Proveedor establecerá por escrito en el conocimiento de embarque las instrucciones para el conductor del vehículo que transporta los bienes, para que éste entregue el mencionado sobre al representante de tráfico de Chrysler a la llegada a las instalaciones de Chrysler.

Las Partes están de acuerdo en que el Proveedor será responsable de la mercancía hasta su entrega en el punto designado en la Orden.

(ii)     Chrysler podrá especificar qué transportista y/o qué modo de transporte de los bienes, y el Proveedor procesará los documentos de envío y las rutas de envío de la mercancía desde el punto de entrega, de acuerdo a las especificaciones de Chrysler. El Proveedor será responsable de todos los gastos adicionales en que incurra Chrysler derivado del incumplimiento de las instrucciones de transporte, de los requisitos de entrega y/o de los horarios especificados por Chrysler.

(iii)     Si el Proveedor no cumple con todos los requerimientos de entrega contenidos en esta Orden, Chrysler tendrá el derecho de exigir la misma entrega mediante envío express o embarque aéreo y el Proveedor reembolsará a Chrysler cualquier costo que ocasione dicho transporte, a menos que la falta del Proveedor se deba por caso fortuito o de fuerza mayor. Chrysler está autorizado a deducir de cualquier pago que deba hacer al Proveedor, cualquier costo de los mencionados en este párrafo.

(iv)     Las palabras "Material No Productivo" o "Material Productivo" deben estar claramente marcadas y visibles en el exterior de los contenedores o empaques.

(v)     Las etiquetas de identificación, así como los empaques Mopar, deberán ser adquiridos con los proveedores autorizados por Chrysler, los cuales se apegan a los estándares emitidos por Chrysler Group LLC. El listado de dichos Proveedores será proporcionado por Chrysler al Proveedor de tiempo en tiempo, según se vaya modificando dicho listado. Los precios de compra serán los previamente negociados entre Chrysler y los proveedores aprobados. Ninguna desviación de empaque y/o etiqueta podrá ser empleada sin la previa autorización de Chrysler y de la Gerencia de Almacén Mopar.

(vi)     De acuerdo al inciso que antecede, será responsabilidad del Proveedor que los productos estén debidamente etiquetados en cumplimiento de las disposiciones internacionales y nacionales en materia de etiquetado, incluyendo las leyes vigentes en la República Mexicana y las Normas Oficiales Mexicanas aplicables.

(vii)     El Proveedor será responsable de todos los gastos adicionales en que incurra Chrysler derivado del incumplimiento en el uso de los sistemas de Chrysler para el manejo de racks y contenedores, como pueden ser pérdida de racks y contenedores, exceso de transportación y/o uso de empaques de cartón. El Proveedor deberá mantener actualizados diariamente sus inventarios de racks y contenedores en los sistemas de Chrysler y deberá reportar cualquier discrepancia en el momento que sea detectada. Asimismo, el Proveedor deberá contar con un empaque alterno desarrollado en base al Manual de Empaque debidamente aprobado por Chrysler.

**SEXTA.-**     **PROYECCIONES DE VOLUMEN, CAPACIDAD, REQUERIMIENTOS Y AUTORIZACIÓN DE LIBERACIÓN**

(i)     Chrysler podrá proporcionar al Proveedor estimaciones, pronósticos o proyecciones de los próximos requerimientos de mercancías, cada una de estas estimaciones de futuros requerimientos de mercancías será proporcionada únicamente con propósitos informativos, y no constituirán un compromiso u obligación por parte de Chrysler de comprar al Proveedor mercancía conforme a dichas estimaciones.

(ii)     El Proveedor deberá:

      (a)     Tener un plan de mantenimiento y producción local que le permitirá suministrar el flujo diario, semanal y anual de requerimientos de mercancía de Chrysler, incluidas piezas de servicio. Asimismo, la capacidad del Proveedor tendrá como base el Plan de Mantenimiento y Producción, tal y como se indica en la Orden.

         La Orden podrá incluir mercancías que sean fabricadas por el Proveedor con el mismo proceso de fabricación y producción que el Proveedor utilice para la fabricación de otros materiales no incluidos en la Orden ("Proceso de Producción Común de Partes").

         Si la Orden contempla un Proceso de Producción Común de Partes, la capacidad total del Proveedor para todas las mercancías dentro del mismo Proceso de Producción Común de Partes, incluyendo los bienes contemplados en la Orden, deberán ser cargados por el Proveedor en la "Base de Datos de Capacidad de Producción Chrysler" o la base de datos que la sustituya, mismas que serán proporcionadas por Chrysler al Proveedor.

         En caso de que el Proveedor no cargue dicha información en la Base de Datos de Capacidad de Producción Chrysler o en la base de datos que la sustituya, Chrysler tendrá derecho de retener el pago de cualquier cantidad que le deba al Proveedor, hasta en tanto la información sea cargada en dicha base de datos.

         En el caso de que los requerimientos de Chrysler establecidos en la Orden excedan la capacidad del Proveedor, Chrysler y el Proveedor, a petición de cualquiera de ellas, se reunirán para que de acuerdo con las políticas de administración de capacidad de Chrysler (incluidas el sistema de variación de volumen y la base de datos de capacidad) discutir si, en el caso particular, las posibles inversiones de capital adicionales que pudiera hacer el Proveedor, junto con los gastos directamente relacionados con tal aumento de la demanda, son razonables y justificables para que el Proveedor continúe cumpliendo con los requerimientos de Chrysler.

         Posterior a dicha reunión, el Proveedor podrá presentar a Chrysler por escrito y dentro de los cinco (5) días siguientes, una solicitud de ajuste de precios o una nueva orden de producción como resultado de la necesidad de inversión de capital adicional de compra, derivado de la necesidad de las inversiones de capital adicionales.

         Chrysler tendrá el derecho de aceptar o no las solicitudes de ajuste de precios o una nueva orden de producción por parte del Proveedor. Asimismo, Chrysler tendrá la facultad de solicitar los bienes y/o servicios que excedan la capacidad del Proveedor, de algún otro proveedor.

         No habrá cambios en la Orden o en estos Términos y Condiciones, salvo aquellos que surjan derivados de la aceptación de la solicitud de ajuste de precios o de la emisión de una nueva orden de producción que estén directamente relacionados con la necesidad de inversiones de capital adicional acordadas entre el Proveedor y Chrysler en esta Cláusula.

      (b)     Presentar la información precisa conforme a los sistemas, bases de datos de administración de capacidad, así como a las instrucciones y manuales de Chrysler que le

serán entregados al Proveedor de manera periódica. Esta información podrá incluir, sin limitación alguna, la capacidad de producción actual y potencial, los ritmos de trabajo, las horas extraordinarias y las capacidades de las Partes con respecto al Proceso de Producción Común de Partes, y deberá tener en cuenta no sólo los límites de capacidad del Proveedor sino cualquier restricción que enfrenten los proveedores del Proveedor, en el entendido de que el Proveedor será responsable de monitorear las limitaciones de capacidad de sus proveedores, independientemente si éstos son proveedores directos de Chrysler o no.

Chrysler podrá retener el pago del Herramental de Chrysler (como se define en la Cláusula Décima Primera de estos Términos y Condiciones) usado para fabricar las mercancías amparadas por la Orden, hasta en tanto el Proveedor presente toda la información necesaria conforme a los sistemas y bases de datos de capacidad proporcionados por Chrysler, y éste podrá basarse en la información que el Proveedor presente en dichos sistemas y bases de datos para planear sus tiempos de producción.

(iii)   Cuando se establezca que las entregas sean conforme a los comunicados de liberación emitidos por escrito por Chrysler, el Proveedor no fabricará o ensamblará ninguna mercancía, ni adquirirá los materiales necesarios, ni enviará suministro alguno, excepto en la medida que sea autorizado por tales comunicados de liberación o por las disposiciones de la Orden, los que especificarán la fabricación mínima o los requisitos de entrega.

## SÉPTIMA.-   INSPECCIÓN, RECHAZOS Y CALIDAD

Chrysler podrá, a su entera discreción, inspeccionar, evaluar y probar toda la mercancía (incluyendo el Herramental de Chrysler, accesorios, todo el equipo y todo el material utilizado directa o indirectamente en la fabricación de las mercancías) y todos los servicios proporcionados por el Proveedor en horas y lugares designados por Chrysler.

El Proveedor proporcionará y mantendrá un Sistema de Gestión de Calidad que cumpla con la norma ISO/TS 16949, para lo cual deberá cumplir con los siguientes requerimientos, políticas y manuales, o cualesquiera que los sustituyan de tiempo en tiempo:

(i)    Los "Requerimientos Específicos de Chrysler Group LLC para su uso con la norma ISO/TS 16949 e ISO 14001",

(ii)   El manual de "Procesos de Planeación y Auditoría" (*Process Planning & Audit Manual* en inglés, anteriormente conocido como Avance de Planeación Avanzada de la Calidad y Proceso de Liberación (*Advance Quality Planning & Process Sign-off Manual* en inglés)) y

(iii)  Cualquier documento específico dentro del "Sistema de Información de Gestión de Calidad" del portal electrónico del Portal Global de Proveedores o cualquier portal electrónico sustituto de Chrysler.

El Proveedor cumplirá puntualmente con las revisiones de la norma ISO/TS 16949, los "Requerimientos Específicos de Chrysler Group LLC para su uso con la norma ISO/TS 16949 e ISO 14001", el manual de "Revisión del Plan del Proceso de Manufactura" y cualquier documento señalado en el "Sistema de Información de Gestión de Calidad" del portal electrónico del Portal Global para Proveedores o cualquiera de los sitios sustitutos de Chrysler.

El Proveedor llevará a cabo inspecciones según lo señalado por Chrysler, y deberá implementar los sistemas de inspección, procedimientos y registros que razonablemente le solicite Chrysler y que tengan por objeto la mejora continua del suministro y/o prestación de servicio. El Proveedor deberá estar registrado y mantenerse durante toda la vigencia de la Orden, en el Sistema electrónico de Gestión de Calidad de Chrysler ("CQMS" por sus siglas en inglés) y en cualquier otro sistema electrónico de Planeación Avanzada de Calidad ("AQP" por sus siglas en inglés) que haya designado Chrysler.

No obstante el pago y cualquier inspección previa de la mercancía, Chrysler podrá revocar la aceptación, rechazarla o requerir la corrección y devolver la mercancía al Proveedor (a costo y riesgo de pérdida del Proveedor) respecto de las mercancías entregadas o servicios prestados, que no se ajusten a los requisitos aplicables solicitados por Chrysler.

La Orden se emite para los productos específicamente identificados en ésta, y cualquier sustitución de material sin la aprobación previa por escrito de Chrysler, será una violación a la Orden.

Sin perjuicio de las acciones legales a que tenga derecho Chrysler, y después de dar aviso al Proveedor, Chrysler podrá:

(i)     Reemplazar o corregir cualquier producto o servicio con el que no esté conforme, estableciéndose que el costo y riesgo de tal sustitución o corrección correrá a cargo del Proveedor,

(ii)    Rescindir la Orden por incumplimiento del Proveedor, de conformidad con lo establecido en la Cláusula Vigésima Tercera del presente,

(iii)   Promover las acciones legales para reclamar los daños y perjuicios sufridos por Chrysler, y/o

(iv)    Remover al Proveedor como un "proveedor autorizado" de Chrysler.

El Proveedor deberá cumplir con todas las reglas contempladas en el programa denominado "Contingencias con Terceros y Resolución de Problemas" ("3CPR" por sus siglas en inglés), o cualquiera que lo sustituya, así como con las políticas contenidas en dicho programa y en forma regular con los requisitos del proyecto contenidos en el sistema basado en la Red del programa 3CPR en su versión actualizada, documento que puede ser revisado en el siguiente portal electrónico: https://www.esupplierconnect.com.

Dentro de las 24 horas siguientes de haberse iniciado por parte de Chrysler un proyecto en el programa 3CPR sobre materiales sospechosos del Proveedor, el Proveedor afectado deberá contratar a un proveedor incluido en el programa 3CPR que Chrysler haya señalado, con el propósito de llevar a cabo el proyecto señalado en el programa 3CPR en cada instalación afectada.

El Proveedor y Chrysler asumirán por partes iguales el costo de pagar al proveedor que forme parte del programa 3CPR y que se requiera, respecto a un proyecto del programa 3CPR relacionado con la Orden. Una vez terminado un proyecto del programa 3CPR, Chrysler, a su entera discreción y de manera justa y razonable, examinará los costos generados por la implementación de un proyecto en el programa 3CPR a cargo de Chrysler y del Proveedor, respectivamente, estos costos se generarán sobre la base de una imputación de responsabilidad del Proveedor por materiales sospechosos y, tras la realización de dicho análisis, Chrysler informará al Proveedor de cualquier modificación de asignación de tales gastos, la cual se reflejará en la siguiente factura del Proveedor como débito o crédito.

**OCTAVA.-     CONFLICTOS LABORALES**

El Proveedor deberá notificar inmediatamente a Chrysler de cualquier conflicto laboral actual o potencial que pueda afectar al Proveedor o a los proveedores de éste, o que pueda retrasar o amenazar con retrasar la ejecución oportuna de la Orden, proporcionando toda la información pertinente sobre el conflicto laboral a Chrysler.

El Proveedor notificará por escrito a Chrysler, con seis (6) meses de anticipación, sobre la expiración de cualquier contrato de trabajo vigente del Proveedor, que de no renovarse pudiera afectar el cumplimiento de la Orden. Antes del vencimiento del contrato de trabajo celebrado por el Proveedor, éste constituirá a su cargo (a excepción que se acuerde lo contrario por el Proveedor y Chrysler en forma escrita), un suministro de mercancías por un periodo de cuarenta (40) días hábiles en un lugar de almacenaje neutral que el Proveedor dará a conocer a Chrysler, y que estará ubicado en México a una distancia de por lo menos (80) ochenta kilómetros de las plantas de producción del Proveedor.

Este suministro de mercancías permanecerá en dicho lugar por lo menos diez (10) días hábiles antes del vencimiento de cualquiera de los contratos laborales celebrados por el Proveedor. El sitio de almacenamiento y suministro de mercancías que se describe en esta Cláusula, estará sujeto a derechos de auditoría de Chrysler, bajo la Cláusula Trigésima Primera de estos Términos y Condiciones Generales.

Asimismo las Partes reconocen expresamente que la única relación jurídica entre Chrysler y el Proveedor es la que deriva de la Orden, y que por ningún motivo podrá considerarse entablada una relación laboral, dirección, subordinación o dependencia alguna entre Chrysler y el Proveedor por virtud de la ejecución de la Orden.

Ambas Partes reconocen estar debidamente establecidas y contar con elementos propios en los términos del artículo 13 de la Ley Federal del Trabajo, por lo que no podrán considerarse en ningún momento como intermediarios. Debido a lo anterior, Chrysler y el Proveedor son los únicos responsables del cumplimiento de las obligaciones en materia laboral, fiscal, administrativa, así como ante el Instituto Mexicano del Seguro Social (IMSS), el Instituto del Fondo Nacional de la Vivienda para los Trabajadores (INFONAVIT), el Sistema de Ahorro para el Retiro (SAR), derivadas de las relaciones con los trabajadores que tienen a su cargo para dar cumplimiento a la Orden.

Las obligaciones antes mencionadas subsistirán aún a la terminación de la Orden, liberándose en éste momento ambas partes de cualquier obligación laboral que surja con motivo del cumplimiento de sus obligaciones conforme a la Orden, incluyendo a los subcontratados, haciéndose responsable cada parte ante cualquier autoridad por dichas relaciones, y obligándose a sacar en paz y a salvo de cualquier responsabilidad, demanda, reclamación o procedimiento que se entable en contra de alguna parte por alguno de sus empleados, y en su caso debiendo reembolsar los montos que hubiera tenido que pagar la otra parte por los conceptos aquí mencionados.

En términos de lo anterior el Proveedor se obliga a:

(i)     Que el personal destinado a dar cumplimiento a la Orden, se encuentre inscrito en el IMSS.

(ii)    Efectuar las retenciones, enteros y pagos correspondientes a:

1. Impuesto sobre la Renta que establece la Ley del Impuesto Sobre la Renta (ISR).

2. IMSS.

3. INFONAVIT.

4. Depósitos del SAR.

5. Cualesquiera otras disposiciones fiscales aplicables.

(iii)   Encontrarse al corriente de todas sus obligaciones frente al IMSS y hacer frente a todos los requerimientos provenientes de dicho Instituto en tiempo y forma; en este último caso, deberá dar aviso a Chrysler dentro de los 2 (dos) días hábiles siguientes a la fecha de notificación de cualquier requerimiento. Asimismo, el Proveedor contará con 2 (dos) días hábiles para informar a Chrysler de la atención oportuna de los mismos, enviando en todo caso copias de la documentación correspondiente.

(iv)    Para este último caso, el Proveedor se obliga a pagar de forma inmediata cualquier crédito, incluyendo de forma enunciativa más no limitativa: Cuotas obrero-patronales, multas y capitales constitutivos entre otros, mismos que sean requeridos al Proveedor y/o a Chrysler por el IMSS, debiendo entregar a Chrysler el comprobante de dicho pago, y en su caso, reembolsarle cualquier monto que éste hubiera tenido que pagar por el incumplimiento del Proveedor a sus obligaciones aquí establecidas.

(v)     En caso de que Chrysler requiera expresamente al Proveedor, éste deberá enviarle el

comprobante del pago así como el archivo .SUA que se hayan generado dentro del periodo en curso, así como cualquier otra documentación e información requerida por Chrysler para efecto de verificar el cumplimiento de sus obligaciones ante las autoridades descritas en esta Cláusula, el Proveedor lo entregará a más tardar dentro de los 3 (tres) días hábiles siguientes a la solicitud.

Asimismo, en caso de que el Proveedor subcontrate servicios para dar cumplimiento a la Orden, se obliga a liberar de cualquier responsabilidad y sacar en paz y a salvo a Chrysler por las contingencias obrero-patronales de sus subcontratistas.

**NOVENA.-** __GARANTÍA GENERAL__

(i)     El Proveedor garantiza que los productos o servicios:

      (a)     Cumplirán con todas las normas de funcionamiento y las características del producto, incluyendo sin limitación alguna: Especificaciones, dibujos, descripciones, muestras y ensamblado especificados por Chrysler,

      (b)     Estarán libres de defectos en cuanto a su material y mano de obra.

      (c)     Contra fallas de manufactura o defectos de fabricación en condiciones normales de uso.

El Proveedor garantiza además, que en la medida en que éste lleve a cabo el diseño de cualquier mercancía o Chrysler se base en la experiencia del Proveedor, en cualquier aspecto del diseño de los productos, los bienes serán aptos y suficientes para los fines previstos.

El plazo de garantía coincidirá con la extensión de garantía que Chrysler ofrece a sus clientes, o con cualquier otra fecha acordada en la Orden por Chrysler y el Proveedor, salvo que, antes del comienzo de la producción del volumen inicial respecto a la Solicitud de Propuesta, Chrysler y el Proveedor acuerden que los productos deban cumplir con los requisitos de calidad o durabilidad por un mayor plazo, en cuyo caso el plazo de garantía deberá ser más largo.

Al amparo de dicha garantía el Proveedor deberá reembolsar, de manera enunciativa más no limitativa:

      (a)  El precio de la parte dañada a precio de venta de refacciones de Chrysler,

      (b)  el costo de la mano de obra originada por la falla de la parte, y

      (c)  el 40% del valor de la reclamación realizada por Chrysler por el manejo de materiales.

(ii)    La responsabilidad del Proveedor de reembolsar los gastos de garantía a Chrysler por los reclamos hechos por los distribuidores de Chrysler por incumplimiento del Proveedor al inciso anterior, o a cualquier garantía implícita por ley o en otro medio hecha por el Proveedor, se determinará de conformidad con el Programa de Políticas y Procedimientos de Reducción de Garantía del Proveedor, o de cualquier otro programa o política que lo sustituya, publicado en el portal electrónico de Chrysler (como se indica en la Cláusula Primera), en la fecha de la Orden o en la fecha de cualquier modificación a la Orden.

(iii)   El Proveedor garantiza además que Chrysler recibirá la mercancía, servicios, producción, accesorios o equipos, libre de todo gravamen y garantiza que los mismos no violarán ninguna patente, derecho de autor o marca que estén vigentes o en disputa.

(iv)    Estas garantías son adicionales a cualquier garantía implícita por ley o a cualquier otra garantía dada por el Proveedor y aplicarán aún después de la aceptación y pago por Chrysler de los bienes o productos.

(v)     El Proveedor está de acuerdo en defender, indemnizar y mantener a Chrysler a salvo de cualquier reclamación o queja, resultante de violaciones a la garantía antes mencionada.

## DÉCIMA.-     PRECIOS

Los precios indicados en la Orden son definitivos y no están sujetos a ningún ajuste por la variación en el volumen, por los cambios en el precio de las materias primas o la mano de obra, por los cambios en la valoración de la moneda o por cualquier otra razón, a menos que un documento específicamente agregado a la Orden o alguna Cláusula contenida en la Orden (previo consentimiento por escrito de Chrysler) determinen expresamente que los precios se ajustarán de forma particular y sólo en la medida especificada en el documento o en la Cláusula.

## DÉCIMA PRIMERA.-     PROPIEDAD Y HERRAMENTALES

Todas las herramientas, equipos, materiales, dibujos, ayudantes de producción, matrices, pruebas y montaje, plantillas, medidores, patrones, modelos de fundición, cavidades, moldes y documentación, incluyendo las especificaciones de ingeniería, libros PPAP (Proceso para Aprobación de Partes de Producción) e informes de ensayo, junto con los accesorios, partes, sustituciones, cambios y accesorios que resulten necesarios para la fabricación de componentes y servicios destinados para Chrysler y para los cuales ésta emita una Orden, serán denominados como el "Herramental de Chrysler". Dicho Herramental de Chrysler estará en posesión del Proveedor en calidad de comodato, y será utilizado exclusivamente por el Proveedor en relación con la fabricación de componentes y servicios para las mercancías y productos destinados a Chrysler, razón por la cual, bajo ninguna causa o circunstancia podrá fabricar componentes o prestar servicios para cualquier otro tercero. El "Herramental de Chrysler" será en todo momento, sin limitación alguna, propiedad de Chrysler, con excepción de aquel que no haya sido pagado por Chrysler; en éste caso, al efectuar Chrysler el pago completo del precio aplicable, dicho Herramental de Chrysler pasará a ser propiedad de Chrysler.

Con respecto al Herramental que no sea propiedad de Chrysler, al momento del pago, así como todo el "Herramental de Chrysler" (mismo que incluye las regalías correspondientes), el Proveedor concede a Chrysler, además de cualquier otra licencia concedida a Chrysler en la Orden, una licencia no exclusiva, mundial, irrevocable y perpetua en relación con:

(i)     Cualquier propiedad intelectual del Proveedor que se incorpore o utilice para la creación o diseño de las mercancías conforme a la Orden;

(ii)    el "Know How" y el procedimiento respecto al uso de tal "Herramental de Chrysler" para que éste pueda fabricar, poner a la venta, importar, exportar o modificar bienes, o cualquiera de los vehículos que Chrysler fabrique utilizando dichos bienes, y

(iii)   asegurar que Chrysler pueda hacer pleno uso de los derechos previstos en este documento, para lo cual el Proveedor proporcionará el Herramental de Chrysler, troqueles y moldes para esos bienes, incluyendo, sin limitación, cualquier información de diseño gráfico de tales herramientas así como sus especificaciones, listas de materiales, información del proveedor para cualquier componente que se emplee en ese Herramental de Chrysler y la información del proceso de fabricación con respecto a ese Herramental de Chrysler.

En el caso del "Herramental de Chrysler" no pagado, el precio aplicable en virtud de esta Cláusula, será el monto establecido en la Orden con la correspondiente deducción de los pagos ya efectuados por Chrysler al Proveedor en relación con ese Herramental de Chrysler, así como de la deducción de las cantidades necesarias para satisfacer los gravámenes que pudieran existir en relación con ese Herramental de Chrysler.

En los demás casos, el precio aplicable en virtud de esta Cláusula, será el mayor entre (i) el valor neto contable (definido como el valor contable menos la depreciación aplicada al Herramental de Chrysler por parte del Proveedor utilizando un método de aplicación coherente con el método GAAP (por sus siglas en inglés, Principios de Contabilidad Generalmente Aceptados) y/o NIF (Normas de Información Financiera) a

elección de Chrysler), y (ii) el precio de liquidación, con la deducción de los importes necesarios a efecto de satisfacer los gravámenes correspondientes en relación con ese Herramental de Chrysler.

En relación con la determinación del precio aplicable para cualquier pago en virtud de esta Cláusula, Chrysler se reserva el derecho a deducir los importes del "Herramental de Chrysler" incompleto o con los que no esté conforme. El Proveedor reconoce y acepta que Chrysler es un tercero beneficiario de un acuerdo entre el Proveedor y una parte distinta a Chrysler para la producción del "Herramental de Chrysler", y que Chrysler tendrá la propiedad de y el acceso al "Herramental de Chrysler" que se encuentre en poder de cualquiera de ellas, aún y cuando esté sujeto a una disputa por la propiedad de dicho Herramental de Chrysler.

El Proveedor deberá cumplir con las instrucciones de Chrysler relativas al "Herramental de Chrysler", (esté o no completo) en su posesión y/o control, y bajo los términos establecidos en la Cláusula inmediata siguiente.

Ni el Proveedor, ni ninguna otra persona o entidad diversa a Chrysler tendrá derecho alguno sobre el "Herramental de Chrysler", excepto por la obligación del Proveedor, sujeta a la discrecionalidad de Chrysler, de hacer uso de dicho "Herramental de Chrysler" en la fabricación de componentes y de piezas de servicio para beneficio de Chrysler.

En el caso de que exista alguna disputa entre el Proveedor y Chrysler sobre el precio aplicable para el "Herramental de Chrysler" que estuviera pendiente de pago, Chrysler tendrá el derecho a la posesión inmediata y uso del "Herramental de Chrysler" que se encuentre en disputa, y el Proveedor no podrá retener la entrega de la posesión del "Herramental a Chrysler" en tanto se resuelva dicha controversia, pero seguirá estando sujeta a cualquier reclamación o derecho al pago del Proveedor de las cantidades en disputa (a pesar de la renuncia del Proveedor a la posesión).

El Proveedor presentará toda la información necesaria sobre el "Herramental de Chrysler" a través del sistema de "Proceso de Herramental" o su sistema sustituto determinado por Chrysler y cumplirá con todos los demás requisitos, políticas y procedimientos respecto del "Herramental de Chrysler", incluyendo, sin limitación, el uso del Formulario de Registro de "Herramental de Chrysler" o su sustituto que determine Chrysler.

El Proveedor se adhiere al procedimiento en vigor determinado por Chrysler en el momento de la presentación de solicitudes de reembolso de los costos del "Herramental de Chrysler", incluyendo sin limitación alguna al uso del Formulario de Registro de Herramental de Chrysler o su sustituto. Todas las solicitudes de reembolso por costos de "Herramental de Chrysler" serán objeto de revisión, aprobación y auditoría por parte de Chrysler.

Todo el "Herramental de Chrysler" será transferido como Chrysler lo señale en cualquier momento; si el Proveedor hace cualquier transferencia no autorizada o re-ubicación del "Herramental de Chrysler", el Proveedor reembolsará los gastos de Chrysler efectuados en la devolución del "Herramental de Chrysler" a Chrysler, o su re-ubicación según las indicaciones de Chrysler.

Si Chrysler, de buena fe, determinara que el Proveedor ha hecho algún uso inapropiado del "Herramental de Chrysler" que fuere incompatible con estos Términos y Condiciones, con la Orden, o con los intereses de Chrysler, el Proveedor reconoce y acepta que:

(i)     Chrysler tendrá derecho a retener cualquier ganancia obtenida por el Proveedor como resultado del uso inapropiado.

(ii)    Los daños y perjuicios ocasionados a Chrysler como resultado del uso inapropiado, darán lugar a una reclamación por parte de Chrysler bajo la Cláusula Décima Sexta del presente, incluyendo, sin limitación, la deducción, la compensación y recuperación del "Herramental de Chrysler". El Proveedor mantendrá las políticas de control interno necesarias para evitar cualquier uso irregular del "Herramental de Chrysler" por el propio Proveedor o por cualquiera de sus empleados.

**DÉCIMA SEGUNDA.- PROPIEDAD EN COMODATO**

(i)     La propiedad de todo bien, incluyendo sin limitación al "Herramental de Chrysler" y cualquier sub-componente, materia prima y anaqueles proporcionados al Proveedor por Chrysler en relación con el cumplimiento de la Orden (identificado como el "Equipo en Comodato") es y será en todo momento, de la única y exclusiva propiedad de Chrysler, y la posesión del equipo será detentada por el Proveedor en su calidad de comodatario.

(ii)    El Proveedor se obliga a usar el Equipo en Comodato en el domicilio que Chrysler le autorice y exclusivamente en la producción de los artículos que Chrysler le solicite, con exclusión de cualquier otro. Asimismo, el Proveedor deberá obtener autorización por escrito de Chrysler cuando desee cambiar la ubicación del Equipo en Comodato a un lugar distinto del autorizado inicialmente.

(iii)   El Proveedor se obliga a poner toda diligencia en la conservación del Equipo en Comodato y será responsable de su manejo, inventario, administración y custodia, así como del costo de su mantenimiento y reparación. En caso de pérdida, inutilización o discrepancias de inventario, por cualquier causa ajena a Chrysler, el Proveedor será responsable de su reposición, inclusive cuando la pérdida sobreviniera por caso fortuito o fuerza mayor. En caso de pérdida, inutilización o discrepancia por cualquier causa ajena a Chrysler, el Proveedor, además de cumplir con su obligación de reponer el Equipo en Comodato respectivo, se obliga a pagar a Chrysler a la vista, una pena convencional equivalente al valor del Equipo en Comodato que haya sufrido la pérdida o la inutilización; adicionalmente, el Proveedor será responsable del deterioro que sufra el Equipo en Comodato, excepto por el deterioro que se origine por su uso normal, así como de los causados por el transcurso del tiempo. Para efectos de lo anterior, las Partes convienen en que de conformidad con el artículo 2506 del Código Civil para el Distrito Federal, el valor de los objetos materia de este contrato, es el que se les asigna en la Orden.

(iv)    El Proveedor se obliga a mantener el Equipo en Comodato en su posesión o control y garantizará por su pérdida o daño. Asimismo lo almacenará en forma segura y separada de los bienes propiedad del Proveedor, marcado y plenamente identificado con leyendas claras y visibles como propiedad de Chrysler.

(v)     El Proveedor reconoce que la propiedad de todo Equipo en Comodato será siempre de Chrysler y que dicha propiedad en Comodato estará sujeta a la dirección y control de Chrysler. El Proveedor no tendrá ningún derecho sobre el Equipo en Comodato, excepto el de utilizarlo conforme a lo establecido por Chrysler. Asimismo, las Partes están de acuerdo en que el Proveedor no podrá conceder ningún derecho, incluyendo la posesión y la propiedad del Equipo en Comodato a persona alguna, incluyendo sin limitación a cualquier filial del Proveedor o de un tercero respecto de dicho Equipo en Comodato.

(vi)    Cualquier reparación o modificación del Equipo en Comodato, deberá ser supervisada y aprobada por Chrysler, quien manifestará su autorización para que el Proveedor pueda continuar la producción de las partes que Chrysler le haya encargado producir con el Equipo en Comodato, dicha autorización no será negada de manera irrazonable. El Proveedor será responsable ante Chrysler de los daños y perjuicios por el incumplimiento de esta obligación. Asimismo, Chrysler no estará obligada a adquirir del Proveedor las partes fabricadas por éste cuando el Equipo en Comodato haya sido modificado o reparado, si la modificación o reparación fue efectuada sin la aprobación de Chrysler.

(vii)   El Proveedor no tendrá derecho a retener la posesión de ningún Equipo en Comodato, una vez que haya recibido en cualquier momento, la solicitud de devolución por parte de Chrysler del Equipo en Comodato.

(viii)  El Proveedor no permitirá que ningún acto se realice en el Equipo en Comodato que no sea necesario para el cumplimiento de la Orden.

(ix)    No será necesario que Chrysler realice notificación alguna, cuando a ésta le sobreviniera la

necesidad urgente del Equipo en Comodato, tal y como lo establece el artículo 2512 del Código Civil para el Distrito Federal, y en este caso, el Proveedor deberá poner el Equipo en Comodato a disposición de Chrysler dentro de un plazo no mayor a 5 (cinco) días hábiles después de la solicitud de devolución), tomando en cuenta que la entrega del mismo se llevará a cabo en el domicilio de Chrysler o en el de un tercero designado por Chrysler.

(x)     La entrega del Equipo en Comodato por parte del Proveedor, deberá realizarse en el domicilio de Chrysler o en el de un tercero designado por Chrysler y deberá incluir todos los objetos que de hecho y por derecho le corresponden, salvo por deterioros normales que se originen por su uso, así como de los causados por el transcurso del tiempo.

(xi)    En caso de que la Orden terminara por cualquier motivo, desde este momento el Proveedor autoriza expresa e irrevocablemente a Chrysler a entrar en sus instalaciones y retirar todo el Equipo en Comodato sin necesidad de una orden judicial.

(xii)   El Proveedor notificará a todos sus acreedores que tiene en comodato el Equipo de Chrysler, dicha notificación se realizará en la forma, manera y en tiempos razonablemente aceptables para Chrysler. En la medida establecida por la ley, el Proveedor no deberá permitir que se constituya ningún gravamen, carga, garantía real o reclamación de cualquier naturaleza sobre el Equipo en Comodato. Si se llegare a establecer un gravamen, carga, garantía real o reclamación de cualquier naturaleza sobre el Equipo en Comodato imputable al Proveedor, éste, de conformidad con lo establecido por la ley, de inmediato deberá tomar todas las medidas necesarias para eliminar tal gravamen, carga, garantía real o reclamo y restituir el Equipo en Comodato a Chrysler.

(xiii)  El Proveedor deberá seguir las instrucciones de Chrysler en relación con el Equipo en Comodato, incluyendo, sin limitación alguna, la restitución del Equipo en Comodato,  de la propiedad de bienes procesados y del envío de mercancías procesadas, tal y como lo establezca Chrysler.

(xiv)   Chrysler tiene el derecho de supervisar en cualquier momento el Equipo en Comodato, por lo que del Proveedor se obliga a concederle todas las facilidades a su alcance para ese fin, siempre que dicha supervisión no entorpezca las operaciones del Proveedor.

(xv)    Adicionalmente, el Proveedor se obliga a dar acceso a las instalaciones en donde se ubica el Equipo en Comodato, tanto a Chrysler como a quien ésta indique, a efecto de que puedan verificar el estado del Equipo en Comodato y en su caso retirarlo en cualquier momento si así lo decide Chrysler.

(xvi)   El Proveedor proporcionará a Chrysler informes en forma periódica o conforme Chrysler se lo solicite, respecto a la cantidad y el estado del Equipo en Comodato en posesión o control del Proveedor.

## DÉCIMA TERCERA.-    SEGURO E INDEMNIZACIÓN

A.      Seguro.

El Proveedor obtendrá y mantendrá en vigor durante el Plazo:

(i)     Un seguro de compensación a los trabajadores.

(ii)    Un seguro de contingencias laborales, tratándose de servicios en los que empleados del Proveedor entren a las instalaciones de Chrysler.

(iii)   Un seguro de Responsabilidad Civil para Actividades e Inmuebles, incluida la responsabilidad contractual de los productos y la responsabilidad de completar las operaciones, tratándose de servicios en los que empleados del Proveedor entren a las instalaciones de Chrysler.

(iv)    Un seguro de responsabilidad civil de automóviles, incluidos los de su propiedad, los arrendados y

los que tenga en su posesión por cualquier causa.

(v)     Un seguro contra robo, incluido el robo por parte de sus propios empleados.

(vi)    Un seguro amplio contra todo riesgo que cubra la propiedad del Proveedor, incluyendo el "Herramental de Chrysler" y el Herramental no pagado, así como todos los bienes de Chrysler, materias primas y productos terminados, incluyendo el Equipo en Comodato mientras se encuentren en posesión, custodia o control por parte del Proveedor.

Todos los seguros antes mencionados deberán tener la cobertura suficiente para cubrir todas las reclamaciones señaladas.

Estas pólizas señalarán a Chrysler como beneficiario en primer lugar, y dichos seguros no serán adicionales o adyacentes con cualquier otro seguro vigente pagado por Chrysler. Asimismo, deberán establecer que la aseguradora dará a Chrysler una notificación por escrito, con treinta días de anticipación, sobre cualquier cancelación o cambio sustancial en la cobertura de cualquiera de las pólizas.

El Proveedor renuncia y hará que sus aseguradoras renuncien a cualquier tipo de cesión de las pólizas y/o sus derechos, y evitará que se cobren deducibles o coaseguros derivados de dichas pólizas a Chrysler o a sus filiales, incluyendo a sus empleados, funcionarios, directores, agentes y/o representantes.

Chrysler podrá exigir al Proveedor que acredite la existencia de seguros anteriores; la falta de solicitud de Chrysler respecto de la acreditación, no exime al Proveedor de su obligación establecida en esta Cláusula Décima Tercera.

El Proveedor será responsable de pagar cualquiera de las primas, deducibles, retenciones, auto-seguro, coaseguro, o cualquier cantidad adicional; el Proveedor podrá optar por cumplir con los requisitos de esta Cláusula Décima Tercera a través de una combinación de auto-seguro y un seguro de catástrofe excesiva.

B.      Indemnización.

El Proveedor defenderá, indemnizará y mantendrá a Chrysler y a sus filiales, incluyendo sus empleados, funcionarios, directores, agentes o representantes, en paz y a salvo de cualquier reclamo, demanda, acción o procedimiento ("Reclamaciones") y pagará:

(i)     Todas las responsabilidades, pérdidas y daños (incluyendo, sin limitación alguna los juicios, cantidades pagadas en la liquidación y otras recuperaciones).

(ii)    Gastos y costas (incluyendo sin limitación alguna los honorarios de los abogados y expertos).

(iii)   Otros gastos (colectivamente los "Gastos") en relación con cualquier violación o incumplimiento por parte del Proveedor a la Orden y/o a estos Términos y Condiciones, incluyendo lesiones o muerte de cualquier persona; además del daño o pérdida de cualquier propiedad que resulte o que surja de cualquier acto, omisión o negligencia por parte del Proveedor o de sus empleados, agentes o subcontratistas, en relación con el cumplimiento de la Orden, ya sea en la propiedad de Chrysler o en el curso de su trabajo.

Lo anterior, incluye sin limitación alguna, todos aquellos gastos que surjan con motivo de llamados a revisión y campañas de satisfacción al cliente respecto de vehículos que contengan bienes suministrados por la Orden, sin embargo, si Chrysler y el Proveedor se someten al Plan de Definición de Autoridad ("ADP" por sus siglas en inglés) emitido por Chrysler respecto a los bienes suministrados en la Orden, el cual establecerá, como mínimo, la asignación de responsabilidad por defectos relacionados con el diseño de los productos, entonces la obligación del Proveedor al pago de la indemnización de los gastos de Campaña, estará determinada con base al plan ADP.

**DÉCIMA CUARTA.-      CAMBIOS**

(i) Chrysler podrá, en cualquier momento, hacer cambios en la Orden, incluyendo sin limitación alguna, los cambios en la expresión de la Orden que se describe en la Cláusula Cuadragésima Primera del presente documento. Cualquier reclamación por parte del Proveedor derivada de un cambio en el ajuste de precios basado en los costos realmente incurridos, o en los que se incurrirá como consecuencia del cambio, deberá hacerse valer por escrito dentro de los diez (10) días contados a partir de la fecha de recepción por el Proveedor de la notificación hecha por Chrysler. Chrysler tendrá el derecho de verificar todas las reclamaciones presentadas mediante la auditoría de registros relevantes, instalaciones, trabajo o sobre los materiales del Proveedor. El Proveedor se compromete a cumplir con la Orden una vez que haya aceptado el cambio realizado conforme a esta Cláusula Décima Cuarta.

(ii) Todos los cambios de ingeniería, ya sean iniciados por Chrysler o por el Proveedor, se llevarán a cabo de conformidad con las prácticas de Chrysler en vigor al momento del cambio, utilizando para ello el denominado "Sistema de Cambios de Ingeniería" emitido por Chrysler, o por los sistemas que surjan en un futuro.

A más tardar dentro de los siguientes siete (7) días posteriores a que Chrysler haya proporcionado una solución documentada (actualmente conocida como una "selección alternativa" en el Sistema de Cambios de Ingeniería), incluyendo los requisitos correspondientes de diseño, el Proveedor deberá proporcionar a Chrysler todos los cambios en los precios (calculados como se establece a continuación) y los requisitos de tiempo para poner en práctica esa solución, sujeto a la condición de que Chrysler podrá a su discreción, extender el periodo de los siete (7) días de respuesta, en caso de que la complejidad de la solución de fondo requiera una respuesta en un plazo mayor.

Asimismo, una vez que Chrysler y el Proveedor estén de acuerdo con los cambios de precio y fecha pactada (actualmente conocida como la realización de "SPIN" en el Sistema de Cambios de Ingeniería), el Proveedor tendrá veinticuatro (24) horas para capturar los datos en el sistema de NC emitido por Chrysler, reflejando los cambios acordados para la aprobación de Chrysler. Todos los cambios de ingeniería aprobados por Chrysler, respecto a la especificación de partes, se aplicarán lo antes posible por el Proveedor conforme a las indicaciones de Chrysler. Los cambios de precios para aprobación de Chrysler en los cambios de ingeniería, se basarán exclusivamente en la variación de los gastos de diseño respecto al diseño sustituido y deberán estar sustentados con la documentación adecuada y que Chrysler apruebe.

(iii) El Proveedor certificará la(s) ubicación(es) a las cuales se enviarán los productos contenidos en la Orden. Si el Proveedor en cualquier momento pretende cambiar dicha(s) ubicación(es), deberá notificar previamente a Chrysler antes del cambio, de forma tal, que el efecto de dicho cambio pueda ser evaluado y negociado en caso necesario, derivado de su efecto sobre el tiempo de tránsito, los métodos de embalaje y cualquier otro impacto significativo para Chrysler.

Si el Proveedor no notifica a Chrysler sobre el incremento en los gastos de transporte respecto al cambio en el(os) punto(s) de embarque, el Proveedor asumirá dichos gastos. El Proveedor no podrá cambiar las ubicaciones de fabricación sin antes recibir la aprobación escrita de Chrysler.

(iv) No se harán cambios en la Orden o en estos Términos y Condiciones, que sean distintos a los cambios en el precio y gastos de transporte conforme a lo dispuesto en esta Cláusula.

**DÉCIMA QUINTA.-    PIEZAS, SERVICIO**

(i) El Proveedor fabricará y venderá a Chrysler las partes para los productos contemplados en la Orden por un periodo de 10 (diez) años posteriores al término de la duración del programa de producción de los vehículos aplicables, o por un plazo mayor, según lo solicite Chrysler (y acordado con el Proveedor en relación con la Solicitud de Propuesta previo al comienzo de la producción de volumen inicial), para que Chrysler esté en posibilidad de ofrecer el servicio a los vehículos aplicables, atención post venta y así cumplir con los requisitos de garantía de dichos vehículos.

Mientras que los productos que se encuentren contemplados en la Orden se sigan utilizando en la producción de vehículos para Chrysler, el incremento en los precios de las piezas que se utilicen para el servicio de los vehículos, atención post venta y requisitos de garantía, no será mayor que el precio contemplado en la Orden para dichos bienes, más los gastos efectivamente incurridos por el Proveedor para el embalaje especial de dichos bienes.

La Orden incluye acuerdos para potenciales requerimientos de la división de refacciones de Chrysler, si no están especificados en ese documento, serán requeridos y negociados por separado en empaque especial para partes de servicio. Los proveedores extranjeros deberán marcar con la leyenda "hecho en (país de origen)" las partes y refacciones para asegurar la correcta identificación de embarques, y las etiquetas de empaque siempre deberán incluir el número correspondiente del programa de entregas Chrysler.

(ii) Por lo menos durante los tres primeros años después de que un bien ya no sea utilizado en la producción de vehículos de Chrysler, el incremento en los precios de las piezas para el servicio de los vehículos, atención post venta y requisitos de garantía, no será mayor al precio establecido en la Orden que sea fijado para los productos respectivos a la producción correspondiente, más los gastos efectivamente incurridos por el Proveedor para el embalaje especial de dichos bienes.

(iii) Después de tres años de la terminación del periodo de duración del programa de producción de vehículos correspondiente, la suma de los precios de las piezas para el servicio de los vehículos, atención post venta y requisitos de garantía, no será mayor al último precio indicado en la Orden para dichos productos, más o menos:

    (a) Cualquier cambio en el costo de los materiales desde la terminación del periodo de duración del programa de producción de vehículos aplicable, más

    (b) un ajuste de precio relacionado con el volumen que refleje el aumento real en el costo por pieza cada por producir menos piezas, más

    (c) un cargo que refleje el costo real de la preparación para la ejecución de la producción de piezas, más

    (d) cualquier costo adicional incurrido por un embalaje especial.

Todos los componentes necesarios para fijar el precio se documentarán de manera razonable y de conformidad con lo señalado por Chrysler, incluyendo sin limitación alguna, a los detalles de configuración, productividad de la máquina, asignación de chatarra, ineficiencia del trabajo y el exceso en los requerimientos de materia prima.

(iv) Si las piezas se fabrican en un país distinto del país en el que las mercancías sean entregadas a Chrysler, el Proveedor marcará las piezas enviadas para el servicio de Chrysler, después de realizada la compra y habiendo cumplido los requisitos de garantía, con la leyenda "Hecho en (país de origen)".

(v) El Proveedor cumplirá con todos los requisitos establecidos por Chrysler para el servicio a los vehículos, tal y como se encuentra señalado en el Portal para Proveedores Globales de Chrysler, en la fecha de la Orden o en la de cualquier modificación a la Orden.

**DÉCIMA SEXTA.-**     **FACTURACIÓN Y PAGO**

Las condiciones de pago son las establecidas en la Orden. El Proveedor puntualmente presentará las facturas correspondientes, correctas y completas, u otro medio de cobro acordado junto con la documentación adecuada (en adelante, la "Factura") y cualquier otra información que Chrysler le requiera después de la entrega de mercancías y/o prestación de servicios. El plazo de pago establecido en la Orden comenzará hasta que Chrysler haya recibido la Factura correspondiente de manera correcta y completa y que cumpla con todos los requisitos establecidos por Chrysler, además de los requisitos

legales y fiscales aplicables.

(i)   La Factura deberá indicar lo siguiente:

- Código de 5 dígitos del Proveedor.
- Número de Orden de compra y nivel correspondiente del aviso de cambio.
- Número de Requisición y/o programa de entregas (Release).
- Dirección "Embarcar a:".
- Dirección "Facturar a:".
- Código de Material No Productivo o número de parte productivo.
- Forma y/o condiciones de embarque.
- Fecha de embarque.
- Número de factura.
- Fecha de factura y fecha de embarque.
- Precio unitario.
- Cantidad y unidad de medida de acuerdo a la Orden.
- Gran Total de la Factura.

(ii)   Chrysler se compromete a pagar al Proveedor las cantidades que se deban de conformidad con los términos de la Orden y de estos Términos y Condiciones.

(iii)   Chrysler podrá en cualquier momento y sin notificación previa, deducir o compensar de las cantidades que le adeude al Proveedor con motivo de la Orden, los montos adeudados por el Proveedor a Chrysler derivados de la propia Orden, de estos Términos y Condiciones o de cualquier otra transacción de negocios entre Chrysler y el Proveedor. Para estos efectos, el Proveedor deberá levantar un ticket en la mesa de ayuda correspondiente de Chrysler, solicitando el soporte de dichos ajustes.

(iv)   Chrysler tendrá derecho a ceder a sus afiliadas (Chrysler Canadá Inc. y Chrysler Group LLC), la obligación de pago al Proveedor y a sus afiliados, así como el derecho de cobro de cualquier cantidad adeudada por el Proveedor a Chrysler, quedando sus afiliadas obligadas a pagar al Proveedor, conforme se establezca en la Orden o en estos Términos y Condiciones.

(v)   A petición del Proveedor, Chrysler fundamentará la base de cualquier deducción o compensación dentro de los quince (15) días siguientes a la solicitud que realice el Proveedor, o dentro de cualquier otro plazo que puede ser acordado por las Partes.

(vi)   Con la aceptación de la Orden y de estos Términos y Condiciones, el Proveedor se responsabiliza en cumplir con lo establecido en los artículos 29 y 29-A del Código Fiscal de la Federación, relativo a los requisitos que deberán contener las notas, remisiones y/o facturas.

(vii)   El Proveedor deberá facturar a:

Chrysler de México, S.A. de C.V.
Av. Prolongación Paseo de la Reforma 1240
Santa Fe, Distrito Federal.
C.P. 05109
R.F.C: CME720930GM9

(viii)   Por la operación de contenido en pesos del precio indicado en la Orden y con base a lo establecido en las Cláusulas 051R, 147R, 261R y/o por el descuento por pronto pago acordado entre el Proveedor y Chrysler, el Proveedor se compromete a generar una nota de crédito o cargo, según sea el caso, a favor de Chrysler, la cual deberá incluir el IVA y cumplir con los requisitos fiscales que señala el Código Fiscal de la Federación para la emisión de Comprobantes Fiscales. Las notas mencionadas deberán ser entregadas dentro de los 5 días hábiles posteriores a la recepción de su pago.

(ix)     El Proveedor documentará todos sus envíos mediante una Factura o Factura-Remisión, presentando el original con cuatro copias al momento de entregar la mercancía en la bodega de recibo, el Proveedor recabará el sello de recibido, tanto en la Factura o Factura-Remisión original, como en la copia que conservara como contra recibo.

(x)      Asimismo, el Proveedor se obliga a enviar las facturas en papel al corporativo de Chrysler a la dirección señalada en el inciso (G) anterior y tratándose de facturas electrónicas, las mismas deberán ser cargadas en el sistema COFIDI.

(xi)     El precio de la Orden será pagado en pesos mexicanos de acuerdo al tipo de cambio para solventar obligaciones denominadas en moneda extranjera pagaderas en la República Mexicana publicado por Banco de México en el Diario Oficial de la Federación el día hábil inmediato anterior al día en que se efectúa el pago de las facturas vencidas.

## DÉCIMA SÉPTIMA.-     ADUANAS, EXPORTACIONES

(i)      El Proveedor deberá notificar por escrito y en forma inmediata a Chrysler, en el caso de que los materiales o componentes utilizados por el Proveedor para cumplir sus obligaciones en relación con la Orden, procedan de un país distinto del país en el que las mercancías se entreguen a Chrysler, así como cualquier impuesto incluido en el precio de compra de las mercancías. El Proveedor proporcionará a Chrysler toda la documentación e información necesaria para determinar el país de origen y demostrará que dichos materiales o componentes cumplen con las normas y requisitos de origen del país destino, así como cualquier otro programa especial de comercio.

(ii)     El Proveedor declara que conoce el contenido, y está de acuerdo en sujetarse a las leyes de control a las exportaciones de los Estados Unidos de América ("*US Export Control Laws*"); razón por la cual no usará, transferirá, exportará, venderá o de cualquier otra forma dispondrá de las mercancías o información técnica objeto de la Orden, con algún destino o usuario final que esté prohibido por las *US Export Control Laws*, a menos que cuente con una autorización expresa por parte del gobierno de los Estados Unidos de América.

(iii)    Asimismo, el Proveedor deberá proporcionar toda la información y soporte necesario para determinar la correcta clasificación arancelaria, incluyendo de manera enunciativa más no limitativa, catálogos, fotos y descripción de los materiales o componentes que integren el producto.

(iv)     Los derechos y beneficios por cualquier devolución de derechos, incluidos los que surjan por sustitución y los que puedan ser adquiridos por proveedores del Proveedor y créditos a la exportación, en la medida que puedan ser transferidos a Chrysler, son propiedad de éste. El Proveedor deberá proporcionar toda la documentación e información necesaria y tomará las medidas pertinentes para obtener una restitución devolución de lo pagado indebidamente, ya sean impuestos o tasas, así como para recibir los créditos a la exportación por el gobierno del país de origen o de exportación.

(v)      La responsabilidad de pago de los impuestos al comercio exterior así como los honorarios de los agentes aduanales, se determinará de conformidad con el punto de entrega y el código de transporte establecido en la Orden. Si la Orden establece que Chrysler será responsable de los impuestos al comercio exterior, lo anterior no incluirá ningún impuesto especial, incluyendo pero no limitando prácticas antidumping y cuotas compensatorias, mismas que en todo momento deberán ser asumidas por el Proveedor.

(vi)     El Proveedor proporcionará a Chrysler toda la documentación e información requerida por la ley, reglamento o por cualquier otro ordenamiento aplicable que sea necesaria para determinar la correcta recepción, liberación oportuna y el despacho aduanal de las mercancías, así como la comprobación de que los costos incurridos fueron los mínimos necesarios para ingresar legalmente las mercancías al país de destino.

(vii)    El Proveedor deberá asesorar a Chrysler respecto a si la importación o exportación de los productos requiere el cumplimiento de algún requisito legal, y en caso de ser así, deberá auxiliar a Chrysler en el cumplimiento de dicho requisito.

(viii)   El Proveedor garantiza que la información proporcionada a Chrysler relativa a la importación o exportación de las mercancías suministradas a Chrysler es verdadera y correcta, y que todas las ventas a las que se refiere la Orden nunca se harán en un precio menor al valor justo de mercado conforme a las leyes anti-dumping de los países a los que se exportan las mercancías.

**DÉCIMA OCTAVA.-    USO DEL NOMBRE DE CHRYSLER**

El Proveedor de ninguna forma podrá hacer público, sin el consentimiento previo por escrito de Chrysler, el hecho de que es proveedor de Chrysler.

El Proveedor tampoco podrá utilizar dentro de su publicidad, ni dentro de ningún otro tipo de publicación, el nombre o marcas registradas de Chrysler o de las cuales Chrysler sea licenciatario, ni de los productos de Chrysler o de cualquiera de sus empresas afiliadas.

El Proveedor no podrá establecer marcas registradas propias ni las de ningún otro tercero en la mercancía que ostente una marca propiedad de o licenciada a Chrysler, ni sobre ninguna otra mercancía cuyo diseño sea exclusivo de Chrysler (una "Parte Marcada").

El Proveedor garantiza que: (i) Venderá cada "Parte Marcada" y artículos similares sólo para Chrysler y (ii) Que no venderá ninguna "Parte Marcada" o productos similares a terceros, sin el previo consentimiento por escrito de Chrysler.

El Proveedor reconoce que cualquier venta por parte de éste de una "Parte Marcada" en violación de esta Cláusula, se considerará como una violación expresa de los derechos de marca propiedad de Chrysler.

Todos los productos manufacturados por el Proveedor con base en los dibujos, especificaciones u otra información que Chrysler le haya divulgado en relación con la Orden, no podrán ser utilizados para uso propio por el Proveedor, ni vendidos, transferidos o divulgados a terceros bajo ningún concepto.

No obstante la prohibición establecida en el párrafo inmediato anterior, dicha prohibición no será aplicable a los productos manufacturados por el Proveedor conforme a los diseños de su propiedad, en los cuales se utilice manufactura diversa a:

(i)     La de Chrysler.

(ii)    Herramental no pagado (pendiente de pago que podría convertirse en "Herramental de Chrysler" de conformidad con la Cláusula Décima Primera).

(iii)   Cualquier otra propiedad intelectual, conocimientos o procedimientos que estén sujetos a una licencia no exclusiva, mundial, irrevocable y perpetua a la que Chrysler tenga derecho en virtud de la Cláusula Décima Novena del presente.

El Proveedor marcará los bienes suministrados a Chrysler de conformidad con las normas de marcación publicadas por Chrysler.

**DÉCIMA NOVENA.-    DIVULGACIÓN    DE    INFORMACIÓN:    DERECHOS    DE    PROPIEDAD INTELECTUAL**

(i)     La "Información de Chrysler" significa: (i) Toda la información y los datos que Chrysler pone a disposición del Proveedor en relación con el cumplimiento de la Orden, incluyendo sin limitación alguna, normas de funcionamiento, características del producto, especificaciones, dibujos, descripciones, muestras de diseños y fabricación de datos entre otros y (ii) Toda la información (con exclusión de la información proporcionada por el Proveedor sobre sus costos internos de

producción de bienes y servicios que ofrece a Chrysler en virtud de la Orden) que sea procesada por el Proveedor, directa o indirectamente utilizando cualquier sistema que el Proveedor posea o controle directa o indirectamente con el propósito de llevar a cabo las obligaciones del Proveedor en virtud de la Orden.

No obstante lo anterior, los derechos sobre cualquier información que abarque propiedad intelectual concebida, desarrollada o adquirida por el Proveedor con el fin de dar cumplimiento a la Orden, se determinarán conforme a esta Cláusula.

(ii)     Serán propiedad de Chrysler todos aquellos derechos, títulos y beneficios sobre la "Información de Chrysler", incluidas las patentes y modelos de utilidad de Chrysler, diseños industriales, sus solicitudes, derechos de autor, secretos industriales, marcas, avisos y nombres comerciales, así como aquellos derechos, títulos o beneficios que se deriven del mejoramiento a la Información de Chrysler, incluyendo la reputación comercial inherente *"good will"* (en lo sucesivo la "Propiedad Intelectual"), ya sea que sean realizadas por Chrysler o por el Proveedor como Producto de Trabajo (como dicho término se define más adelante).

Salvo pacto en contrario, expreso y por escrito, no se concederá al Proveedor ningún derecho o licencia sobre la "Información de Chrysler", salvo aquella que sea estrictamente necesaria para que el Proveedor de cumplimiento a la Orden.

El Proveedor tiene prohibido utilizar o divulgar la "Información de Chrysler" para cualquier otro propósito no autorizado por la Orden. El Proveedor hará uso de la "Información de Chrysler" de tal forma que se asegure que no se utilizará para otro propósito en detrimento de los intereses de Chrysler. El Proveedor no podrá transmitir ni revelar la "Información de Chrysler" a terceros sin el previo consentimiento por escrito de Chrysler.

(iii)    El Proveedor se compromete a devolver a Chrysler o a destruir toda la Información que Chrysler le haya transmitido en cualquier forma, al momento en que Chrysler se lo solicite.

(iv)     No se otorgará ningún derecho de Propiedad Intelectual o cualquier tipo de Propiedad Intelectual licenciada por parte de Chrysler al Proveedor, salvo aquellos que sean necesarios para cumplir las obligaciones del Proveedor en virtud de la Orden.

(v)      El Proveedor será responsable de que ningún bien o servicio prestado conforme a la Orden ("Producto de Trabajo"), infrinja derechos de Propiedad Intelectual de terceros.

(vi)     El Proveedor se compromete a sacar en paz y a salvo a Chrysler, así como a sus compañías afiliadas, clientes, distribuidores, comerciantes y los clientes de éstos últimos, indistintamente, contra cualquier reclamación hecha contra alguno de ellos respecto a cualquier bien o servicio u otro Producto de Trabajo que infrinja la Propiedad Intelectual de terceros. El Proveedor pagará todos los gastos y costas, incluyendo el pago de abogados y asesores documentados, en los que incurra Chrysler con motivo de estas reclamaciones.

**VIGÉSIMA.-      INFORMACIÓN CONFIDENCIAL**

Chrysler se compromete a llevar a cabo todos los esfuerzos comercialmente razonables para mantener la confidencialidad de la "Información Confidencial" del Proveedor respecto a: (i) Terceros, excepto asesores, consultores y proveedores de servicios de Chrysler que necesiten saber y que estén sujetos a una obligación de confidencialidad con respecto a la "Información Confidencial" del Proveedor, y (ii) Los empleados de Chrysler que no necesiten tener acceso a dicha información.

Dicha "Información Confidencial" podrá ser utilizada por Chrysler por cualquier motivo relacionado con o en relación con sus funciones de gestión de riesgos.

"Información Confidencial" como se utiliza en la presente Cláusula, se entenderá como la información proporcionada a Chrysler de conformidad con la Cláusula Décimo Novena anterior, la que también

comprende: (i) La información del Proveedor relativa a sus operaciones, sistemas, servicios, personal, asuntos financieros, comercialización, realización de la inversión, inversión propiamente dicha, esfuerzos de investigación y desarrollo. (ii) La información que se obtenga de terceros por parte del Proveedor en virtud de una obligación de confidencialidad. (iii) Cualquier otra información relacionada con el negocio del Proveedor que no se haga pública, directamente o indirectamente por el Proveedor.

No obstante lo anterior, nada impedirá a Chrysler, en caso de ser requerida por autoridad judicial competente con jurisdicción sobre el Proveedor o sobre Chrysler, a revelar información confidencial sin el consentimiento previo y por escrito del Proveedor, siempre y cuando Chrysler haya notificado con anticipación al Proveedor de cualquier requerimiento hecho por la autoridad.

En cualquier caso, el término "Información Confidencial" no incluye la información: (i) Que fuera o se hubiera convertido en información disponible para el público como resultado de una divulgación indebida por parte de Chrysler; (ii) que Chrysler haya estado consciente de la misma, antes de que fuera divulgada a Chrysler por parte del Proveedor; (iii) que Chrysler haya obtenido de un tercero, sin que existiera la obligación de confidencialidad respecto al Proveedor, y (iv) que Chrysler obtenga de cualquier órgano jurisdiccional, por medio del arbitraje u otros procedimientos legales.

**VIGÉSIMA PRIMERA.- CESIÓN**

El Proveedor no podrá ceder los derechos ni obligaciones de la Orden y de los presentes Términos y Condiciones, sin el consentimiento previo y por escrito por parte de Chrysler, incluyendo sin limitación alguna, la subcontratación del trabajo a realizar descrito en la Orden; por lo que cualquier intento de cesión que viole esta Cláusula será nulo y no tendrá ningún efecto jurídico.

Chrysler podrá, sin embargo, ceder los derechos y obligaciones de la Orden y de estos Términos y Condiciones a cualquiera de sus empresas controladoras, filiales o subsidiarias, bastando para ello un aviso al Proveedor con posterioridad a la cesión correspondiente.

**VIGÉSIMA SEGUNDA.- INFORMACIÓN FINANCIERA**

(i) El Proveedor proporcionará a Chrysler cualquier información relativa a sus operaciones, negocios y situación financiera, o cualquier otra información que Chrysler pueda razonablemente solicitarle al respecto, además de la información acerca del Proveedor que deba proporcionarle periódicamente según lo dispuesto en el inciso (B) siguiente.

(ii) El Proveedor proporcionará Chrysler, o a un tercero designado por éste, en el formato establecido por Chrysler, la siguiente información:

    (a) Estados Financieros Trimestrales. Dentro de los sesenta (60) días después del cierre de cada período contable trimestral del Proveedor o bien en la fecha en que los estados financieros descritos sean legalmente exigibles, lo que suceda primero, el Proveedor deberá entregar a Chrysler, el balance contable trimestral y los correspondientes estados de resultados sobre ingresos y ganancias retenidas, así como los estados de flujo de efectivo por ese periodo. Dichos balances deberán ser certificados por un representante legal del Proveedor.

    (b) Estados Financieros Anuales. Dentro de los ciento veinte (120) días posteriores al cierre de cada ejercicio fiscal del Proveedor o bien en la fecha en que los estados financieros anuales sean legalmente exigibles, lo que suceda primero, el Proveedor deberá entregar a Chrysler su balance contable al cierre del año fiscal, así como los estados de resultados sobre ingresos y las utilidades retenidas y de flujo de efectivo para el año fiscal que establezcan cifras comparativas del año fiscal anterior y firmados por un representante legal del Proveedor. Asimismo, en caso de que el Proveedor audite sus estados financieros, deberá proporcionar a Chrysler una copia de los estados financieros auditados.

(c) Notificación de Eventos de Incumplimiento. De manera inmediata, el Proveedor deberá notificar a Chrysler sobre cualquier incumplimiento a cualquier contrato en el que el Proveedor sea Parte y cuyo el efecto pueda tener un impacto material adverso en la situación financiera del Proveedor o en su capacidad para cumplir con las obligaciones establecidas en la Orden.

(d) Información sobre la encuesta anual. Una vez por año calendario, el Proveedor proporcionará a Chrysler sus respuestas a la "Encuesta Anual de Chrysler de Información", incluyendo sin ninguna limitación, la "Plantilla de Ventas Mixtas de Autos" y la "Plantilla de Producción de Ventas Mixtas".

(e) Actualizaciones de información de proveedores. El Proveedor deberá actualizar la información proporcionada a través del "Sistema de Información de Proveedores de Chrysler", por lo menos una vez cada trimestre.

(f) Cambio en el Control. El Proveedor deberá informar a Chrysler, dentro de los quince (15) días siguientes al hecho, en el caso de que se dé un cambio de control del Proveedor, entendiéndose como tal, cuando un tercero adquiera por cualquier medio la propiedad del treinta y cinco por ciento (35%) o más de las acciones con derecho a voto del Proveedor; no obstante lo anterior, si el cambio de control es en favor de una empresa competidora de Chrysler (entendidas estas como cualquier empresa armadora de vehículos automotores terrestres, o empresas distribuidoras o vendedoras en mayoreo de dichos vehículos), entonces bastará con que adquiera un diez por ciento (10%) para que se haga efectiva la obligación del Proveedor de notificar a Chrysler.

(iii) La información descrita en esta Cláusula y que sea entregada a Chrysler debidamente identificada con la leyenda de "Confidencial", será considerada como Información Confidencial (según dicho término se define en la Cláusula Vigésima), por lo tanto Chrysler deberá tratarla de conformidad con lo establecido en dicha Cláusula.

**VIGÉSIMA TERCERA.-          INCUMPLIMIENTO**

(i) Chrysler podrá, a su entera discreción, exigir el cumplimiento forzoso o rescindir la totalidad o parte de la Orden, más el pago de daños y perjuicios en ambos casos, sin responsabilidad alguna para Chrysler, con excepción del pago de las mercancías que se hubieran entregado o de los servicios que se hubieran prestado en cumplimiento de la Orden y de estos Términos y Condiciones, y podrá ejercer cualquiera de las acciones legales a que tenga derecho en caso de que suceda cualquiera de los siguientes supuestos (señalado cada uno como un "Evento de Incumplimiento"):

(a) Si el Proveedor incumple en la entrega de la mercancía o en la prestación de servicios en forma oportuna, y éste no pueda darle a Chrysler un plan de recuperación dentro del siguiente día a aquel en que Chrysler le hubiere notificado dicho incumplimiento; o

(b) Si el Proveedor incumple cualquier otra disposición, o cualquier requisito contenido en la Orden dentro del Plazo fijado, si dicho incumplimiento fuera subsanable y no lo hiciere dentro de los cinco (5) días siguientes a dicho "Evento de Incumplimiento"; o

(c) Si el Proveedor: (i) Se declara insolvente, no paga o admite por escrito su incapacidad para pagar sus deudas a su vencimiento, (ii) entra en concurso mercantil, se acuerda su disolución, liquidación quiebra o reorganización, o de cualquier manera cede a un tercero la totalidad o una parte sustancial de sus bienes, activos o negocios, (iii) lleve a cabo un acto corporativo con el fin de efectuar cualquiera de los supuestos (i) o (ii) anteriores, o se inicie un procedimiento conforme a la Ley de Concursos Mercantiles o procedimiento legal similar, a menos que dicha petición se deje sin efectos en un plazo de cuarenta y cinco (45) días; o

(d) Si el Proveedor incumple las disposiciones establecidas en estos Términos y Condiciones,

y dicho incumplimiento no es remediado en un plazo de cinco (5) días naturales contados a partir de la notificación que haga Chrysler, señalando la causa del incumplimiento (salvo que expresamente se disponga un plazo de curación diferente para dicho incumplimiento); o

(e)  Si el Proveedor no paga alguna de las cuentas pendientes por pagar frente a terceros, frente a Chrysler, o frente a alguna de las subsidiarias o filiales de Chrysler conforme al curso ordinario de los negocios del Proveedor que no sean razonablemente materia de disputa y que hayan estado pendientes de pago durante más de sesenta (60) días después de la fecha que se debieron pagar.

(ii)  El Proveedor podrá rescindir la Orden por incumplimiento grave y material por parte de Chrysler conforme a la Orden y siempre que dicho incumplimiento no se resuelva dentro de los treinta (30) días contados desde la notificación que haga el Proveedor a Chrysler del incumplimiento sustancial.

(iii)  Respecto a la recepción, de cualquier aviso de rescisión con arreglo a esta Cláusula Vigésima Tercera, el Proveedor dejará de operar en la fecha y conforme a la medida especificada en dicho aviso, y cancelará todos los pedidos y subcontratos que se relacionen con la Orden o con respecto a la parte que se haya terminado.

## VIGÉSIMA CUARTA.-  TERMINACIÓN ANTICIPADA

Chrysler podrá dar por terminada anticipadamente la Orden en su totalidad o parcialmente, en cualquier momento y por cualquier motivo de negocios sin necesidad de justificarlo (incluyendo, sin limitación alguna, la "competitividad" como se define en la Cláusula Trigésima Séptima del presente). No obstante lo anterior, Chrysler no podrá dar por terminada anticipadamente la Orden de conformidad con la Cláusula Vigésima Cuarta por deficiencias en costos competitivos a menos que el Proveedor haya tenido conocimiento y la oportunidad para remediar las carencias de éstas, de conformidad con la Cláusula Trigésima Séptima del presente.

Dentro de los 15 (quince) días posteriores a que el Proveedor reciba cualquier notificación de terminación anticipada por parte de Chrysler, a opción de ésta, el Proveedor deberá cesar sus trabajos conforme a la Orden en la medida especificada en dicho aviso, y dar por terminado todos los pedidos y subcontratos que se relacionan con dicha Orden.

Dentro de los sesenta (60) días siguientes a la terminación efectiva de la Orden, el Proveedor podrá presentar a Chrysler todas las reclamaciones derivadas de dicha terminación. No obstante lo anterior, el Proveedor no podrá incluir en su reclamación: (i) Los costos generales de venta o administrativos, (ii) los costos por intereses o el costo del capital, (iii) las pérdidas de ganancia, (iv) la absorción de gastos fijos, (v) la inversión en activos no amortizados, (vi) los costos de instalación, (vii) los costos de modificación de las fábricas, (viii) los costos laborales, (ix) los gastos de capacitación, y (x) otros costos relacionados con el cumplimiento de la Orden.

En el caso de Herramental de Chrysler solicitado por Chrysler, que aún no se haya completado, la reclamación del Proveedor podrá incluir los costos efectivos de mano de obra directa, materiales directos y los gastos generales aplicados en la fabricación, pero deberá restarse el importe del valor de los desechos del Herramental de Chrysler no completado a dicha reclamación. Chrysler tendrá el derecho de verificar las reclamaciones presentadas a través de una auditoría de los registros, las instalaciones, el trabajo o los materiales del Proveedor y/o de sus subcontratistas.

Chrysler pagará al Proveedor por el trabajo terminado aceptado por Chrysler, así como por el costo documentado en el que el Proveedor incurra por trabajo en proceso y materias primas imputables a la labor terminada a la fecha del aviso de terminación, siempre que el monto no sea superior a la autorización previa de Chrysler. El pago de una reclamación válida, en virtud de la presente Cláusula, incluirá la transmisión de la propiedad y posesión en favor de Chrysler respecto de todas las mercancías entregadas y servicios prestados a Chrysler inmediatamente después de la realización del pago por parte de Chrysler.

Las disposiciones de esta Cláusula no se aplicarán a la rescisión por parte de Chrysler debido a un incumplimiento por parte del Proveedor, o por cualquier otra causa reconocida por la ley o especificada por la Orden o por estos Términos y Condiciones.

**VIGÉSIMA QUINTA.-   OBLIGACIONES DEL PROVEEDOR EN CASO DE RESCISIÓN O TERMINACIÓN ANTICIPADA TOTAL O PARCIAL DE LA ORDEN**

(i)     En caso de cualquier "Evento de Incumplimiento" según lo descrito en la Cláusula Vigésima Tercera, o de terminación anticipada conforme a la Cláusula Vigésima Cuarta, Chrysler tendrá el derecho de tomar la posesión y la titularidad de la totalidad o parte de cualquier trabajo realizado por el Proveedor en virtud de la Orden, para lo cual efectuará una notificación por escrito al Proveedor y podrá realizar cualquier otra acción que le permita la ley aplicable. Chrysler también tendrá el derecho a tomar posesión inmediata de todo "Herramental de Chrysler" (como se define en la Cláusula Décima Primera del presente) en cualquier momento y sin pago de ningún tipo al Proveedor; si Chrysler opta por ejercer este derecho, el Proveedor deberá cooperar con Chrysler en la toma de posesión del "Herramental de Chrysler", incluyendo el acceso a las instalaciones del Proveedor.

(ii)    Si Chrysler ejerce su derecho de dar por terminado anticipadamente o rescindir la Orden en su totalidad, entonces:

(a)     El Proveedor deberá otorgar a Chrysler una licencia no exclusiva, mundial, irrevocable y sin el pago de regalías adicionales, respecto a cualquier propiedad intelectual del Proveedor que se incorpore o utilice para la creación o diseño de los productos o de Productos del Trabajo utilizados para las mercancías o servicios encomendados en la Orden, a efecto de que Chrysler esté en posibilidad de fabricar, vender, importar, exportar o modificar dichos bienes o Productos del Trabajo. La licencia concedida a Chrysler en esta Cláusula, permanecerá en vigor durante la vida del (los) programa(s) de vehículos en los cuales dichos bienes o Productos del Trabajo sean utilizados (en la actualidad o en el futuro), incluyendo partes para dar servicio a dichos vehículos;

(b)     Por otra parte, previa solicitud por escrito de Chrysler al Proveedor, éste último proporcionará lo siguiente para este tipo de bienes o Productos del Trabajo: (a) Cualquier asistente de diseño, incluyendo sin limitación alguna, cualquier información sobre el diseño asistido de computadora, (b) especificaciones, (c) las listas de materiales, (d) la información del Proveedor de los componentes utilizados para comprar estos bienes o Productos del Trabajo y (e) información sobre el proceso de fabricación de tales bienes o Productos del Trabajo, y

(c)     En la medida en que Chrysler haya pagado por los prototipos de herramientas de los productos o de Productos del Trabajo en virtud de una orden de compra, ya sea por separado o en otro acuerdo, y a fin de asegurar que Chrysler pueda hacer pleno uso de los derechos previstos en esta Cláusula, el Proveedor proporcionará a Chrysler los siguientes bienes y Productos del Trabajo: (a) Cualquier herramienta prototipo (por ejemplo, moldes y matrices), incluyendo sin limitación alguna, cualquier información asistida de diseño para las herramientas de prototipo y (b) las especificaciones, listas de materiales, información del Proveedor para todos los componentes comprados y usados en herramientas como prototipo y la información de proceso de fabricación con respecto a estos prototipos de herramienta.

**VIGÉSIMA SEXTA.-   CUMPLIMIENTO REQUERIDO**

El Proveedor se obliga y deberá cumplir en todo momento con (a) las Leyes Aplicables, y (b) las políticas que Chrysler dé a conocer de tiempo en tiempo.

Por lo tanto, el Proveedor y sus Personas Afiliadas acuerdan y se obligan a lo siguiente:

(i) Cumplir y continuar cumpliendo con las Leyes Aplicables y ejercer o dejar de ejercer cualquier acción cuyo ejercicio u omisión, respectivamente, pueda sujetar a Chrysler o a Grupo Chrysler a responsabilidad alguna bajo las Leyes Aplicables.

(ii) No ofrecer ni otorgar favores ni recompensas ni directa o indirectamente pagar, prestar, otorgar, prometer o proporcionar dinero, valores, descuentos, prestaciones, incentivos u otros bienes en especie o de valor (incluyendo regalos, beneficios u otros favores) a o en beneficio de cualquier Funcionario, con el objeto de: (a) influenciar algún acto o decisión de dichos Funcionarios en el ámbito de sus atribuciones, (b) inducir a dichos Funcionarios a hacer o dejar de hacer algún acto en violación de sus deberes oficiales, (c) obtener cualquier provecho indebido, o (d) inducir a dichos Funcionarios a utilizar su influencia frente a una Entidad Gubernamental para modificar o influenciar cualquier acto de esa Entidad Gubernamental, que influya directamente en que el Proveedor, sus Personas Afiliadas, Chrysler o Grupo Chrysler se viera favorecido o beneficiado, buscando obtener cualquier clase de beneficio para sí o para una tercera persona.

(iii) Excusarse de intervenir en forma alguna en la atención, tramitación o resolución de asuntos en los que pueda resultar algún beneficio indebido para Chrysler y/o que el mismo pueda implicar un conflicto de intereses.

(iv) No inducir a que se realice u omita cualquier acto que viole las Leyes Aplicables y que le proporcione alguna ventaja sobre sus competidores o que influya para que cualquier Entidad Gubernamental tome una decisión favoreciendo una relación de negocio directa con Chrysler.

(v) El Proveedor y sus Personas Afiliadas no son ni serán una Entidad Gubernamental o Funcionarios, cuyos deberes oficiales incluyan tomar decisiones que envíen negocios al Proveedor, sus Personas Afiliadas, Chrysler o Grupo Chrysler o que supervisen o controlen las acciones directas de Funcionarios que se encuentran en una posición de negocios directa con el Proveedor, sus Personas Afiliadas, Chrysler o Grupo Chrysler excepto cuando el Proveedor así lo divulgue y notifique a Chrysler de conformidad con lo señalado en inciso (vii) a continuación.

(vi) En caso de que el Proveedor o cualquiera de sus Personas Afiliadas sean una Entidad Gubernamental o Funcionarios, el Proveedor y/o sus Personas Afiliadas se obligan a en su carácter de Entidad Gubernamental o Funcionario (i) no participar de manera alguna en decisiones gubernamentales para comprar productos o servicios de Chrysler o Grupo Chrysler, (ii) hacer o dirigir negocios en beneficio de Chrysler o a cualquier compañía del Grupo Chrysler, (iii) en su carácter de Funcionario influenciar decisiones de gobierno que pudiesen beneficiar a Chrysler o a cualquier compañía del Grupo Chrysler, o (iv) tomar decisiones gubernamentales que beneficiarían directo o indirectamente a Chrysler o a cualquier compañía del Grupo Chrysler.

(vii) El Proveedor acepta que tan pronto tenga conocimiento o razón suficiente de que se realizó algún pago o transferencia (o cualquier oferta o promesa de pago o transferencia) que viole esta Cláusula o las Leyes Aplicables, deberá hacerlo del conocimiento de Chrysler.

(viii) El Proveedor deberá auxiliar y cooperar, y se encargará que sus Personas Afiliadas auxilien y cooperen, completamente con los esfuerzos de Chrysler para cumplir con las Leyes Aplicables.

(ix) Asimismo, el Proveedor deberá indemnizar, defender y sacar a Chrysler y al Grupo Chrysler en paz y a salvo de cualquier acción, demanda, procedimiento, litigio, juicio, controversia, multa, clausura o cualquier otra sanción judicial o administrativa, que se hubiera generado porque el Proveedor y/o sus Personas Afiliadas hubiere incumplido cualquiera de sus obligaciones señaladas en la presente cláusula o en el resto del Contrato o en cualquier Ley Aplicable, y el Proveedor deberá repararle a Chrysler y al Grupo Chrysler cualquier daño o perjuicio, incluyendo honorarios y gastos erogados por la prestación de servicios legales, que les sean ocasionados en relación con o derivados de lo anterior.

(x)    En ningún caso Chrysler estará obligada a llevar a cabo cualquier acción si considera que dichos actos u omisiones podrían ser considerados un incumplimiento, ya sea por parte de Chrysler o Grupo Chrysler, a las Leyes Aplicables.

(xi)    Adicionalmente el Proveedor garantiza que ni él ni ninguna de sus Personas Afiliadas utilizan esclavos, prisioneros, niños o cualquier otra forma de trabajo forzoso o involuntario en relación con el suministro de bienes o prestación de servicios en virtud del presente Contrato. Chrysler podrá solicitar al Proveedor certificar por escrito su conformidad con lo anterior y el Proveedor cumplirá dicha solicitud.

(xii)    En caso que el Proveedor o cualquiera de sus Personas Afiliadas incumplan con cualquiera de las disposiciones aquí señaladas, en adición a cualquier otro derecho que Chrysler pueda tener bajo el presente Contrato, el Proveedor se estará a lo siguiente:

    (a)    El Proveedor renuncia a su derecho de cobro de cualquier cantidad que Chrysler le adeude, renunciado al reembolso de cualquier cantidad pagada u otorgada en crédito en favor de Chrysler de conformidad con las Leyes Aplicables.

    (b)    El Proveedor acepta que le será retenida la entrega de productos sin responsabilidad alguna para Chrysler por cualquier queja, pérdida o daños relacionados con dicha decisión.

Para efectos de la presente Cláusula, se deberá entender lo siguiente:

1.    Chrysler.- Significa Chrysler de México, S.A. de C.V.

2.    Entidad Gubernamental.- Significa, en los Estados Unidos Mexicanos, cualquier:

    (a)    Entidad Federativa, Municipio o el Distrito Federal;

    (b)    Poder Ejecutivo, sea éste Federal, Estatal o Municipal, incluyendo todas las entidades de la administración pública centralizada ya sea Federal, Estatal o Municipal y cualquiera de sus órganos desconcentrados o descentralizados;

    (c)    Empresas de participación estatal mayoritaria, fideicomisos públicos, instituciones nacionales de crédito, organizaciones auxiliares nacionales de crédito e instituciones nacionales de seguros y de fianzas;

    (d)    Organizaciones internacionales públicas;

    (e)    Organismos Constitucionales Autónomos, incluyendo de manera enunciativa más no limitativa, el Instituto Federal Electoral, la Comisión Nacional de los Derechos Humanos y el Banco de México;

    (f)    Poder Legislativo, sea éste Federal o Estatal, incluyendo enunciativa mas no limitativamente, el Congreso de la Unión, la Cámara de Diputados, el Senado de la República, así como las legislaturas de los Estados y la Asamblea Legislativa del Distrito Federal;

    (g)    Poder Judicial, entendiéndose por éste cualquier órgano que realice una función jurisdiccional, pudiendo ser tribunales federales o locales, ya sean éstos judiciales, administrativos, electorales, militares o del trabajo; y

    (h)    Persona que maneje recursos económicos públicos y toda aquella persona que trabaje, tenga una relación de supra a subordinación o que preste cualquier tipo de servicio en cualquiera de las entidades anteriores.

3.    Familiar.- Toda persona con quien cualquier Servidor Público Nacional, Servidor Público Extranjero o Miembro de Partido Político tenga parentesco por afinidad o civil hasta en tercer grado en línea recta o colateral.

4.    Funcionarios.- Conjuntamente, los Servidores Públicos Nacionales, Servidores Públicos Extranjeros, Miembros de Partidos Políticos y los Familiares.

5.    Grupo Chrysler.- Significa Chrysler Group LLC y sus filiales y subsidiarias o empresas o sociedades en las cuales Chrysler Group LLC o Chrysler tenga participación o el control.

6.    Leyes Aplicables.- Significa toda la legislación federal, estatal y municipal, reglas, reglamentos, normas mexicanas o normas oficiales mexicanas, así como todos los Tratados Internacionales en los que México sea parte, incluyendo la Convención Interamericana contra la Corrupción de la Organización de Estados Americanos, Contrato de lucha contra la corrupción de agentes públicos extranjeros en las transacciones comerciales internacionales, la Convención de las Naciones Unidas contra la Corrupción y cualesquiera otro que de tiempo en tiempo se ratifiquen por el gobierno de los Estados Unidos Mexicanos, así como la Ley de los Estados Unidos de América sobre Prácticas Corruptas en el Extranjero(*Foreign Corrupt Practices Act*), independientemente de sus limitantes jurisdiccionales y todas las demás leyes, reglamentos, reglas, ordenes, decretos o directrices que tengan el carácter de legislación aplicable a cualquier de las actividades realizadas por el Proveedor o cualquier de sus Personas Afiliadas en relación con el presente Contrato o cualquier otro acto comercial que involucre al Proveedor, a Chrysler o a Grupo Chrysler.

7.    Miembro de Partido Político.- Toda persona que desempeñe un empleo, cargo o comisión en cualquier Partido Político.

8.    Partido Político.- Organizaciones políticas que hayan obtenido su registro como tal de conformidad a las leyes electorales mexicanas o extranjeras.

9.    Personas Afiliadas.- Significa, de forma enunciativa mas no limitativa, las subsidiarias, filiales y matriz del Proveedor, así como sus respectivos accionistas, socios, administradores, directores, funcionarios, personal, empleados, agentes, sucesores, cesionarios, subcontratistas y distribuidores autorizados.

10.   Servidor Público Extranjero.- Toda persona que desempeñe un empleo, cargo o comisión de cualquier naturaleza, ya sea por designación o elección popular, en cualquier Entidad Gubernamental de un país extranjero.

11.   Servidor Público Nacional.- Toda persona que desempeñe un empleo, cargo o comisión de cualquier naturaleza, ya sea por designación o elección popular, en cualquier Entidad Gubernamental de los Estados Unidos Mexicanos.

## VIGÉSIMA SÉPTIMA.- IMPUESTOS

Las Partes reconocen que cada una será responsable de los impuestos que se generen a su cargo derivado del cumplimiento de las obligaciones de la Orden.

Con fundamento en la fracción IV del Artículo 1-A de la Ley del Impuesto al Valor Agregado vigente, Chrysler efectuará la retención del IVA (Impuesto al Valor Agregado), cuando adquiera de proveedores nacionales bienes destinados al proceso de manufactura y ensamble de vehículos y/o de autopartes.

## VIGÉSIMA OCTAVA.- COMUNICACIÓN ELECTRÓNICA

Chrysler establecerá los aspectos referentes a la comunicación electrónica entre el Proveedor y Chrysler, y el Proveedor cumplirá con cada una de las directrices establecidas por Chrysler respecto a cualquiera de esos aspectos. Los proveedores de Chrysler deben contar con acceso a por lo menos los siguientes sistemas, o aquellos que los substituyan: EFT (*Electronic Fund Transfer*), EDI (*Electronic Data*

*Interchange*) y eSupplierConnect (antes Covisint).

El Proveedor está de acuerdo que en caso de presentarse circunstancias que temporalmente le impidan mantener actualizada su información, contactará inmediatamente a su comprador, designado por Chrysler, y al grupo de EDI (*Electronic Data Interchange*), para encontrar soluciones alternativas.

### VIGÉSIMA NOVENA.- CUMPLIMIENTO CON LOS REQUISITOS APLICABLES

El Proveedor deberá cumplir con todos los requisitos vigentes establecidos por Chrysler en relación con la manipulación, transporte, procesamiento, uso o disposición de los productos, envases y embalajes, incluyendo sin limitación alguna, la formulación y el uso de materias primas y otras sustancias en los productos (denominados "Medio Ambiente, Salud y Requisitos de Seguridad"). Asimismo, el Proveedor se obliga a cumplir con las leyes, reglamentos, Normas Mexicanas o Normas Oficiales Mexicanas, decretos, acuerdos, así como con cualquier disposición de carácter general y obligatorio que en materia de protección ambiental y de seguridad e higiene en el trabajo se encuentren vigentes en los Estados Unidos Mexicanos. El Proveedor se obliga, por tanto, a sacar en paz y a salvo a Chrysler de los daños y/o perjuicios que se hayan generado por cualquier acto u omisión que le sea directamente atribuible a las actividades que en esta materia se realicen con motivo de la Orden.

A petición de Chrysler, el Proveedor proporcionará de inmediato y en la forma y detalle que Chrysler establezca: (i) La fórmula o lista de todos los ingredientes o materiales de los productos, (ii) la cantidad de todos los ingredientes o materiales y el porcentaje de cada ingrediente o material en los bienes y (iii) una fórmula de actualización o lista de ingredientes o materiales respecto a cualquier cambio a lo establecido por Chrysler. Esta información podrá ser requerida por Chrysler para ésta cumpla con las leyes aplicables. A petición de Chrysler, el Proveedor certificará que cumple con todos los requisitos de medio ambiente, salud y seguridad.

Antes de y con el envío de la mercancía, el Proveedor proporcionará a Chrysler la advertencia pertinente y el aviso por escrito (incluyendo la colocación de las etiquetas adecuadas en los productos, envases, o en el embalaje) de cualquier material que sea un ingrediente, material de o una parte de cualquiera de los bienes que sean o pudieran ser peligrosos. Asimismo, deberá informar las instrucciones necesarias de manejo especial y una advertencia para los transportistas, para Chrysler y sus respectivos empleados, sobre la forma de prevenir lesiones o daño en la propiedad, en el manejo, transporte, transformación, utilización o eliminación de los productos, envases y embalajes enviados a Chrysler.

### TRIGÉSIMA.- ANÁLISIS

A.  Programa de Retorno de Materiales:

(i)  El Proveedor deberá presentarse en el Centro de Retorno de Materiales, indicado por Chrysler, cuando menos cada quince (15) días calendario para recoger partes para análisis, firmando el reporte de asistencia. En caso de que el Proveedor no recoja las partes en un periodo de quince (15) días, recibirá un cargo por el costo de las partes, basado en el costo de garantía de Chrysler y las partes se enviarán al proceso de destrucción de material, sin responsabilidad para Chrysler.

(ii)  El Proveedor contará con un periodo de veinte (20) días, desde la fecha en que recoja el material en las instalaciones del Centro de Retorno de Materiales, para presentar el resultado del análisis debidamente firmado por la persona del Departamento de Calidad señalada por Chrysler que haya presenciado dicho análisis, así como presentar las partes analizadas en las que no existiera responsabilidad para el Proveedor de acuerdo al resultado, debidamente identificadas. Si el Proveedor no envía el resultado del análisis, así como las partes en las que no tenga responsabilidad, dentro del periodo de veinte (20) días, recibirá un cargo por el costo de las partes involucradas basado en el costo de garantía de Chrysler. Si el resultado del análisis indica que la falla es responsabilidad del Proveedor, este recibirá un cargo por el costo de las partes involucradas, basado en el costo de garantía de Chrysler. El costo de garantía de Chrysler incluirá el costo de la parte a precio de distribuidor de Chrysler. El costo de la mano de obra utilizada en la reparación del reclamo de garantía de la parte, incluirá un cuarenta por ciento (40%) del costo de

la parte a precio de distribuidor de Chrysler por manejo de material.

B.      Programa de Muestreo:

(i)     Los Proveedores participantes en el "Programa de Muestreo" señalado por Chrysler, tendrán que presentarse en el Centro de Retorno de Materiales a recoger las partes enviadas por la zona de servicio en cuestión, proveniente de reclamos de garantía que no se hayan incluido en el Programa de Retorno de Materiales, de acuerdo al calendario emitido por Chrysler. En caso de que el Proveedor no recoja las partes en un periodo de quince (15) días, recibirá un cargo por el costo de las partes, basado en el costo de garantía de Chrysler, y las partes se enviarán al proceso de destrucción de materiales, sin responsabilidad para Chrysler.

(ii)    Los Proveedores contaran con un periodo veinte (20) días, desde la fecha en la que recogieron el material en las instalaciones del Centro de Retorno de Materiales, para presentar el resultado del análisis firmado por la persona del Departamento de Calidad señalada por Chrysler que haya presenciado dicho análisis, así como las partes analizadas en las que no exista responsabilidad para el Proveedor de acuerdo al resultado, debidamente identificadas. En caso de que el Proveedor no envíe el resultado del análisis, así como las partes en las que no tiene responsabilidad dentro del periodo de veinte días, recibirá un cargo por el costo de las partes involucradas, basado en el costo de garantía de Chrysler. Si el resultado del análisis indica que la falla es responsabilidad del Proveedor, este recibirá un cargo por el costo de las partes involucradas, basado en el costo de garantía de Chrysler.

**TRIGÉSIMA PRIMERA.-**      **DERECHO A AUDITAR**

El Proveedor deberá otorgarle a Chrysler el acceso a toda su información, incluyendo sin limitación alguna, a los libros, registros, datos de nómina, recibos, correspondencia y otros documentos electrónicos y no electrónicos relacionados con los productos o servicios que se prestarán en virtud de la Orden, "Herramental de Chrysler" y Herramental no pagado, las obligaciones del Proveedor en virtud de la Orden y cualquier pago hecho al Proveedor o cualquier reclamación hecha por el Proveedor, que sea razonablemente necesaria para los fines de la auditoría o la verificación del funcionamiento deseado de sus obligaciones, en virtud de la Orden y los cargos surgidos.

El Proveedor conservará dicha información y estos documentos por un período de por lo menos cinco (5) años después de haberse hecho el último pago en virtud de la Orden. El Proveedor compartirá su información y los documentos, según las indicaciones de Chrysler, y cooperará con Chrysler para facilitar la auditoría o el proceso de verificación.

Además, Chrysler tendrá el derecho de inspeccionar visualmente y auditar cualquier instalación o proceso, en relación con los productos o servicios que se prestarán en virtud de la Orden, incluidas las relativas a la calidad de producción. El Proveedor reconoce que Chrysler tendrá el derecho de auditar y realizar copias de todos los documentos pertinentes, los datos y otras informaciones referentes a cualquier obligación de algún subcontratista o proveedor del Proveedor en virtud de la Orden.

Previa petición de Chrysler, el Proveedor le permitirá inspeccionar visualmente y auditar las instalaciones o procesos de cualquier subcontratista relacionados con los productos o servicios que se prestarán en virtud de la Orden. La información transmitida a Chrysler mediante esta Cláusula Trigésima Primara será considerada como "Información Confidencial".

**TRIGÉSIMA SEGUNDA.-**      **ELIMINACIÓN DE DESECHOS**

Las mercancías, ensambles, sub-ensambles o materiales relacionados con la Orden, que se consideren como "chatarra", y que el Proveedor no venda a Chrysler en los términos de la Orden, deberán ser destruidos o utilizados como desechos y/o "chatarra" de acuerdo a la normatividad aplicable.

Si alguna autoridad competente solicita la destrucción de cualquiera de las mercancías, ensambles, sub-ensambles o materiales, dicha destrucción deberá ser posterior a la inspección, auditoría y recepción de

instrucciones para la eliminación por parte de Chrysler.

Chrysler tiene el derecho de examinar todos los documentos pertinentes, los datos y toda la información relativa a la destrucción de cualquier desecho. Asimismo, Chrysler tiene el derecho de inspeccionar visualmente y auditar cualquier instalación o proceso en relación con la destrucción de chatarra. El Proveedor estará obligado a mantener todos los documentos, datos e información escrita sobre su obligación de destruir chatarra conforme a la Orden, durante al menos cinco (5) años contados a partir de la última entrega de mercancía o el pago final en virtud de la Orden. Los documentos, datos e información por escrito sobre la obligación del Proveedor de destruir la chatarra se pondrán a disposición de Chrysler previa instrucción de ésta.

**TRIGÉSIMA TERCERA.-**     **PROGRAMAS DE AHORRO DE COSTOS**

El Proveedor proporcionará a Chrysler, por escrito, a más tardar el 1 de octubre de cada año y durante la vigencia de la Orden, el plan deseado para la aplicación de ahorro de costos y mejoras de la productividad para reducir los costos del Proveedor, de conformidad con el programa de Chrysler de ahorro de costos vigente en ese momento.

**TRIGÉSIMA CUARTA.-**     **CONTRATOS DEL PROVEEDOR CELEBRADOS CON SUS PROVEEDORES Y SUBCONTRATISTAS**

El Proveedor se asegurará de que sus proveedores y subcontratistas de bienes o servicios, suministrados en virtud de la Orden, cumplan con las obligaciones y otorguen a Chrysler por lo menos los derechos especificados en las Cláusulas Décimo Novena, Vigésima Sexta y Vigésima Octava de estos Términos y Condiciones. El Proveedor también hará uso de los esfuerzos comercialmente razonables para asegurar que sus proveedores y subcontratistas cumplan con las obligaciones y proporcionen a Chrysler por lo menos los derechos que se especifican en las Cláusulas Décimo Octava y Trigésima Segunda de estos Términos y Condiciones.

Si Chrysler solicita por escrito al Proveedor la contratación de un proveedor o subcontratista particular, en relación con los productos o servicios que se prestarán en virtud de la Orden, entonces: (i) Chrysler será responsable de negociar los precios establecidos para el Proveedor con el proveedor o subcontratista particular de que se trate, (ii) el Proveedor será responsable de todos los demás aspectos de la relación de suministro entre el Proveedor y el proveedor o subcontratista designado, y (iii) el Proveedor se compromete a hacer cumplir los derechos derivados de su acuerdo con dicho proveedor o subcontratista para el beneficio de Chrysler.

En todos los casos en los que el Proveedor esté autorizado a subcontratar proveedores o contratistas, queda expresamente acordado que el Proveedor será responsable frente a Chrysler del incumplimiento a la Orden o a estos Términos y Condiciones por parte de dichos terceros.

**TRIGÉSIMA QUINTA.- DATOS PERSONALES / DATOS PERSONALES SENSIBLES**

El Proveedor será el único responsable en obtener el consentimiento de los titulares de datos personales y/o datos personales sensibles de conformidad con la Ley Federal de Protección de Datos Personales en Posesión de los Particulares, cuando se obtengan con motivo de una prestación de servicios conforme a la Orden y a estos Términos y Condiciones.

El Proveedor se obliga a hacer los avisos de privacidad correspondientes, de conformidad con la mencionada ley, y obtener las autorizaciones correspondientes para transferir dichos datos a Chrysler, cuando así sea requerido por las Partes, y de conformidad con la Orden y estos Términos y Condiciones.

Asimismo, el Proveedor será responsable del manejo, almacenamiento y protección de los datos personales y los datos personales sensibles, y sacará en paz y a salvo a Chrysler de cualquier reclamación, multa o sanción que pudiera derivarse del uso indebido o ilegal de dichos datos, así como a pagar los gastos y costas y honorarios de abogados en que incurra Chrysler en su defensa conforme a esta Cláusula.

**TRIGÉSIMA SEXTA.-   SUBSISTENCIA DE OBLIGACIONES**

Las disposiciones de estos Términos y Condiciones contenidos en la Orden, mismos que se pretende sigan vigentes a la terminación, cancelación o caducidad de la Orden, tendrán efecto independientemente de cualquier terminación, cancelación o caducidad de la Orden, incluyendo, sin limitación alguna las Cláusulas Tercera, Sexta, Novena, Décima, Décima Primera, Décima Segunda, Décima Tercera, Décima Quinta, Décima Sexta, Décima Séptima, Décima Octava, Décima Novena, Vigésima, Vigésima Segunda, Vigésima Tercera, Vigésima Quinta, Vigésima Novena, Trigésima Sexta, Trigésima Tercera y Trigésima Cuarta.

**TRIGÉSIMA SÉPTIMA.-          COMPETITIVIDAD**

El Proveedor deberá ser y continuar siendo competitivo con respecto a cada mercancía suministrada o servicio prestado a Chrysler, de conformidad con la Orden, sobre la base del costo total, teniendo en cuenta cada uno de los siguientes atributos: costo, calidad, entrega, fiabilidad del suministro, tecnología, estabilidad financiera y cumplimiento de las obligaciones conforme a la Orden.

Chrysler se reserva el derecho, en cualquier momento durante la vigencia de la Orden, a poner a prueba de mercado (Benchmarking) los servicios o bienes que vaya a suministrar el Proveedor, en virtud de la Orden, para determinar la competitividad de los proveedores de un bien o un servicio.

Ser "competitivos" significa que el Proveedor deberá: (i) Ser igual o mejor que los demás proveedores y los proveedores potenciales de ese bien o servicio en la mayoría de los atributos enumerados anteriormente, y (ii) mantener un costo competitivo.

Las comparaciones de costos competitivos se tendrán en cuenta para la ingeniería de aplicación, la investigación y los costos de desarrollo; si el Proveedor no es competitivo con respecto a otros atributos diferentes al costo, Chrysler podrá rescindir la Orden de conformidad con la Cláusula Vigésima Cuarta de estos Términos y Condiciones.

Si el Proveedor no mantiene un costo competitivo con respecto a un bien o servicio, Chrysler podrá notificar al Proveedor su no-competitividad mediante la especificación de la deficiencia de costo competitivo en un aviso por escrito (el "Aviso de Modificación"). Chrysler se compromete a no entregar una carta de aviso dentro de los doce (12) meses siguientes al inicio de la producción de volumen.

Tras la notificación, el Proveedor podrá, dentro de un plazo de treinta (30) días posteriores a la notificación de falta de competencia, proponer a Chrysler un plan para mejorar la competitividad de su producto o servicio.

El plan para mejorar la competitividad propuesto por el Proveedor, identificará las acciones necesarias para remediar su déficit con respecto a la competitividad de costos, además de incluir un calendario para la realización de cada acción. Chrysler deberá notificar al Proveedor la aceptación o rechazo de dicho plan de solución, en un plazo de treinta (30) días siguientes a la recepción del plan.

**TRIGÉSIMA OCTAVA.-         DERECHOS ACUMULATIVOS; NO MODIFICACIÓN O NOVACIÓN**

Los derechos de Chrysler y los recursos reservados en este documento a Chrysler son acumulativos y en adición a cualquier otro derecho y recurso disponible en ley. El hecho de que  Chrysler, en algún momento, no exija del Proveedor el cumplimiento de cualesquiera de las obligaciones consignadas en la Orden o en estos Términos y Condiciones, de ninguna manera significará una   modificación o novación de las obligaciones o una renuncia a exigirlos, por lo que no afectará el derecho de Chrysler a exigir el cumplimiento de la obligación de que se trate.

**TRIGÉSIMA NOVENA.-         NOTIFICACIONES**

Los avisos deberán ser por escrito. Las notificaciones por correo electrónico serán válidas y aceptables; cualquier notificación por correo electrónico enviada a Chrysler se considerará que se ha recibido en el

segundo día hábil después de que dicha notificación haya sido enviada (si no se rechaza primero mediante la respuesta automática). Cualquier aviso escrito, deberá llevar acuse de recibo.

**CUADRAGÉSIMA.-    TÍTULOS DE LAS CLÁUSULAS**

Los títulos de las Cláusulas que aparecen en estos Términos y Condiciones, son exclusivamente para facilitar su lectura y manejo, por lo que no se considera que definan, limiten o describan el contenido de las mismas, por lo que en nada trascienden a su contenido, ni deberán de ser tomadas en consideración para su interpretación.

**CUADRAGÉSIMA PRIMERA.-  PLAZO**

La Orden es un acuerdo por un periodo definido. El plazo de la Orden se señala en la primera página de la Orden ("Plazo"). Si el Plazo de duración es inferior a la duración del Programa de Producción de Vehículos aplicable, a elección de Chrysler, el Plazo podrá ser prorrogado por un año más respecto al modelo adicional, mediante notificación previa que Chrysler haga al Proveedor en un plazo no mayor de noventa (90) días, o en el Plazo de ejecución establecido en la Orden (ya sea que Chrysler notifique al Proveedor de la extensión o por la presentación de un comunicado por parte de Chrysler respecto a algunos o todos los productos señalados en la Orden para un modelo de un año futuro), que haya sido ampliada por cada bien del cual el Proveedor reciba una liberación o comunicación adecuada para ampliar esta la Orden para un modelo de un año futuro adicional.

**CUADRAGÉSIMA SEGUNDA.-    JURISDICCIÓN Y LEGISLACIÓN APLICABLE**

Para la interpretación y cumplimiento del presente Contrato, las Partes se someten expresamente a las leyes y tribunales competentes de la Ciudad de México, Distrito Federal, renunciando a cualquier otro fuero o competencia que por motivo de su domicilio presente o futuro les pudiera corresponder.

# Exhibit 6



FIAT CHRYSLER AUTOMOBILES

December 4, 2020

**Via Email to** pderamo@martinrea.com

Pat D'Eramo
Chief Executive Officer
Martinrea International US Inc.
2100 N Opdyke Rd
Auburn Hills, MI 48326

**Re:    FCA US LLC's ("FCA US") Demand for Adequate Assurance of Performance**

I am writing in response to our telephone conferences on December 2, 2020 and December 3, 2020 in which you indicated Martinrea intends to reallocate capacity on one of its 3,500-ton aluminum die casting machines from FCA US to another customer and, as a result, Martinrea will not be able to satisfy FCA US's releases for Pentastar Upgrade Blocks (the "Parts") under purchase order number 10911294 (the "PO"). This is unacceptable.

Pursuant to the PO, Martinrea must continue to timely deliver in accordance with FCA US's release requirements. Martinrea is well aware of the fact that the PO is valid and remains in full force and effect. As recently as November 4, 2020, your team submitted a written capacity review presentation to FCA US that detailed Martinrea's plan to support FCA US's increasing demand requirements through utilization of the full capacity set forth in the PO. Martinrea's obligations under the PO are separate from and in addition to any future delivery obligations under purchase order number 11407555 for machine-only parts, which have a different part number.

Martinrea has not provided FCA US with any credible information as to why Martinrea believes it is excused from fully performing under the PO. In communications with FCA US, Martinrea has made vague references to Covid-19. But that is not sufficient to excuse Martinrea's performance. The PO does not include a "force majeure" clause. Therefore, MCL 440.2615 governs whether Martinrea's performance is excused under any particular circumstance. Courts routinely find that a seller cannot claim its performance is excused based on increased expense (i.e., expedited shipments or additional labor) or if the seller caused the circumstances leading to a claimed impracticability (i.e., breached the contract by improperly reallocating capacity).

If Martinrea maintains its current position, its failure to timely supply FCA US with Parts in accordance with our releases will imminently cause a shortfall of Parts resulting in production disruptions and other damages. Under the terms and conditions incorporated in the PO, Martinrea is required to have a production plan to supply FCA US's peak daily, weekly, and annual requirements according to the capacity stated on the PO. And "[i]f [Martinrea] fails to make deliveries or perform services at the agreed time, all damages suffered by FCA US as a result of [Martinrea's] non-performance, including but not limited to any premium transportation or other costs incurred by FCA US in its efforts to mitigate the impact of [Martinrea's] late performance on its manufacturing operations, will be at [Martinrea's] expense." Separately, under the PO terms and conditions, even if Martinrea had a legitimate reason for not meeting the capacity requirements, it



FIAT CHRYSLER AUTOMOBILES

is obligated to engage and pay for a third party acceptable to FCA US that will support Martinrea's remediation of its capacity deficiencies. **To be clear, FCA US will hold Martinrea fully responsible for all damages relating to Martinrea's failure to timely deliver and any related production disruptions. This will include, but is not limited to, downtime charges, expediting costs, lost profits, and all other incidental and consequential damages, which in very short order will likely amount to tens of millions of dollars or more.**

Based on Martinrea's recent statements and failure to provide any substantiated evidence to support its position, FCA US has reasonable grounds for insecurity that Martinrea will perform in a manner that satisfies its contractual obligations. Therefore, pursuant to MCL 440.2609, FCA US demands that by 3:00 p.m. Eastern on December 7, 2020, Martinrea provide FCA US with written adequate assurance that it will continue to make available to FCA US the capacity set forth under the PO and Martinrea will continue timely shipments to FCA US according to FCA US's releases. If Martinrea fails to provide the requested adequate assurance, FCA US will pursue all necessary legal remedies.

I look forward to your response.

Sincerely,

*Martin Horneck*

Martin Horneck
Head of Purchasing and Supply Chain North America
FCA US LLC

# Exhibit 7



**Martinrea International US Inc.**
2100 N Opdyke Rd
Auburn Hills, Michigan, 48326
www.martinrea.com

December 11, 2020

**By e-mail to** martin.horneck@fcagroup.com

Martin Horneck
Head of Purchasing and Supply Chain, North America
FCA US LLC
1000 Chrysler Drive
Auburn Hills, MI 48326

Dear Mr. Horneck:

**Re:     Martinrea's Supply of Pentastar Engine Blocks**

This letter responds to your December 4, 2020 letter. For several reasons, FCA's demand for adequate assurance of performance is legally and factually baseless.

First, you have addressed the wrong company: the ordering, production, and delivery of the Engine Blocks (the "Parts") is done entirely in Mexico between two Mexican entities. Martinrea International US Inc. is not contractually obligated to supply FCA US LLC with the "Parts" to support the Pentastar PSU Program (the "Program"). The Parts are supplied by Martinrea Honsel México S.A. de C.V. ("Martinrea México") to FCA México, S.A. de C.V. ("FCA México") pursuant to Purchase Orders 10911294 and 11407555 (collectively, the "Purchase Orders").

Second, FCA US's demand for assurances is mistakenly based on Michigan law, which does not apply.   Specifically, FCA US cites Michigan Compiled Laws § 440.2609, part of Michigan's adoption of the Uniform Commercial Code. But Mexican law, not Michigan law, governs the Purchase Orders.   Both Purchase Orders state that the following terms and conditions apply: "Los T?rminos [*sic*] y Condiciones Generales de Chrysler aplicables a Material Productivo (07/2013)" which are "Chrysler's General Terms and Conditions (07/2013)" (the "T&C").   The governing version of the T&C are in Spanish, and FCA labeled the English translation "**ENGLISH TRANSLATION FOR INFORMATION PURPOSES ONLY.**"   Bold original. Nonetheless, for ease of reference, I will refer to the English translation, which Martinrea's Mexican counsel,

cc'd here, have confirmed is accurate. Section 42 of the T&C states that the Purchase Orders are governed by Mexican law and that all disputes must be brought in Mexico City:

**FORTY TWO. JURISDICTION AND GOVERNING LAW**
For the interpretation and compliance of this Agreement, the Parties expressly submit to the laws and competent courts of Mexico City, Federal District; thereby waiving any other venue or jurisdiction that may correspond by virtue of their present or future domicile.

Martinrea's counsel in Mexico advises that Mexican law does not have a provision like Uniform Commercial Code 2-609 allowing a buyer a right to demand adequate assurances of performance from a seller. Therefore, FCA US's demand is without legal basis. Although we have been advised that we have no duty to answer your letter, because FCA is a valued customer, and we remain willing to try to work through this problem together, we will proceed to address the allegations in your letter.

Third, even if Michigan law did apply (it doesn't) and the correct FCA entity had demanded assurances from the correct Martinrea entity, the demand would still have failed, because Martinrea México has not breached, or threatened to breach, its agreement with FCA México.

Your letter cites as the contract Purchase Order 10911294, but that purchase order is not the whole agreement. Your letter fails to cite Purchase Order 11407555, which FCA México issued less than two months ago, on October 12, 2020, after FCA decided to take away from Martinrea, México and in-source, approximately 30% of the casting production it now claims is necessary to support the Program.

As you know, in August 2016, FCA México issued to Martinrea México Purchase Order 10911294 and historically has ordered, on average, substantially less than the weekly volumes that FCA is asking to supply today. At this time, for all Parts, Martinrea México was manufacturing raw castings and then machining those castings into finished engine blocks with a process referred to by FCA México as "cubing."

Beginning in 2018, FCA communicated that it planned to take away from Martinrea, and in-source to FCA US's Kokomo, Indiana facility, the manufacture of approximately 30% of the castings required to support the Program and, with respect to these castings, Martinrea would only perform the cubing / machining operation. From May 2019 to March 2020, FCA requested Martinrea to quote on several different "Cubing-Only" volume scenarios culminating with FCA México's issuance of Purchase Order 11407555 on October 12, 2020 confirming the reduction in casting manufacture by Martinrea. FCA proceeded down this path, and earlier this year, refused to refurbish all eight dies, and only refurbished six, leaving Martinrea without sufficient tooling. Martinrea was disappointed that FCA chose to in-source a significant portion of the casting production but, Martinrea relied on, and reallocated, the open casting production capacity created by FCA's decision. What your letter ignores is that Martinrea wanted to keep this business, but FCA took it away anyway. Martinrea tried to persuade FCA to keep the business with Martinrea, including throughout the summer of 2020, but despite Martinrea's efforts, FCA decided to in-

2

source this production and award Martinrea only the machining for those blocks, as evidenced by Purchase Order 11407555.

FCA recently abruptly changed course, apparently in response to another supplier's situation after which FCA elected to in-source its operations. FCA is now suddenly demanding that Martinrea produce 13,000 Parts per week – for a period of time – a weekly volume that FCA has *never* come close to demanding for many years.

Martinrea has no contractual obligation to meet FCA's new, increased volume demand. And, in any event, Martinrea cannot meet FCA's demand for three reasons. First, as stated above, Martinrea dedicated to another customer the excess casting production capacity it had because of FCA's decision to pull the work, since it had the capacity it would need to meet FCA's new, lower demand. Second, as stated above, Martinrea does not have enough tooling because in January 2020, Martinrea requested refurbishment for eight dies but FCA authorized the refurbishment of only six dies. Third, as previously communicated, COVID-19 has had a crippling effect on Martinrea's labor force and operations. Martinrea does not have the skilled labor necessary to meet FCA's new production demands and, despite its best efforts, has been unable to strengthen its work force with sufficient qualified operators. Martinrea's counsel in Mexico advises that, under Mexican law and due to the unforeseeable circumstances created by COVID-19, Martinrea's full performance is excused and Martinrea rightfully declared force majeure, as referenced in the T&C (unlike FCA's U.S. T&C, its T&C in Mexico reference force majeure).

Martinrea understands that FCA is in a difficult position, but that is entirely the consequence of FCA's own choices. If we could both turn the clock back, Martinrea would have preferred to retain this business. FCA, however, made its choice, as evidenced by its machining only purchase order. Martinrea has also been forced to make its choices. This is what people in this business must do every day.

Fortunately, FCA has choices that will allow it to continue production uninterrupted. First, it can simply proceed to do what it has planned to do since early 2018 – cast the Parts at its Kokomo, Indiana facility. Second, as separately communicated, there are other casting suppliers with capacity who are able to support FCA to cover the excess Part volume. The damages you allege in your letter would be the result of FCA's own choices, past and future, and Martinrea will not be responsible for them.

If FCA chooses to initiate legal action in Mexico, Martinrea will have no choice but to aggressively defend itself. However, taking legal action against Martinrea is not going to remedy FCA's problem and result in more Parts. Martinrea values its business relationship with and will continue to do what it can to support, FCA. If you wish us to increase capacity, buy a new machine, refurbish tools and get to a position where we can on mutually beneficial terms, we would love to work with you.

Please give me a call to discuss.

Sincerely,

Rob Fairchild
Executive Vice-President, Sales and Engineering

cc by e-mail only:

Pat D'Eramo, President and Chief Executive Officer
Carlos Arguelles, Santamarina + Steta (carguelles@s-s.mx)
Carlos Brehm T., Santamarina + Steta (cbrehm@s-s.mx)

4

This case has been designated as an eFiling case. To review a copy of the
Notice of Mandatory eFiling visit www.oakgov.com/efiling.

Original – Court

| STATE OF MICHIGAN<br>6TH JUDICIAL CIRCUIT<br>COUNTY OF OAKLAND | NOTICE OF ASSIGNMENT TO THE<br>BUSINESS COURT | 2020-185155-CB<br><br>JUDGE MARTHA D.<br>ANDERSON |
|---|---|---|

Court address
1200 N Telegraph Rd   Pontiac, MI 48341

Court telephone no.
248-858-0345

| Plaintiff's name(s), address(es), and telephone number(s)<br>FCA USA LLC, a Delaware corporation | v | Defendant's name(s), address(es), and telephone number(s)<br>MARTINREA INTERNATIONAL US INC., a Delaware corporation<br>MARTINREA HONSEL MEXICO SA DE CV, a foreign entity |
|---|---|---|
| Plaintiff's attorney, bar no., address, telephone no., and email address<br>Moheeb H. Murray (P63893)<br>Bush Seyferth PLLC<br>100 West Big Beaver Road, Suite 400<br>Troy, MI 48084, (248) 822-7800 | | Defendant's attorney, bar no., address, telephone no., and email address |

The ☑ Plaintiff ☐ Defendant requests assignment of the above captioned matter to the Business Court. The case qualifies for the Business Court and the matter should be identified as Business Court eligible pursuant to MCL 600.8031, MCL 600.8035, and LAO 2013-xx as indicated below. (Check all that apply.)

The case is a qualifying business or commercial dispute as defined by MCL 600.8031(1)(c) as:
- ☑ All of the parties are business enterprises;
- ☐ One or more of the parties is a business enterprise and the other parties are its or their present or former owners, managers, shareholders, members of a limited liability company or similar business organization, directors, officers, agents, employees, suppliers, guarantors of a commercial loan, or competitors, and the claims arise out of those relationships;
- ☐ One of the parties is a nonprofit organization and the claims arise out of that party's organizational structure, governance, or finances.

The business or commercial dispute involves:
- ☐ The sale, merger, purchase, combination, dissolution, liquidation, structure, governance, or finances of a business enterprise.
- ☐ Information technology, software, or website development, maintenance or hosting;
- ☐ The internal organization of business entities and the rights or obligations of shareholders, partners, members, owners, officers, directors, or managers;
- ☑ Contractual agreements or other business dealings, including licensing, trade secret, intellectual property, antitrust, securities, noncompete, nonsolicitation, and confidentiality agreements if all available administrative remedies are completely exhausted, including, but not limited to, alternative dispute resolution processes prescribed in the agreements;
- ☐ Commercial transactions, including commercial bank transactions;
- ☐ Business or commercial insurance policies; and/or
- ☐ Commercial real property.
- ☐ Other:(Please explain)

December 13, 2020
Date

/s/ Moheeb H. Murray
Name

Attorney for: Plaintiff FCA US LLC

OCBC 01 (10/17) **NOTICE OF ASSIGNMENT TO THE BUSINESS COURT**

FILED   Received for Filing   Oakland County Clerk   12/14/2020 8:00 AM